NO. 13-2881
(Consolidated With Case Nos. 13-3353 and 13-3495)

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

IN RE:
    ARCHDIOCESE OF MILWAUKEE,
        Debtor.

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS,
        Appellant,

Nos. 13-2881 and 13-3495        v.

JEROME E. LISTECKI, Archbishop, Trustee of the
Archdiocese of Milwaukee Catholic Cemetery
Perpetual Care Trust,
        Appellee.

] Appeals from the United States
] District Court for the Eastern District
] of Wisconsin
]
] No. 2:13-cv-00179-RTR
]
] Rudolph T. Randa, Judge

IN RE:
    ARCHDIOCESE OF MILWAUKEE,
        Debtor.

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS,
        Petitioner,

RUDOLPH T. RANDA,
        Respondent,

No. 13-3353        v.

JEROME E. LISTECKI, Archbishop, Trustee of the
Archdiocese of Milwaukee Catholic Cemetery
Perpetual Care Trust,
        Party-In-Interest,

and

ARCHDIOCESE OF MILWAUKEE,
        Party-In-Interest.

] Appeals from the United States
] District Court for the Eastern District
] of Wisconsin
]
] No. 2:13-cv-00179-RTR
]
] Rudolph T. Randa, Judge

Marci A. Hamilton, Esq.
36 Timber Knoll Drive
Washington Crossing, PA 18977
Telephone: (215) 353-8984
E-mail: Hamilton.marci@gmail.com

Appeal from and Petition for a Writ of Mandamus to
the United States District Court
For the Eastern District of Wisconsin
Case No. 13-CV-179
The Honorable Rudolph T. Randa

## BRIEF AND SHORT APPENDIX OF APPELLANT AND PETITIONER OFFICIAL COMMITTEE OF UNSECURED CREDITORS

# DISCLOSURE STATEMENTS

## CIRCUIT RULE 26.1  DISCLOSURE STATEMENT

Appellate Court No: __13-2881__

Short Caption: __Official Committee of Unsecured Creditors v. Archbishop Jerome E. Listecki, Trustee__

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

     **[ ]   PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

    Official Committee of Unsecured Creditors in the chapter 11 bankruptcy case of the Archdiocese of Milwaukee

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Pachulski, Stang, Ziehl & Jones LLP

    Howard, Solochek & Weber, S.C.

    Marci A. Hamilton (solo practitioner)

(3)  If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

       N/A

    ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

       N/A

Attorney's Signature: _Marci A. Ha_       Date: __August 28, 2013__

Attorney's Printed Name: __Marci A. Hamilton__

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes __X__  No ____

Address:   36 Timber Knoll Drive

           Washington Crossing, PA 18977

Phone Number: __(212) 790-0215__     Fax Number: __(215) 493-1094__

E-Mail Address: __hamilton02@aol.com__

rev. 01/08 AK

## CIRCUIT RULE 26.1   DISCLOSURE STATEMENT

Appellate Court No: 13-2881

Short Caption: Official Committee of Unsecured Creditors v. Archbishop Jerome E. Listecki, Trustee

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[  ]   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Official Committee of Unsecured Creditors in the chapter 11 bankruptcy case of the Archdiocese of Milwaukee

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Pachulski, Stang, Ziehl & Jones LLP

Howard, Solochek & Weber, S.C.

Marci A. Hamilton (solo practitioner)

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

Attorney's Signature:                                             Date: August 28, 2013

Attorney's Printed Name: James I. Stang

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ◯   No ✕

Address: 10100 Santa Monica Blvd, 13th Floor

Los Angeles, California 90067

Phone Number: (310) 277-6910          Fax Number: (310) 201-0760

E-Mail Address: jstang@pszjlaw.com

rev. 01/08 AK

## CIRCUIT RULE 26.1   DISCLOSURE STATEMENT

Appellate Court No: 13-2881

Short Caption: Official Committee of Unsecured Creditors v. Archbishop Jerome E. Listecki, Trustee

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[  ]   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

   Official Committee of Unsecured Creditors in the chapter 11 bankruptcy case of the Archdiocese of Milwaukee

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   Pachulski, Stang, Ziehl & Jones LLP

   Howard, Solochek & Weber, S.C.

   Marci A. Hamilton (solo practitioner)

(3)  If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

      N/A

    ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

      N/A

Attorney's Signature: _Kenneth Brown_   Date: August 30, 2013

Attorney's Printed Name: Kenneth H. Brown

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes  ◯   No ✕

Address: 150 California St., 15th Flr.

       San Francisco, CA 94111

Phone Number: (415) 263-7000   Fax Number: (415) 263-7010

E-Mail Address: kbrown@pszjlaw.com

rev. 01/08 AK

## CIRCUIT RULE 26.1   DISCLOSURE STATEMENT

Appellate Court No: 13-2881

Short Caption: Official Committee of Unsecured Creditors v. Archbishop Jerome E. Listecki, Trustee

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> [  ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Official Committee of Unsecured Creditors in the chapter 11 bankruptcy case of the Archdiocese of Milwaukee

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Pachulski Stang Ziehl & Jones LLP

Howard, Solochek & Weber, S.C.

Marci A. Hamilton (solo practitioner)

(3)   If the party or amicus is a corporation:

   i)   Identify all its parent corporations, if any; and

   N/A

   ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

   N/A

Attorney's Signature: _William N Brown_    Date: Aug. 29, 2013
Attorney's Printed Name: Gillian N. Brown

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ◯   No ✕

Address: 10100 Santa Monica Blvd, 13th Floor

Los Angeles, California 90067

Phone Number: (310) 277-6910    Fax Number: (310) 201-0760

E-Mail Address: gbrown@pszjlaw.com

rev. 01/08 AK

## CIRCUIT RULE 26.1  DISCLOSURE STATEMENT

Appellate Court No: 13-2881

Short Caption: Official Committee of Unsecured Creditors v. Archbishop Jerome E. Listecki, Trustee

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[  ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Official Committee of Unsecured Creditors in the chapter 11 bankruptcy case of the Archdiocese of Milwaukee

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Pachulski  Stang  Ziehl & Jones LLP

Howard, Solochek & Weber, S.C.

Marci A. Hamilton (solo practitioner)

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

N/A

ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

Attorney's Signature: _____    Date: August 28, 2013

Attorney's Printed Name: Erin Gray

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes  ◯    No  ✕

Address: 10100 Santa Monica Blvd, 13th Floor

Los Angeles, California 90067

Phone Number: (310) 277-6910    Fax Number: (310) 201-0760

E-Mail Address: egray@pszjlaw.com

rev. 01/08 AK

## CIRCUIT RULE 26.1  DISCLOSURE STATEMENT

Appellate Court No: 13-2881

Short Caption: Official Committee of Unsecured Creditors v. Archbishop Jerome E. Listecki, Trustee

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> [  ]   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Official Committee of Unsecured Creditors in the chapter 11 bankruptcy case of the Archdiocese of Milwaukee

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Pachulski, Stang, Ziehl & Jones LLP

Howard, Solochek & Weber, S.C.

Marci A. Hamilton (solo practitioner)

(3)   If the party or amicus is a corporation:

i)   Identify all its parent corporations, if any; and

N/A

ii)   list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

Attorney's Signature: _Albert Solochek_   Date: September 13, 2013

Attorney's Printed Name: Albert Solochek

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ◯   No ✕

Address: 324 E. Wisconsin Ave, Suite 1100

Milwaukee, WI 53202

Phone Number: (414) 272-0760   Fax Number: (414) 272-7265

E-Mail Address: alsolochek@hswmke.com

rev. 01/08 AK

### CIRCUIT RULE 26.1  DISCLOSURE STATEMENT

Appellate Court No: <u>13-2881</u>

Short Caption: <u>Official Committee of Unsecured Creditors v. Archbishop Jerome E. Listecki, Trustee</u>

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

>       [  ]   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED
>       AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

<u>Official Committee of Unsecured Creditors in the chapter 11 bankruptcy case of the Archdiocese of Milwaukee</u>

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Pachulski, Stang, Ziehl & Jones LLP</u>

<u>Howard, Solochek & Weber, S.C.</u>

<u>Marci A. Hamilton (solo practitioner)</u>

(3)  If the party or amicus is a corporation:

   i)  Identify all its parent corporations, if any; and

     <u>N/A</u>

   ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

     <u>N/A</u>

Attorney's Signature: _____ Date: <u>September 13, 2013</u>

Attorney's Printed Name: <u>Jason Pilmaier</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes ◯   No ✕

Address: <u>324 E. Wisconsin Ave, Suite 1100</u>

       <u>Milwaukee, WI 53202</u>

Phone Number: <u>(414) 272-0760</u>   Fax Number: <u>(414) 272-7265</u>

E-Mail Address: <u>jpilmaier@hswmke.com</u>

rev. 01/08 AK

## STATEMENT CONCERNING ORAL ARGUMENT

Appellant Official Committee of Unsecured Creditors moves pursuant to F.R.A.P. Rule 34(a) and Seventh Circuit Rule 34(f) to set this case for oral argument. This case meets the standards in Rule 34(a)(2) for oral argument, in that (a) this appeal is not frivolous; (b) the dispositive issues raised in this appeal have not been recently and authoritatively decided; and (c) the decisional process would be significantly aided by oral argument, given the number of issues and the complexity of some of the bankruptcy and other issues in this case.

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ........................................................................ 1

ISSUES PRESENTED.......................................................................................... 2

STATEMENT OF THE CASE................................................................................ 4

STATEMENT OF FACTS ..................................................................................... 6

SUMMARY OF ARGUMENT ............................................................................... 9

ARGUMENT .................................................................................................... 12

    I.    The Court Should Issue a Writ of Mandamus Directing Judge Randa to Recuse Himself. ...................................................................... 12

        A.    Standard of Review ............................................................... 12

        B.    Judge Randa erred when he failed to recuse himself under 28 U.S.C. § 455(b)(4). ................................................................ 12

        C.    Judge Randa erred when he failed to recuse himself under 28 U.S.C. § 455(a). .................................................................... 16

    II.    Judge Randa Erred When He Failed to Vacate the Judgment and the SJ Decision. ............................................................................... 17

        A.    Standard of Review ............................................................... 18

        B.    This Court should vacate the Judgment and the Summary Judgment Decision because Judge Randa was required to recuse himself and failed to do so. ............................................ 18

    III.    As a Matter of Law, the District Court Erred in Granting Summary Judgment for the Claims under the Religious Freedom Restoration Act and the First Amendment and Should Be Reversed. .................................................................. 20

        A.    Standard of Review. .............................................................. 21

        B.    Free Exercise Claims May Only Be Invoked Against a Government Actor, and the Committee Is Not a Government Actor. .......................... 21

        C.    The District Court's Conclusions Regarding Substantial Burden Never Should Have Been Reached and Are Erroneous. ......................... 30

        D.    The District Court Should Not Have Reached the Compelling Interest and Least Restrictive Means Issues, and, Assuming It Was Appropriate, Erred in Reaching these issues under RFRA and the First Amendment. ............................................... 37

        E.    RFRA May Not Be Applied To Modify, Preempt Or Trump State Law ....................................................................................... 38

CONCLUSION ................................................................................................. 40

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS ................. 43

ADDENDUM OF STATUTES ............................................................................. 44

SHORT APPENDIX .......................................................................................... 123

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30 ........................... 124

TABLE OF CONTENTS FOR SHORT APPENDIX ............................................ 125

DOCS_LA:274534.9

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs v. Gardner*,
   387 U.S. 136 (1967)................................................................................ 36

*Alexander v. Sandoval*,
   532 U.S. 275 (2001)................................................................................ 25

*Alvarado-Fonseca v. Holder*,
   631 F.3d 385 (7th Cir. 2011) ................................................................. 24

*American Textile Mfrs. Inst. v. Limited, Inc.*,
   190 F.3d 729 (6th Cir. 1999) ................................................................. 14

*Blum v. Yaretsky*,
   457 U.S. 991 (1982)................................................................................ 32

*Boerne v. Flores*,
   521 U.S. 507 (1997)........................................................................ passim

*Brownson v. Bogenschutz*,
   966 F. Supp. 795 (E.D. Wis. 1997)........................................................ 28

*Burnham v. Barth*,
   89 Wis. 362, (1895) ............................................................................... 47

*Butner v. United States*,
   440 U.S. 48 (1979).......................................................................... 5, 45

*Caminetti v. United States*,
   242 U.S. 470 (1917)................................................................................ 24

*Chase Manhattan Bank v. Affiliated FM Ins. Co.*,
   343 F.3d 120 (2d Cir. 2003)................................................................... 18

*Christians v. Crystal Evangelical Free Church (In re Young)*,
   141 F.3d 854 (8th Cir. 1998) ........................................................... 46, 47

*Church of Lukumi Babalu Aye v. City of Hialeah*,
   508 U.S. 520 (1993)................................................................................ 40

*Civil Liberties for Urban Believers v. City of Chicago*,
   342 F.3d 752 (7th Cir. 2003) ....................................................... 39, 40, 42

*Duke Power Co. v. Carolina Envt'l Study Grp.*,
   438 U.S. 59 (1978).................................................................................. 36

*Edmonson v. Leesville Concrete Co.*,
   500 U.S. 614 (1991)................................................................................ 33

*Emp't Div. v. Smith*,
   494 U.S. 872 (1990)........................................................................ passim

*Flagg Bros., Inc. v. Brooks*,
   436 U.S. 149 (1978)................................................................................ 35

*Fuel Oil Supply & Terminaling v. Gulf Oil Corp.*,
   762 F.2d 1283 (5th Cir. 1985) ............................................................... 32

*Granfinanciera, S.A. v. Nordberg*,
   492 U.S. 33 (1989).................................................................................. 30

*Guardian Pipeline, L.L.C. v. 950.80 Acres of Land*,
   525 F.3d 554 (7th Cir. 2008) ................................................................. 15

DOCS_LA:274534.9

*Harold Washington Party v. Cook County, Illinois Democratic Party*
   984 F.2d 875 (7th Cir. 1993) ........................................................................ 2
*Hartford Underwriters Ins. Co. v. Union Planters Bank,*
   530 U.S. 1, 6 (2000).................................................................................... 24
*Harting v. Tri-City Baptist Temple (In re Gomes),*
   219 B.R. 286 (Bankr. D. Or. 1998).............................................................. 42
*Harvey v. Harvey,*
   949 F.2d 1127 (11th Cir. 1992) .................................................................. 34
*Home Placement Serv., Inc. v. Providence Journal Co.,*
   739 F.2d 671 (1st Cir. 1984)....................................................................... 18
*Hook v. McDade,*
   89 F.3d 350 (7th Cir. 1996) ........................................................................ 13
*Hosanna-Tabor Evangelical Lutheran Church School v. EEOC,*
   ___, U.S. ___, 132 S. Ct. 694 (2012)................................................... 11, 26
*In re Aetna UCR Litig.,*
   2013 WL 1622160 (D.N.J. April 15, 2013) ................................................ 16
*In re Apollo,*
   2013 WL 4083236 (3d Cir. Aug. 14, 2013).................................................. 18
*In re Dow Corning Corp.,*
   255 B.R. 445 (E.D. Mich. 2000)................................................................. 32
*In re Mason,*
   916 F.2d 384 (7th Cir. 1990) ...................................................................... 18
*In re Meyer,*
   467 B.R. 451 (Bankr. E.D. Wis. 2012) ....................................................... 44
*In re Navarro,*
   83 B.R. 348 (Bankr. E.D. Pa. 1988) ........................................................... 44
*In re Refco, Inc.,*
   336 B.R. 187 (Bankr. S.D.N.Y. 2006) ........................................................ 27
*In re Sherwin-Williams Co.,*
   607 F.3d 474 (7th Cir. 2010) ...................................................................... 18
*Int'l Union of Operating Eng'rs, Local 150 v. Ward,*
   563 F.3d 276 (7th Cir. 2009) ...................................................................... 25
*Jackson v. Metro. Edison Co.,*
   419 U.S. 345 (1974)..................................................................................... 30
*John Doe 1 v. Archdiocese of Milwaukee*, 303 Wis. 2d 34 (Wis. 2007) ........... 4
*Koger v. Bryan,*
   523 F.3d 789 (7th Cir. 2008) ................................................................. 23, 38
*Kojis v. Doctors Hosp.,*
   12 Wis.2d 367, 372 (1961) .......................................................................... 22
*Lamie v. U.S. Trustee,*
   540 U.S. 526 (2004)..................................................................................... 24
*Liljeberg v. Health Servs. Acquisition Corp.,*
   486 U.S. 847 (1988) ................................................................ 13, 18, 20, 21
*Listecki v. Official Committee (In re Archdiocese of Milwaukee),*
   2013 WL 5491895 (E.D. Wis. Oct. 1, 2013) ................................... 6, 17, 19

*Listecki v. Official Committee (In re Archdiocese of Milwaukee)*,
 485 B.R. 385 (Bankr. E.D. Wis. 2013)............................................................... passim
*Listecki v. Official Committee (In re Archdiocese of Milwaukee)*,
 496 B.R. 905 (E.D. Wis. 2013)......................................................................... passim
*Luedke v. Delta Air Lines, Inc.*,
 159 B.R. 385 (S.D.N.Y. 199)..................................................................................... 33
*Mitchell v. Esparza*,
 540 U.S. 12 (2003)...................................................................................................... 39
*Morris v. Midway Southern Baptist Church (In re Newman)*,
 183 B.R. 239 (Bankr. D. Kan. 1995)......................................................................... 44
*Nat'l Park Hospitality Ass'n v. Dep't of Interior*,
 538 U.S. 803 (2003)................................................................................................... 36
*Navajo Nation v. U.S. Forest Service*,
 535 F.3d 1058 (9th Cir. 2008)................................................................................... 36
*New Mexico v. Southern Union Co. (In re New Mexico Natural Gas Antitrust Litig.)*,
 620 F.2d 794 (10th Cir. 1980)............................................................................. 16, 17
*Philos Technologies, Inc. v. Philos & D., Inc.*,
 645 F.3d 851 (7th Cir. 2011) .................................................................................... 20
*Porter v. Singletary*,
 49 F.3d 1483 (11th Cir. 1995) .................................................................................. 13
*Rayburn v. Hogue*,
 241 F.3d 1341 (11th Cir. 2001) ................................................................................ 34
*Reed v. Faulkner*,
 842 F.2d 960 (7th Cir. 1988) .................................................................................... 38
*Rodriguez v. Plymouth Ambulance Service*,
 577 F.3d 816 (7th Cir. 2009) .................................................................................... 31
*Russell v. Lane*,
 890 F.2d 947 (7th Cir. 1989) .................................................................................... 20
*SCA Servs., Inc. v. Morgan*,
 557 F.2d 110 (7th Cir. 1977) ......................................................................... 2, 10, 17
*Sherbert v. Verner*,
 374 U.S. 398 (1963)................................................................................................... 40
*Smart World Technologies v. Juno Online Services (In re Smart World Technologies, LLC)*,
 423 F.3d 166 (2d Cir. 2005)...................................................................................... 27
*St. John's United Church of Christ*,
 502 F.3d 616 (7th Cir. 2007) ............................................................................... 40, 41
*Starnes v. Capital Cities Media, Inc.*,
 39 F.3d 1394 (7th Cir. 1994) ............................................................................... 28, 29
*Stern v. Marshall*,
 131 S.Ct. 2594 (2011)................................................................................................ 31
*Swanson v. Horseshoe Hammond, LLC*,
 445 Fed. Appx. 868 (7th Cir. 2011).......................................................................... 30
*Taylor v. O'Grady*,
 888 F.2d 1189 (7th Cir. 1989) .................................................................................. 13
*Texas Monthly, Inc. v. Bullock*,
 489 U.S. 1 (1989)....................................................................................................... 39

*Thornton v. Caldor,*
  472 U.S. 703 (1985) ................................................................................ 40
*Tomic v. Catholic Diocese of Peoria,*
  442 F.3d 1036 (7th Cir. 2006) ........................................................ 11, 26
*Tort Claimants Comm. v. Roman Catholic Archbishop of Portland (In re Roman Catholic Archbishop of Portland),*
  335 B.R. 842, 860 (Bankr. D. Or. 2005) .......................................... 42, 46
*Touche Ross & Co. v. Redington,*
  442 U.S. 560 (1979) ................................................................................ 25
*Tramonte v. Chrysler Corp.,*
  136 F.3d 1025 (5th Cir. 1998) ............................................................... 16
*United States v. Balistrieri,*
  779 F.2d 1191 (7th Cir. 1985) ................................................................. 2
*United States v. Kras,*
  409 U.S. 434 (1973) ................................................................................ 44
*United States v. Lee,*
  455 U.S. 252 (1982) ................................................................................ 39
*Vickery v. Jones,*
  100 F.3d 1334 (7th Cir. 1996) ............................................................... 31
*Virginia Elec. & Power Co. v. Sun Shipbuilding & Dry Dock (In re Virginia Elec. & Power Co.),*
  539 F.2d 357 (4th Cir. 1976) .......................................................... 16, 17
*Vision Church v. Vill. of Long Grove,*
  468 F.3d 975 (7th Cir. 2006) .......................................................... 40, 41
*Wallace v. Jaffree,*
  472 U.S. 38 (1985) .................................................................................. 39
*Weibrecht v. S. Illinois Transfer, Inc.,*
  241 F.3d 875 (7th Cir. 2001) ................................................................. 24
*Zuni Pub. Sch. Dist. No. 89 v. Dept. of Educ.,*
  550 U.S. 81 (2007) .................................................................................. 26

## STATUTES

11 U.S.C. § 101(27) ...................................................................................... 24
11 U.S.C. § 101(4) ........................................................................................ 14
11 U.S.C. § 101(41) ...................................................................................... 24
11 U.S.C. § 330(a)(1) .................................................................................... 24
11 U.S.C. § 503(b)(2) .................................................................................... 24
11 U.S.C. § 541 ................................................................................ 20, 34, 36
11 U.S.C. § 542 .............................................................................................. 20
11 U.S.C. § 544 ................................................................................ 20, 34, 36
11 U.S.C. § 544(b)(2) .................................................................................... 40
11 U.S.C. § 547 ...................................................................................... 34, 36
11 U.S.C. § 548 ...................................................................................... 34, 36
11 U.S.C. § 548(a)(2) .................................................................................... 40
11 U.S.C. § 548(a)(2)(A) ............................................................................... 39
11 U.S.C. § 548(d)(3) .................................................................................... 40
11 U.S.C. § 549 .............................................................................................. 36
28 U.S.C. § 157(c)(1) ...................................................................................... 1

28 U.S.C. § 157(d) ............................................................................................... 1
28 U.S.C. § 1651 .................................................................................................. 2
28 U.S.C. § 455 ......................................................................................... 1, 2, 18
28 U.S.C. § 455(a) ...................................................................................... passim
28 U.S.C. § 455(b) ............................................................................................... 9
28 U.S.C. § 455(b)(4) ................................................................................. passim
28 U.S.C. § 455(c) ............................................................................................. 12
28 U.S.C. § 455(d)(4) ........................................................................................ 12
28 U.S.C. § 1291 .................................................................................................. 1
28 U.S.C. § 1334(a) ............................................................................................. 1
42 U.S.C. § 2000bb-1(b) ........................................................................... passim
Wis. Stats. § 242.04(1)(a) ................................................................................. 39
Wis. Stats. § 242.04(1)(b) ................................................................................. 39
Wis. Stats. § 242.05(1) ...................................................................................... 39
Wis. Stats. § 242.07 ........................................................................................... 39

## OTHER AUTHORITIES

Code of Conduct for United States Judges, Canon 3 ...................................... 12
Harriet Ryan, *Cardinal Mahoney Used Cemetery Money To Pay Sex Abuse Settlement*,
    Los Angeles Times (Feb. 9, 2013) .............................................................. 33
Mary Jo Newborn Wiggins, *A Statute of Disbelief?: Clashing Ethical Imperatives in Fraudulent Transfer Law*,
    48 S.C. L. Rev. 771, 784 (1997) ........................................................... 36, 37
U.S. CONST. Amend. 1 ............................................................................. passim

## RULES

Fed. R. Civ. P. 60(b) .................................................................................... 1, 18

DOCS_LA:274534.9

## JURISDICTIONAL STATEMENT

Appeal Nos. 13-2881 & 13-3495. On January 17, 2013, the United States Bankruptcy Court for the Eastern District of Wisconsin (the "Bankruptcy Court") granted partial summary judgment to the Official Committee of Unsecured Creditors (the "Committee") in an adversary proceeding related to the chapter 11 bankruptcy case of the Archdiocese of Milwaukee, *Archbishop Jerome E. Listecki, as Trustee of the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust v. Official Committee of Unsecured Creditors* (the "Cemetery Trust Litigation"). On August 1, 2013, the United States District Court for the Eastern District of Wisconsin (the "District Court") reversed the Bankruptcy Court, entered summary judgment in favor of Archbishop Jerome E. Listecki ("Archbishop Listecki" or the "Trustee"), in his capacity as trustee of the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust (the "Cemetery Trust") and dismissed the case (the "Judgment"). On August 26, 2013, the Committee timely filed its notice of appeal (Appeal No. 13-2881). On October 1, 2013, the District Court denied the Committee's Motion to Vacate Judgment and Decision and Order Pursuant to Federal Rule of Civil Procedure 60(b) and 28 U.S.C. § 455 (the "Motion to Vacate"), from which the Committee appealed by filing an amended notice of appeal on October 29, 2013 (Appeal No. 13-3495).

The District Court had jurisdiction over the Bankruptcy Court's order granting partial summary judgment to the Committee as (a) an exercise of its original jurisdiction pursuant to 28 U.S.C. § 1334(a) and 28 U.S.C. § 157(c)(1) and (b) pursuant to the District Court's withdrawal of the reference pursuant to 28 U.S.C. § 157(d). This Court has jurisdiction over the Committee's appeal of the Judgment pursuant to 28 U.S.C. § 1291 as a final order that ended the adversary proceeding on the merits. This Court also has jurisdiction over the Committee's appeal of the

1

order denying the Motion to Vacate pursuant to 28 U.S.C. § 1291. *See Harold Washington Party v. Cook County, Illinois Democratic Party,* 984 F.2d 875, 880 (7th Cir. 1993), *cert. denied*, 510 U.S. 825 (1993).

Appeal No. 13-3353. On October 1, 2013, the District Court denied the Committee's Motion to Recuse the Honorable Randolph T. Randa from the Cemetery Trust Litigation and any Cemetery Related Proceedings (the "Motion to Recuse"). On October 23, 2013, the Committee filed its Petition for Writ of Mandamus Directing the Honorable Rudolph T. Randa to Recuse Himself Pursuant to 28 U.S.C. § 455. This Court has jurisdiction over the Petition for Writ of Mandamus pursuant to 28 U.S.C. § 1651. A petition for a writ of mandamus is the only recourse available to challenge a judge's denial of a motion to recuse under 28 U.S.C. § 455. *United States v. Balistrieri*, 779 F.2d 1191, 1205 (7th Cir. 1985), *cert. denied*, 475 U.S. 1095 (1986); *SCA Servs., Inc. v. Morgan*, 557 F.2d 110, 117-18 (7th Cir. 1977).

## ISSUES PRESENTED

1.      Did Judge Randa err when he refused to recuse himself from presiding over the Cemetery Trust Litigation where (i) he violated 28 U.S.C. § 455(b)(4) because he has a financial interest in the Cemetery Trust and in the subject matter of the litigation, and (ii) he violated 28 U.S.C. § 455(a) because he has created the appearance of impropriety by presiding over a case involving the financing and future maintenance of cemeteries in which his parents and other close family members are buried, the Debtor is contractually obligated to him to provide that maintenance, and the Cemetery Trust is the sole source of funding for that maintenance?

2.      Given that Judge Randa should have recused himself, did he err when he refused to vacate his Judgment dismissing the Cemetery Trust Litigation and related written opinion?

2

3.      Whether a committee of private unsecured creditors in a chapter 11 bankruptcy case is a government or state actor for the purpose of the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb-1(b), and the First Amendment to the United States Constitution.

4.      Whether the District Court should have reached the issue of whether the Bankruptcy Code imposes a "substantial burden" on the Cemetery Trust's free exercise of religion based on a single declaration, without discovery, and in the face of an agreement by the parties and an order of the Bankruptcy Court that the issue was not before the court.

5.      Assuming the District Court properly reached the "substantial burden" issue, whether, in light of the state of evidence, the District Court correctly ruled that the Cemetery Trust carried its burden of proving that the recovery of all or some of the funds in the Cemetery Trust for the benefit of the Debtor's bankruptcy estate imposes a substantial burden on the Cemetery Trust's free exercise of religion.

6.      Whether the relevant provisions of the Bankruptcy Code are neutral and generally applicable, and therefore, under the First Amendment are properly analyzed under rationality review pursuant to *Emp't Div. v. Smith*, 494 U.S. 872 (1990).

7.      Whether the District Court should have reached the "compelling interest" and "least restrictive means" issues without briefing or oral argument by the parties, and, assuming those issues were properly before the District Court, whether it did so correctly.

8.      Whether the application of RFRA to state fraudulent conveyance and trust law violates the holding of *Boerne v. Flores*, 521 U.S. 507 (1997).

## STATEMENT OF THE CASE

In March of 2008, shortly after the Wisconsin Supreme Court opened the door to lawsuits against the Debtor based on clergy sex abuse, the Archdiocese of Milwaukee (the "Debtor") moved approximately $55 million from its bank account to the Cemetery Trust.[1] The Committee contends that these funds are a part of the Debtor's estate, which should be available to satisfy its obligations to its creditors, while the Debtor and the Cemetery Trust argue that they cannot be touched. The Committee asserts, among other legal theories, that the transfer is both actually and constructively fraudulent under the Bankruptcy Code and Wisconsin law and that the Cemetery Trust is a voidable self-settled trust in which the Debtor is a beneficiary.

After the Debtor filed its voluntary petition under chapter 11 of the Bankruptcy Code, Archbishop Listecki, the trustee of the Cemetery Trust and the president and sole member of the Debtor, filed a lawsuit against the Committee which sought a declaration that neither the Cemetery Trust nor the transferred funds are property of the Debtor's bankruptcy estate, and therefore unavailable to its creditors, invoking free exercise rights under RFRA and the First Amendment. The Committee sought partial summary judgment against the Cemetery Trust's free exercise defenses (the "MPSJ") on the purely legal issues. The Committee's MPSJ was subsequently granted by the Bankruptcy Court on all theories. *Listecki v. Official Committee (In re Archdiocese of Milwaukee)*, 485 B.R. 385 (Bankr. E.D. Wis. 2013).

Specifically, the Bankruptcy Court held: (1) The committee of private creditors is not a "government" actor, and is not acting under color of law as that term is used in RFRA or the First Amendment, and therefore RFRA cannot be invoked against the Committee; (2) RFRA does not apply because state law is the ultimate law to be applied to determine if the Cemetery

---

[1] On July 11, 2007, the Wisconsin Supreme Court decided *John Doe 1 v. Archdiocese of Milwaukee*, 303 Wis. 2d 34, 75-76, 734 N.W.2d 827, 846-847 (Wis. 2007), which made it possible for some victims of clergy abuse to sue for damages. Before that decision, such cases were blocked by prior case law.

Trust's assets are to be included in the Debtor's estate (*Butner v. United States*, 440 U.S. 48, 55 (1979)), and RFRA may not be used to invalidate or narrow state law under *Boerne v. Flores*, 521 U.S. 507 (1997); and (3) the Bankruptcy Code is a neutral and generally applicable statute that does not target religion or religious conduct for negative treatment, and therefore, under *Emp't Div. v. Smith*, 494 U.S. 872 (1990), the First Amendment is no defense to any of the Committee's theories of recovery.

On July 29, 2013, the District Court issued its Decision and Order which reversed the Bankruptcy Court on all theories (the "SJ Decision"). *Listecki v. Official Committee (In re Archdiocese of Milwaukee)*, 496 B.R. 905 (E.D. Wis. 2013). The District Court held that (1) a committee of private creditors in a chapter 11 bankruptcy is a government actor, and therefore, the Cemetery Trust may invoke the First Amendment and RFRA against the Committee; and (2) the Cemetery Trust is immunized by the First Amendment and RFRA from the law of fraudulent transfers, and therefore, the Cemetery Trust and its assets are absolutely immune from inclusion in the estate. In the course of reaching the First Amendment and RFRA issues on the merits, the District Court improperly reached the preliminary substantial burden issue (which the parties had agreed to set aside and the Bankruptcy Court ordered would not be addressed without further discovery), and then the compelling interest and least restrictive means issues, all without briefing or oral argument.

In August 2013, counsel for the Committee discovered that District Court Judge Rudolph T. Randa's parents, two sisters, a brother–in-law, an uncle, an aunt and his parents-in-law are interred in cemeteries owned by the Debtor. The Committee also discovered that Judge Randa purchased his parents' burial rights pursuant to a contract with the Debtor that obligates the Debtor to maintain their crypts (the "Randa Contract") and which maintenance costs are paid by

the Cemetery Trust. At no time did Judge Randa, the Debtor, the Archbishop, the Cemetery

Trust (or any other party) disclose the foregoing information to the Committee. On August 12,

2013, the Committee filed its Motion to Recuse and its Motion to Vacate. On October 1, 2013,

Judge Randa entered one order denying both motions (the "Recusal Order"). *Listecki v. Official*

*Committee (In re Archdiocese of Milwaukee)*, 2013 WL 5491895 (E.D. Wis. Oct. 1, 2013).

These appeals followed.

## STATEMENT OF FACTS

The Debtor owns and operates eight cemeteries and mausoleums (collectively the

"Cemeteries"), including the two cemeteries in which Judge Randa's parents and his other close

relatives are buried. Sapp. at 166.[2]  On April 2, 2007, the Debtor, as trustor, and Timothy M.

Dolan, in his official capacity as Archbishop, as trustee, executed the Trust Agreement Creating

the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust. Sapp. at 016. On June 4,

2007, Archbishop Dolan wrote a letter to the Vatican requesting permission to transfer

$56,943,983.35 (the "Transferred Funds") of the Debtor's money to the Cemetery Trust. The

letter states in pertinent part:

> By transferring these assets to the Trust, I foresee an improved protection
> for these funds from any legal claim and liability. A careful analysis by
> experts has concluded that the funds currently held for perpetual care
> needs are sufficient for the long-term use by the Catholic cemeteries. The
> value of the fund to be transferred was $56,943,983.35 as of December 31,
> 2006.

Sapp. at 025 (emphasis added). The request was granted, and in March of 2008, the Debtor

moved the Transferred Funds to the Cemetery Trust. Sapp. at 033. Prior to their transfer to the

Cemetery Trust, the Transferred Funds were classified as "unrestricted" in the Debtor's financial

statements. Sapp. at 033, 093.

---

[2] References to "App" are to documents contained in the Short Appendix attached hereto.  References to
"Sapp" are to documents contained in the separate Supplemental Appendix submitted concurrently.

On January 4, 2011, with approximately a dozen sex abuse cases pending, the Debtor filed a petition under chapter 11 of the United States Bankruptcy Code (Case No. 11-20059-SVK). Sapp. at 126.  On or about January 24, 2011, the Committee was appointed pursuant to 11 Bankruptcy Code section  1102(a)(1). On June 28, 2011, the Cemetery Trust (later amended to substitute Archbishop Listecki as plaintiff) initiated the Cemetery Trust Litigation. Sapp. at 001. Due to the Debtor's obvious conflict (Archbishop Listecki is trustee of the Cemetery Trust and the president and sole member of the Debtor), the Committee defended the lawsuit on behalf of the Debtor's estate and filed counterclaims against the Cemetery Trust pursuant to a written agreement with the Debtor. Sapp. at 155.  The Committee asserted numerous affirmative defenses that it contended defeated the Cemetery Trust's First Amendment and RFRA claims, including: (i) federal bankruptcy laws are neutral, generally applicable laws, which are valid under the Religion Clauses of the First Amendment; (ii) the application of RFRA to state law is unconstitutional, and (iii) the Committee is a private entity, and, therefore, the First Amendment and RFRA are not applicable because the government is not a party to the Cemetery Trust Litigation.

On November 16, 2011, the Debtor filed an unliquidated, uncertified class proof of claim (the "Cemetery Claim") "on behalf of purchasers of graves, crypts, mausoleum space, income care, endowment care, perpetual care and the estates, legal representatives, heirs, successors, assigns and beneficiaries of decedents buried, interred or otherwise preserved in the cemeteries of the Archdiocese of Milwaukee" (the "Cemetery Claimants"). Sapp. at 164, 166.  In paragraph 6 of the Rider to the Cemetery Claim, the Debtor acknowledges that the claim, "may be affected by existence of funds that are currently held by the [Cemetery Trust] which is currently the subject of the [Cemetery Trust Litigation]." Sapp. at 167.

In May of 2012, the Committee filed its MPSJ, which sought partial summary judgment against the Cemetery Trust on the solely legal issues involving the Cemetery Trust's statutory and constitutional free exercise claims and defenses. Sapp. at 170. On July 9, 2012, the Cemetery Trust filed its response (the "Response") as well as the Declaration of Archbishop Listecki (the "Listecki Declaration"). Sapp. at 216, 264. While the Committee's MPSJ raised purely legal questions and did not seek summary judgment on the factual issue of whether permitting the Committee to recover the fraudulently transferred $55 million would impose a substantial burden on the Cemetery Trust's free exercise of religion, the Cemetery Trust, in response, briefed the substantial burden issue, submitted the Listecki Declaration in support, and asked the Bankruptcy Court to enter summary judgment in its favor on the entire case on the theory that it had borne its burden of proof on "substantial burden" and, therefore, the court could reach the merits of the RFRA and the First Amendment claims (the "Cross-MSJ").

Prior to the deadline for the Committee to file its reply to the Cross-MSJ and any factual or legal opposition to the Listecki Declaration, the parties agreed that the Cross-MSJ would not go forward and would instead be briefed only after the Bankruptcy Court determined the purely legal issues regarding RFRA and the First Amendment raised in the Committee's MPSJ. Sapp. at 294-297. This agreement was memorialized in a Minute Order issued by the Bankruptcy Court. Sapp. at 326. Accordingly, the Committee's reply papers did not address the substantial burden issues or the factual matters alleged in the Listecki Declaration.

On January 17, 2013, the Bankruptcy Court granted the Committee's MPSJ on all theories. Sapp. at 352, 364. On July 29, 2013, the District Court reversed and issued the SJ Decision. App. at 001. On August 1, 2013, the District Court entered the Judgment against the Committee and dismissed the Cemetery Trust Litigation. App. at 031.

8

In August 2013, counsel for the Committee discovered that Judge Randa's parents, two sisters, a brother–in–law, an uncle and an aunt and parents-in-law are interred in cemeteries owned by the Debtor. Sapp. at 384-87. On August 12, 2013, in response to an emergency motion, the Debtor produced the Randa Contract pursuant to which the Committee discovered that Judge Randa paid $3,800.00 to the Debtor for his parents' burial rights and the Debtor's promise to maintain their crypts. Sapp. at 450, 484. On August 12, 2013, the Committee filed its Motion to Vacate and its Motion to Recuse. Sapp. at 419, 490. Judge Randa subsequently entered the Recusal Order denying both motions. App. at 036.

## SUMMARY OF ARGUMENT

Judge Randa violated 28 U.S.C. § 455(a) and (b) when he failed to recuse himself in the Cemetery Trust Litigation because of his personal and financial interest in the Cemetery Trust arising from his purchase of his parents' burial rights in an Archdiocesan cemetery, and the gravesites of other close relatives in the subject cemeteries. *SCA Services, Inc. v. Morgan*, 557 F.2d 110, 115-16 (7th Cir. 1977). Under the Judicial Code of Conduct, Judge Randa lacks and appears to lack impartiality as it relates to the Cemetery Trust Litigation. Judge Randa further erred in failing to vacate the SJ Decision and Judgment, as it was unjust to the Committee, the denial of vacatur will produce injustice in other cases, and there is a high risk of undermining the public's confidence in the judicial system in the absence of vacatur. Accordingly, this Court should issue a writ of mandate ordering Judge Randa to recuse himself from all Cemetery Trust proceedings and vacate his Recusal Order, the Judgment and the SJ Decision.

If this Court does not vacate, the Committee asks that it reverse the District Court's grant of summary judgment, and hold that the Cemetery Trust does not have free exercise rights that immunize it from the state fraudulent conveyance laws or other provisions of the Bankruptcy

Code that may incorporate state law. As a matter of law, the District Court erred in reversing the Bankruptcy Court and granting summary judgment to the Cemetery Trust under RFRA and the First Amendment. First, the District Court incorrectly concluded that the Committee of private creditors is a government actor. In the absence of a government actor, RFRA and the First Amendment do not apply. *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006), *cert. denied*, 549 U.S. 881 (2006), *abrogated on other grounds, Hosanna-Tabor Evangelical Lutheran Church School v. EEOC*, ___, U.S. ___, 132 S. Ct. 694 (2012). The Committee is not a traditional government actor, was not acting under color of law, or exercising a traditional public function. Rather, the Committee is a private party with a personal and private interest in the outcome of the litigation.

Even if the District Court correctly determined that the Committee of private creditors is a government actor, the District Court erred when it reached out to decide the "substantial burden" issue.  This determination should never have been made as the parties expressly agreed to set aside the substantial burden issue until there was discovery, and to only proceed on the purely legal issues, which agreement the Bankruptcy Court approved.  The Bankruptcy Court did not address the issue.  It was a violation of Due Process and the Establishment Clause for the District Court to decide the substantial burden issue on the basis of an unopposed statement by Archbishop Listecki without discovery or opportunity for the Committee to challenge sincerity, whether there was in fact a burden, or the substantiality of any burden.  Moreover, the decision was wrong on the merits, as a single, unopposed affidavit does not satisfy the Cemetery Trust's burden to prove a substantial burden as a matter of law. Moreover, the lack of discovery also meant that the assumptions made by the District Court regarding whether some or all of the Cemetery Trust would be affected if included in the estate were baseless.

Assuming that the District Court should have decided the "substantial burden" issue, and then forged ahead to decide what level of scrutiny should apply under the First Amendment, the District Court again erred in its analysis. Every provision of the Bankruptcy Code at stake in this case is a neutral and generally applicable law, and should only have been subjected to rationality review. *Emp't Div. v. Smith*, 494 U.S. 872, 879-80 (1990).  Even if the District Court appropriately determined substantial burden, and that the First Amendment requires strict scrutiny of the Bankruptcy Code, the relevant provisions meet the "compelling interest" and "least restrictive means" tests, contrary to the District Court's conclusions. Therefore, the fraudulent transfer law and other provisions of the Bankruptcy Code  at issue in this case should stand under RFRA and the First Amendment, and the Cemetery Trust should not have been rewarded a supposed free exercise right to engage in fraudulent transfers and the creation of self-settled trusts for its own benefit to evade its creditors. Lastly, RFRA may not be invoked to trump state law, as it violates the central holding in *City of Boerne v. Flores*, 521 U.S. 507 (1997).

For the foregoing reasons, this Court should issue a writ of mandamus directing Judge Randa to recuse himself from the Cemetery Trust Litigation, and vacate the District Court's Recusal Order, SJ Decision and Judgment, or alternatively, reverse the District Court's SJ Decision and Judgment and enter summary judgment in favor of the Committee on the legal issues set forth in the Committee's MPSJ.

**ARGUMENT**

I.     **The Court Should Issue a Writ of Mandamus Directing Judge Randa to Recuse Himself.**

A.     **Standard of Review**

The court of appeals reviews a district judge's decision not to recuse himself *de novo*. *Hook v. McDade*, 89 F.3d 350, 353 (7th Cir. 1996), *cert. denied*, 519 U.S. 1071 (1997); *Taylor v. O'Grady*, 888 F.2d 1189, 1201 (7th Cir. 1989).

B.     **Judge Randa erred when he failed to recuse himself under 28 U.S.C. § 455(b)(4).**

A federal judge has an ethical obligation to perform his or her duties impartially. *See* Code of Conduct for United States Judges, Canon 3 (the "Judicial Code of Conduct"). To that end, a federal judge is required to disqualify himself or herself when:

> He knows that he . . . has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding.

28 U.S.C. § 455(b)(4) (2012). A "financial interest" means "ownership of a legal or equitable interest, however small . . . ." *Id*. § 455(d)(4). Section 455(b)(4) disqualification is required "no matter how insubstantial the financial interest and regardless of whether or not the interest actually creates an appearance of impropriety." *See Liljeberg v. Health Servs. Acquisition Corp*., 486 U.S. 847, 860 n.8 (1988).

Judges have an affirmative duty to investigate and disclose any facts on which their impartiality might reasonably be questioned or that relate to a financial interest that they may have in a case. *Porter v. Singletary,* 49 F.3d 1483, 1489 (11th Cir. 1995). *See* 28 U.S.C. § 455(c); Judicial Code of Conduct, Canon 3(C)(2). Litigants are entitled to assume judicial impartiality and have no duty to investigate a judge's potentially disqualifying circumstances. *See American*

12

*Textile Mfrs. Inst. v. Limited, Inc.*, 190 F.3d 729, 742 (6th Cir. 1999), *cert denied*, 529 U.S. 1054 (2000).

According to the Cemetery Trust and the Debtor, Judge Randa has a beneficial interest in the Cemetery Trust. The Debtor asserts, "To fulfill its perpetual care obligations, the Archdiocese places a portion of ***every*** sale of a mausoleum, crypt and gravesite in trust to assure the perpetual care of these sacred grounds and to maintain their continuous operation. These perpetual care funds are held in the [Cemetery] Trust." Sapp. at 168. If true, the Debtor set aside a portion of the $3,800.00 Judge Randa paid for his parents' burial crypts to fulfill the Debtor's future obligations to maintain those crypts (the "Randa Trust Funds"); it held those funds in trust, and then it transferred those funds to the Cemetery Trust as a part of the transfer that is being challenged by the Committee in the Cemetery Trust Litigation. Accordingly, if true, the Cemetery Trust contains funds paid by Judge Randa to maintain his parents' crypts.[3] According to the Cemetery Trust and the Debtor, then, Judge Randa has a beneficial interest in the Cemetery Trust, which is an "equitable interest" in a party, prohibited by section 455(b)(4).[4]

Judge Randa also has a separate financial interest in the subject matter in controversy. Pursuant to the Randa Contract, the Debtor is required to provide care and maintenance for his parents' crypts. Sapp. at 484-85. The Debtor contends that it will be unable to satisfy its care obligations if the Cemetery Trust has to turn over its assets to the Debtor, and Judge Randa specifically found this to be true in his SJ Decision:

> If the Trust is legally compelled to cede all or part of the funds to the
> estate, there will be no funds or substantially less funds for that perpetual
> care. As a result, neither the Debtor nor the Trust and its Trustee will be

---

[3] The Committee disputes that the Debtor held any of the funds it received from crypt buyers for perpetual care in trust prior to 2008.

[4] The Committee is not seeking to recuse Judge Randa because he is Catholic, but rather due to his undisclosed  interests in the funds held in the Cemetery Trust, in the outcome of the litigation, and in the care and maintenance of his parents' burial sites, all of which call his ability to be impartial into doubt.

> able to fulfill their canonical and moral obligations to provide the
> appropriate care for these sacred sites-consistent with Catholic doctrine
> and canon law—or assure the requisite permanence, reverence and respect
> for those buried there.

*Listecki v. Official Committee*, 496 B.R. at 911-912. If this is true, then Judge Randa has an

interest in seeing that the Cemetery Trust prevails so that there are adequate funds to cover the

Debtor's perpetual care obligations. This interest is disqualifying under section 455(b)(4).[5]

Judge Randa's financial interest in the subject matter of the litigation is further evidenced by

the Cemetery Claim filed by the Debtor. By definition, Judge Randa is a member of the

uncertified class of "Cemetery Claimants" on whose behalf the Debtor filed the Cemetery Claim.

By filing the claim, the Debtor has represented that all Cemetery Claimants, including Judge

Randa, have a "claim" against the Debtor. A "claim" is "a right to payment, whether or not such

right is . . . contingent . . . ." 11 U.S.C. § 101(4) (2012). Therefore, the Debtor, on behalf of

Judge Randa and the other Cemetery Claimants, has asserted that the Cemetery Claimants have a

right to payment from the Debtor. The amount of the Cemetery Claim is contingent on the

amount of funds held in the Cemetery Trust—the funds held in the Cemetery Trust reduce the

amount of the Cemetery Claim dollar for dollar. From the standpoint of the putative class

members (including Judge Randa) who are the beneficiaries of the Cemetery Claim, it is far

preferable to have actual dollars in the Cemetery Trust than to have an unsecured claim against

the insolvent Debtor which will be paid pennies on the dollar. As Judge Randa is part of the

uncertified class on whose behalf the Debtor filed the Cemetery Claim, his disqualification is

mandatory under 455(b)(4). *See Tramonte v. Chrysler Corp.*, 136 F.3d 1025, 1030 (5th Cir.

1998); *accord In re Aetna UCR Litig.*, 2013 WL 1622160, *3 (D.N.J. April 15, 2013).

---

[5] *Guardian Pipeline, L.L.C. v. 950.80 Acres of Land*, 525 F.3d 554 (7th Cir. 2008), does not support
Judge Randa's failure to recuse, as that case involved a mere hope of future business, which did not
qualify as a financial interest. Here, the financial interest is not hypothetical.

Judge Randa defended his failure to disclose his interest and his failure to recuse himself on the theory his interest is too remote and speculative, relying on *New Mexico v. Southern Union Co. (In re New Mexico Natural Gas Antitrust Litig.)*, 620 F.2d 794 (10th Cir. 1980), and *Virginia Elec. & Power Co. v. Sun Shipbuilding & Dry Dock (In re Virginia Elec. & Power Co.)*, 539 F.2d 357 (4th Cir. 1976). Neither case supports his position. In *In re New Mexico Natural Gas Antitrust Litig.*, the judge (who lived in the area serviced by defendant gas companies) recused himself because he would have benefitted from lower gas rates if the plaintiffs won. The appellate court held that the judge was not required to recuse himself where the benefit he received was as a member of the general public. *See also In re Virginia Elec. & Power Co.*, 539 F.2d at 363 (same). Here, Judge Randa is not receiving a benefit as a member of the general public, but as the buyer of burial rights for his parents.

Finally, section 455(b)(4) also requires disqualification if the judge knows that he has any other interest that could be substantially affected by the outcome of the proceeding. This interest does not have to be financial. *See SCA Services, Inc. v. Morgan*, 557 F.2d 110, 115-16 (7th Cir. 1977) (holding that "any other interest" might include goodwill or professional reputation). Judge Randa has such an interest, namely, his interest in the care and maintenance of his parents' crypts and those of other close relatives. In his SJ Decision, Judge Randa specifically found that if the Cemetery Trust has to return its assets to the Debtor, the Debtor *will be unable* to provide for the perpetual care of its Cemeteries. *See supra*. In the Recusal Order, however, Judge Randa found it "*unlikely*" that the Cemetery Trust will be unable to satisfy its duty to provide perpetual care. *Listecki v. Official Committee*, 2013 WL 5491895, *2.[6] The circularity of his reasoning

---

[6] Judge Randa assumed that local municipalities would bail out the Cemeteries if the Cemetery Trust and the Debtor were unable to provide perpetual care. There is no guarantee, however, that a municipality would maintain the Cemeteries in a fashion that would meet the Archbishop's standard that "the deceased must be treated with respect and charity in the Catholic faith with the hope of resurrection." Sapp. at 272.

further underscores why Judge Randa should not be deciding issues involving the ultimate

upkeep of his parents' and close family members' final resting places.

## C.     Judge Randa erred when he failed to recuse himself under 28 U.S.C. § 455(a).

To preserve the public's confidence in the judiciary, federal judges are required to recuse

themselves, not just in proceedings in which they are *actually* biased, but "in any proceeding in

which [their] impartiality *might reasonably be questioned*." 28 U.S.C. § 455(a) (emphasis

added); Judicial Code of Conduct, Canon 3(c)(1). *See Liljeberg v. Health Servs. Acquisition

Corp.*, 486 U.S. at 865. The test under section 455 (a) is "whether a reasonable person perceives

a significant risk that the judge will resolve the case on a basis other than the merits. This is an

objective inquiry." *In re Mason*, 916 F.2d 384, 385-86 (7th Cir. 1990); *In re Sherwin-Williams

Co*., 607 F.3d 474, 477-78 (7th Cir. 2010). Moreover, the standard is quite low. *Home Placement

Serv., Inc. v. Providence Journal Co.,* 739 F.2d 671 (1st Cir. 1984), *cert. denied*, 496 U.S. 1191,

105 S.Ct. 964, 83 L.Ed.2d 969 (1985). *See also In re Apollo*, 2013 WL 4083236, *5 (3d Cir.

Aug. 14, 2013) (unpublished); *Chase Manhattan Bank v. Affiliated FM Ins. Co.*, 343 F.3d 120,

128 (2d Cir. 2003).

In addition to the financial interests discussed above, there is also a nonmonetary factor that

would cause a reasonable person to question Judge Randa's ability to be impartial, and this is

according to Judge Randa himself:

> For Catholics, moreover, the belief in resurrection is a belief in the
> ultimate resurrection of one's *own* body. According to this belief, the soul
> separates from the physical body at death to meet God, while awaiting
> reunion with its body, transformed and resurrected through the power of
> Jesus' resurrection, on the last day.

*Listecki v. Official Committee*, 496 B.R. at 911 (emphasis original). He further characterized the

gravesites in the cemeteries at issue as "sacred sites," which demand "permanence, reverence

and respect for those buried there." *Id.*  Any reasonable person would assume, based on these

16

assertions alone, that Judge Randa would be deeply concerned about the state of his parents' and other close relatives' bodies and gravesites. Based on his opinion, and the fact of his purchase of his parents' burial rights, their very resurrection is at stake. Could there be any more important value that would suggest a lack of impartiality?

Incredibly, Judge Randa then stated in his denial of the Committee's Motion to Recuse, "[T]he Committee's motion presumes that I would be personally upset or aggrieved by the remote possibility that a family member's grave site might fall into disrepair, so much so that I would ignore my duty to exercise impartial judgment." *Listecki v. Official Committee*, 2013 WL 549185, at *3. His reasoning ignores his earlier statements in his SJ Decision, ignores the objective standard, and defies common sense. Even if he were inclined to set aside his deep attachment to his parents and close relatives and their eventual resurrection, the issue is not whether the prospect of his parents' burial crypt falling into disrepair would actually cause Judge Randa to be biased. The issue is whether a reasonable person would question his impartiality. The Committee submits that any reasonable person would doubt his impartiality in light of his statements in the SJ Decision.[7] For all the foregoing reasons, this Court should issue a writ of mandamus directing Judge Randa to recuse himself from the Cemetery Trust Litigation and any Cemetery Related Proceedings.[8]

## II.      Judge Randa Erred When He Failed to Vacate the Judgment and the SJ Decision.

---

[7] Judge Randa's reliance on *In re National Union Fire Ins. Co.,* 839 F.2d 1226 (7th Cir. 1988), is misplaced. The Seventh Circuit found no basis for recusal where the defendant bank had hired the judge's son to represent a debtor in a revolving credit transaction. *Id.* at 1227. The court held that 28 U.S.C. §§ 455 (b)(4) and 455(a) did not apply, as the son did not represent the bank in the case before his father, and neither the judge nor the son had any interest in the outcome. In this case, in contrast, Judge Randa has a direct financial and emotional interest in the outcome of the case.

[8] Cemetery Related Proceedings include any proceedings related to the Debtor's Cemeteries (including but not limited to any objection to the Cemetery Claim, any rejection or assumptions of burial rights contracts, and any settlement or other disposition of the Cemetery Trust Litigation pursuant to a plan of reorganization or otherwise.

## A.      Standard of Review

This Court reviews a district judge's denial of a motion to vacate pursuant to Federal Rule of Civil Procedure 60(b) for an abuse of discretion. Fed. R. Civ. P. 60(b); *see, e.g., Philos Technologies, Inc. v. Philos & D., Inc.*, 645 F.3d 851, 854-55 (7th Cir. 2011).

## B.      This Court should vacate the Judgment and the Summary Judgment Decision because Judge Randa was required to recuse himself and failed to do so.

Federal Rule of Civil Procedure 60(b) provides, "On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order or proceeding for the following reasons . . . (6) any other reason that justifies relief." Fed. R. Civ. P. 60(b). A presiding judge's failure to recuse himself pursuant to 28 U.S.C. § 455 is grounds to vacate the judgment under Rule 60(b)(6). *See Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 863-64 (1988); *Russell v. Lane*, 890 F.2d 947, 949 (7th Cir. 1989).

As was established above, Judge Randa should have recused himself under both subsections 455(a) and 455(b)(4). In such a case, *Liljeberg* authorizes the Court to vacate the judgment after considering the following factors: (a) the risk of injustice to the parties, (b) the risk that the denial of relief will produce injustice in other cases, and (c) the risk of undermining the public's confidence in the judicial process. 486 U.S. at 863. Each of these factors weighs in favor of vacatur.

Judge Randa's interest and apparent bias created an injustice to the creditors of the Debtor's estate. Had Judge Randa disclosed his interest in the dispute when the appeal was assigned to him, the Committee would have requested that he recuse himself at that time. He failed to make the disclosures, reached issues that were not before him, reversed the Bankruptcy Court's order granting summary judgment against the Cemetery Trust on its First Amendment and RFRA defenses, and then went beyond that to grant summary judgment to the Cemetery Trust and

18

dismiss the entire action. The Court did so in spite of the parties' agreement and a Bankruptcy Court order that determined that the Cross-MSJ and substantial burden could not be determined without discovery.

If the Judgment and the SJ Decision stand, they will have a deleterious effect on other cases. While failing to disclose his own interest in this case, the District Court interpreted the law in an unprecedented fashion to find that a committee of private, unsecured creditors is a government actor. If this were a correct interpretation of the law, all creditor committees could be accused of (and potentially sued for) constitutional and federal statutory civil rights violations, dramatically chilling the assertion of creditors' claims in chapter 11 proceedings. Whether these are winning strategies or not, they will add to bankruptcy litigation costs, deter creditors from pursuing legitimate claims, and undermine the goals of the Bankruptcy Code.

Moreover, the District Court's decision provides a road map for a  religious entity  to insulate its assets from creditor claims (both tort and contract) by creating self-settled trusts for any religious purpose, transferring its assets into those  trusts for no consideration, voluntarily file a bankruptcy case and then successfully assert that the fraudulent conveyance provisions of state law and/or the Bankruptcy Code cannot be used to recover those fraudulently transferred assets for the benefit of its creditors even where the transfers to the self-settled trusts were made for the purpose of defrauding creditors.[9]

The SJ Decision allows a religious debtor (and only a religious debtor) to "cherry pick' the provisions of the Bankruptcy Code rather than requiring it to accept its burdens as the price of enjoying its benefits. If the District Court decision stands, a religious debtor my file bankruptcy

---

[9] The Wisconsin Supreme Court abrogated the doctrine of charitable immunity in 1961. *Kojis v. Doctors Hosp.*, 12 Wis.2d 367, 372, 107 N.W.2d 131 (1961). By permitting religious debtors to shelter their assets from tort victims in self-settled trusts without recourse, the District Court essentially reinstated the law of charitable immunity in violation of Wisconsin law.

and  invoke the automatic stay to halt all pending litigation and prohibit the filing of any further litigation based on its pre-bankruptcy conduct,  and avail itself of the discharge provisions to extinguish its debts for pennies on the dollar, while rejecting any provision of the Bankruptcy Code or state law (incorporated into the Bankruptcy Code by various sections, including sections 541, 542 and 544) that defines property of the estate in a manner the debtor believes is burdensome to its religious beliefs, or enables  the avoidance of  fraudulently transferred assets. (The District Court ignores the fact that any burdens are imposed by the Archbishop's ***voluntary election*** to file bankruptcy.) No other Court has determined that  religious debtors (and religious debtors alone) may avail themselves of  the benefits of the Bankruptcy Code  while exempting themselves from those provisions they dislike.

Finally, permitting a judge to preside over a dispute over the fate of funds that are to be used to care for the graves of his parents, his sisters, and other close family members in a religious cemetery will undermine the public's confidence in the judiciary. The damage done can, however, be ameliorated by vacating the interested judge's decision. For the foregoing reasons, the Committee asks the Court to vacate the SJ Decision and the Judgment.

**III.     As a Matter of Law, the District Court Erred in Granting Summary Judgment for the Claims under the Religious Freedom Restoration Act and the First Amendment and Should Be Reversed.**

Should this Court find that Judge Randa acted appropriately in presiding over the Cemetery Trust Litigation and proceed to the substantive constitutional and federal statutory issues, the Committee asks this Court to reverse the Judgment and the SJ Decision in their entirety and enter summary judgment in favor of the Committee on its MPSJ. *See Koger v. Bryan*, 523 F.3d 789 (7th Cir. 2008).

The Cemetery Trust's free exercise claims fail as a matter of law. First, the committee of private creditors is not a "government" and is not acting under color of law under either RFRA

or the First Amendment. Second, the "substantial burden" issues never should have been reached by the District Court, and, even if they were reached appropriately, were decided erroneously. Third, the District Court never should have reached the "compelling interest" or "least restrictive means" issues, and, even if it did so appropriately, the Court's reasoning was erroneous. Finally, RFRA does not apply to the fraudulent conveyance claims, because state law is the ultimate law to be applied to determine if the Cemetery Trust's assets are to be included in the Debtor's estate, which RFRA may not be used to invalidate or narrow under *City of Boerne v. Flores*, 521 U.S. 507 (1997). The District Court rulings to the contrary are simply wrong as a matter of law.

**A.      Standard of Review.**

This Court reviews a district court's interpretation of all constitutional claims and federal statutory issues *de novo*. *See Weibrecht v. S. Illinois Transfer, Inc.*, 241 F.3d 875 (7th Cir. 2001); *United States v. Schaffner*, 258 F.3d 675, 678 (7th Cir. 2001); *Alvarado-Fonseca v. Holder*, 631 F.3d 385, 389 (7th Cir. 2011).

**B.      Free Exercise Claims May Only Be Invoked Against a Government Actor, and the Committee Is Not a Government Actor.**

Whether a free exercise claim is brought under the First Amendment or RFRA, it may not be asserted against a private party. The Committee is such a private party. The Bankruptcy Court correctly held that the Committee may not be sued for free exercise violations under either RFRA or the First Amendment, and the District Court erred by reversing the Bankruptcy Court's sound reasoning.

**1.      RFRA May Only be Invoked Against a Government Actor, and the Committee Is Not a Government Actor.**

The plain language of a statute controls its interpretation, and federal courts must first look to the language of a statute to determine its meaning. *See e.g., Caminetti v. United States*, 242 U.S. 470, 485 (1917); *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004). It is particularly necessary for

courts to follow a legislature's plain meaning when the subject is the existence of a cause of

action. *Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1, 6 (2000); *Touche

Ross & Co. v. Redington*, 442 U.S. 560, 571 (1979). The separation of powers is violated if

courts ignore the plain language of the statute and create a right of action where it is not provided

for in the statute. *See, e.g., Touche Ross v. Redington*, 442 U.S. at 568; *Int'l Union of Operating

Eng'rs, Local 150 v. Ward*, 563 F.3d 276, 282 (7th Cir. 2009), *cert. denied*, 558 U.S. 947 (2009);

*Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001).

The Cemetery Trust asserts that permitting the Committee to recover any of its assets for the

benefit of the Debtor's estate will substantially burden its free exercise of religion in violation of

RFRA, which provides:

> In General. *Government* shall not substantially burden a person's exercise
> of religion even if the burden results from a rule of general applicability,
> except as provided in subsection (b) of this section.
>
> Exception. *Government* may substantially burden a person's exercise of
> religion only if it demonstrates that application of the burden to the
> person-(1) is in furtherance of a compelling governmental interest; and (2)
> is the least restrictive means of furthering that compelling governmental
> interest.
>
> Judicial relief. A person whose religious exercise has been burdened in
> violation of this section may assert that violation as a claim or defense in a
> judicial proceeding and obtain appropriate relief *against a government*.
> Standing to assert a claim or defense under this section shall be governed
> by the general rules of standing under article III of the Constitution.

42 U.S.C. § 2000bb-1 (2012) (emphasis added). The plain language of this section is

unambiguous. Congress intended that religious believers may only bring a proper RFRA claim

for relief "against a government" that has intruded on their religious beliefs. *Zuni Pub. Sch. Dist.

No. 89 v. Dept. of Educ.*, 550 U.S. 81, 93 (2007) (citations omitted). The Bankruptcy Court

correctly rejected the Cemetery Trust's RFRA claims, because RFRA only creates a cause of

action against "a government," and the Committee is a private party. *Listecki v. Official*

*Committee*, 485 B.R. at 392. The Seventh Circuit has articulated precisely this view, stating in dictum, "RFRA is applicable only to suits to which the government is a party." *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006), *cert. denied*, 549 U.S. 881 (2006), *abrogated on other grounds*, *Hosanna-Tabor Evangelical Lutheran Church School v. EEOC*, ___, U.S. ___, 132 S. Ct. 694 (2012). The District Court correctly assumed that RFRA is only applicable against a government, but then erroneously concluded that a committee of private creditors is a government actor.

### a. The Committee is not a government actor subject to a claim under RFRA.

The District Court erred when it held that a creditors' committee in a bankruptcy proceeding is a "government" actor for purposes of RFRA. Under RFRA, the term "government" means, "a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity." 42 U.S.C. § 2000bb-2(1). The Committee is not a branch, department, agency or instrumentality of the United States. Nor is it an official (or other person acting under color of law) of any of the foregoing. The Committee is a collection of independent, individual, private creditors of the Debtor who represent the interests of a larger class of unsecured, private creditors and has a fiduciary duty to protect their interests. *See Smart World Technologies v. Juno Online Services (In re Smart World Technologies, LLC)*, 423 F.3d 166, 175 n.12 (2d Cir. 2005). While the United States Trustee's Office (the "OUST") appoints the members of a private, creditors committee (subject to their agreement to serve), the committee functions entirely independently of the OUST. A committee elects its own chairperson, enacts its own bylaws, and enjoys its own confidential attorney-client relationship with its counsel. *In re Refco, Inc.,* 336 B.R. 187, 197 (Bankr. S.D.N.Y. 2006). A private creditors' committee consults with the debtor in possession on administration of the case,

investigate the debtor's conduct, business operations, assets and liabilities, and participate in formulating a plan. 11 U.S.C. § 1103. The committee's expenses (11 U.S.C. § 503 (b)(3)(f)) and the fees and expenses of its professionals (11 U.S.C. §§ 330 (a)(1), 503(b)(2)) are paid by the debtor's estate, not by any governmental entity.

With respect to the Cemetery Trust Litigation specifically, the Debtor entered into a written agreement with the Committee that granted the Committee permission to bring the avoidance action claims against the Cemetery Trust derivatively on behalf of the Debtor's estate. Sapp. at 155. It did so because the Debtor could not and would not defend or bring affirmative claims against the Cemetery Trust, given the conflict presented by the fact that Archbishop Listecki is both the president of the Debtor and the trustee of the Cemetery Trust. The Committee, therefore, is acting on behalf of the Debtor's estate (a private actor) by virtue of rights granted by the Debtor (a private actor) and for the benefit of the Debtor, its estate and its creditors (all private actors), not the government.

Neither RFRA nor the Bankruptcy Code treat creditors' committees as government actors. A creditors' committee is not included in the Bankruptcy Code's definition of "governmental unit."[10] Furthermore, only "persons" are eligible to serve on a creditors' committee and the Bankruptcy Code's definition of "person" specifically excludes "governmental units", with a narrow exception that permits only limited government creditors to sit on committees. *See* 11 U.S.C. § 101(41). No governmental units are members of the Committee. Sapp. at 576.

---

[10] A "governmental unit" means "United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government." 11 U.S.C. § 101 (27).

#### b. The Committee, as a private party, was not acting "under color of law" or exercising a traditional public function

There are only two instances in which a private party might be construed to be a government actor; neither is implicated here. First, a private party might be subject to RFRA if "acting under color of law." 42 U.S.C. § 2000bb-2(1); *Brownson v. Bogenschutz*, 966 F. Supp. 795, 798 (E.D. Wis. 1997). That occurs only when the "state has so implicated itself in the defendant's action that the state has in effect compelled the action." *Starnes v. Capital Cities Media, Inc.*, 39 F.3d 1394, 1396 (7th Cir. 1994). Simply following generally applicable law such as the provisions of the Bankruptcy Code, as the Committee does in the performance of its duties, does not constitute acting under color of law.

Second, a private actor might be subject to a RFRA claim if it "willfully participated in joint action with state officials." *Starnes*, at 1396. The Cemetery Trust provided no evidence—nor can it—that the Committee has acted with any state official, let alone willfully participated in joint action with state officials. At no time has the Committee acted under the direction of or in concert with the Court, the OUST or any other instrument of the government in connection with its decisions and strategy in the prosecution of the claims asserted in the Cemetery Trust Litigation. The Committee is autonomous and all of its decisions are entirely independent.

The Bankruptcy Court applied the governmental nexus test to determine if the Committee was acting under color of law; if there was a sufficient nexus between the private entity and the government, the private party could be said to be acting under color of law. *Listecki v. Official Committee*, 485 B.R. at 390-91. The Bankruptcy Court held that the Committee was not acting under color of law; there was no nexus, no joint action, and no allegations of conspiracy or official cooperation between the government and the Committee. *Id.*

The District Court reversed, holding that the "pursuit of claims on behalf of a bankruptcy estate is a traditional public function" and further asserting:

> [T]he debtor-in-possession is an officer of the court charged with the duty to act for the benefit of the bankruptcy estate. By giving the Committee derivative standing to bring claims on behalf of the estate, the bankruptcy court effectively transferred the responsibility for performing this traditional public function from the Archdiocese, as debtor-in-possession, to the Committee. Stated another way, because of its inability to pursue legal action against the Trust, the Archdiocese, in conjunction with the bankruptcy court, delegated this function to the Committee, a function that is "traditionally the exclusive prerogative" of the government. *Jackson*, 419 U.S. at 353.

*Listecki v. Official Committee*, 496 B.R. at 917. There are two problems with the District Court's conclusion. First, the Supreme Court disagrees. In *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 55-56 (1989), the Supreme Court held that a bankruptcy trustee's right to recover a fraudulent conveyance was a private right, not a public one, for the purpose of determining the defendant's right to a jury trial. The Supreme Court explained:

> There can be little doubt that fraudulent conveyance actions by bankruptcy trustees-suits which, we said in *Schoenthal v. Irving Trust Co.,*287 U.S., at 94-95, 53 S.Ct., at 51 (citation omitted), "constitute no part of the proceedings in bankruptcy but concern controversies arising out of it"-are quintessentially suits at common law that more nearly resemble state-law contract claims brought by a bankrupt corporation to augment the bankruptcy estate than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res. *See Gibson* 1022-1025. They therefore appear matters of private rather than public right.

*Id*. at 56. Therefore, the District Court's holding on this issue was in error and must be reversed.

Second, even the District Court's decision did not directly contradict *Granfinanciera*, the District Court misapplied the public function test by omitting the "exclusivity" requirement. In *Jackson v. Metro. Edison Co.,* 419 U.S. 345 (1974), the Supreme Court stated, "We have, of course, found state action present in the exercise by a private entity of powers traditionally *exclusively* reserved to the State." *Id*. at 352 (emphasis added); *see also Swanson v. Horseshoe*

26

*Hammond, LLC*, 445 Fed. Appx. 868, *2 (7th Cir. 2011) (no state action where defendant casino

detained a trespasser because "the power to arrest and detain is not *exclusively* reserved to the

government"), *cert. denied*, ___ U.S. ___, 132 S.Ct. 1650 (2012). The Supreme Court continued:

> If we were dealing with the exercise by [the utility company] of some
> power delegated to it by the State which is traditionally associated with
> **sovereignty**, such as eminent domain, our case would be quite a different
> one. But while the Pennsylvania statute imposes an obligation to furnish
> service on regulated utilities, it imposes no such obligation on the State.
> The Pennsylvania courts have rejected the contention that the furnishing of
> utility services is either a state function or a municipal duty.

*Id*. at 352-53 (emphasis added). The government is not now, nor has it ever been  in the business

of bringing lawsuits to recover fraudulent transfers. It is neither a power traditionally

"exclusively" reserved to the state, nor is it traditionally associated with "sovereignty." In fact, in

this case, the right to do so lay *exclusively* with the Debtor prior to its assignment to the

Committee. To the extent that the District Court's implication is that a debtor-in-possession itself

is a government actor simply by virtue of filing a bankruptcy case and fulfilling its fiduciary

duties to creditors, this conclusion is wholly without authority and at odds with the Supreme

Court's description of the chapter 11 debtor in *Stern v. Marshall*,___ U.S. ___, 131 S.Ct. 2594,

2614 (2011) as a "private party." Therefore, the Committee does not qualify as a state actor

under the "public function" analysis, a rigorous test that is rarely met. *See Rodriguez v. Plymouth

Ambulance Service*, 577 F.3d 816, 824 n.11 (7th Cir. 2009) ("We noted in *Vickery v. Jones*, 100

F.3d 1334 (7th Cir. 1996) that the court has rarely found this test met in modern times.").

Courts have held, in other contexts, that creditors' committees are non-government private

parties, and that their actions in connection with a bankruptcy cannot be viewed as governmental

actions or as part of a government action. In *In re Dow Corning Corp.*, 255 B.R. 445 (E.D. Mich.

2000), the court rejected the argument that an approved joint plan of reorganization proposed by

the debtor and the creditors' committee violated a creditor's constitutional rights and noted,

27

"Appellants have cited no authority that a Bankruptcy Court or any court's approval of an order establishes a governmental action. A governmental action is required to state a constitutional claim and a 'mere approval of or acquiescence in the initiatives *of a private party* is not sufficient to justify holding the government responsible for those initiatives.'" *Id.* at 523. (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1002 (1982). *See also Fuel Oil Supply & Terminaling v. Gulf Oil Corp.*, 762 F.2d 1283, 1286 (5th Cir. 1985) (holding that a creditors' committee did not have an unconditional right to intervene in an adversary proceeding because "private parties are rarely given an unconditional statutory right to intervene.").

The District Court also erroneously concluded that because committee members are entitled to qualified immunity, they act under color of law. *Listecki v. Official Committee*, 496 B.R. at 917. None of the cases cited by the District Court hold that because an individual (much less a creditors' committee in a bankruptcy case) is entitled to qualified immunity, he or she is, therefore, acting under color of law for the purpose of RFRA, the Bill of Rights, or any federal civil rights statute. The District Court confused two distinct concepts-qualified immunity and state action.

Furthermore, why would any creditor ever agree to sit on a creditors' committee if it did not have qualified immunity? These are ordinary people, laypeople, who are assisting in a complicated reorganization process. In the same way that members of the board of directors of a nonprofit or a for-profit corporation are protected from acts of ordinary negligence by directors and officers insurance, members of a creditors' committee are protected by implied qualified immunity. It does not turn them into the government for RFRA or any other purpose. *See Luedke v. Delta Air Lines, Inc.*, 159 B.R. 385, 393 (S.D.N.Y. 199) (holding that the heightened pleading standard required to lift the qualified immunity of officials performing core governmental

functions is "unlikely to be extended to actions brought against persons, such as the Committee and its members, appointed by government officials to look after their own private interests and the interests of those who are similarly situated.").

Finally, the District Court's reliance on *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614 (1991) is misplaced. In *Edmonson*, the court held that when making peremptory challenges based on racial discrimination, private litigants may be serving a governmental function and may be accountable for constitutional violations. *Id.* at 628. Here, however, the Committee cannot be equated with private civil rights litigants exercising their rights to peremptory challenges. The private civil rights litigants in *Edmonson* were acting so as to create a jury composed of members of the public. This is distinct from the role of the Committee members here, who are present in court not to represent the public, but for the limited purpose of representing the private interests of creditors seeking compensation from the bankrupt estate. This is outside the scope of a governmental function and the District Court's parallel conclusion between *Edmonson* and this case was erroneous.

### 2.      The First Amendment May Only be Invoked Against A Government Actor

While RFRA is explicit that it may only be used against "a government," constitutional rights occasionally, though rarely, may be asserted against private actors. As a matter of well-established law, a private party can be viewed as a government actor "only in rare circumstances." *Harvey v. Harvey*, 949 F.2d 1127, 1130 (11th Cir. 1992). A private party is not liable for constitutional violations unless it was operating "under color of law" (addressed above) or "willfully participating in joint action with government officials." To determine whether a private actor can be treated as a government actor under the First Amendment, courts consider whether any of the following three conditions are met: (1) the government has coerced or at least

29

significantly encouraged the action alleged to violate the Constitution; (2) the private party

performed a public function, or (3) the government has so insinuated itself into a position of

interdependence with the private party that it was a joint participant in the enterprise. *See*

*Rayburn v. Hogue*, 241 F.3d 1341, 1347 (11th Cir. 2001). None of these conditions are met in

this case.

The Committee does not begin to meet the requirements to be considered a government

actor under the analysis applicable to constitutional claims. First, the federal government has not

coerced or significantly encouraged the Committee to violate the Cemetery Trust's Free Exercise

rights. Nor does the Committee perform a public function. For the "public function" analysis to

apply, the function must be one that has traditionally been exclusively the domain of the

government. As was noted above, the Committee is not exercising powers traditionally

exclusively reserved to the state. Instead, the Committee is a private group of individuals who

are exercising their rights to collect private debts from the Debtor. The state and federal

bankruptcy laws are not obligating the state to step in. *See also Flagg Bros., Inc. v. Brooks*, 436

U.S. 149, 161 (1978) (settlement of disputes between debtors and creditors is not traditionally an

exclusive public function).

**C.    The District Court's Conclusions Regarding Substantial Burden Never Should Have Been Reached and Are Erroneous.**

The District Court never should have reached the RFRA or First Amendment arguments on

the merits, because the issue of "substantial burden" is a threshold prerequisite for both issues on

the merits, and the parties agreed to set aside the substantial burden issue, which the Bankruptcy

Court approved. Until a free exercise claimant has borne its burden of proving a substantial

burden, no free exercise claim can or should be reached by the federal courts. The issue is a

matter of fact, and no discovery or fact-finding was done below to support the Cemetery Trust's

burden of proving a substantial burden on religious conduct. Nevertheless, the District Court forged ahead, deciding the substantial burden issue and then the free exercise merits. Without conceding the inappropriateness of the District Court's choice to decide these issues, the Committee addresses the merits below.

### 1. The District Court Should Not Have Reached the Substantial Burden Fact Issue Without Discovery Under Any Theory.

The parties (and the Bankruptcy Court) agreed not to address the substantial burden issue and the Bankruptcy Court explicitly declined to rule on it, noting that it would be inappropriate and unprecedented given the fact that the Committee is not the government. *Id.,* 485 B.R. at 388. The Bankruptcy Court correctly stated that ruling on substantial burden under RFRA, the First Amendment, or both, would require a finding that the creditors' committee is the government, and "[t]his is a leap of faith the Court will not make." *Id.* Given the court's direct and clear handling of this issue below, it was improper for the District Court to rule on it.[11]

The free exercise claimant bears the burden of proving "substantial burden" as a threshold issue, whether based on RFRA or the First Amendment's Free Exercise Clause, and it has been treated, until now, as a fact question, or at most, a mixed question of fact and law. *Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058, 1076 (9th Cir. 2008) ("The additional statutory requirement of a least restrictive means is triggered only by a finding that a substantial burden exists...Absent a

---

[11] It is also inappropriate for this Court to consider it because it is fact-based and unripe. *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). As the Bankruptcy Court noted, it is premature to know how much, if any, of the Cemetery Trust's assets might be included in the ultimate plan of reorganization. *In re Archdiocese of Milwaukee*, 485 B.R. at 388. *See also Duke Power Co. v. Carolina Envt'l Study Grp.*, 438 U.S. 59, 81 (1978). The mere recovery of the Transferred Funds for the benefit of the estate does not preclude the use of some or all of the money for the perpetual care of the Debtor's cemeteries. The ripeness requirement exists for the purpose of ensuring that federal courts have an adequate factual base on which to reach decisions, and do not issue advisory opinions. *Abbott Labs v. Gardner*, 387 U.S. 136, 148 (1967). Any burden or injury to the Cemetery Trust in this dispute is purely speculative at this stage and unripe.

substantial burden, the government need not establish a compelling interest, much less prove it has adopted the least restrictive means."), *cert. denied*, 556 U.S. 1281 (2009).

The SJ Decision relieved the Cemetery Trust of that burden of proof, and denied the Committee any opportunity for discovery. Because the District Court unilaterally deemed the Listecki Declaration "uncontroverted," without discovery, fact-finding, briefing, or oral argument, the Committee never had the opportunity to dispute its factual inaccuracies or to test the sincerity of the statement. For example, in the SJ Decision, the District Court found (based solely on the Listecki Declaration) that "the funds that comprise the Trust's principal took nearly a century to accumulate and include approximately $55 million that had been held, separately for that period, for the perpetual care of the Milwaukee Catholic Cemeteries even prior to being transferred to the Trust in or around March of 2008 . . .").  *Listecki v. Official Committee*, 496 B.R. at 910. Had the Committee had an opportunity to introduce factual evidence to contradict the Listecki Declaration, it would have shown that prior to 2008, the perpetual care funds were comingled with the Debtor's general operating funds and were not designated as trust funds on the Debtor's own financial statements.

> **2.      The District Court Failed to Observe the Proper Burden of Proof for "Substantial Burden" Analysis Under RFRA or the Necessity of Fact-finding.**

Perhaps the most troubling portion of the decision reached by the District Court was its holding that for the purpose of analyzing whether a government action creates a substantial burden on the free exercise of religion, the burden of proving substantial burden is satisfied according to whatever the believer says it is. Specifically, the District Court conceded that the issue was not addressed below, but forged ahead to state:

> That being said, *Archbishop's declaration stands unopposed, and on the issue of religious doctrine, it is unassailable. Moreover the issue of substantial burden is essentially coterminous with religious doctrine.*

32

> Canon law dictates that the funds in the Trust must be used for the perpetual care of those interred under the tenets of the Catholic faith. Removing some or all of these funds from the Trust and placing them in the bankruptcy estate would undoubtedly put "substantial pressure" on Archbishop Listecki and the Trust to "modify [their] behavior" and "violate [their] beliefs." *No amount of discovery can change canon law.* In this context, the transfer of funds from the Trust to the estate would meet the substantial burden test.

*Listecki v. Official Committee*, 496 B.R. at 921 (emphasis added) (citations omitted, quoting *Koger v. Bryan*, 523 F.3d 789, 799 (7th Cir. 2008)). The decision leapfrogs over the standard substantial burden issues, all of which require fact-finding. Frequently, and legitimately, defendants challenge a free exercise claim based on sincerity. *Reed v. Faulkner*, 842 F.2d 960, 962 (7th Cir. 1988). There is reason to doubt Archbishop Listecki's sincerity in this case, based on the actions of other bishops dealing with claims of survivors. For example, Cardinal Mahoney used cemetery funds to cover the payment of victims' claims in Los Angeles. Harriet Ryan, *Cardinal Mahoney Used Cemetery Money To Pay Sex Abuse Settlement*, Los Angeles Times (Feb. 9, 2013), http://articles.latimes.com/2013/feb/09/local/la-me-church-cemetery-fund-20130210. Sapp. at 487.

If this were the proper application of the doctrine, churches could obtain any zoning they choose simply by stating that they believe their chosen location is the best location and tax objectors could avoid payment of federal taxes by asserting they do not believe in paying the taxes. In other words, the reasoning of the decision would require the reversal of *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752 (7th Cir. 2003), *cert. denied,* 541 U.S. 1096 (2004), and *United States v. Lee*, 455 U.S. 252 (1982).

The District Court violated the Committee's rights under the Due Process Clause, as well as the Establishment Clause, by unilaterally deciding that the Cemetery Trust had satisfied its burden of proving a substantial burden based on a unilateral and unchallenged affidavit raised on

33

an appeal, and even though the parties and Bankruptcy Court had agreed **to set the issue aside, as discovery was required for its resolution.** It is fundamentally unfair for a District Court to reach a decision in a bankruptcy case on an issue that the parties agreed to set aside before the Bankruptcy Court, because it requires discovery, before discovery on the issue ever occurs. *See, e.g., Mitchell v. Esparza*, 540 U.S. 12 (2003) (holding that the court violated defendant's due process rights when it sustained a death sentence for a charge that had not been issued to the jury). It is also a rank preference for one religion over all other religions raising free exercise claims, and irreligion generally. *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1 (1989); *Wallace v. Jaffree*, 472 U.S. 38 (1985); *Thornton v. Caldor*, 472 U.S. 703 (1985). Free exercise litigation should not be a game of "gotcha."

> ### 3. The District Court Erred in Granting Summary Judgment Under the First Amendment Based on a Theory that the Bankruptcy Code Imposes a Substantial Burden on the Trust.

It is well-settled that neutral, generally applicable laws are subject to rationality review under the First Amendment's Free Exercise Clause. *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 1001 (7th Cir. 2006), *cert. denied*, 552 U.S. 940 (2007); *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 762-65 (7th Cir. 2003), *cert. denied*, 541 U.S. 1096 (2004). Rationality review requires no more than a showing that the government has a rational basis for the law. *See Sherbert v. Verner*, 374 U.S. 398, 406 (1963); *St. John's United Church of Christ*, 502 F.3d 616, 637-38 (7th Cir. 2007). A more exacting standard – strict scrutiny – is reserved for instances in which the law is either not neutral or not generally applicable. *See Emp't Div. v. Smith*, 494 U.S. 872, 879-80 (1990); *Sherbert v. Verner*, 374 U.S. at 406; *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 542 (1993).

The District Court held that certain Bankruptcy Code provisions (presumably at a minimum Bankruptcy Code sections 541, 544, 547 and 548 (the "Challenged Bankruptcy Provisions"),

violate the Trustee's constitutional free exercise of religion, despite the fact that the law is neutral and generally applicable, which should have led the District Court to uphold the Bankruptcy Code provisions under *Emp't Div. v. Smith*, 494 U.S. 872 (1990). *Listecki v. Official Committee*, 496 B.R. at 922.  Without justifying its reasoning, or citing any case that justified its leap in logic, the District Court jumped to strict scrutiny, concluding that although the law was facially neutral, "the burden on the Trustee's free exercise of religion is substantial, [and] there is no compelling governmental interest which can justify the burden." *Id*. at 922-23.

The District Court erroneously relied upon *Vision Church v. Vill of Long Grove*, 468 F.3d 975 (7th Cir. 2006), *cert. denied*, 552 U.S. 940 (2007), and *St. John's United Church of Christ v. City of Chi.*, 502 F.3d 616 (7th Cir. 2007), to justify its conclusion that strict scrutiny is the appropriate standard of review in this case. *St. John's Church of Christ* was based on the Illinois Religious Freedom of Restoration Act, and so its analysis is not applicable here. In *Vision Church*, the court stated in dictum that strict scrutiny will only be applied when the neutral and generally applicable law imposes an undue burden on the religious organization. 468 F.3d at 997. The District Court takes this statement out of context, and fails to follow the rest of the reasoning in *Vision Church*, which also held that incidental burdens on the religious organization resulting from a neutral and generally applicable law are not sufficient to rise to the level of a substantial burden, and would not raise the analysis to strict scrutiny. *Id.* at 998. The District Court in this case should not have reached, without discovery, either the question whether the burden is substantial or undue, and therefore, *Vision Church* is inapposite.

As the Bankruptcy Court correctly held, the Challenged Bankruptcy Provisions are neutral and generally applicable and, therefore, constitutional under the Free Exercise Clause. *Listecki v. Official Committee*, 485 B.R. at 392-93. *See Civil Liberties for Urban Believers v. City of*

*Chicago*, 342 F.3d at 752; *Harting v. Tri-City Baptist Temple (In re Gomes)*, 219 B.R. 286, 295-

96 (Bankr. D. Or. 1998); *Weinman v. Word of Life Christian Ctr. (In re Bloch)*, 207 B.R. 944,

950 (Bankr. D. Colo. 1997). Section 541 is neutral with respect to any religion as it merely

identifies what state-defined property is included in the bankruptcy estate. In *Tort Claimants*

*Comm. v. Roman Catholic Archbishop of Portland (In re Roman Catholic Archbishop of*

*Portland)*, 335 B.R. 842, 860 (Bankr. D. Or. 2005), the court questioned how enforcing

bankruptcy and state law to determine what property was part of the bankruptcy estate could

substantially burden religion at all. "A determination under § 541 is simply a determination of

status, that is, who owns property. It is hard to understand how the court's determination of what

constitutes property of the bankruptcy estate under § 541 could impose a substantial burden on

the exercise of religion." *Id.* at 861.

With regard to the Bankruptcy Code's strong-arm and avoiding powers (sections 544, 547,

548, 549), their neutral purpose has been characterized as follows:

> One of the underlying notions of avoiding powers [within bankruptcy law]
> is the idea that private agreements that might be good for the debtor and a
> single creditor (in this case, the church) might not be good for creditors as
> a whole. Advocates for churches sometimes seem to forget that the money
> recovered by the trustee is intended for unsecured creditors whom, after
> all, the debtor has also promised to repay.

Mary Jo Newborn Wiggins, *A Statute of Disbelief?: Clashing Ethical Imperatives in Fraudulent*

*Transfer Law*, 48 S.C. L. Rev. 771, 784 (1997). None of the Challenged Bankruptcy Provisions

were drafted to target religious actors, and they do not operate to single out religious actors.

Quite to the contrary, they operate neutrally and generally across all those debtors, religious or

not religious, who would choose to file for voluntary bankruptcy, and all creditors affected by

such filings and/or other transferees that might be the target of an avoidance action. Thus, under

the Free Exercise Clause, rationality review governs their constitutionality.

36

Without a doubt, the avoidance provisions serve a rational interest:

> At the heart of bankruptcy's fraudulent transfer law lies the notion that creditors should be protected from attempts (actually or constructively fraudulent) to deplete assets that would have otherwise gone to deserving creditors. Because of this notion, even innocent actions that would be permissible outside of bankruptcy are not permissible inside of bankruptcy, or when a bankruptcy is likely.

Wiggins, *supra, A Statute of Disbelief?*, 48 S.C. L. Rev. at 780. Therefore, the Challenged Bankruptcy Provisions can be applied to the Cemetery Trust without concern that the First Amendment is being abridged. *See United States v. Kras*, 409 U.S. 434, 446-47 (1973).

**D.     The District Court Should Not Have Reached the Compelling Interest and Least Restrictive Means Issues, and, Assuming It Was Appropriate, Erred in Reaching these issues under RFRA and the First Amendment.**

Even if the Cemetery Trust had actually succeeded in showing a substantial burden in the context of fair and evenhanded discovery, and under RFRA strict scrutiny were required; or it had prevailed under a fair process to prove a substantial burden and it had shown that the Challenged Bankruptcy Provisions are either not neutral or not generally applicable, the Challenged Bankruptcy Provisions would stand because they serve a compelling interest, and do so in the only means possible to serve the ends of federal bankruptcy law. *See Morris v. Midway Southern Baptist Church (In re Newman)*, 183 B.R. 239, 252 (Bankr. D. Kan. 1995), *aff'd*, 203 B.R. 468 (D. Kan. 1996). As the *Newman* court noted:

> Section 548(a)(2) draws a line between proper and improper diminution in what would seem to be the only practical way: by determining whether the quantifiable economic value received by the debtor is reasonably equivalent to that of the property transferred. As stated above, this standard is neutral toward religion and can operate to avoid non-religious transfers where no economic value is received by the debtor.

*Newman*, 203 B.R. 468, 475, n.4 (Bankr. D. Kan. 1996). *See also In re Meyer*, 467 B.R. 451, 460-61 (Bankr. E.D. Wis. 2012); *In re Navarro*, 83 B.R. 348, 353 (Bankr. E.D. Pa. 1988) (pre-RFRA; administration of bankruptcy system and protection of legitimate interests of creditors are

compelling governmental interests). Accordingly, the application of the Challenged Bankruptcy

Provisions satisfy strict scrutiny and should have been upheld under either RFRA or the First

Amendment.

**E.      RFRA May Not Be Applied To Modify, Preempt Or Trump State Law**

> **1.      The District Court erred when it held that *City of Boerne v. Flores* is no obstacle to applying RFRA in this Case.**

In *City of Boerne v. Flores*, 521 U.S. 507 (1997), the Supreme Court held that RFRA was a

violation of (1) the inherent limitations of federalism (*Id.* at 534); (2) the separation of powers

(*Id.* at 536), and (3) the procedures for constitutional amendment in Article V of the Constitution

(*Id.* at 529). At a bare minimum, RFRA is beyond Congress's power to regulate the states and

any attempt to modify, preempt, or trump state law through RFRA is unconstitutional.

At issue in the Cemetery Trust Litigation is whether the funds held in the Cemetery Trust

and/or the Cemetery Trust itself are property of the Debtor's bankruptcy estate and whether

transfers of property from the Debtor to the Cemetery Trust may be avoided. The District Court

concluded that because "the ultimate issue of whether or not property can be brought into the

bankruptcy estate is governed solely by the Bankruptcy Code . . . *Boerne* is no obstacle to the

application of RFRA in this case." *Listecki v. Official Committee*, 496 B.R. at 914. This is simply

incorrect. While Bankruptcy Code section 541 defines what property of the debtor's becomes

part of the bankruptcy estate, the nature and extent of the debtor's interest in that property is

governed by state law. *See Butner v. United States*, 440 U.S. 48, 55 (1979). In order to determine

whether funds transferred to the Cemetery Trust are property of the Debtor's estate, the trial

court will have to determine, for example, whether the funds transferred by the Debtor to the

Cemetery Trust were held in a resulting trust under Wisconsin law prior to the time they were

transferred as alleged by the Debtor and the Cemetery Trust and whether the Cemetery Trust is

void as a self-settled trust in which the Debtor is a beneficiary pursuant to Wisconsin Statutes

section 701.06 (6). RFRA cannot apply to a determination of a status of property that is governed

solely by state law. *Roman Catholic Archbishop of Portland*, 335 B.R. at 860.

Furthermore, while the Committee has standing to bring the fraudulent conveyance causes of

actions against the Cemetery Trust pursuant Bankruptcy Code section 544(b), the substantive

law that applies to the underlying causes of action for the recovery of the fraudulent conveyance

are governed exclusively by Wisconsin state law (specifically, Wis. Stats. §§ 242.04(1)(a),

242.04(1)(b), 242.05(1), 242.07). Any "substantial" burden that is placed on a transferee's

religious practice is imposed on it by the state law, and accordingly, *Boerne* prohibits the

application of RFRA to these claims for relief.

The District Court erroneously relied on *Christians v. Crystal Evangelical Free Church (In

re Young)*, 141 F.3d 854 (8th Cir. 1998), *cert denied*, 525 U.S. 811 (1998), to support its

decision. In that case, the Eighth Circuit found that RFRA amended the Bankruptcy Code and

"engrafted the additional clause to section 548(a)(2)(A) that a recovery that places a substantial

burden on a debtor's free exercise will not be allowed unless it is the least restrictive means to

satisfy a compelling governmental interest." *Id.* at 861. Although the court there found that

avoiding tithes as fraudulent transfers violated RFRA because protecting the interests of creditors

and allowing a debtor a fresh start were not compelling interests, *Young* is distinguishable on

several grounds. First, here, the Committee is suing under state law grounds, which makes *Young*

inapplicable. Moreover, under *Boerne*, RFRA may not be applied to a state law cause of action.

Additionally, *Young* was decided prior to Congress's subsequent amendment to the Bankruptcy

Code under the Religious Liberty and Charitable Donation Protection Act of 1998 ("RLCDPA"),

which amended numerous Bankruptcy Code sections to limit the ability of a trustee to recover

charitable donations made by a natural person to qualified charitable or religious organizations. *See* 11 U.S.C. §§ 548(a)(2), 548(d)(3), 544(b)(2). If Congress had intended RFRA to amend section 548 or any other section of the Bankruptcy Code, as the *Young* court claimed, RLCDPA would not have been necessary or enacted. Furthermore, tithing cases can be distinguished from avoidance issues in the Cemetery Trust litigation because in the tithing cases, the individual debtor had no choice about how to give the money to the church and no matter how tithing was accomplished, the transfer could be avoided by the trustee. Here, the Debtor could have avoided the application of the fraudulent transfer law by properly holding funds received from the purchasers of the burial rights in a segregated account pursuant to an express written trust agreement under state law.[12]

In addition, in the tithing cases, there is no concern that debtors are tithing to intentionally defraud creditors. In this case, allowing the Cemetery Trust to insulate itself from avoidance actions as a result of the Debtor's voluntary election to file a chapter 11 petition flies in the face of logic, common sense and the clear purpose of the Bankruptcy Code. As state law may not be re-interpreted through the lens of RFRA, the District Court must be reversed on this issue.

## CONCLUSION

For the reasons set forth above, the Committee asks this Court to: (a) issue a writ of mandamus directing the Honorable Rudolph T. Randa, United States District Judge for the Eastern District of Wisconsin, to recuse himself from presiding over the Cemetery Trust Litigation and any Cemetery Related Proceedings pursuant to 28 U.S.C. sections 455(b)(4) and 455(a); (b) vacate the Recusal Order, Judgment and SJ Decision; or, alternatively, (c) reverse the

---

[12]Under Wisconsin law, if alleged trust funds are commingled with non-trust funds (as they were here prior to their transfer to the Cemetery Trust in 2008), the party seeking to uphold the trust must be able to trace the trust funds or the trust will fail. *Burnham v. Barth*, 89 Wis. 362, 62 N.W. 96, 98-99 (1895).

Judgment and SJ Decision; and (d) enter summary judgment in favor of the Committee on the legal issues in its MPSJ.


[remainder of page left intentionally blank]

Respectfully submitted,

Dated: January 15, 2014         By    _/s/ Marci A. Hamilton, Esq._
                                      Marci A. Hamilton, Esq.
                                      36 Timber Knoll Drive
                                      Washington Crossing, PA 18977
                                      Telephone: (215) 353-8984
                                      Email: Hamilton.marci@gmail.com

                                      Special Counsel to the Official Committee
                                      of Unsecured Creditors


                                PACHULSKI STANG ZIEHL & JONES LLP


                                By    _/s/ James Stang_
                                      James I. Stang (CA Bar No. 94435)
                                      Kenneth H. Brown (CA Bar No. 100396)
                                      Gillian N. Brown (CA Bar No. 205132)
                                      Erin Gray (CA Bar No. 157658)
                                      Pachulski Stang Ziehl & Jones LLP
                                      10100 Santa Monica Blvd., 13th Floor
                                      Los Angeles, CA 90067
                                      Telephone: (310) 277-6910
                                      Facsimile: (310) 201-0760
                                      E-mail:   jstang@pszjlaw.com
                                                kbrown@pszjlaw.com
                                                gbrown@pszjlaw.com
                                                egray@pszjlaw.com

                                      -and-

                                      Albert Solochek (State Bar No. 1011075)
                                      Howard, Solochek & Weber, S.C.
                                      324 E. Wisconsin Ave., Suite 1100
                                      Milwaukee, WI 53202
                                      Telephone: (414) 272-0760
                                      Facsimile: (414) 272-7265
                                      E-mail:   asolochek@hswmke.com

                                      Attorneys for the Official Committee of
                                      Unsecured Creditors

**CERTIFICATE OF COMPLIANCE WITH**
**TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS,**
**AND TYPE STYLE REQUIREMENTS**

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,737 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 with 12 point Times New Roman font.

Dated: January 15, 2014                 By    */s/ Marci A. Hamilton, Esq.*
                                               Marci A. Hamilton, Esq.
                                               36 Timber Knoll Drive
                                               Washington Crossing, PA 18977
                                               Telephone: (215) 353-8984
                                               Email: Hamilton.marci@gmail.com

                                               Special Counsel to the Official Committee
                                               of Unsecured Creditors

43

# ADDENDUM OF STATUTES

DOCS_LA:274534.10

**Statutes**

11 U.S.C. § 101(5)

11 U.S.C. § 101(27)

11 U.S.C. § 101(41)

11 U.S.C. § 330

11 U.S.C. § 503

11 U.S.C. § 541

11 U.S.C. § 544

11 U.S.C. § 547

11 U.S.C. § 548

11 U.S.C. § 549

11 U.S.C. § 1102

11 U.S.C. § 1103

28 U.S.C. § 157

28 U.S.C. § 455

28 U.S.C. § 1291

28 U.S.C. § 1334

28 U.S.C. § 1651

42 U.S.C.A . § 2000bb-1

42 U.S.C.A . § 2000bb-2

Wis. Stats. § 242.04

Wis. Stats. § 242.05

Wis. Stats. § 242.07

Wis. Stats. § 701.06

**Other Authorities**

Code of Conduct for United States Judges

First Amendment to the United States Constitution

Religious Liberty and Charitable Donation Protection Act of 1998

**Rules**

Fed. R. Civ. P. 60

operating agreement.

**(3)** The term "assisted person" means any person whose debts consist primarily of consumer debts and the value of whose nonexempt property is less than $186,825 [FN1].

**(4)** The term "attorney" means attorney, professional law association, corporation, or partnership, authorized under applicable law to practice law.

**(4A)** The term "bankruptcy assistance" means any goods or services sold or otherwise provided to an assisted person with the express or implied purpose of providing information, advice, counsel, document preparation, or filing, or attendance at a creditors' meeting or appearing in a case or proceeding on behalf of another or providing legal representation with respect to a case or proceeding under this title.

**(5)** The term "claim" means--

**(A)** right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

**(B)** right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

**(6)** The term "commodity broker" means futures commission merchant, foreign futures commission merchant, clearing organization, leverage transaction merchant, or commodity options dealer, as defined in section 761 of this title, with respect to which there is a customer, as defined in section 761 of this title.

**(7)** The term "community claim" means claim that arose before the commencement of the case concerning the debtor for which property of the kind specified in section 541(a)(2) of this title is liable, whether or not there is any such property at the time of the commencement of the case.

**(7A)** The term "commercial fishing operation" means--

**(A)** the catching or harvesting of fish, shrimp, lobsters, urchins, seaweed, shellfish, or other aquatic species or products of such species; or

**(B)** for purposes of section 109 and chapter 12, aquaculture activities consisting of raising for market any species or product described in subparagraph (A).

**(7B)** The term "commercial fishing vessel" means a vessel used by a family fisherman to carry out a

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

with respect to each agreement or transaction under such master agreement that is referred to in subparagraph (A), (B), or (C); or

**(E)** any security agreement or arrangement, or other credit enhancement related to any agreement or transaction referred to in subparagraph (A), (B), (C), or (D), including any guarantee or reimbursement obligation by or to a forward contract merchant or financial participant in connection with any agreement or transaction referred to in any such subparagraph, but not to exceed the damages in connection with any such agreement or transaction, measured in accordance with section 562.

**(26)** The term "forward contract merchant" means a Federal reserve bank, or an entity the business of which consists in whole or in part of entering into forward contracts as or with merchants in a commodity (as defined in section 761) or any similar good, article, service, right, or interest which is presently or in the future becomes the subject of dealing in the forward contract trade.

**(27)** The term "governmental unit" means United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government.

**(27A)** The term "health care business"--

**(A)** means any public or private entity (without regard to whether that entity is organized for profit or not for profit) that is primarily engaged in offering to the general public facilities and services for--

**(i)** the diagnosis or treatment of injury, deformity, or disease; and

**(ii)** surgical, drug treatment, psychiatric, or obstetric care; and

**(B)** includes--

**(i)** any--

**(I)** general or specialized hospital;

**(II)** ancillary ambulatory, emergency, or surgical treatment facility;

**(III)** hospice;

**(40B)** The term "patient records" means any record relating to a patient, including a written document or a record recorded in a magnetic, optical, or other form of electronic medium.

**(41)** The term "person" includes individual, partnership, and corporation, but does not include governmental unit, except that a governmental unit that--

    **(A)** acquires an asset from a person--

        **(i)** as a result of the operation of a loan guarantee agreement; or

        **(ii)** as receiver or liquidating agent of a person;

    **(B)** is a guarantor of a pension benefit payable by or on behalf of the debtor or an affiliate of the debtor; or

    **(C)** is the legal or beneficial owner of an asset of--

        **(i)** an employee pension benefit plan that is a governmental plan, as defined in section 414(d) of the Internal Revenue Code of 1986; or

        **(ii)** an eligible deferred compensation plan, as defined in section 457(b) of the Internal Revenue Code of 1986;

        shall be considered, for purposes of section 1102 of this title, to be a person with respect to such asset or such benefit.

**(41A)** The term "personally identifiable information" means--

    **(A)** if provided by an individual to the debtor in connection with obtaining a product or a service from the debtor primarily for personal, family, or household purposes--

        **(i)** the first name (or initial) and last name of such individual, whether given at birth or time of adoption, or resulting from a lawful change of name;

        **(ii)** the geographical address of a physical place of residence of such individual;

        **(iii)** an electronic address (including an e-mail address) of such individual;

c

**Effective:[See Notes]**

United States Code Annotated Currentness
   Title 11. Bankruptcy (Refs & Annos)
      Chapter 3. Case Administration (Refs & Annos)
         Subchapter II. Officers
            → → **§ 330. Compensation of officers**

**(a)(1)** After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee, a consumer privacy ombudsman appointed under section 332, an examiner, an ombudsman appointed under section 333, or a professional person employed under section 327 or 1103--

    **(A)** reasonable compensation for actual, necessary services rendered by the trustee, examiner, ombudsman, professional person, or attorney and by any paraprofessional person employed by any such person; and

    **(B)** reimbursement for actual, necessary expenses.

**(2)** The court may, on its own motion or on the motion of the United States Trustee, the United States Trustee for the District or Region, the trustee for the estate, or any other party in interest, award compensation that is less than the amount of compensation that is requested.

**(3)** In determining the amount of reasonable compensation to be awarded to an examiner, trustee under chapter 11, or professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including--

    **(A)** the time spent on such services;

    **(B)** the rates charged for such services;

    **(C)** whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

    **(D)** whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 13-3495      Document: 10      Filed: 01/15/2014      Pages: 187

**(E)** with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

**(F)** whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

**(4)(A)** Except as provided in subparagraph (B), the court shall not allow compensation for--

**(i)** unnecessary duplication of services; or

**(ii)** services that were not--

**(I)** reasonably likely to benefit the debtor's estate; or

**(II)** necessary to the administration of the case.

**(B)** In a chapter 12 or chapter 13 case in which the debtor is an individual, the court may allow reasonable compensation to the debtor's attorney for representing the interests of the debtor in connection with the bankruptcy case based on a consideration of the benefit and necessity of such services to the debtor and the other factors set forth in this section.

**(5)** The court shall reduce the amount of compensation awarded under this section by the amount of any interim compensation awarded under section 331, and, if the amount of such interim compensation exceeds the amount of compensation awarded under this section, may order the return of the excess to the estate.

**(6)** Any compensation awarded for the preparation of a fee application shall be based on the level and skill reasonably required to prepare the application.

**(7)** In determining the amount of reasonable compensation to be awarded to a trustee, the court shall treat such compensation as a commission, based on section 326.

**(b)(1)** There shall be paid from the filing fee in a case under chapter 7 of this title $45 to the trustee serving in such case, after such trustee's services are rendered.

**(2)** The Judicial Conference of the United States--

**(A)** shall prescribe additional fees of the same kind as prescribed under section 1914(b) of title 28; and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(B)** may prescribe notice of appearance fees and fees charged against distributions in cases under this title;

to pay $15 to trustees serving in cases after such trustees' services are rendered. Beginning 1 year after the date of the enactment of the Bankruptcy Reform Act of 1994, such $15 shall be paid in addition to the amount paid under paragraph (1).

**(c)** Unless the court orders otherwise, in a case under chapter 12 or 13 of this title the compensation paid to the trustee serving in the case shall not be less than $5 per month from any distribution under the plan during the administration of the plan.

**(d)** In a case in which the United States trustee serves as trustee, the compensation of the trustee under this section shall be paid to the clerk of the bankruptcy court and deposited by the clerk into the United States Trustee System Fund established by section 589a of title 28.

CREDIT(S)

(Pub.L. 95-598, Nov. 6, 1978, 92 Stat. 2564; Pub.L. 98-353, Title III, §§ 433, 434, July 10, 1984, 98 Stat. 370; Pub.L. 99-554, Title II, §§ 211, 257(f), Oct. 27, 1986, 100 Stat. 3099, 3114; Pub.L. 103-394, Title I, § 117, Title II, § 224(b), Oct. 22, 1994, 108 Stat. 4119, 4130; Pub.L. 109-8, Title II, § 232(b), Title IV, §§ 407, 415, Title XI, 1104(b), Apr. 20, 2005, 119 Stat. 74, 106, 107, 192.)

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

1978 Acts. Section 330 authorizes the court to award compensation for services and reimbursement of expenses of officers of the estate, and other professionals. The compensation is to be reasonable, for economy in administration is the basic objective. The compensation is to be for actual necessary services, based on the time spent, the nature, the extent and the value of the services rendered, and the cost of comparable services in nonbankruptcy cases. There are the criteria that have been applied by the courts as analytic aids in defining "reasonable" compensation.

The reference to "the cost of comparable services" in a nonbankruptcy case is not intended as a change of existing law. In a bankruptcy cases fees are not a matter for private agreement. There is inherent a "public interest" that "must be considered in awarding fees," *Massachusetts Mutual Life Insurance Co. v. Brock*, 405 F.2d 429, 432 (C.A.5, 1968), cert. denied , 395 U.S. 906 (1969) [89 S.Ct. 1748, 23 L.Ed.2d 220]. An allowance is the result of a balance struck between moderation in the interest of the estate and its security holders and the need to be "generous enough to encourage" lawyers and others to render the necessary and exacting services that bankruptcy cases often require. *In re Yale Express System, Inc.,* 366 F.Supp. 1376, 1381 (S.D.N.Y.1973). The rates for similar kinds of services in private employment is one element, among others, in that balance. Compensation in private employment noted in subsection (a) is a point of reference, not a controlling determinant of what shall be allowed in bankruptcy cases.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



**Effective:[See Notes]**

United States Code Annotated Currentness
   Title 11. Bankruptcy (Refs & Annos)
      Chapter 5. Creditors, the Debtor, and the Estate (Refs & Annos)
         Subchapter I. Creditors and Claims
           ➞➞ **§ 503. Allowance of administrative expenses**

**(a)** An entity may timely file a request for payment of an administrative expense, or may tardily file such request if permitted by the court for cause.

**(b)** After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including--

  **(1)(A)** the actual, necessary costs and expenses of preserving the estate including--

    **(i)** wages, salaries, and commissions for services rendered after the commencement of the case; and

    **(ii)** wages and benefits awarded pursuant to a judicial proceeding or a proceeding of the National Labor Relations Board as back pay attributable to any period of time occurring after commencement of the case under this title, as a result of a violation of Federal or State law by the debtor, without regard to the time of the occurrence of unlawful conduct on which such award is based or to whether any services were rendered, if the court determines that payment of wages and benefits by reason of the operation of this clause will not substantially increase the probability of layoff or termination of current employees, or of nonpayment of domestic support obligations, during the case under this title;

  **(B)** any tax--

    **(i)** incurred by the estate, whether secured or unsecured, including property taxes for which liability is in rem, in personam, or both, except a tax of a kind specified in section 507(a)(8) of this title; or

    **(ii)** attributable to an excessive allowance of a tentative carryback adjustment that the estate received, whether the taxable year to which such adjustment relates ended before or after the commencement of the case;

**(C)** any fine, penalty, or reduction in credit relating to a tax of a kind specified in subparagraph (B) of this paragraph; and

**(D)** notwithstanding the requirements of subsection (a), a governmental unit shall not be required to file a request for the payment of an expense described in subparagraph (B) or (C), as a condition of its being an allowed administrative expense;

**(2)** compensation and reimbursement awarded under section 330(a) of this title;

**(3)** the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by--

**(A)** a creditor that files a petition under section 303 of this title;

**(B)** a creditor that recovers, after the court's approval, for the benefit of the estate any property transferred or concealed by the debtor;

**(C)** a creditor in connection with the prosecution of a criminal offense relating to the case or to the business or property of the debtor;

**(D)** a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title;

**(E)** a custodian superseded under section 543 of this title, and compensation for the services of such custodian; or

**(F)** a member of a committee appointed under section 1102 of this title, if such expenses are incurred in the performance of the duties of such committee;

**(4)** reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under subparagraph (A), (B), (C), (D), or (E) of paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant;

**(5)** reasonable compensation for services rendered by an indenture trustee in making a substantial contribution in a case under chapter 9 or 11 of this title, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title;

**(6)** the fees and mileage payable under chapter 119 of title 28;

**(7)** with respect to a nonresidential real property lease previously assumed under section 365, and subsequently rejected, a sum equal to all monetary obligations due, excluding those arising from or relating to a failure to operate or a penalty provision, for the period of 2 years following the later of the rejection date or the date of actual turnover of the premises, without reduction or setoff for any reason whatsoever except for sums actually received or to be received from an entity other than the debtor, and the claim for remaining sums due for the balance of the term of the lease shall be a claim under section 502(b)(6);

**(8)** the actual, necessary costs and expenses of closing a health care business incurred by a trustee or by a Federal agency (as defined in section 551(1) of title 5) or a department or agency of a State or political subdivision thereof, including any cost or expense incurred--

    **(A)** in disposing of patient records in accordance with section 351; or

    **(B)** in connection with transferring patients from the health care business that is in the process of being closed to another health care business; and

**(9)** the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business.

**(c)** Notwithstanding subsection (b), there shall neither be allowed, nor paid--

**(1)** a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business, absent a finding by the court based on evidence in the record that--

    **(A)** the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;

    **(B)** the services provided by the person are essential to the survival of the business; and

    **(C)** either--

        **(i)** the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

(ii) if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred;

**(2)** a severance payment to an insider of the debtor, unless--

**(A)** the payment is part of a program that is generally applicable to all full-time employees; and

**(B)** the amount of the payment is not greater than 10 times the amount of the mean severance pay given to nonmanagement employees during the calendar year in which the payment is made; or

**(3)** other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

CREDIT(S)

(Pub.L. 95-598, Nov. 6, 1978, 92 Stat. 2581; Pub.L. 98-353, Title III, § 446, July 10, 1984, 98 Stat. 374; Pub.L. 99-554, Title II, § 283(g), Oct. 27, 1986, 100 Stat. 3117; Pub.L. 103-394, Title I, § 110, Title II, § 213(c), Title III, § 304(h)(2), Oct. 22, 1994, 108 Stat. 4113, 4126, 4134; Pub.L. 109-8, Title III, §§ 329, 331, Title IV, § 445, Title VII, § 712(b), (c), Title XI, § 1103, Title XII, §§ 1208, 1227(b), Apr. 20, 2005, 119 Stat. 101, 102, 117, 128, 190, 194, 200.)

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

1978 Acts. Subsection (a) of this section permits administrative expense claimants to file with the court a request for payment of an administrative expense. The Rules of Bankruptcy Procedure will specify the time, the form, and the method of such a filing.

Subsection (b) specifies the kinds of administrative expenses that are allowable in a case under the bankruptcy code. The subsection is derived mainly from section 64a(1) of the Bankruptcy Act [section 104(a)(1) of former Title 11], with some changes. The actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the order for relief, and any taxes on, measured by, or withheld from such wages, salaries, or commissions, are allowable as administrative expenses.

In general, administrative expenses include taxes which the trustee incurs in administering the debtor's estate, including taxes on capital gains from sales of property by the trustee and taxes on income earned by the estate during the case. Interest on tax liabilities and certain tax penalties incurred by the trustee are also included in

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

c

**Effective: December 22, 2010**

United States Code Annotated Currentness
  Title 11. Bankruptcy (Refs & Annos)
    Chapter 5. Creditors, the Debtor, and the Estate (Refs & Annos)
      Subchapter III. The Estate (Refs & Annos)
      → → **§ 541. Property of the estate**

**(a)** The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

**(1)** Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

**(2)** All interests of the debtor and the debtor's spouse in community property as of the commencement of the case that is--

**(A)** under the sole, equal, or joint management and control of the debtor; or

**(B)** liable for an allowable claim against the debtor, or for both an allowable claim against the debtor and an allowable claim against the debtor's spouse, to the extent that such interest is so liable.

**(3)** Any interest in property that the trustee recovers under section 329(b), 363(n), 543, 550, 553, or 723 of this title.

**(4)** Any interest in property preserved for the benefit of or ordered transferred to the estate under section 510(c) or 551 of this title.

**(5)** Any interest in property that would have been property of the estate if such interest had been an interest of the debtor on the date of the filing of the petition, and that the debtor acquires or becomes entitled to acquire within 180 days after such date--

**(A)** by bequest, devise, or inheritance;

**(B)** as a result of a property settlement agreement with the debtor's spouse, or of an interlocutory or final

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 13-3495    Document: 10    Filed: 01/15/2014    Pages: 187

divorce decree; or

**(C)** as a beneficiary of a life insurance policy or of a death benefit plan.

**(6)** Proceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case.

**(7)** Any interest in property that the estate acquires after the commencement of the case.

**(b)** Property of the estate does not include--

**(1)** any power that the debtor may exercise solely for the benefit of an entity other than the debtor;

**(2)** any interest of the debtor as a lessee under a lease of nonresidential real property that has terminated at the expiration of the stated term of such lease before the commencement of the case under this title, and ceases to include any interest of the debtor as a lessee under a lease of nonresidential real property that has terminated at the expiration of the stated term of such lease during the case;

**(3)** any eligibility of the debtor to participate in programs authorized under the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.; 42 U.S.C. 2751 et seq.), or any accreditation status or State licensure of the debtor as an educational institution;

**(4)** any interest of the debtor in liquid or gaseous hydrocarbons to the extent that--

**(A)(i)** the debtor has transferred or has agreed to transfer such interest pursuant to a farmout agreement or any written agreement directly related to a farmout agreement; and

**(ii)** but for the operation of this paragraph, the estate could include the interest referred to in clause (i) only by virtue of section 365 or 544(a)(3) of this title; or

**(B)(i)** the debtor has transferred such interest pursuant to a written conveyance of a production payment to an entity that does not participate in the operation of the property from which such production payment is transferred; and

**(ii)** but for the operation of this paragraph, the estate could include the interest referred to in clause (i) only by virtue of section 365 or 542 of this title;

**(5)** funds placed in an education individual retirement account (as defined in section 530(b)(1) of the Internal

Revenue Code of 1986) not later than 365 days before the date of the filing of the petition in a case under this title, but--

   **(A)** only if the designated beneficiary of such account was a child, stepchild, grandchild, or stepgrandchild of the debtor for the taxable year for which funds were placed in such account;

   **(B)** only to the extent that such funds--

      **(i)** are not pledged or promised to any entity in connection with any extension of credit; and

      **(ii)** are not excess contributions (as described in section 4973(e) of the Internal Revenue Code of 1986); and

   **(C)** in the case of funds placed in all such accounts having the same designated beneficiary not earlier than 720 days nor later than 365 days before such date, only so much of such funds as does not exceed $6,225 [FN1];

**(6)** funds used to purchase a tuition credit or certificate or contributed to an account in accordance with section 529(b)(1)(A) of the Internal Revenue Code of 1986 under a qualified State tuition program (as defined in section 529(b)(1) of such Code) not later than 365 days before the date of the filing of the petition in a case under this title, but--

   **(A)** only if the designated beneficiary of the amounts paid or contributed to such tuition program was a child, stepchild, grandchild, or stepgrandchild of the debtor for the taxable year for which funds were paid or contributed;

   **(B)** with respect to the aggregate amount paid or contributed to such program having the same designated beneficiary, only so much of such amount as does not exceed the total contributions permitted under section 529(b)(6) of such Code with respect to such beneficiary, as adjusted beginning on the date of the filing of the petition in a case under this title by the annual increase or decrease (rounded to the nearest tenth of 1 percent) in the education expenditure category of the Consumer Price Index prepared by the Department of Labor; and

   **(C)** in the case of funds paid or contributed to such program having the same designated beneficiary not earlier than 720 days nor later than 365 days before such date, only so much of such funds as does not exceed $6,225 [FN1];

**(7)** any amount--

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(A)** withheld by an employer from the wages of employees for payment as contributions--

**(i)** to--

**(I)** an employee benefit plan that is subject to title I of the Employee Retirement Income Security Act of 1974 or under an employee benefit plan which is a governmental plan under section 414(d) of the Internal Revenue Code of 1986;

**(II)** a deferred compensation plan under section 457 of the Internal Revenue Code of 1986; or

**(III)** a tax-deferred annuity under section 403(b) of the Internal Revenue Code of 1986;

except that such amount under this subparagraph shall not constitute disposable income as defined in section 1325(b)(2); or

**(ii)** to a health insurance plan regulated by State law whether or not subject to such title; or

**(B)** received by an employer from employees for payment as contributions--

**(i)** to--

**(I)** an employee benefit plan that is subject to title I of the Employee Retirement Income Security Act of 1974 or under an employee benefit plan which is a governmental plan under section 414(d) of the Internal Revenue Code of 1986;

**(II)** a deferred compensation plan under section 457 of the Internal Revenue Code of 1986; or

**(III)** a tax-deferred annuity under section 403(b) of the Internal Revenue Code of 1986;

except that such amount under this subparagraph shall not constitute disposable income, as defined in section 1325(b)(2); or

**(ii)** to a health insurance plan regulated by State law whether or not subject to such title;

**(8)** subject to subchapter III of chapter 5, any interest of the debtor in property where the debtor pledged or sold tangible personal property (other than securities or written or printed evidences of indebtedness or title) as collateral for a loan or advance of money given by a person licensed under law to make such loans or advances, where--

Case: 13-3495     Document: 10        Filed: 01/15/2014     Pages: 187

**(A)** the tangible personal property is in the possession of the pledgee or transferee;

**(B)** the debtor has no obligation to repay the money, redeem the collateral, or buy back the property at a stipulated price; and

**(C)** neither the debtor nor the trustee have exercised any right to redeem provided under the contract or State law, in a timely manner as provided under State law and section 108(b); or

**(9)** any interest in cash or cash equivalents that constitute proceeds of a sale by the debtor of a money order that is made--

**(A)** on or after the date that is 14 days prior to the date on which the petition is filed; and

**(B)** under an agreement with a money order issuer that prohibits the commingling of such proceeds with property of the debtor (notwithstanding that, contrary to the agreement, the proceeds may have been commingled with property of the debtor),

unless the money order issuer had not taken action, prior to the filing of the petition, to require compliance with the prohibition.

Paragraph (4) shall not be construed to exclude from the estate any consideration the debtor retains, receives, or is entitled to receive for transferring an interest in liquid or gaseous hydrocarbons pursuant to a farmout agreement.

**(c)(1)** Except as provided in paragraph (2) of this subsection, an interest of the debtor in property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5) of this section notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law--

**(A)** that restricts or conditions transfer of such interest by the debtor; or

**(B)** that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, or on the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement, and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

**(2)** A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title.

**(d)** Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

(e) In determining whether any of the relationships specified in paragraph (5)(A) or (6)(A) of subsection (b) exists, a legally adopted child of an individual (and a child who is a member of an individual's household, if placed with such individual by an authorized placement agency for legal adoption by such individual), or a foster child of an individual (if such child has as the child's principal place of abode the home of the debtor and is a member of the debtor's household) shall be treated as a child of such individual by blood.

(f) Notwithstanding any other provision of this title, property that is held by a debtor that is a corporation described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from tax under section 501(a) of such Code may be transferred to an entity that is not such a corporation, but only under the same conditions as would apply if the debtor had not filed a case under this title.

CREDIT(S)

(Pub.L. 95-598, Nov. 6, 1978, 92 Stat. 2594; Pub.L. 98-353, Title III, §§ 363(a), 456, July 10, 1984, 98 Stat. 363, 376; Pub.L. 101-508, Title III, § 3007(a)(2), Nov. 5, 1990, 104 Stat. 1388-28; Pub.L. 102-486, Title XXX, § 3017(b), Oct. 24, 1992, 106 Stat. 3130; Pub.L. 103-394, Title III, §§ 208(b), 223, Oct. 22, 1994, 108 Stat. 4124, 4129; Pub.L. 109-8, Title II, § 225(a), Title III, § 323, Title XII, §§ 1212, 1221(c), 1230, Apr. 20, 2005, 119 Stat. 65, 97, 194, 196, 201; Pub.L. 111-327, § 2(a)(22), Dec. 22, 2010, 124 Stat. 3560.)

[FN1] Dollar amount as adjusted by the Judicial Conference of the United States. See Adjustment of Dollar Amounts notes set out under this section and 11 U.S.C.A. § 104.

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

1978 Acts. This section defines property of the estate, and specifies what property becomes property of the estate. The commencement of a bankruptcy case creates an estate. Under paragraph (1) of subsection (a), the estate is comprised of all legal or equitable interest of the debtor in property, wherever located, as of the commencement of the case. The scope of this paragraph is broad. It includes all kinds of property, including tangible or intangible property, causes of action (see Bankruptcy Act § 70a(6) [section 110(a)(6) of former Title 11] ), and all other forms of property currently specified in section 70a of the Bankruptcy Act § 70a [sic] [section 110(a) of former Title 11], as well as property recovered by the trustee under section 542 of proposed title 11, if the property recovered was merely out of the possession of the debtor, yet remained "property of the debtor." The debtor's interest in property also includes "title" to property, which is an interest, just as are a possessory interest, or leasehold interest, for example. The result of *Segal v. Rochelle*, 382 U.S. 375 (1966) [86 S.Ct. 511, 15 L.Ed.2d 428], is followed, and the right to a refund is property of the estate.

**c**

**Effective: June 19, 1998**

United States Code Annotated Currentness
  Title 11. Bankruptcy (Refs & Annos)
    Chapter 5. Creditors, the Debtor, and the Estate (Refs & Annos)
      Subchapter III. The Estate (Refs & Annos)
        → → **§ 544. Trustee as lien creditor and as successor to certain creditors and purchasers**

**(a)** The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by--

  **(1)** a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

  **(2)** a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or

  **(3)** a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

**(b)(1)** Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

**(2)** Paragraph (1) shall not apply to a transfer of a charitable contribution (as that term is defined in section 548(d)(3)) that is not covered under section 548(a)(1)(B), by reason of section 548(a)(2). Any claim by any person to recover a transferred contribution described in the preceding sentence under Federal or State law in a Federal or State court shall be preempted by the commencement of the case.

CREDIT(S)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.          063



**Effective: April 1, 2010**

United States Code Annotated Currentness
   Title 11. Bankruptcy (Refs & Annos)
      Chapter 5. Creditors, the Debtor, and the Estate (Refs & Annos)
         Subchapter III. The Estate (Refs & Annos)
           →→ **§ 547. Preferences**

**(a)** In this section--

  **(1)** "inventory" means personal property leased or furnished, held for sale or lease, or to be furnished under a contract for service, raw materials, work in process, or materials used or consumed in a business, including farm products such as crops or livestock, held for sale or lease;

  **(2)** "new value" means money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation;

  **(3)** "receivable" means right to payment, whether or not such right has been earned by performance; and

  **(4)** a debt for a tax is incurred on the day when such tax is last payable without penalty, including any extension.

**(b)** Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property--

  **(1)** to or for the benefit of a creditor;

  **(2)** for or on account of an antecedent debt owed by the debtor before such transfer was made;

  **(3)** made while the debtor was insolvent;

  **(4)** made--

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if--

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

(c) The trustee may not avoid under this section a transfer--

(1) to the extent that such transfer was--

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange;

(2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was--

(A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or

(B) made according to ordinary business terms;

(3) that creates a security interest in property acquired by the debtor--

(A) to the extent such security interest secures new value that was--

(i) given at or after the signing of a security agreement that contains a description of such property as collateral;

(ii) given by or on behalf of the secured party under such agreement;

Case: 13-3495    Document: 10    Filed: 01/15/2014    Pages: 187

(iii) given to enable the debtor to acquire such property; and

(iv) in fact used by the debtor to acquire such property; and

(B) that is perfected on or before 30 days after the debtor receives possession of such property;

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor--

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor;

(5) that creates a perfected security interest in inventory or a receivable or the proceeds of either, except to the extent that the aggregate of all such transfers to the transferee caused a reduction, as of the date of the filing of the petition and to the prejudice of other creditors holding unsecured claims, of any amount by which the debt secured by such security interest exceeded the value of all security interests for such debt on the later of--

(A)(i) with respect to a transfer to which subsection (b)(4)(A) of this section applies, 90 days before the date of the filing of the petition; or

(ii) with respect to a transfer to which subsection (b)(4)(B) of this section applies, one year before the date of the filing of the petition; or

(B) the date on which new value was first given under the security agreement creating such security interest;

(6) that is the fixing of a statutory lien that is not avoidable under section 545 of this title;

(7) to the extent such transfer was a bona fide payment of a debt for a domestic support obligation;

(8) if, in a case filed by an individual debtor whose debts are primarily consumer debts, the aggregate value of all property that constitutes or is affected by such transfer is less than $600; or

(9) if, in a case filed by a debtor whose debts are not primarily consumer debts, the aggregate value of all property that constitutes or is affected by such transfer is less than $6,225 [FN1].

(d) The trustee may avoid a transfer of an interest in property of the debtor transferred to or for the benefit of a

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 13-3495     Document: 10     Filed: 01/15/2014     Pages: 187

surety to secure reimbursement of such a surety that furnished a bond or other obligation to dissolve a judicial lien that would have been avoidable by the trustee under subsection (b) of this section. The liability of such surety under such bond or obligation shall be discharged to the extent of the value of such property recovered by the trustee or the amount paid to the trustee.

**(e)(1)** For the purposes of this section--

    **(A)** a transfer of real property other than fixtures, but including the interest of a seller or purchaser under a contract for the sale of real property, is perfected when a bona fide purchaser of such property from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest that is superior to the interest of the transferee; and

    **(B)** a transfer of a fixture or property other than real property is perfected when a creditor on a simple contract cannot acquire a judicial lien that is superior to the interest of the transferee.

**(2)** For the purposes of this section, except as provided in paragraph (3) of this subsection, a transfer is made--

    **(A)** at the time such transfer takes effect between the transferor and the transferee, if such transfer is perfected at, or within 30 days after, such time, except as provided in subsection (c)(3)(B);

    **(B)** at the time such transfer is perfected, if such transfer is perfected after such 30 days; or

    **(C)** immediately before the date of the filing of the petition, if such transfer is not perfected at the later of--

        **(i)** the commencement of the case; or

        **(ii)** 30 days after such transfer takes effect between the transferor and the transferee.

**(3)** For the purposes of this section, a transfer is not made until the debtor has acquired rights in the property transferred.

**(f)** For the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition.

**(g)** For the purposes of this section, the trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section, and the creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the nonavoidability of a transfer under subsection (c) of this section.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(h)** The trustee may not avoid a transfer if such transfer was made as a part of an alternative repayment schedule between the debtor and any creditor of the debtor created by an approved nonprofit budget and credit counseling agency.

**(i)** If the trustee avoids under subsection (b) a transfer made between 90 days and 1 year before the date of the filing of the petition, by the debtor to an entity that is not an insider for the benefit of a creditor that is an insider, such transfer shall be considered to be avoided under this section only with respect to the creditor that is an insider.

CREDIT(S)

(Pub.L. 95-598, Nov. 6, 1978, 92 Stat. 2597; Pub.L. 98-353, Title III, §§ 310, 462, July 10, 1984, 98 Stat. 355, 377; Pub.L. 99-554, Title II, § 283(m), Oct. 27, 1986, 100 Stat. 3117; Pub.L. 103-394, Title II, § 203, Title III, § 304(f), Oct. 22, 1994, 108 Stat. 4121, 4133; Pub.L. 109-8, Title II, §§ 201(b), 217, Title IV, §§ 403, 409, Title XII, § 1213(a), 1222, Apr. 20, 2005, 119 Stat. 42, 55, 104, 106, 194, 196.)

[FN1] Dollar amount as adjusted by the Judicial Conference of the United States. See Adjustment of Dollar Amounts notes set out under this section and 11 U.S.C.A. § 104.

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

1978 Acts. This section is a substantial modification of present law. It modernizes the preference provisions and brings them more into conformity with commercial practice and the Uniform Commercial Code.

Subsection (a) contains three definitions. Inventory, new value, and receivable are defined in their ordinary senses, but are defined to avoid any confusion or uncertainty surrounding the terms.

Subsection (b) is the operative provision of the section. It authorizes the trustee to avoid a transfer if five conditions are met. These are the five elements of a preference action. First, the transfer must be to or for the benefit of a creditor. Second, the transfer must be for or on account of an antecedent debt owed by the debtor before the transfer was made. Third, the transfer must have been made when the debtor was insolvent. Fourth, the transfer must have been made during the 90 days immediately preceding the commencement of the case. If the transfer was to an insider, the trustee may avoid the transfer if it was made during the period that begins one year before the filing of the petition and ends 90 days before the filing, if the insider to whom the transfer was made had reasonable cause to believe the debtor was insolvent at the time the transfer was made.

Finally, the transfer must enable the creditor to whom or for whose benefit it was made to receive a greater percentage of his claim than he would receive under the distributive provisions of the bankruptcy code. Specifically, the creditor must receive more than he would if the case were a liquidation case, if the transfer had

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**c**

Effective:[See Notes]

United States Code Annotated Currentness
   Title 11. Bankruptcy (Refs & Annos)
      Chapter 5. Creditors, the Debtor, and the Estate (Refs & Annos)
         Subchapter III. The Estate (Refs & Annos)
         ➡➡ **§ 548. Fraudulent transfers and obligations**

**(a)(1)** The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--

    **(A)** made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

    **(B)(i)** received less than a reasonably equivalent value in exchange for such transfer or obligation; and

    **(ii)(I)** was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

    **(II)** was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

    **(III)** intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

    **(IV)** made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

**(2)** A transfer of a charitable contribution to a qualified religious or charitable entity or organization shall not be considered to be a transfer covered under paragraph (1)(B) in any case in which--

    **(A)** the amount of that contribution does not exceed 15 percent of the gross annual income of the debtor for

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

the year in which the transfer of the contribution is made; or

**(B)** the contribution made by a debtor exceeded the percentage amount of gross annual income specified in subparagraph (A), if the transfer was consistent with the practices of the debtor in making charitable contributions.

**(b)** The trustee of a partnership debtor may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, to a general partner in the debtor, if the debtor was insolvent on the date such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation.

**(c)** Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

**(d)(1)** For the purposes of this section, a transfer is made when such transfer is so perfected that a bona fide purchaser from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee, but if such transfer is not so perfected before the commencement of the case, such transfer is made immediately before the date of the filing of the petition.

**(2)** In this section--

**(A)** "value" means property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor;

**(B)** a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency that receives a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, takes for value to the extent of such payment;

**(C)** a repo participant or financial participant that receives a margin payment, as defined in section 741 or 761 of this title, or settlement payment, as defined in section 741 of this title, in connection with a repurchase agreement, takes for value to the extent of such payment;

**(D)** a swap participant or financial participant that receives a transfer in connection with a swap agreement takes for value to the extent of such transfer; and

**(E)** a master netting agreement participant that receives a transfer in connection with a master netting agreement or any individual contract covered thereby takes for value to the extent of such transfer, except that, with respect to a transfer under any individual contract covered thereby, to the extent that such master netting agreement participant otherwise did not take (or is otherwise not deemed to have taken) such transfer for value.

**(3)** In this section, the term "charitable contribution" means a charitable contribution, as that term is defined in section 170(c) of the Internal Revenue Code of 1986, if that contribution--

**(A)** is made by a natural person; and

**(B)** consists of--

**(i)** a financial instrument (as that term is defined in section 731(c)(2)(C) of the Internal Revenue Code of 1986); or

**(ii)** cash.

**(4)** In this section, the term "qualified religious or charitable entity or organization" means--

**(A)** an entity described in section 170(c)(1) of the Internal Revenue Code of 1986; or

**(B)** an entity or organization described in section 170(c)(2) of the Internal Revenue Code of 1986.

**(e)(1)** In addition to any transfer that the trustee may otherwise avoid, the trustee may avoid any transfer of an interest of the debtor in property that was made on or within 10 years before the date of the filing of the petition, if--

**(A)** such transfer was made to a self-settled trust or similar device;

**(B)** such transfer was by the debtor;

**(C)** the debtor is a beneficiary of such trust or similar device; and

**(D)** the debtor made such transfer with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made, indebted.

**(2)** For the purposes of this subsection, a transfer includes a transfer made in anticipation of any money

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

judgment, settlement, civil penalty, equitable order, or criminal fine incurred by, or which the debtor believed would be incurred by--

**(A)** any violation of the securities laws (as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(47))), any State securities laws, or any regulation or order issued under Federal securities laws or State securities laws; or

**(B)** fraud, deceit, or manipulation in a fiduciary capacity or in connection with the purchase or sale of any security registered under section 12 or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78l and 78o(d)) or under section 6 of the Securities Act of 1933 (15 U.S.C. 77f).

CREDIT(S)

(Pub.L. 95-598, Nov. 6, 1978, 92 Stat. 2600; Pub.L. 97-222, § 5, July 27, 1982, 96 Stat. 236; Pub.L. 98-353, Title III, §§ 394, 463, July 10, 1984, 98 Stat. 365, 378; Pub.L. 99-554, Title II, § 283(n), Oct. 27, 1986, 100 Stat. 3117; Pub.L. 101-311, Title I, § 104, Title II, § 204, June 25, 1990, 104 Stat. 268, 269; Pub.L. 103-394, Title V, § 501(b)(5), Oct. 22, 1994, 108 Stat. 4142; Pub.L. 105-183, §§ 2, 3(a), June 19, 1998, 112 Stat. 517; Pub.L. 109-8, Title IX, § 907(f), (o)(4) to (6), Title XIV, § 1402, Apr. 20, 2005, 119 Stat. 177, 182, 214.)

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

1978 Acts. This section is derived in large part from section 67d of the Bankruptcy Act [section 107(d) of former Title 11]. It permits the trustee to avoid transfers by the debtor in fraud of his creditors. Its history dates from the statute of 13 Eliz. c. 5 (1570).

The trustee may avoid fraudulent transfers or obligations if made with actual intent to hinder, delay, or defraud a past or future creditor. Transfers made for less than a reasonably equivalent consideration are also vulnerable if the debtor was or thereby becomes insolvent, was engaged in business with an unreasonably small capital, or intended to incur debts that would be beyond his ability to repay.

The trustee of a partnership debtor may avoid any transfer of partnership property to a partner in the debtor if the debtor was or thereby became insolvent.

If a transferee's only liability to the trustee is under this section, and if he takes for value and in good faith, then subsection (c) grants him a lien on the property transferred, or other similar protection.

Subsection (d) specifies that for the purposes of fraudulent transfer section, a transfer is made when it is valid against a subsequent bona fide purchaser. If not made before the commencement of the case, it is considered made immediately before then. Subsection (d) also defines "value" to mean property, or the satisfaction or securing of a present or antecedent debt, but does not include an unperformed promise to furnish support to the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

c

**Effective:[See Notes]**

United States Code Annotated Currentness
  Title 11. Bankruptcy (Refs & Annos)
    Chapter 5. Creditors, the Debtor, and the Estate (Refs & Annos)
      Subchapter III. The Estate (Refs & Annos)
        ➡➡ **§ 549. Postpetition transactions**

**(a)** Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate--

**(1)** that occurs after the commencement of the case; and

**(2)(A)** that is authorized only under section 303(f) or 542(c) of this title; or

**(B)** that is not authorized under this title or by the court.

**(b)** In an involuntary case, the trustee may not avoid under subsection (a) of this section a transfer made after the commencement of such case but before the order for relief to the extent any value, including services, but not including satisfaction or securing of a debt that arose before the commencement of the case, is given after the commencement of the case in exchange for such transfer, notwithstanding any notice or knowledge of the case that the transferee has.

**(c)** The trustee may not avoid under subsection (a) of this section a transfer of an interest in real property to a good faith purchaser without knowledge of the commencement of the case and for present fair equivalent value unless a copy or notice of the petition was filed, where a transfer of an interest in such real property may be recorded to perfect such transfer, before such transfer is so perfected that a bona fide purchaser of such real property, against whom applicable law permits such transfer to be perfected, could not acquire an interest that is superior to such interest of such good faith purchaser. A good faith purchaser without knowledge of the commencement of the case and for less than present fair equivalent value has a lien on the property transferred to the extent of any present value given, unless a copy or notice of the petition was so filed before such transfer was so perfected.

**(d)** An action or proceeding under this section may not be commenced after the earlier of--

**(1)** two years after the date of the transfer sought to be avoided; or

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(2)** the time the case is closed or dismissed.

CREDIT(S)

(Pub.L. 95-598, Nov. 6, 1978, 92 Stat. 2601; Pub.L. 98-353, Title III, § 464, July 10, 1984, 98 Stat. 379; Pub.L. 99-554, Title II, § 283(o), Oct. 27, 1986, 100 Stat. 3117; Pub.L. 103-394, Title V, § 501(d)(18), Oct. 22, 1994, 108 Stat. 4146; Pub.L. 109-8, Title XII, § 1214, Apr. 20, 2005, 119 Stat. 195.)

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

1978 Acts. This section modifies section 70d of current law [section 110(d) of former Title 11]. It permits the trustee to avoid transfers of property that occur after the commencement of the case. The transfer must either have been unauthorized, or authorized under a section that protects only the transferor. Subsection (b) protects "involuntary gap" transferees to the extent of any value (including services, but not including satisfaction of a debt that arose before the commencement of the case), given after commencement in exchange for the transfer. Notice or knowledge of the transferee is irrelevant in determining whether he is protected under this provision. Senate Report No. 95-989.

1984 Acts. Statements by Legislative Leaders, see 1984 U.S. Code Cong. and Adm. News, p. 576.

1986 Acts. House Report No. 99-764 and House Conference Report No. 99-958, see 1986 U.S. Code Cong. and Adm. News, p. 5227.

1994 Acts. House Report No. 103-835, see 1994 U.S. Code Cong. and Adm. News, p. 3340.

2005 Acts. House Report No. 109-31(Part I), see 2005 U.S. Code Cong. and Adm. News, p. 88.

Legislative Statements

Section 549 of the House amendment has been redrafted in order to incorporate section 342(b) and (c) of the Senate amendment. Those sections have been consolidated and redrafted in section 549(c) of the House amendment. Section 549(d) of the House amendment adopts a provision contained in section 549(c) of the Senate amendment.

Amendments

2005 Amendments. Subsec. (c). Pub.L.109-8, § 1214, inserted "an interest in" after "transfer of" each place it appeared, struck out "such property" and inserted "such real property" following "a bona fide purchaser of", and struck out "the interest" and inserted "such interest".

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

C

**Effective:[See Notes]**

United States Code Annotated Currentness
  Title 11. Bankruptcy (Refs & Annos)
    Chapter 11. Reorganization (Refs & Annos)
      Subchapter I. Officers and Administration (Refs & Annos)
      → → **§ 1102. Creditors' and equity security holders' committees**

**(a)(1)** Except as provided in paragraph (3), as soon as practicable after the order for relief under chapter 11 of this title, the United States trustee shall appoint a committee of creditors holding unsecured claims and may appoint additional committees of creditors or of equity security holders as the United States trustee deems appropriate.

**(2)** On request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders. The United States trustee shall appoint any such committee.

**(3)** On request of a party in interest in a case in which the debtor is a small business debtor and for cause, the court may order that a committee of creditors not be appointed.

**(4)** On request of a party in interest and after notice and a hearing, the court may order the United States trustee to change the membership of a committee appointed under this subsection, if the court determines that the change is necessary to ensure adequate representation of creditors or of equity security holders. The court may order the United States trustee to increase the number of members of a committee to include a creditor that is a small business concern (as described in section 3(a)(1) of the Small Business Act), if the court determines that the creditor holds claims (of the kind represented by the committee) the aggregate amount of which, in comparison to the annual gross revenue of that creditor, is disproportionately large.

**(b)(1)** A committee of creditors appointed under subsection (a) of this section shall ordinarily consist of the persons, willing to serve, that hold the seven largest claims against the debtor of the kinds represented on such committee, or of the members of a committee organized by creditors before the commencement of the case under this chapter, if such committee was fairly chosen and is representative of the different kinds of claims to be represented.

**(2)** A committee of equity security holders appointed under subsection (a)(2) of this section shall ordinarily consist of the persons, willing to serve, that hold the seven largest amounts of equity securities of the debtor of the kinds represented on such committee.

**(3)** A committee appointed under subsection (a) shall--

    **(A)** provide access to information for creditors who--

        **(i)** hold claims of the kind represented by that committee; and

        **(ii)** are not appointed to the committee;

    **(B)** solicit and receive comments from the creditors described in subparagraph (A); and

    **(C)** be subject to a court order that compels any additional report or disclosure to be made to the creditors described in subparagraph (A).

CREDIT(S)

(Pub.L. 95-598, Nov. 6, 1978, 92 Stat. 2626; Pub.L. 98-353, Title III, § 499, July 10, 1984, 98 Stat. 384; Pub.L. 99-554, Title II, § 221, Oct. 27, 1986, 100 Stat. 3101; Pub.L. 103-394, Title II, § 217(b), Oct. 22, 1994, 108 Stat. 4127; Pub.L. 109-8, Title IV, §§ 405, 432(b), Apr. 20, 2005, 119 Stat. 105, 110.)

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

1978 Acts. This section provides for the election and appointment of committees. Subsection (c) provides that this section does not apply in case of a public company, as to which a trustee, appointed under section 1104(a) will have responsibility to administer the estate and to formulate a plan as provided in section 1106(a).

There is no need for the election or appointment of committees for which the appointment of a trustee is mandatory. In the case of a public company there are likely to be several committees, each representing a different class of security holders and seeking authority to retain accountants, lawyers, and other experts, who will expect to be paid. If in the case of a public company creditors or stockholders wish to organize committees, they may do so, as authorized under section 1109(a). Compensation and reimbursement will be allowed for contributions to the reorganization pursuant to section 503(b)(3) and (4). Senate Report No. 95-989.

This section provides for the appointment of creditors' and equity security holders' committees, which will be the primary negotiating bodies for the formulation of the plan of reorganization. They will represent the various classes of creditors and equity security holders from which they are selected. They will also provide supervision of the debtor in possession and of the trustee, and will protect their constituents' interests.

Subsection (a) requires the court to appoint at least one committee. That committee is to be composed of creditors holding unsecured claims. The court is authorized to appoint such additional committees as are

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**c**

**Effective:[See Text Amendments]**

United States Code Annotated Currentness
  Title 11. Bankruptcy (Refs & Annos)
    Chapter 11. Reorganization (Refs & Annos)
      Subchapter I. Officers and Administration (Refs & Annos)
      ➡➡ **§ 1103. Powers and duties of committees**

**(a)** At a scheduled meeting of a committee appointed under section 1102 of this title, at which a majority of the members of such committee are present, and with the court's approval, such committee may select and authorize the employment by such committee of one or more attorneys, accountants, or other agents, to represent or perform services for such committee.

**(b)** An attorney or accountant employed to represent a committee appointed under section 1102 of this title may not, while employed by such committee, represent any other entity having an adverse interest in connection with the case. Representation of one or more creditors of the same class as represented by the committee shall not per se constitute the representation of an adverse interest.

**(c)** A committee appointed under section 1102 of this title may--

  **(1)** consult with the trustee or debtor in possession concerning the administration of the case;

  **(2)** investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan;

  **(3)** participate in the formulation of a plan, advise those represented by such committee of such committee's determinations as to any plan formulated, and collect and file with the court acceptances or rejections of a plan;

  **(4)** request the appointment of a trustee or examiner under section 1104 of this title; and

  **(5)** perform such other services as are in the interest of those represented.

**(d)** As soon as practicable after the appointment of a committee under section 1102 of this title, the trustee shall

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

meet with such committee to transact such business as may be necessary and proper.


CREDIT(S)

(Pub.L. 95-598, Nov. 6, 1978, 92 Stat. 2627; Pub.L. 98-353, Title III, §§ 324, 500, July 10, 1984, 98 Stat. 358, 384.)


HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

1978 Acts. This section defines the powers and duties of a committee elected or appointed under section 1102.


Under subsection (a) the committee may, if authorized by the court, employ one or more attorneys, accountants, or other agents to represent or perform services for the committee. Normally one attorney should suffice; more than one may be authorized for good cause. The same considerations apply to the services of others, if the need for any at all is demonstrated.


Under subsections (c) and (d) the committee, like any party in interest, may confer with the trustee or debtor regarding the administration of the estate; may advise the court on the need for a trustee under section 1104(b). The committee may investigate matters specified in paragraph (2) of subsection (c), but only if authorized by the court and if no trustee or examiner is appointed. Senate Report No. 95-989.


Subsection (a) of this section authorizes a committee appointed under section 1102 to select and authorize the employment of counsel, accountants, or other agents, to represent or perform services for the committee. The committee's selection and authorization is subject to the court's approval, and may only be done at a meeting of the committee at which a majority of its members are present. The subsection provides for the employment of more than one attorney. However, this will be the exception, and not the rule; cause must be shown to depart from the normal standard.


Subsection (b) requires a committee's counsel to cease representation of any other entity in connection with the case after he begins to represent the committee. This will prevent the potential of severe conflicts of interest.


Subsection (c) lists a committee's functions in a chapter 11 case. The committee may consult with the trustee or debtor in possession concerning the administration of the case, may investigate the acts, conduct, assets, liabilities and financial condition of the debtor, the operation of the debtor's business, and the desirability of the continuance of the business, and any other matter relevant to the case or to the formulation of a plan. The committee may participate in the formulation of a plan, advise those it represents of the committee's recommendation with respect to any plan formulated, and collect and file acceptances. These will be its most important functions. The committee may also determine the need for the appointment of a trustee, if one has not previously been appointed, and perform such other services as are in the interest of those represented.



**Effective:[See Notes]**

United States Code Annotated Currentness
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part I. Organization of Courts (Refs & Annos)
      Chapter 6. Bankruptcy Judges (Refs & Annos)
        → → **§ 157. Procedures**

**(a)** Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.

**(b)(1)** Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.

**(2)** Core proceedings include, but are not limited to--

  **(A)** matters concerning the administration of the estate;

  **(B)** allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11;

  **(C)** counterclaims by the estate against persons filing claims against the estate;

  **(D)** orders in respect to obtaining credit;

  **(E)** orders to turn over property of the estate;

  **(F)** proceedings to determine, avoid, or recover preferences;

  **(G)** motions to terminate, annul, or modify the automatic stay;

**(H)** proceedings to determine, avoid, or recover fraudulent conveyances;

**(I)** determinations as to the dischargeability of particular debts;

**(J)** objections to discharges;

**(K)** determinations of the validity, extent, or priority of liens;

**(L)** confirmations of plans;

**(M)** orders approving the use or lease of property, including the use of cash collateral;

**(N)** orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed claims against the estate;

**(O)** other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims; and

**(P)** recognition of foreign proceedings and other matters under chapter 15 of title 11.

**(3)** The bankruptcy judge shall determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11. A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law.

**(4)** Non-core proceedings under section 157(b)(2)(B) of title 28, United States Code, shall not be subject to the mandatory abstention provisions of section 1334(c)(2).

**(5)** The district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending.

**(c)(1)** A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

**(2)** Notwithstanding the provisions of paragraph (1) of this subsection, the district court, with the consent of all the parties to the proceeding, may refer a proceeding related to a case under title 11 to a bankruptcy judge to hear and determine and to enter appropriate orders and judgments, subject to review under section 158 of this title.

**(d)** The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

**(e)** If the right to a jury trial applies in a proceeding that may be heard under this section by a bankruptcy judge, the bankruptcy judge may conduct the jury trial if specially designated to exercise such jurisdiction by the district court and with the express consent of all the parties.

CREDIT(S)

(Added Pub.L. 98-353, Title I, § 104(a), July 10, 1984, 98 Stat. 340; amended Pub.L. 99-554, Title I, §§ 143, 144(b), Oct. 27, 1986, 100 Stat. 3096; Pub.L. 103-394, Title I, § 112, Oct. 22, 1994, 108 Stat. 4117; Pub.L. 109-8, Title VIII, § 802(c)(1), Apr. 20, 2005, 119 Stat. 145.)

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

1984 Acts. Statements by Legislative Leaders, see 1984 U.S. Code Cong. and Adm. News, p. 576.

1986 Acts. House Report No. 99-764 and House Conference Report No. 99-958, see 1986 U.S. Code Cong. and Adm. News, p. 5227.

1994 Acts. House Report No. 103-835, see 1994 U.S. Code Cong. and Adm. News, p. 3340.

2005 Acts. House Report No. 109-31(Part I), see 2005 U.S. Code Cong. and Adm. News, p. 88.

References in Text

Chapter 11, 12, or 13 of title 11, referred to in subsec. (b)(2)(B), is 11 U.S.C.A. § 1101 et seq.,11 U.S.C.A. § 1201 et seq., or 11 U.S.C.A. § 1301 et seq., respectively.

Chapter 15 of title 11, referred to in subsec. (b)(2)(P), is 11 U.S.C.A. § 1501 et seq.

**Effective:[See Text Amendments]**

United States Code Annotated Currentness
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part I. Organization of Courts (Refs & Annos)
      Chapter 21. General Provisions Applicable to Courts and Judges
        → → § 455. Disqualification of justice, judge, or magistrate judge

**(a)** Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

**(b)** He shall also disqualify himself in the following circumstances:

  **(1)** Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

  **(2)** Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;

  **(3)** Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;

  **(4)** He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

  **(5)** He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

    **(i)** Is a party to the proceeding, or an officer, director, or trustee of a party;

    **(ii)** Is acting as a lawyer in the proceeding;

Case: 13-3495      Document: 10      Filed: 01/15/2014      Pages: 187

**(iii)** Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

**(iv)** Is to the judge's knowledge likely to be a material witness in the proceeding.

**(c)** A judge should inform himself about his personal and fiduciary financial interests, and make a reasonable effort to inform himself about the personal financial interests of his spouse and minor children residing in his household.

**(d)** For the purposes of this section the following words or phrases shall have the meaning indicated:

**(1)** "proceeding" includes pretrial, trial, appellate review, or other stages of litigation;

**(2)** the degree of relationship is calculated according to the civil law system;

**(3)** "fiduciary" includes such relationships as executor, administrator, trustee, and guardian;

**(4)** "financial interest" means ownership of a legal or equitable interest, however small, or a relationship as director, adviser, or other active participant in the affairs of a party, except that:

**(i)** Ownership in a mutual or common investment fund that holds securities is not a "financial interest" in such securities unless the judge participates in the management of the fund;

**(ii)** An office in an educational, religious, charitable, fraternal, or civic organization is not a "financial interest" in securities held by the organization;

**(iii)** The proprietary interest of a policyholder in a mutual insurance company, of a depositor in a mutual savings association, or a similar proprietary interest, is a "financial interest" in the organization only if the outcome of the proceeding could substantially affect the value of the interest;

**(iv)** Ownership of government securities is a "financial interest" in the issuer only if the outcome of the proceeding could substantially affect the value of the securities.

**(e)** No justice, judge, or magistrate judge shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b). Where the ground for disqualification arises only under subsection (a), waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

(f) Notwithstanding the preceding provisions of this section, if any justice, judge, magistrate judge, or bankruptcy judge to whom a matter has been assigned would be disqualified, after substantial judicial time has been devoted to the matter, because of the appearance or discovery, after the matter was assigned to him or her, that he or she individually or as a fiduciary, or his or her spouse or minor child residing in his or her household, has a financial interest in a party (other than an interest that could be substantially affected by the outcome), disqualification is not required if the justice, judge, magistrate judge, bankruptcy judge, spouse or minor child, as the case may be, divests himself or herself of the interest that provides the grounds for the disqualification.

CREDIT(S)

(June 25, 1948, c. 646, 62 Stat. 908; Dec. 5, 1974, Pub.L. 93-512, § 1, 88 Stat. 1609; Nov. 6, 1978, Pub.L. 95-598, Title II, § 214(a), (b), 92 Stat. 2661; Nov. 19, 1988, Pub.L. 100-702, Title X, § 1007, 102 Stat. 4667; Dec. 1, 1990, Pub.L. 101-650, Title III, § 321, 104 Stat. 5117.)

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

1948 Acts. Based on Title 28, U.S.C., 1940 ed., § 24 (Mar. 3, 1911, c. 231, § 20, 36 Stat. 1090 [Derived from R.S. § 601] ).

Section 24 of Title 28, U.S.C., 1940 ed., applied only to district judges. The revised section is made applicable to all justices and judges of the United States.

The phrase "in which he has a substantial interest" was substituted for "concerned in interest in any suit."

The provision of section 24 of Title 28, U.S.C., 1940 ed., as to giving notice of disqualification to the "senior circuit judge," and words "and thereupon such proceedings shall be had as are provided in sections 17 and 18 of this title," were omitted as unnecessary and covered by section 291 et seq. of this title relating to designation and assignment of judges. Such provision is not made by statute in case of disqualification or incapacity, for other cause. See sections 140, 143, and 144 of this title. If a judge or clerk of court is remiss in failing to notify the chief judge of the district or circuit, the judicial council of the circuit has ample power under section 332 of this title to apply a remedy.

Relationship to a party's attorney is included in the revised section as a basis of disqualification in conformity with the views of judges cognizant of the grave possibility of undesirable consequences resulting from a less inclusive rule.

Changes were made in phraseology. 80th Congress House Report No. 308.

1974 Acts. House Report No. 93-1453, see 1974 U.S.Code Cong. and Adm.News, p. 6351.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.    Case: 13-3495    Document: 10    Filed: 01/15/2014    Pages: 187

28 U.S.C.A. § 1291    Page 1

**c**

**Effective:[See Text Amendments]**

United States Code Annotated Currentness
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part IV. Jurisdiction and Venue (Refs & Annos)
      Chapter 83. Courts of Appeals (Refs & Annos)
      → → § 1291. Final decisions of district courts

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

CREDIT(S)

(June 25, 1948, c. 646, 62 Stat. 929; Oct. 31, 1951, c. 655, § 48, 65 Stat. 726; July 7, 1958, Pub.L. 85-508, § 12(e), 72 Stat. 348; Apr. 2, 1982, Pub.L. 97-164, Title I, § 124, 96 Stat. 36.)

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

1948 Acts. Based on Title 28, U.S.C., 1940 ed., §§ 225(a), 933(a)(1), and section 1356 of Title 48, U.S.C., 1940 ed., Territories and Insular Possessions, and sections 61 and 62 of Title 7 of the Canal Zone Code (Mar. 3, 1911, c. 231, § 128, 36 Stat. 1133; Aug. 24, 1912, c. 390, § 9, 37 Stat. 566; Jan. 28, 1915, c. 22, § 2, 38 Stat. 804; Sept. 21, 1922, c. 370, § 3, 42 Stat. 1006; Feb. 7, 1925, c. 150, 43 Stat. 813; Feb. 13, 1925, c. 229, § 1, 43 Stat. 936; Jan. 31, 1928, c. 14, § 1, 45 Stat. 54; May 17, 1932, c. 190, 47 Stat. 158; Feb. 16, 1933, c. 91, § 3, 47 Stat. 817; May 31, 1935, c. 160, 49 Stat. 313; June 20, 1938, c. 526, 52 Stat. 779; Aug. 2, 1946, c. 753, § 412(a)(1), 60 Stat. 844).

This section rephrases and simplifies paragraphs "First", "Second", and "Third" of section 225(a) of Title 28, U.S.C., 1940 ed., which referred to each Territory and Possession separately, and to sections 61 and 62 of the Canal Zone Code, section 933(a)(1) of said title relating to jurisdiction of appeals in tort claims cases, and the provisions of section 1356 of Title 48, U.S.C., 1940 ed., relating to jurisdiction of appeals from final judgments of the district court for the Canal Zone.


▷

**Effective:[See Notes]**

United States Code Annotated Currentness
   Title 28. Judiciary and Judicial Procedure (Refs & Annos)
      Part IV. Jurisdiction and Venue (Refs & Annos)
         Chapter 85. District Courts; Jurisdiction (Refs & Annos)
           →→ **§ 1334. Bankruptcy cases and proceedings**

**(a)** Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.

**(b)** Except as provided in subsection (e)(2), and notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

**(c)(1)** Except with respect to a case under chapter 15 of title 11, nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

**(2)** Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

**(d)** Any decision to abstain or not to abstain made under subsection (c) (other than a decision not to abstain in a proceeding described in subsection (c)(2)) is not reviewable by appeal or otherwise by the court of appeals under section 158(d), 1291, or 1292 of this title or by the Supreme Court of the United States under section 1254 of this title. Subsection (c) and this subsection shall not be construed to limit the applicability of the stay provided for by section 362 of title 11, United States Code, as such section applies to an action affecting the property of the estate in bankruptcy.

**(e)** The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction--

**(1)** of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate; and

**(2)** over all claims or causes of action that involve construction of section 327 of title 11, United States Code, or rules relating to disclosure requirements under section 327.

CREDIT(S)

(June 25, 1948, c. 646, 62 Stat. 931; Nov. 6, 1978, Pub.L. 95-598, Title II, § 238(a), 92 Stat. 2667; July 10, 1984, Pub.L. 98-353, Title I, § 101(a), 98 Stat. 333; Oct. 27, 1986, Pub.L. 99-554, Title I, § 144(e), 100 Stat. 3096; Dec. 1, 1990, Pub.L. 101-650, Title III, § 309(b), 104 Stat. 5113; Oct. 22, 1994, Pub.L. 103-394, Title I, § 104(b), 108 Stat. 4109; Apr. 20, 2005, Pub.L. 109-8, Title III, § 324(a), Title VIII, § 802(c)(2), Title XII, § 1219, 119 Stat. 98, 145, 195.)

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

1948 Acts. Based on Title 28, U.S.C., 1940 ed., §§ 41(19) and 371(6) (Mar. 3, 1911, c. 231, §§ 24, par. 19, 256, par. 6, 36 Stat. 1093, 1160).

Changes in phraseology were made.

1984 Acts. Statements by Legislative Leaders, see 1984 U.S. Code Cong. and Adm. News, p. 576.

1986 Acts. House Report No. 99-764 and House Conference Report No. 99-958, see 1986 U.S. Code Cong. and Adm. News, p. 5227.

1990 Acts. Senate Report No. 101-416, House Report Nos. 101-123, 101-512, 101-514, 101-734, and 101-735, and Statement by President, see 1990 U.S. Code Cong. and Adm. News, p. 6802.

1994 Acts. House Report No. 103-835, see 1994 U.S. Code Cong. and Adm. News, p. 3340.

2005 Acts. House Report No. 109-31(Part I), see 2005 U.S. Code Cong. and Adm. News, p. 88.

References in Text

Chapter 15 of title 11, referred to in subsec. (c), is 11 U.S.C.A. § 1501 et seq.

**Effective:[See Text Amendments]**

United States Code Annotated Currentness
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part V. Procedure
      Chapter 111. General Provisions (Refs & Annos)
        → → **§ 1651. Writs**

**(a)** The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

**(b)** An alternative writ or rule nisi may be issued by a justice or judge of a court which has jurisdiction.

CREDIT(S)

(June 25, 1948, c. 646, 62 Stat. 944; May 24, 1949, c. 139, § 90, 63 Stat. 102.)

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

1948 Acts. Based on Title 28, U.S.C., 1940 ed., §§ 342, 376, 377 (Mar. 3, 1911, c. 231, §§ 234, 261, 262, 36 Stat. 1156, 1162 [derived from R.S. §§ 688, 717, 716, respectively] ).

Section consolidates sections 342, 376, and 377 of Title 28, U.S.C., 1940 ed., with necessary changes in phraseology.

Such section 342 provided:

"The Supreme Court shall have power to issue writs of prohibition to the district courts, when proceeding as courts of admiralty and maritime jurisdiction; and writs of mandamus, in cases warranted by the principles and usages of law, to any courts appointed under the authority of the United States, or to persons holding office under the authority of the United States, where a State, or an ambassador, or other public minister, or a consul, or vice consul is a party."

Such section 376 provided:



**Effective:[See Text Amendments]**

United States Code Annotated Currentness
   Title 42. The Public Health and Welfare
      Chapter 21B. Religious Freedom Restoration
        **§ 2000bb-1. Free exercise of religion protected**

(a) In general

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

(b) Exception

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person--

   **(1)** is in furtherance of a compelling governmental interest; and

   **(2)** is the least restrictive means of furthering that compelling governmental interest.

(c) Judicial relief

A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

CREDIT(S)

(Pub.L. 103-141, § 3, Nov. 16, 1993, 107 Stat. 1488.)

Current through P.L. 113-65 (excluding P.L. 113-54) approved 12-20-13

Westlaw. (C) 2014 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.



**Effective: September 22, 2000**

United States Code Annotated Currentness
   Title 42. The Public Health and Welfare
      Chapter 21B. Religious Freedom Restoration
        ➡➡ **§ 2000bb-2. Definitions**

As used in this chapter--


   **(1)** the term "government" includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity;


   **(2)** the term "covered entity" means the District of Columbia, the Commonwealth of Puerto Rico, and each territory and possession of the United States;


   **(3)** the term "demonstrates" means meets the burdens of going forward with the evidence and of persuasion; and


   **(4)** the term "exercise of religion" means religious exercise, as defined in section 2000cc-5 of this title.


CREDIT(S)

(Pub.L. 103-141, § 5, Nov. 16, 1993, 107 Stat. 1489; Pub.L. 106-274, § 7(a), Sept. 22, 2000, 114 Stat. 806.)


Current through P.L. 113-65 (excluding P.L. 113-54) approved 12-20-13

Westlaw. (C) 2014 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

**C**

**Effective:[See Text Amendments]**

West's Wisconsin Statutes Annotated Currentness
  Fraudulent Conveyances and Contracts (Ch. 240 to 243)
    Chapter 242. Uniform Fraudulent Transfer Act (Refs & Annos)
    ➡➡ **242.04. Transfers fraudulent as to present and future creditors**

(1) A transfer made or obligations incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(a) With actual intent to hinder, delay or defraud any creditor of the debtor; or

(b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

1. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

2. Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

(2) In determining actual intent under sub. (1)(a), consideration may be given, among other factors, to whether:

(a) The transfer or obligation was to an insider;

(b) The debtor retained possession or control of the property transferred after the transfer;

(c) The transfer or the obligation was disclosed or concealed;

(d) Before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit;

(e) The transfer was of substantially all the debtor's assets;

(f) The debtor absconded;

(g) The debtor removed or concealed assets;

(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

<<For credits, see Historical Note field.>>

HISTORICAL AND STATUTORY NOTES

Source:

    1987 Act 192, § 1, eff. April 8, 1988.

Prior Laws:

    L.1919, c. 470, § 2.

    St.1919, §§ 2320-5 to 2320-7.

    L.1925, c. 4.

    St.1925, §§ 242.05 to 242.07.

    St.1985, §§ 242.05 to 242.07.

Uniform Law:

This section is similar to § 4 of the Uniform Fraudulent Transfer Act, see 7A Uniform Laws Annotated, Master Edition.

C

**Effective:[See Text Amendments]**

West's Wisconsin Statutes Annotated Currentness
    Fraudulent Conveyances and Contracts (Ch. 240 to 243)
        Chapter 242. Uniform Fraudulent Transfer Act (Refs & Annos)
      ➡➡ **242.05. Transfers fraudulent as to present creditors**

(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(2) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent.

<<For credits, see Historical Note field.>>

HISTORICAL AND STATUTORY NOTES

Source:

    1987 Act 192, § 1, eff. April 8, 1988.

Prior Laws:

    L.1919, c. 470, § 2.

    St.1919, §§ 2320-4, 2320-8.

    L.1925, c. 4.

    St.1925, §§ 242.04, 242.08.

    St.1985, §§ 242.04, 242.08.

Uniform Law:

**c**

**Effective:[See Text Amendments]**

West's Wisconsin Statutes Annotated Currentness
     Fraudulent Conveyances and Contracts (Ch. 240 to 243)
          Chapter 242. Uniform Fraudulent Transfer Act (Refs & Annos)
          ➡➡ **242.07. Remedies of creditors**

(1) In an action for relief against a transfer or obligation under this chapter, a creditor, subject to the limitations in s. 242.08, may obtain any of the following:

(a) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim.

(b) An attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with chs. 810 to 813.

(c) Subject to applicable principles of equity and in accordance with applicable rules of civil procedure:

1. An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;

2. Appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or

3. Any other relief the circumstances may require.

(2) If a creditor has obtained a judgment on a claim against the debtor, the creditor, if the court so orders, may levy execution on the asset transferred or its proceeds.

<<For credits, see Historical Note field.>>

HISTORICAL AND STATUTORY NOTES

Source:

     1987 Act 192, § 1, eff. April 8, 1988.



**Effective: July 1, 2008**

West's Wisconsin Statutes Annotated Currentness
    Property (Ch. 700 to 710)
        Chapter 701. Trusts (Refs & Annos)
        ➡➡ **701.06. Spendthrift provisions and rights of creditors of beneficiaries**

**(1) Income beneficiaries.** A settlor may expressly provide in the creating instrument that the interest in income of a beneficiary other than the settlor is not subject to voluntary or involuntary alienation. The income interest of such a beneficiary cannot be assigned and is exempt from claims against the beneficiary until paid over to the beneficiary pursuant to the terms of the trust.

**(2) Principal beneficiaries.** A settlor may expressly provide in the creating instrument that the interest in principal of a beneficiary other than the settlor is not subject to voluntary or involuntary alienation. The interest in principal of such a beneficiary cannot be assigned and is exempt from claims against the beneficiary, but a judgment creditor, after any payments of principal have become due or payable to the beneficiary pursuant to the terms of the trust, may apply to the court for an order directing the trustee to satisfy the judgment out of any such payments and the court in its discretion may issue an order for payment of part or all of the judgment.

**(3) Disclaimer or renunciation not an assignment.** A disclaimer or renunciation by a beneficiary of part or all of his or her interest under a trust shall not be considered an assignment under sub. (1) or (2).

**(4) Claims for child support.** Notwithstanding any provision in the creating instrument or subs. (1) and (2), upon application of a person having a valid order directing a beneficiary to make payment for support of the beneficiary's child, the court may:

(a) If the beneficiary is entitled to receive income or principal under the trust, order the trustee to satisfy part or all of the claim out of part or all of payments of income or principal as they are due, presently or in the future;

(b) In the case of a beneficiary under a discretionary trust, order the trustee to satisfy part or all of the claim out of part or all of future payments of income or principal which are to be made pursuant to the exercise of the trustee's discretion in favor of such beneficiary.

**(5) Claims for public support.** Notwithstanding any provision in the creating instrument or subs. (1) and (2), if the settlor is legally obligated to pay for the public support of a beneficiary under s. 46. 10, 49.345, or 301.12 or the beneficiary is legally obligated to pay for the beneficiary's public support or that furnished the beneficiary's

Case: 13-3495     Document: 10     Filed: 01/15/2014     Pages: 187

spouse or minor child under s. 46.10, 49.345, or 301.12, upon application by the appropriate state department or county official, the court may:

(a) If such beneficiary is entitled to receive income or principal under the trust, order the trustee to satisfy part or all of the liability out of part or all of payments of income or principal as they are due, presently or in the future;

(b) Except as otherwise provided in par. (c), in the case of a beneficiary under a discretionary trust, order the trustee to satisfy part or all of the liability out of part or all of future payments of income or principal which are to be made pursuant to the exercise of the trustee's discretion in favor of such beneficiary;

(c) In the case of a beneficiary under a discretionary trust who is a settlor or a spouse or minor child of the settlor, order the trustee to satisfy part or all of the liability without regard to whether the trustee has then exercised or may thereafter exercise the trustee's discretion in favor of the beneficiary.

**(5m) Trust for disabled individual.** Subsection (5) does not apply to any trust that is established for the benefit of an individual who has a disability which has continued or can be expected to continue indefinitely, substantially impairs the individual from adequately providing for his or her own care or custody, and constitutes a substantial handicap to the afflicted individual if the trust does not result in ineligibility for public assistance under ch. 49. A trustee of a trust which is exempt from claims for public support under this subsection shall notify the county department under s. 46.215 or 46.22 in the county where the disabled beneficiary resides of the existence of the trust.

**(6) Settlor as beneficiary.** (a) Notwithstanding any provision in the creating instrument and in addition to the remedies available under subs. (4) and (5) where the settlor is a beneficiary, upon application of a judgment creditor of the settlor, the court may, if the terms of the instrument require or authorize the trustee to make payments of income or principal to or for the benefit of the settlor, order the trustee to satisfy part or all of the judgment out of part or all of the payments of income or principal as they are due, presently or in the future, or which are payable in the trustee's discretion, to the extent in either case of the settlor's proportionate contribution to the trust.

(b) A beneficiary of a trust may not be considered a settlor solely because of a lapse, waiver, or release of any of the following:

1. A power described under par. (c).

2. The beneficiary's right to withdraw part of the trust property, to the extent that the value of the property affected by the lapse, waiver, or release in any year does not exceed the greater of the amount in:

a. Section 2041(b)(2) or 2514(e), Internal Revenue Code of 1986.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

b. Section 2503(b), Internal Revenue Code of 1986.

(c) A beneficiary of a trust is not a settlor, has not made a voluntary or involuntary transfer of the beneficiary's interest in the trust, or does not have the power to make a voluntary or involuntary transfer of the beneficiary's interest in the trust solely because the beneficiary holds or exercises, in any capacity, any of the following:

1. A presently exercisable power to consume, invade, appropriate, or distribute property to or for the benefit of the beneficiary if the power is any of the following:

a. Exercisable only on consent of another person holding an interest adverse to the beneficiary's interest.

b. Limited by an ascertainable standard, such as health, education, support, or maintenance of the beneficiary.

2. A presently exercisable power to appoint any property of the trust to or for the benefit of a person other than the beneficiary, a creditor of the beneficiary, the beneficiary's estate, or a creditor of the beneficiary's estate.

3. A testamentary power of appointment.

4. A presently exercisable right described in par. (b)2.

(d) A beneficiary of a trust is not a settlor solely because the beneficiary is entitled to nondiscretionary distributions from the trust.

**(7) Subsequent modification of court's order.** Any order entered by a court under sub. (4), (5) or (6)(a) is subject to modification upon application of an interested person.

**(8) Exempt assets.** Assets of a trust, to the extent they are exempt from claims of creditors under other statutes, shall not be subject to sub. (4), (5), or (6)(a).

<<For credits, see Historical Note field.>>

COMMENTS--L.1969, C. 283, § 17

This replaces present ss. 231.11(8), 231.16, 231.19, 241.01 and 272.30.

Section 701.07(3) deals with creditors' rights where a settlor retains powers over a living trust.

# Guide to Judiciary Policy

Vol 2: Ethics and Judicial Conduct
Pt A: Codes of Conduct

## Ch 2: Code of Conduct for United States Judges

Introduction

Canon 1:    A Judge Should Uphold the Integrity and Independence of the Judiciary

Canon 2:    A Judge Should Avoid Impropriety and the Appearance of Impropriety in All Activities

Canon 3:    A Judge Should Perform the Duties of the Office Fairly, Impartially and Diligently

Canon 4:    A Judge May Engage in Extrajudicial Activities That Are Consistent with the Obligations of Judicial Office

Canon 5:    A Judge Should Refrain from Political Activity

Compliance with the Code of Conduct

Applicable Date of Compliance

---

### Introduction

The Code of Conduct for United States Judges was initially adopted by the Judicial Conference on April 5, 1973, and was known as the "Code of Judicial Conduct for United States Judges." **See:** JCUS-APR 73, pp. 9-11. Since then, the Judicial Conference has made the following changes to the Code:

- March 1987: deleted the word "Judicial" from the name of the Code;
- September 1992: adopted substantial revisions to the Code;
- March 1996: revised part C of the Compliance section, immediately following the Code;
- September 1996: revised Canons 3C(3)(a) and 5C(4);
- September 1999: revised Canon 3C(1)(c);
- September 2000: clarified the Compliance section;
- March 2009: adopted substantial revisions to the Code.

*Last substantive revision (Transmittal GR-2) June 30, 2009*
*Last revised (minor technical changes) June 2, 2011*

This Code applies to United States circuit judges, district judges, Court of International Trade judges, Court of Federal Claims judges, bankruptcy judges, and magistrate judges.  Certain provisions of this Code apply to special masters and commissioners as indicated in the "Compliance" section.  The Tax Court, Court of Appeals for Veterans Claims, and Court of Appeals for the Armed Forces have adopted this Code.

The Judicial Conference has authorized its Committee on Codes of Conduct to render advisory opinions about this Code only when requested by a judge to whom this Code applies.  Requests for opinions and other questions concerning this Code and its applicability should be addressed to the Chair of the Committee on Codes of Conduct by email or as follows:

> Chair, Committee on Codes of Conduct
> c/o General Counsel
> Administrative Office of the United States Courts
> Thurgood Marshall Federal Judiciary Building
> One Columbus Circle, N.E.
> Washington, D.C.  20544
> 202-502-1100

Procedural questions may be addressed to:

> Office of the General Counsel
> Administrative Office of the United States Courts
> Thurgood Marshall Federal Judiciary Building
> One Columbus Circle, N.E.
> Washington, D.C. 20544
> 202-502-1100

## CANON 1:  A JUDGE SHOULD UPHOLD THE INTEGRITY AND INDEPENDENCE OF THE JUDICIARY

An independent and honorable judiciary is indispensable to justice in our society. A judge should maintain and enforce high standards of conduct and should personally observe those standards, so that the integrity and independence of the judiciary may be preserved.  The provisions of this Code should be construed and applied to further that objective.

COMMENTARY

Deference to the judgments and rulings of courts depends on public confidence in the integrity and independence of judges.  The integrity and independence of judges depend in turn on their acting without fear or favor.  Although judges should be independent, they must comply with the law and should comply with this Code.

Adherence to this responsibility helps to maintain public confidence in the impartiality of the judiciary.  Conversely, violation of this Code diminishes public confidence in the judiciary and injures our system of government under law.

The Canons are rules of reason.  They should be applied consistently with constitutional requirements, statutes, other court rules and decisional law, and in the context of all relevant circumstances.  The Code is to be construed so it does not impinge on the essential independence of judges in making judicial decisions.

The Code is designed to provide guidance to judges and nominees for judicial office.  It may also provide standards of conduct for application in proceedings under the Judicial Councils Reform and Judicial Conduct and Disability Act of 1980 (28 U.S.C. §§ 332(d)(1), 351-364).  Not every violation of the Code should lead to disciplinary action.  Whether disciplinary action is appropriate, and the degree of discipline, should be determined through a reasonable application of the text and should depend on such factors as the seriousness of the improper activity, the intent of the judge, whether there is a pattern of improper activity, and the effect of the improper activity on others or on the judicial system.  Many of the restrictions in the Code are necessarily cast in general terms, and judges may reasonably differ in their interpretation.  Furthermore, the Code is not designed or intended as a basis for civil liability or criminal prosecution.  Finally, the Code is not intended to be used for tactical advantage.

## CANON 2:  A JUDGE SHOULD AVOID IMPROPRIETY AND THE APPEARANCE OF IMPROPRIETY IN ALL ACTIVITIES

A.     *Respect for Law.*  A judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

B.     *Outside Influence.*  A judge should not allow family, social, political, financial, or other relationships to influence judicial conduct or judgment. A judge should neither lend the prestige of the judicial office to advance the private interests of the judge or others nor convey or permit others to convey the impression that they are in a special position to influence the judge.  A judge should not testify voluntarily as a character witness.

C.     *Nondiscriminatory Membership.*  A judge should not hold membership in any organization that practices invidious discrimination on the basis of race, sex, religion, or national origin.

COMMENTARY

**Canon 2A.**  An appearance of impropriety occurs when reasonable minds, with knowledge of all the relevant circumstances disclosed by a reasonable inquiry, would conclude that the judge's honesty, integrity, impartiality, temperament, or fitness to

serve as a judge is impaired. Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. This prohibition applies to both professional and personal conduct. A judge must expect to be the subject of constant public scrutiny and accept freely and willingly restrictions that might be viewed as burdensome by the ordinary citizen. Because it is not practicable to list all prohibited acts, the prohibition is necessarily cast in general terms that extend to conduct by judges that is harmful although not specifically mentioned in the Code. Actual improprieties under this standard include violations of law, court rules, or other specific provisions of this Code.

**Canon 2B.** Testimony as a character witness injects the prestige of the judicial office into the proceeding in which the judge testifies and may be perceived as an official testimonial. A judge should discourage a party from requiring the judge to testify as a character witness except in unusual circumstances when the demands of justice require. This Canon does not create a privilege against testifying in response to an official summons.

A judge should avoid lending the prestige of judicial office to advance the private interests of the judge or others. For example, a judge should not use the judge's judicial position or title to gain advantage in litigation involving a friend or a member of the judge's family. In contracts for publication of a judge's writings, a judge should retain control over the advertising to avoid exploitation of the judge's office.

A judge should be sensitive to possible abuse of the prestige of office. A judge should not initiate communications to a sentencing judge or a probation or corrections officer but may provide information to such persons in response to a formal request. Judges may participate in the process of judicial selection by cooperating with appointing authorities and screening committees seeking names for consideration and by responding to official inquiries concerning a person being considered for a judgeship.

**Canon 2C.** Membership of a judge in an organization that practices invidious discrimination gives rise to perceptions that the judge's impartiality is impaired. Canon 2C refers to the current practices of the organization. Whether an organization practices invidious discrimination is often a complex question to which judges should be sensitive. The answer cannot be determined from a mere examination of an organization's current membership rolls but rather depends on how the organization selects members and other relevant factors, such as that the organization is dedicated to the preservation of religious, ethnic or cultural values of legitimate common interest to its members, or that it is in fact and effect an intimate, purely private organization whose membership limitations could not be constitutionally prohibited. *See New York State Club Ass'n. Inc. v. City of New York*, 487 U.S. 1, 108 S. Ct. 2225, 101 L. Ed. 2d 1 (1988); *Board of Directors of Rotary International v. Rotary Club of Duarte*, 481 U.S. 537, 107 S. Ct. 1940, 95 L. Ed. 2d 474 (1987); *Roberts v. United States Jaycees*, 468 U.S. 609, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984). Other relevant factors include the size and nature of the organization and the diversity of persons in the locale who might reasonably be considered potential members. Thus the mere absence of diverse

membership does not by itself demonstrate a violation unless reasonable persons with knowledge of all the relevant circumstances would expect that the membership would be diverse in the absence of invidious discrimination.  Absent such factors, an organization is generally said to discriminate invidiously if it arbitrarily excludes from membership on the basis of race, religion, sex, or national origin persons who would otherwise be admitted to membership.

Although Canon 2C relates only to membership in organizations that invidiously discriminate on the basis of race, sex, religion or national origin, a judge's membership in an organization that engages in any invidiously discriminatory membership practices prohibited by applicable law violates Canons 2 and 2A and gives the appearance of impropriety.  In addition, it would be a violation of Canons 2 and 2A for a judge to arrange a meeting at a club that the judge knows practices invidious discrimination on the basis of race, sex, religion, or national origin in its membership or other policies, or for the judge to use such a club regularly.  Moreover, public manifestation by a judge of the judge's knowing approval of invidious discrimination on any basis gives the appearance of impropriety under Canon 2 and diminishes public confidence in the integrity and impartiality of the judiciary, in violation of Canon 2A.

When a judge determines that an organization to which the judge belongs engages in invidious discrimination that would preclude membership under Canon 2C or under Canons 2 and 2A, the judge is permitted, in lieu of resigning, to make immediate and continuous efforts to have the organization discontinue its invidiously discriminatory practices.  If the organization fails to discontinue its invidiously discriminatory practices as promptly as possible (and in all events within two years of the judge's first learning of the practices), the judge should resign immediately from the organization.

## CANON 3:  A JUDGE SHOULD PERFORM THE DUTIES OF THE OFFICE FAIRLY, IMPARTIALLY AND DILIGENTLY

The duties of judicial office take precedence over all other activities.  In performing the duties prescribed by law, the judge should adhere to the following standards:

A.    *Adjudicative Responsibilities.*

(1)    A judge should be faithful to, and maintain professional competence in, the law and should not be swayed by partisan interests, public clamor, or fear of criticism.

(2)    A judge should hear and decide matters assigned, unless disqualified, and should maintain order and decorum in all judicial proceedings.

(3)    A judge should be patient, dignified, respectful, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity.  A judge should require similar conduct of those subject to the judge's control, including lawyers to the extent consistent with their role in the adversary process.

(4)    A judge should accord to every person who has a legal interest in a proceeding, and that person's lawyer, the full right to be heard according to law.  Except as set out below, a judge should not initiate, permit, or consider ex parte communications or consider other communications concerning a pending or impending matter that are made outside the presence of the parties or their lawyers.  If a judge receives an unauthorized ex parte communication bearing on the substance of a matter, the judge should promptly notify the parties of the subject matter of the communication and allow the parties an opportunity to respond, if requested.  A judge may:

(a)    initiate, permit, or consider ex parte communications as authorized by law;

(b)    when circumstances require it, permit ex parte communication for scheduling, administrative, or emergency purposes, but only if the ex parte communication does not address substantive matters and the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of the ex parte communication;

(c)    obtain the written advice of a disinterested expert on the law, but only after giving advance notice to the parties of the person to be consulted and the subject matter of the advice and affording the parties reasonable opportunity to object and respond to the notice and to the advice received; or

(d)    with the consent of the parties, confer separately with the parties and their counsel in an effort to mediate or settle pending matters.

(5)    A judge should dispose promptly of the business of the court.

(6)    A judge should not make public comment on the merits of a matter pending or impending in any court.  A judge should require similar restraint by court personnel subject to the judge's direction and control.  The prohibition on public comment on the merits does not extend to public statements made in the course of the judge's

official duties, to explanations of court procedures, or to scholarly presentations made for purposes of legal education.

B.  *Administrative Responsibilities.*

    (1)    A judge should diligently discharge administrative responsibilities, maintain professional competence in judicial administration, and facilitate the performance of the administrative responsibilities of other judges and court personnel.

    (2)    A judge should not direct court personnel to engage in conduct on the judge's behalf or as the judge's representative when that conduct would contravene the Code if undertaken by the judge.

    (3)    A judge should exercise the power of appointment fairly and only on the basis of merit, avoiding unnecessary appointments, nepotism, and favoritism.  A judge should not approve compensation of appointees beyond the fair value of services rendered.

    (4)    A judge with supervisory authority over other judges should take reasonable measures to ensure that they perform their duties timely and effectively.

    (5)    A judge should take appropriate action upon learning of reliable evidence indicating the likelihood that a judge's conduct contravened this Code or a lawyer violated applicable rules of professional conduct.

C.  *Disqualification.*

    (1)    A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which:

        (a)    the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

        (b)    the judge served as a lawyer in the matter in controversy, or a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter, or the judge or lawyer has been a material witness;

        (c)    the judge knows that the judge, individually or as a fiduciary, or the judge's spouse or minor child residing in the judge's household, has a financial interest in the subject matter in

controversy or in a party to the proceeding, or any other interest that could be affected substantially by the outcome of the proceeding;

    (d)    the judge or the judge's spouse, or a person related to either within the third degree of relationship, or the spouse of such a person is:

        (i)    a party to the proceeding, or an officer, director, or trustee of a party;

        (ii)    acting as a lawyer in the proceeding;

        (iii)    known by the judge to have an interest that could be substantially affected by the outcome of the proceeding; or

        (iv)    to the judge's knowledge likely to be a material witness in the proceeding;

    (e)    the judge has served in governmental employment and in that capacity participated as a judge (in a previous judicial position), counsel, advisor, or material witness concerning the proceeding or has expressed an opinion concerning the merits of the particular case in controversy.

(2)    A judge should keep informed about the judge's personal and fiduciary financial interests and make a reasonable effort to keep informed about the personal financial interests of the judge's spouse and minor children residing in the judge's household.

(3)    For the purposes of this section:

    (a)    the degree of relationship is calculated according to the civil law system; the following relatives are within the third degree of relationship:  parent, child, grandparent, grandchild, great grandparent, great grandchild, sister, brother, aunt, uncle, niece, and nephew; the listed relatives include whole and half blood relatives and most step relatives;

    (b)    "fiduciary" includes such relationships as executor, administrator, trustee, and guardian;

    (c)    "financial interest" means ownership of a legal or equitable interest, however small, or a relationship as director, advisor, or other active participant in the affairs of a party, except that:

(i)      ownership in a mutual or common investment fund that holds securities is not a "financial interest" in such securities unless the judge participates in the management of the fund;

(ii)     an office in an educational, religious, charitable, fraternal, or civic organization is not a "financial interest" in securities held by the organization;

(iii)    the proprietary interest of a policyholder in a mutual insurance company, or a depositor in a mutual savings association, or a similar proprietary interest, is a "financial interest" in the organization only if the outcome of the proceeding could substantially affect the value of the interest;

(iv)    ownership of government securities is a "financial interest" in the issuer only if the outcome of the proceeding could substantially affect the value of the securities;

(d)     "proceeding" includes pretrial, trial, appellate review, or other stages of litigation.

(4)     Notwithstanding the preceding provisions of this Canon, if a judge would be disqualified because of a financial interest in a party (other than an interest that could be substantially affected by the outcome), disqualification is not required if the judge (or the judge's spouse or minor child) divests the interest that provides the grounds for disqualification.

D.      *Remittal of Disqualification.*  Instead of withdrawing from the proceeding, a judge disqualified by Canon 3C(1) may, except in the circumstances specifically set out in subsections (a) through (e), disclose on the record the basis of disqualification.  The judge may participate in the proceeding if, after that disclosure, the parties and their lawyers have an opportunity to confer outside the presence of the judge, all agree in writing or on the record that the judge should not be disqualified, and the judge is then willing to participate.  The agreement should be incorporated in the record of the proceeding.

## COMMENTARY

**Canon 3A(3).**  The duty to hear all proceedings fairly and with patience is not inconsistent with the duty to dispose promptly of the business of the court.  Courts can be efficient and businesslike while being patient and deliberate.

The duty under Canon 2 to act in a manner that promotes public confidence in the integrity and impartiality of the judiciary applies to all the judge's activities, including the discharge of the judge's adjudicative and administrative responsibilities.  The duty to be respectful includes the responsibility to avoid comment or behavior that could reasonably be interpreted as harassment, prejudice or bias.

**Canon 3A(4).**  The restriction on ex parte communications concerning a proceeding includes communications from lawyers, law teachers, and others who are not participants in the proceeding.  A judge may consult with other judges or with court personnel whose function is to aid the judge in carrying out adjudicative responsibilities.  A judge should make reasonable efforts to ensure that law clerks and other court personnel comply with this provision.

A judge may encourage and seek to facilitate settlement but should not act in a manner that coerces any party into surrendering the right to have the controversy resolved by the courts.

**Canon 3A(5).**  In disposing of matters promptly, efficiently, and fairly, a judge must demonstrate due regard for the rights of the parties to be heard and to have issues resolved without unnecessary cost or delay.  A judge should monitor and supervise cases to reduce or eliminate dilatory practices, avoidable delays, and unnecessary costs.

Prompt disposition of the court's business requires a judge to devote adequate time to judicial duties, to be punctual in attending court and expeditious in determining matters under submission, and to take reasonable measures to ensure that court personnel, litigants, and their lawyers cooperate with the judge to that end.

**Canon 3A(6).**  The admonition against public comment about the merits of a pending or impending matter continues until the appellate process is complete.  If the public comment involves a case from the judge's own court, the judge should take particular care so that the comment does not denigrate public confidence in the judiciary's integrity and impartiality, which would violate Canon 2A.  A judge may comment publicly on proceedings in which the judge is a litigant in a personal capacity, but not on mandamus proceedings when the judge is a litigant in an official capacity (but the judge may respond in accordance with Fed. R. App. P. 21(b)).

**Canon 3B(3).**  A judge's appointees include assigned counsel, officials such as referees, commissioners, special masters, receivers, guardians, and personnel such as law clerks, secretaries, and judicial assistants.  Consent by the parties to an appointment or an award of compensation does not relieve the judge of the obligation prescribed by this subsection.

**Canon 3B(5).**  Appropriate action may include direct communication with the judge or lawyer, other direct action if available, reporting the conduct to the appropriate authorities, or, when the judge believes that a judge's or lawyer's conduct is caused by

drugs, alcohol, or a medical condition, making a confidential referral to an assistance program.  Appropriate action may also include responding to a subpoena to testify or otherwise participating in judicial or lawyer disciplinary proceedings; a judge should be candid and honest with disciplinary authorities.

**Canon 3C.**  Recusal considerations applicable to a judge's spouse should also be considered with respect to a person other than a spouse with whom the judge maintains both a household and an intimate relationship.

**Canon 3C(1)(c).**  In a criminal proceeding, a victim entitled to restitution is not, within the meaning of this Canon, a party to the proceeding or the subject matter in controversy.  A judge who has a financial interest in the victim of a crime is not required by Canon 3C(1)(c) to disqualify from the criminal proceeding, but the judge must do so if the judge's impartiality might reasonably be questioned under Canon 3C(1) or if the judge has an interest that could be substantially affected by the outcome of the proceeding under Canon 3C(1)(d)(iii).

**Canon 3C(1)(d)(ii).**  The fact that a lawyer in a proceeding is affiliated with a law firm with which a relative of the judge is affiliated does not of itself disqualify the judge.  However, if "the judge's impartiality might reasonably be questioned" under Canon 3C(1), or the relative is known by the judge to have an interest in the law firm that could be "substantially affected by the outcome of the proceeding" under Canon 3C(1)(d)(iii), the judge's disqualification is required.

## CANON 4:   A JUDGE MAY ENGAGE IN EXTRAJUDICIAL ACTIVITIES THAT ARE CONSISTENT WITH THE OBLIGATIONS OF JUDICIAL OFFICE

A judge may engage in extrajudicial activities, including law-related pursuits and civic, charitable, educational, religious, social, financial, fiduciary, and governmental activities, and may speak, write, lecture, and teach on both law-related and nonlegal subjects.  However, a judge should not participate in extrajudicial activities that detract from the dignity of the judge's office, interfere with the performance of the judge's official duties, reflect adversely on the judge's impartiality, lead to frequent disqualification, or violate the limitations set forth below.

A.      *Law-related Activities.*

(1)      *Speaking, Writing, and Teaching.*  A judge may speak, write, lecture, teach, and participate in other activities concerning the law, the legal system, and the administration of justice.

(2)      *Consultation.*  A judge may consult with or appear at a public hearing before an executive or legislative body or official:

      (a)    on matters concerning the law, the legal system, or the administration of justice;

      (b)    to the extent that it would generally be perceived that a judge's judicial experience provides special expertise in the area; or

      (c)    when the judge is acting pro se in a matter involving the judge or the judge's interest.

(3)    *Organizations.*  A judge may participate in and serve as a member, officer, director, trustee, or nonlegal advisor of a nonprofit organization devoted to the law, the legal system, or the administration of justice and may assist such an organization in the management and investment of funds.  A judge may make recommendations to public and private fund-granting agencies about projects and programs concerning the law, the legal system, and the administration of justice.

(4)    *Arbitration and Mediation.*  A judge should not act as an arbitrator or mediator or otherwise perform judicial functions apart from the judge's official duties unless expressly authorized by law.

(5)    *Practice of Law.*  A judge should not practice law and should not serve as a family member's lawyer in any forum.  A judge may, however, act pro se and may, without compensation, give legal advice to and draft or review documents for a member of the judge's family.

B.    *Civic and Charitable Activities.*  A judge may participate in and serve as an officer, director, trustee, or nonlegal advisor of a nonprofit civic, charitable, educational, religious, or social organization, subject to the following limitations:

    (1)    A judge should not serve if it is likely that the organization will either be engaged in proceedings that would ordinarily come before the judge or be regularly engaged in adversary proceedings in any court.

    (2)    A judge should not give investment advice to such an organization but may serve on its board of directors or trustees even though it has the responsibility for approving investment decisions.

C.    *Fund Raising.*  A judge may assist nonprofit law-related, civic, charitable, educational, religious, or social organizations in planning fund-raising activities and may be listed as an officer, director, or trustee.  A judge

may solicit funds for such an organization from judges over whom the judge does not exercise supervisory or appellate authority and from members of the judge's family.  Otherwise, a judge should not personally participate in fund-raising activities, solicit funds for any organization, or use or permit the use of the prestige of judicial office for that purpose.  A judge should not personally participate in membership solicitation if the solicitation might reasonably be perceived as coercive or is essentially a fund-raising mechanism.

D.    *Financial Activities.*

(1)    A judge may hold and manage investments, including real estate, and engage in other remunerative activity, but should refrain from financial and business dealings that exploit the judicial position or involve the judge in frequent transactions or continuing business relationships with lawyers or other persons likely to come before the court on which the judge serves.

(2)    A judge may serve as an officer, director, active partner, manager, advisor, or employee of a business only if the business is closely held and controlled by members of the judge's family.  For this purpose, "members of the judge's family" means persons related to the judge or the judge's spouse within the third degree of relationship as defined in Canon 3C(3)(a), any other relative with whom the judge or the judge's spouse maintains a close familial relationship, and the spouse of any of the foregoing.

(3)    As soon as the judge can do so without serious financial detriment, the judge should divest investments and other financial interests that might require frequent disqualification.

(4)    A judge should comply with the restrictions on acceptance of gifts and the prohibition on solicitation of gifts set forth in the Judicial Conference Gift Regulations.  A judge should endeavor to prevent any member of the judge's family residing in the household from soliciting or accepting a gift except to the extent that a judge would be permitted to do so by the Judicial Conference Gift Regulations.  A "member of the judge's family" means any relative of a judge by blood, adoption, or marriage, or any person treated by a judge as a member of the judge's family.

(5)    A judge should not disclose or use nonpublic information acquired in a judicial capacity for any purpose unrelated to the judge's official duties.

E.    *Fiduciary Activities.*  A judge may serve as the executor, administrator, trustee, guardian, or other fiduciary only for the estate, trust, or person of

a member of the judge's family as defined in Canon 4D(4).  As a family fiduciary a judge is subject to the following restrictions:

(1)     The judge should not serve if it is likely that as a fiduciary the judge would be engaged in proceedings that would ordinarily come before the judge or if the estate, trust, or ward becomes involved in adversary proceedings in the court on which the judge serves or one under its appellate jurisdiction.

(2)     While acting as a fiduciary, a judge is subject to the same restrictions on financial activities that apply to the judge in a personal capacity.

F.     *Governmental Appointments.*  A judge may accept appointment to a governmental committee, commission, or other position only if it is one that concerns the law, the legal system, or the administration of justice, or if appointment of a judge is required by federal statute.  A judge should not, in any event, accept such an appointment if the judge's governmental duties would tend to undermine the public confidence in the integrity, impartiality, or independence of the judiciary.  A judge may represent the judge's country, state, or locality on ceremonial occasions or in connection with historical, educational, and cultural activities.

G.     *Chambers, Resources, and Staff.*  A judge should not to any substantial degree use judicial chambers, resources, or staff to engage in extrajudicial activities permitted by this Canon.

H.     *Compensation, Reimbursement, and Financial Reporting.*  A judge may accept compensation and reimbursement of expenses for the law-related and extrajudicial activities permitted by this Code if the source of the payments does not give the appearance of influencing the judge in the judge's judicial duties or otherwise give the appearance of impropriety, subject to the following restrictions:

(1)     Compensation should not exceed a reasonable amount nor should it exceed what a person who is not a judge would receive for the same activity.

(2)     Expense reimbursement should be limited to the actual costs of travel, food, and lodging reasonably incurred by the judge and, where appropriate to the occasion, by the judge's spouse or relative.  Any additional payment is compensation.

(3)     A judge should make required financial disclosures, including disclosures of gifts and other things of value, in compliance with applicable statutes and Judicial Conference regulations and directives.

COMMENTARY

**Canon 4.**  Complete separation of a judge from extrajudicial activities is neither possible nor wise; a judge should not become isolated from the society in which the judge lives.  As a judicial officer and a person specially learned in the law, a judge is in a unique position to contribute to the law, the legal system, and the administration of justice, including revising substantive and procedural law and improving criminal and juvenile justice.  To the extent that the judge's time permits and impartiality is not compromised, the judge is encouraged to do so, either independently or through a bar association, judicial conference, or other organization dedicated to the law.  Subject to the same limitations, judges may also engage in a wide range of non-law-related activities.

Within the boundaries of applicable law (*see, e.g.*, 18 U.S.C. § 953) a judge may express opposition to the persecution of lawyers and judges anywhere in the world if the judge has ascertained, after reasonable inquiry, that the persecution is occasioned by conflict between the professional responsibilities of the persecuted judge or lawyer and the policies or practices of the relevant government.

A person other than a spouse with whom the judge maintains both a household and an intimate relationship should be considered a member of the judge's family for purposes of legal assistance under Canon 4A(5), fund raising under Canon 4C, and family business activities under Canon 4D(2).

**Canon 4A.**  Teaching and serving on the board of a law school are permissible, but in the case of a for-profit law school, board service is limited to a nongoverning advisory board.

Consistent with this Canon, a judge may encourage lawyers to provide pro bono legal services.

**Canon 4A(4).**  This Canon generally prohibits a judge from mediating a state court matter, except in unusual circumstances (*e.g.*, when a judge is mediating a federal matter that cannot be resolved effectively without addressing the related state court matter).

**Canon 4A(5).**  A judge may act pro se in all legal matters, including matters involving litigation and matters involving appearances before or other dealings with governmental bodies.  In so doing, a judge must not abuse the prestige of office to advance the interests of the judge or the judge's family.

**Canon 4B.**  The changing nature of some organizations and their exposure to litigation make it necessary for a judge regularly to reexamine the activities of each organization with which the judge is affiliated to determine if the judge's continued association is appropriate.  For example, in many jurisdictions, charitable hospitals are in court more often now than in the past.

**Canon 4C.**  A judge may attend fund-raising events of law-related and other organizations although the judge may not be a speaker, a guest of honor, or featured on the program of such an event.  Use of a judge's name, position in the organization, and judicial designation on an organization's letterhead, including when used for fund raising or soliciting members, does not violate Canon 4C if comparable information and designations are listed for others.

**Canon 4D(1), (2), and (3).**  Canon 3 requires disqualification of a judge in any proceeding in which the judge has a financial interest, however small.  Canon 4D requires a judge to refrain from engaging in business and from financial activities that might interfere with the impartial performance of the judge's judicial duties.  Canon 4H requires a judge to report compensation received for activities outside the judicial office.  A judge has the rights of an ordinary citizen with respect to financial affairs, except for limitations required to safeguard the proper performance of the judge's duties.  A judge's participation in a closely held family business, while generally permissible, may be prohibited if it takes too much time or involves misuse of judicial prestige or if the business is likely to come before the court on which the judge serves.  Owning and receiving income from investments do not as such affect the performance of a judge's duties.

**Canon 4D(5).**  The restriction on using nonpublic information is not intended to affect a judge's ability to act on information as necessary to protect the health or safety of the judge or a member of a judge's family, court personnel, or other judicial officers if consistent with other provisions of this Code.

**Canon 4E.**  Mere residence in the judge's household does not by itself make a person a member of the judge's family for purposes of this Canon.  The person must be treated by the judge as a member of the judge's family.

The Applicable Date of Compliance provision of this Code addresses continued service as a fiduciary.

A judge's obligation under this Code and the judge's obligation as a fiduciary may come into conflict.  For example, a judge should resign as a trustee if it would result in detriment to the trust to divest holdings whose retention would require frequent disqualification of the judge in violation of Canon 4D(3).

**Canon 4F.**  The appropriateness of accepting extrajudicial assignments must be assessed in light of the demands on judicial resources and the need to protect the courts from involvement in matters that may prove to be controversial.  Judges should not accept governmental appointments that could interfere with the effectiveness and independence of the judiciary, interfere with the performance of the judge's judicial responsibilities, or tend to undermine public confidence in the judiciary.

**Canon 4H.**  A judge is not required by this Code to disclose income, debts, or investments, except as provided in this Canon.  The Ethics Reform Act of 1989 and

implementing regulations promulgated by the Judicial Conference impose additional restrictions on judges' receipt of compensation.  That Act and those regulations should be consulted before a judge enters into any arrangement involving the receipt of compensation.  The restrictions so imposed include but are not limited to:  (1) a prohibition against receiving "honoraria" (defined as anything of value received for a speech, appearance, or article), (2) a prohibition against receiving compensation for service as a director, trustee, or officer of a profit or nonprofit organization, (3) a requirement that compensated teaching activities receive prior approval, and (4) a limitation on the receipt of "outside earned income."

## CANON 5:     A JUDGE SHOULD REFRAIN FROM POLITICAL ACTIVITY

A.     *General Prohibitions.*  A judge should not:

(1)     act as a leader or hold any office in a political organization;

(2)     make speeches for a political organization or candidate, or publicly endorse or oppose a candidate for public office; or

(3)     solicit funds for, pay an assessment to, or make a contribution to a political organization or candidate, or attend or purchase a ticket for a dinner or other event sponsored by a political organization or candidate.

B.     *Resignation upon Candidacy.*  A judge should resign the judicial office if the judge becomes a candidate in a primary or general election for any office.

C.     *Other Political Activity.*  A judge should not engage in any other political activity.  This provision does not prevent a judge from engaging in activities described in Canon 4.

COMMENTARY

The term "political organization" refers to a political party, a group affiliated with a political party or candidate for public office, or an entity whose principal purpose is to advocate for or against political candidates or parties in connection with elections for public office.

## Compliance with the Code of Conduct

Anyone who is an officer of the federal judicial system authorized to perform judicial functions is a judge for the purpose of this Code.  All judges should comply with this Code except as provided below.

A.    Part-time Judge

A part-time judge is a judge who serves part-time, whether continuously or periodically, but is permitted by law to devote time to some other profession or occupation and whose compensation for that reason is less than that of a full-time judge.  A part-time judge:

(1)    is not required to comply with Canons 4A(4), 4A(5), 4D(2), 4E, 4F, or 4H(3);

(2)    except as provided in the Conflict-of-Interest Rules for Part-time Magistrate Judges, should not practice law in the court on which the judge serves or in any court subject to that court's appellate jurisdiction, or act as a lawyer in a proceeding in which the judge has served as a judge or in any related proceeding.

B.    Judge Pro Tempore

A judge pro tempore is a person who is appointed to act temporarily as a judge or as a special master.

(1)    While acting in this capacity, a judge pro tempore is not required to comply with Canons 4A(4), 4A(5), 4D(2), 4D(3), 4E, 4F, or 4H(3); further, one who acts solely as a special master is not required to comply with Canons 4A(3), 4B, 4C, 4D(4), or 5.

(2)    A person who has been a judge pro tempore should not act as a lawyer in a proceeding in which the judge has served as a judge or in any related proceeding.

C.    Retired Judge

A judge who is retired under 28 U.S.C. § 371(b) or § 372(a), or who is subject to recall under § 178(d), or who is recalled to judicial service, should comply with all the provisions of this Code except Canon 4F, but the judge should refrain from judicial service during the period of an extrajudicial appointment not sanctioned by Canon 4F.  All other retired judges who are eligible for recall to judicial service (except those in U.S. territories and possessions) should comply with the provisions of this Code governing part-time judges.  A senior judge in the territories and possessions must comply with this Code as prescribed by 28 U.S.C. §§ 373(c)(5) and (d).

Case: 13-3495    Document: 10    Filed: 01/15/2014    Pages: 187

## Applicable Date of Compliance

Persons to whom this Code applies should arrange their financial and fiduciary affairs as soon as reasonably possible to comply with it and should do so in any event within one year after appointment.  If, however, the demands on the person's time and the possibility of conflicts of interest are not substantial, such a person may continue to act, without compensation, as an executor, administrator, trustee, or other fiduciary for the estate or person of one who is not a member of the person's family if terminating the relationship would unnecessarily jeopardize any substantial interest of the estate or person and if the judicial council of the circuit approves.

Case: 13-3495    Document: 10    Filed: 01/15/2014    Pages: 187

U.S.C.A. Const. Amend. I-Full Text        Page 1

**c**

United States Code Annotated Currentness
  Constitution of the United States
    Annotated
      Amendment I. Freedom of Religion, Speech and Press; Peaceful Assemblage; Petition of Grievances (Refs & Annos)

➡➡ **Amendment I. Freedom of Religion, Speech and Press; Peaceful Assemblage; Petition of Grievances**

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

&lt;This amendment is further displayed in three separate documents according to subject matter&gt;

&lt;see USCA Const Amend. I, Religion&gt;

&lt;see USCA Const Amend. I, Speech&gt;

&lt;see USCA Const Amend. I, Assemblage&gt;

LAW REVIEW AND JOURNAL COMMENTARIES

1994 Term of the Supreme Court and freedom of Speech. Martin H. Belsky, 31 Tulsa L.J. 485 (1996).

ABA Rule 3.6 and California Rule 5-120: A flawed approach to the problem of trial publicity. Comment, 43 UCLA L.Rev. 1321 (1996).

Abolishing the time tax on voting. Elora Mukherjee, 85 Notre Dame L. Rev. 177 (November 2009).

Abortion counseling as vice activity: The free speech implications of *Rust v. Sullivan* and *Planned Parenthood v. Casey.* Christina E. Wells, 95 Colum.L.Rev. 1724 (1995).

Abortion protest: Lawless conspiracy or protected free speech? 72 Denv.U.L.Rev. 445 (1995).

Abraham Lincoln's First Amendment. Geoffrey R. Stone, 78 N.Y.U.L.Rev. 1 (2003).

Abridgements of free speech which discriminate on the basis of viewpoint: *Finzer v. Barry.* Comment, 61 St.John's L.Rev. 127 (1986).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 13-3495      Document: 10      Filed: 01/15/2014      Pages: 187

Public Law 105–183
105th Congress

## An Act

To amend title 11, United States Code, to protect certain charitable contributions, and for other purposes.

June 19, 1998
[S. 1244]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

Religious Liberty and Charitable Donation Protection Act of 1998.
11 USC 101 note.

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Religious Liberty and Charitable Donation Protection Act of 1998".

**SEC. 2. DEFINITIONS.**

Section 548(d) of title 11, United States Code, is amended by adding at the end the following:

"(3) In this section, the term 'charitable contribution' means a charitable contribution, as that term is defined in section 170(c) of the Internal Revenue Code of 1986, if that contribution—

"(A) is made by a natural person; and

"(B) consists of—

"(i) a financial instrument (as that term is defined in section 731(c)(2)(C) of the Internal Revenue Code of 1986); or

"(ii) cash.

"(4) In this section, the term 'qualified religious or charitable entity or organization' means—

"(A) an entity described in section 170(c)(1) of the Internal Revenue Code of 1986; or

"(B) an entity or organization described in section 170(c)(2) of the Internal Revenue Code of 1986.".

**SEC. 3. TREATMENT OF PRE-PETITION QUALIFIED CHARITABLE CONTRIBUTIONS.**

(a) IN GENERAL.—Section 548(a) of title 11, United States Code, is amended—

(1) by inserting "(1)" after "(a)";

(2) by striking "(1) made" and inserting "(A) made";

(3) by striking "(2)(A)" and inserting "(B)(i)";

(4) by striking "(B)(i)" and inserting "(ii)(I)";

(5) by striking "(ii) was" and inserting "(II) was";

(6) by striking "(iii)" and inserting "(III)"; and

(7) by adding at the end the following:

"(2) A transfer of a charitable contribution to a qualified religious or charitable entity or organization shall not be considered to be a transfer covered under paragraph (1)(B) in any case in which—

118

"(A) the amount of that contribution does not exceed 15 percent of the gross annual income of the debtor for the year in which the transfer of the contribution is made; or

"(B) the contribution made by a debtor exceeded the percentage amount of gross annual income specified in subparagraph (A), if the transfer was consistent with the practices of the debtor in making charitable contributions.".

(b) TRUSTEE AS LIEN CREDITOR AND AS SUCCESSOR TO CERTAIN CREDITORS AND PURCHASERS.—Section 544(b) of title 11, United States Code, is amended—

(1) by striking "(b) The trustee" and inserting "(b)(1) Except as provided in paragraph (2), the trustee"; and

(2) by adding at the end the following:

"(2) Paragraph (1) shall not apply to a transfer of a charitable contribution (as that term is defined in section 548(d)(3)) that is not covered under section 548(a)(1)(B), by reason of section 548(a)(2). Any claim by any person to recover a transferred contribution described in the preceding sentence under Federal or State law in a Federal or State court shall be preempted by the commencement of the case.".

(c) CONFORMING AMENDMENTS.—Section 546 of title 11, United States Code, is amended—

(1) in subsection (e)—

(A) by striking "548(a)(2)" and inserting "548(a)(1)(B)"; and

(B) by striking "548(a)(1)" and inserting "548(a)(1)(A)";

(2) in subsection (f)—

(A) by striking "548(a)(2)" and inserting "548(a)(1)(B)"; and

(B) by striking "548(a)(1)" and inserting "548(a)(1)(A)"; and

(3) in subsection (g)—

(A) by striking "section 548(a)(1)" each place it appears and inserting "section 548(a)(1)(A)"; and

(B) by striking "548(a)(2)" and inserting "548(a)(1)(B)".

## SEC. 4. TREATMENT OF POST-PETITION CHARITABLE CONTRIBUTIONS.

(a) CONFIRMATION OF PLAN.—Section 1325(b)(2)(A) of title 11, United States Code, is amended by inserting before the semicolon the following: ", including charitable contributions (that meet the definition of 'charitable contribution' under section 548(d)(3)) to a qualified religious or charitable entity or organization (as that term is defined in section 548(d)(4)) in an amount not to exceed 15 percent of the gross income of the debtor for the year in which the contributions are made".

(b) DISMISSAL.—Section 707(b) of title 11, United States Code, is amended by adding at the end the following: "In making a determination whether to dismiss a case under this section, the court may not take into consideration whether a debtor has made, or continues to make, charitable contributions (that meet the definition of 'charitable contribution' under section 548(d)(3)) to any qualified religious or charitable entity or organization (as that term is defined in section 548(d)(4)).".

11 USC 544 note.    ## SEC. 5. APPLICABILITY.

This Act and the amendments made by this Act shall apply to any case brought under an applicable provision of title 11,

PUBLIC LAW 105–183—JUNE 19, 1998          112 STAT. 519

United States Code, that is pending or commenced on or after the date of enactment of this Act.

**SEC. 6. RULE OF CONSTRUCTION.**                                    11 USC 544 note.

Nothing in the amendments made by this Act is intended to limit the applicability of the Religious Freedom Restoration Act of 1993 (42 U.S.C. 2002bb et seq.).

Approved June 19, 1998.

LEGISLATIVE HISTORY—S. 1244 (H.R. 2604):

HOUSE REPORTS: No. 105–556 accompanying H.R. 2604 (Comm. on the Judiciary).
CONGRESSIONAL RECORD, Vol. 144 (1998):
    May 13, considered and passed Senate.
    June 3, considered and passed House.

○

c

United States Code Annotated Currentness
  Federal Rules of Civil Procedure for the United States District Courts (Refs & Annos)
    Title VII. Judgment
      **Rule 60. Relief From a Judgment or Order**

**(a) Corrections Based on Clerical Mistakes; Oversights and Omissions.**The court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record. The court may do so on motion or on its own, with or without notice. But after an appeal has been docketed in the appellate court and while it is pending, such a mistake may be corrected only with the appellate court's leave.

**(b) Grounds for Relief from a Final Judgment, Order, or Proceeding.**On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

   **(1)** mistake, inadvertence, surprise, or excusable neglect;

   **(2)** newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

   **(3)** fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

   **(4)** the judgment is void;

   **(5)** the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

   **(6)** any other reason that justifies relief.

**(c) Timing and Effect of the Motion.**

   **(1)** *Timing.*A motion under Rule 60(b) must be made within a reasonable time--and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.                121

    **(2)** *Effect on Finality.* The motion does not affect the judgment's finality or suspend its operation.

**(d) Other Powers to Grant Relief.** This rule does not limit a court's power to:

    **(1)** entertain an independent action to relieve a party from a judgment, order, or proceeding;

    **(2)** grant relief under 28 U.S.C. § 1655 to a defendant who was not personally notified of the action; or

    **(3)** set aside a judgment for fraud on the court.

**(e) Bills and Writs Abolished.** The following are abolished: bills of review, bills in the nature of bills of review, and writs of coram nobis, coram vobis, and audita querela.

CREDIT(S)

(Amended December 27, 1946, effective March 19, 1948; December 29, 1948, effective October 20, 1949; March 2, 1987, effective August 1, 1987; April 30, 2007, effective December 1, 2007.)

ADVISORY COMMITTEE NOTES

1937 Adoption

**Note to Subdivision (a).** See [former] Equity Rule 72 (Correction of Clerical Mistakes in Orders and Decrees); Mich.Court Rules Ann. (Searl, 1933) Rule 48, § 3; 2 Wash.Rev.Stat.Ann. (Remington, 1932) § 464(3); Wyo.Rev.Stat.Ann. (Courtright, 1931) § 89-2301(3). For an example of a very liberal provision for the correction of clerical errors and for amendment after judgment, see Va.Code Ann. (Michie, 1936) §§ 6329, 6333.

**Note to Subdivision (b).** Application to the court under this subdivision does not extend the time for taking an appeal, as distinguished from the motion for new trial. This section is based upon Calif.Code Civ.Proc. (Deering, 1937) § 473. See also N.Y.C.P.A. (1937) § 108; 2 Minn.Stat. (Mason, 1927) § 9283.

For the independent action to relieve against mistake, etc., see Dobie, *Federal Procedure,* pages 760 to 765, compare 639; and Simkins, *Federal Practice,* ch. CXXI (pp. 820 to 830) and ch. CXXII (pp. 831 to 834), compare § 214.

**1946 Amendment**

**Note. Subdivision (a).** The amendment incorporates the view expressed in *Perlman v. 322 West Seventy-Second Street, Co., Inc.,* C.C.A.2d, 1942, 127 F.2d 716; 3 *Moore's Federal Practice,* 1938, 3276, and further permits correction after docketing, with leave of the appellate court. Some courts have thought that upon the taking of an appeal the district court lost its power to act. See *Schram v. Safety Investment Co.,* E.D.Mich.1942, 45 F.Supp. 636; also *Miller v. United States,* C.C.A.7th, 1940, 114 F.2d 267.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**SHORT APPENDIX**

DOCS_LA:274534.10

**CERTIFICATE OF COMPLIANCE WITH
CIRCUIT RULE 30**

I, Marci Hamilton, certify that all materials required by Circuit Rule 30(a) and (b) are included in this Appendix.

Dated: January 15, 2014                    By      */s/ Marci A. Hamilton, Esq.*
                                                   Marci A. Hamilton, Esq.
                                                   36 Timber Knoll Drive
                                                   Washington Crossing, PA 18977
                                                   Telephone: (215) 353-8984
                                                   Email: Hamilton.marci@gmail.com

                                                   Special Counsel to the Official Committee
                                                   of Unsecured Creditors

DOCS_LA:274534.10

## TABLE OF CONTENTS FOR SHORT APPENDIX

| Name of Document | Page No. |
|---|---|
| Decision and Order entered by United States District Court for the Eastern District of Wisconsin on July 29, 2013 (Docket No. 24) (Case No. 2:13-cv-00179-RTR) (*Listecki v. Official Committee (In re Archdiocese of Milwaukee)*, 496 B.R. 905 (E.D. Wis. 2013)) | App 001 |
| Judgment in a Civil Case entered by United States District Court for the Eastern District of Wisconsin on August 1, 2013 (Docket No. 26) (Case No. 2:13-cv-00179-RTR) | App 031 |
| Proposed Findings of Fact and Conclusions of Law Pursuant to Remand [Dist. Doc. No. 25] entered on the docket for the Unite States District Court for the Eastern District of Wisconsin on August 1, 2013 (Docket No. 25) (Case No. 2:13-cv-00179-RTR) | App 033 |
| Decision and Order entered by United States District Court for the Eastern District of Wisconsin on October 1, 2013 (Docket No. 46) (Case No. 2:13-cv-00179-RTR) (*Listecki v. Official Committee (In re Archdiocese of Milwaukee)*, 2013 WL 5491895 (E.D. Wis. Oct. 1, 2013 )) | App 036 |

DOCS_LA:274534.10

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**In re Archdiocese of Milwaukee,**

                Debtor.              **Bankruptcy Case No. 11-20059-SVK**

---

**ARCHBISHOP JEROME E. LISTECKI,**
**as Trustee of the Archdiocese of Milwaukee**
**Catholic Cemetery Perpetual Care Trust,**

                Appellant,         **Adv. Proc. No.  11-2459-SVK**

        -vs-              **Case No.  13-C-179**

**OFFICIAL COMMITTEE OF UNSECURED**
**CREDITORS,**

                Appellee.

---

## DECISION AND ORDER

---

The Archdiocese of Milwaukee is in bankruptcy.  One of the issues in this bankruptcy is whether the Archdiocese's creditors, primarily clerical abuse victims who are represented by the Official Committee of Unsecured Creditors (the "Committee"), appointed by the United States Bankruptcy Trustee, can access funds contained in the Archdiocesan Cemetery Trust.  The Cemetery Trust, referred to as the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust, stands apart from the Archdiocese and holds more than $50 million in trust for the perpetual care of more than 500,000 deceased, interred under the tenets of the Catholic faith.

The Cemetery Trust filed an adversary complaint seeking declaratory relief,

App 001

arguing that the Committee cannot access the funds therein without violating the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.* ("RFRA") and the Free Exercise Clause of the First Amendment.   The bankruptcy court granted the Committee's motion for partial summary judgment, finding that neither RFRA nor the First Amendment barred the Committee's claims or defenses in the adversary proceeding.  *In re Archdiocese of Milwaukee*, 485 B.R. 385 (Bankr. E.D. Wis. 2013). Archbishop Jerome E. Listecki, as Trustee for the Cemetery Trust, appealed.

The bankruptcy court's decision is reversed.  The Committee, in pursuing the claims of the unsecured creditors under the authority granted to it by the bankruptcy court, acts "under color of law" and is subject to RFRA.  § 2000bb-2(1).  Therefore, RFRA and the First Amendment prevent the Committee from appropriating the funds in the Trust because doing so would substantially burden the Trustee's free exercise of religion.

## I.    Background

The Archdiocese of Milwaukee was established on November 28, 1843 and created an archbishopric almost 32 years later.  The Archdiocese is both a Wisconsin non-stock corporation and a public juridic person under Codex Iuris Canonici or the Code of Canon Law of the Catholic Church.  The Archdiocese's mission is to serve Catholic parishes, schools and institutions so that they, too, may effectively serve people in Southeastern Wisconsin and the broader community.  The Archbishop is Jerome E. Listecki, successor to the former Archbishop, now Cardinal, Timothy M.

- 2 -

App 002

Dolan.

The Archdiocese has operated and maintained Catholic cemeteries and mausoleums in Milwaukee since as early as 1857 (collectively, the "Milwaukee Catholic Cemeteries"). Those cemeteries consist of Catholic burial facilities within the geographical boundaries of the Archdiocese, including individual burial plots, crypts, niches, and property dedicated to future use as burial facilities. The Milwaukee Catholic Cemeteries encompass approximately 1,000 acres of land in which more than 500,000 individuals are interred. An estimated 3,000 burials take place each year.

In 2007, the Cemetery Trust was formed under Wisconsin law by then-Archbishop Dolan. The funds that comprise the Trust's principal took nearly a century to accumulate and include approximately $55 million that had been held, separately for that period, for the perpetual care of the Milwaukee Catholic Cemeteries even prior to being transferred to the Trust in or around March 2008 (collectively, with any later earned or received Trust funds, the "Perpetual Care Funds"). The Archdiocese receives quarterly distributions from the Trust to cover the costs for providing for the perpetual care of the Milwaukee Catholic Cemeteries.

Under Church law, Catholic cemeteries occupy land blessed and consecrated for the specific use of Christian burial. Church law includes canon law, issued or authorized by the Pope, recognized as the Church's supreme legislator. This Church law is universal and applicable to Catholics world-wide. Church law also includes particular law – that is, law that governs a specific territorial area for which it was

- 3 -

App 003

promulgated.

When the Archdiocese established its first cemeteries in the mid-1800's, Church law in the United States forbade priests from providing funeral services for Catholics buried in non-Catholic cemeteries. Although this prohibition was eased in later years, allowing Catholic funerals for those buried in non-Catholic cemeteries, the Church continued to emphasize the sanctity of Catholic burial sites and the importance of Church-owned cemeteries. It also required, among other things, that Catholic cemeteries be maintained in a manner befitting their sacred purpose with money set aside to provide the necessary maintenance and care.

These expectations and requirements are reflected in the universal law of the Church, first codified in 1917 as the Code of Canon Law and in the particular law of the Archdiocese. The placement of the canons governing cemeteries in the original 1917 Code and the successor 1983 Code emphasizes the belief that Catholic cemeteries are sacred places, not mere property. As expressed in the Archdiocese's 1979 *Guidelines for Christian Burial*: "Not only is the Catholic cemetery a sacred place, a place of prayer, and a place reflecting our beliefs and traditions, it is also for the community a sign of the link among all the faithful, living and dead."

For the Church and therefore Catholics, Catholic cemeteries reflect the Catholic belief in the resurrection of Jesus and the community's commitment to the corporal work of mercy of burying the dead. Resurrection of the dead, of course, has always been an essential element of the Christian faith, beginning with Jesus' own

- 4 -

App 004

resurrection.   For Catholics, moreover, the belief in resurrection is a belief in the ultimate resurrection of one's *own* body.   According to this belief, the soul separates from the physical body at death to meet God, while awaiting reunion with its body, transformed and resurrected through the power of Jesus' resurrection, on the last day.

The sacred nature of Catholic cemeteries – and compliance with the Church's historical and religious traditions and mandates requiring their perpetual care – are understood as a fundamental exercise of this core belief.   Theologically, the deceased must be treated with respect and charity in the Catholic faith with the hope of resurrection.

Although Archbishop Listecki is the administrator of both the Trust and the Archdiocese, the Trust is separate and distinct from the Archdiocese in civil and in canon law.   Under the Code, the ownership of the Trust funds rests in the Trust, not the Archdiocese or the Archbishop.   By administering and holding funds for the ongoing care of the Milwaukee Catholic Cemeteries, the Trust and Trustee assume canonical and moral responsibility for that perpetual care.

Similarly, the Code requires that the Trust's funds be used for the Trust's designated purposes.   If funds are alienated from the Trust without the required canonical approval, the Archbishop as Trustee may well face discipline and a religious penalty from the Church.   Depending on the value of the property at risk, canonical norms require consultation or consent from Church authorities.   They may also require approval from the Vatican.

- 5 -

Archbishop Listecki, as Archbishop and Trustee, adheres to the belief in the resurrection of the body and that belief's exercise through, among other things, the perpetual care of the Milwaukee Catholic Cemeteries. If the Trust is legally compelled to cede all or part of the funds to the estate, there will be no funds or substantially less funds for that perpetual care. As a result, neither the Debtor nor the Trust and its Trustee will be able to fulfill their canonical and moral obligations to provide the appropriate care for these sacred sites – consistent with Catholic doctrine and canon law – or assure the requisite permanence, reverence and respect for those buried there.

## II.    Jurisdiction

An appeal to the district court from an interlocutory order issued by a bankruptcy court is appropriate when it involves a controlling question of law over which there is a substantial ground for difference of opinion, and an immediate appeal from the order may materially advance the termination of the litigation. 28 U.S.C. § 1292(b); *In re Archdiocese of Milwaukee*, 482 B.R. 792, 797 (E.D. Wis. 2012). Previously, the Court held that it was "satisfied that this standard is met, such that it will grant leave to appeal. In the course of briefing, the parties are free to pursue further arguments on this point . . ." April 1, 2013 Decision and Order at 2, ECF No. 2. Taking up the Court's invitation, the Committee argues that leave was improvidently granted.

The Committee concedes that most of the issues presented are pure questions of law. However, the Committee argues that whether the Trustee's free exercise rights

- 6 -

App 006

would be substantially burdened if some or all of the funds in the Trust were made part of the bankruptcy estate is an issue of fact that is not appropriate for an interlocutory appeal.  The Committee is correct that interlocutory appeals on issues of fact are considered "pointless."  "Disputed facts are resolved at trial – by the verdict if it's a jury trial and if it's a bench trial by the judge's findings of fact – and thus resolution comes at the end of the trial, which ordinarily is too late for an *interlocutory* appeal." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 625 (7th Cir. 2010) (emphasis in original).  That said, the bankruptcy court did not reach the substantial burden issue, although it was raised by the Committee, because it ruled that RFRA did not apply to the Committee in the first instance.   Accordingly, the Court is not in the position of reviewing the denial of summary judgment because of the existence of a genuine issue of material fact.  *Arenholz v. Bd. Of Trustees of Univ. of Ill.*, 219 F.3d 674, 676 (7th Cir. 2000) ("question of law" refers to "a question of the meaning of a statutory or constitutional regulation, or common law doctrine rather than to whether the party opposing summary judgment has raised a genuine issue of material fact").

The Committee further argues that there are no substantial grounds for difference of opinion on the issues presented by this appeal.  Ironically, there may be substantial grounds for difference of opinion regarding the standard which governs whether an issue of law is "contestable."  *Compare, Stong v. Bucyrus-Erie Co.*, 476 F. Supp. 224, 225 (E.D. Wis. 1979) (standard is satisfied when "a reasonable appellate judge could vote for reversal of the challenged order"); *In re Bridgestone/Firestone,*

- 7 -

App 007

*Inc.*, 212 F. Supp. 2d 903, 909-10 (S.D. Ind. 2002) (rejecting the standard in *Stong*: "Instead, we examine 'the strength of the arguments in opposition to the challenged ruling.'") (internal citation omitted). The arguments in opposition to the bankruptcy court's ruling are strong enough to meet the latter, more rigorous standard.

Moreover, the Court easily concludes that resolution of the issues presented on appeal will materially advance the termination of this litigation. The bankruptcy court stayed the entire adversary proceeding pending the Court's decision on appeal. It cannot be denied that this Court's decision, or a further ruling on appeal from this Court's decision, will shape the course of future proceedings in bankruptcy. The Committee argues that protracted litigation will still occur because the substantial burden issue is not ripe for decision. As noted, the Committee raised this issue before the bankruptcy court. While the bankruptcy court did not reach this issue, it does not follow that the Court must also refrain from doing so.

On that point, a ruling from this Court is justified on a variety of procedural and jurisdictional grounds aside from the review of an interlocutory order. After the Committee filed its motion for partial summary judgment, the bankruptcy court approved a stipulation in which the parties agreed that the Trustee's RFRA and First Amendment claims are non-core:

> The Parties and the Debtor **do not consent** to the Bankruptcy Court hearing and determining these claims and affirmative defenses. The Parties and the Debtor agree that the Bankruptcy Court may hear the RFRA and First Amendment Claims and the RFRA and First Amendment Affirmative Defenses and submit proposed findings of fact

- 8 -

and conclusions of law to the district court in accordance with the provisions of 28 U.S.C. section 157(c)(1).

Adversary Docket No. 61, ¶ 2 (emphasis in original). Despite this explicit stipulation, and to the apparent surprise of the parties, the bankruptcy court entered an order granting the Committee's motion for partial summary judgment. As the Trustee argued in its motion for leave to appeal, there is cause to withdraw the reference because the Trustee's claims are concededly non-core. The distinction between core and non-core proceedings is the most important factor in determining whether there is cause for withdrawal since "'efficiency, uniformity and judicial economy concerns are largely consumed within it.' This is mainly because a bankruptcy judge cannot enter a final judgment in a non-core proceeding. Instead, the bankruptcy judge makes recommendations that are subject to *de novo* review in the district court." *In re Archdiocese of Milwaukee*, Case No. 13-C-58, 2013 WL 660018, at *1 (E.D. Wis. Feb. 22, 2013) (internal citations omitted). Also, since the bankruptcy court should have submitted "proposed findings of fact and conclusions of law," § 157(c)(1), the Court could simply treat the bankruptcy court's order as such and review it accordingly.

Whether the Court treats this as an interlocutory appeal, a § 157(c)(1) proceeding, or as a withdrawal of the reference from the bankruptcy court, the legal issues are subject to *de novo* review. Interlocutory appeals are not appropriate vehicles to resolve issues of fact, but the bankruptcy court did not make any findings of fact. To the extent that the interlocutory nature of the bankruptcy court's order calls into

- 9 -

App 009

question the Court's plenary authority to resolve the Trustee's RFRA and First Amendment claims, the reference is withdrawn from the bankruptcy court for this limited purpose. *See, e.g., In re Enron Corp.*, No. 03 Civ.1727 LTS, 2003 WL 22481030, at *4 (S.D.N.Y. Nov. 4, 2003) (explaining that if a proceeding is "non-core, [the district court] will ultimately adjudicate the parties' rights, whether in the context of a trial or dispositive motion practice. Legal determinations by the bankruptcy judge will be subject to *de novo* review on appeal in any event, and the Court retains the power to withdraw the reference for cause at any time. The essential attributes of the judicial power remain with this Court to the extent the matter is non-core").

## III.   RFRA

RFRA was passed in response to *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872 (1990), which held that "neutral and generally applicable laws are not susceptible to attack under the Free Exercise Clause of the Constitution even if they incidentally burden the exercise of religion." *Lighthouse Inst. of Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 261 (3d Cir. 2007). RFRA was Congress's attempt to overrule *Smith* by "mandating that neutral laws that substantially burden religious exercise must be justified under the compelling government interest test." *In re Emp't Disc. Litig. Against State of Ala.*, 198 F.3d 1305, 1320 (11th Cir. 1999). Prior to *Smith*, the Court had traditionally held that any law that substantially burdened the free exercise of religion was constitutionally permissible only if the government could show a compelling interest. "Thus, the purpose of RFRA was to return to what

- 10 -

Congress believed was the pre-*Smith* status quo of requiring the Government to show a compelling interest for any law that substantially burdened the free exercise of religion." *Harrell v. Donahue*, 638 F.3d 975, 983-84 (8th Cir. 2011) (internal citations omitted).

In *City of Boerne v. Flores*, 521 U.S. 507 (1997), the Court invalidated RFRA as applied to States and their subdivisions because the Act exceeded Congress's remedial powers under the Fourteenth Amendment. *Cutter v. Wilkinson*, 544 U.S. 709, 715 (2005) (citing *Boerne*, 521 U.S. at 532-36). In the wake of *Boerne*, "[e]very appellate court that has squarely addressed the question has held that the RFRA governs the activities of federal officers and agencies." *O'Bryan v. Bureau of Prisons*, 349 F.3d 399, 401 (7th Cir. 2003) (citing *Guam v. Guerrero*, 290 F.3d 1210, 1221 (9th Cir. 2002); *Henderson v. Kennedy*, 265 F.3d 1072, 1073 (D.C. Cir. 2001); *Kikumura v. Hurley*, 242 F.3d 950, 958 (10th Cir. 2001); *In re Young*, 141 F.3d 854, 856 (8th Cir. 1998)). Nonetheless, the bankruptcy court found that *Boerne* precludes the Trustee's RFRA claims because "Wisconsin trust law governs the validity of the Trust, and Wisconsin fraudulent transfer law governs whether transfers of the Debtor's property to the Trust are avoidable and recoverable by the Committee. . . . [T]hese state laws cannot be invalidated by RFRA." 485 B.R. at 392.

It is true, as the bankruptcy court explained, that the property interests of the Archdiocese in relation to the Trust are generally determined by state law. But the ultimate issue of whether or not that property can be brought into the bankruptcy estate

- 11 -

is governed solely by the Bankruptcy Code.  11 U.S.C. § 541(a) (defining the property

*of the estate*); § 542(a) (turnover of property *to the estate*); § 550(a) ("to the extent that

a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this

title, the trustee may recover, *for the benefit of the estate*, the property transferred . . .")

(emphasis added).   As the Eighth Circuit held in light of *Boerne*:

> We conclude that RFRA is an appropriate means by Congress to modify
> the United States bankruptcy laws. . . . The Trustee has not contended,
> and we can conceive of no argument to support the contention, that
> Congress is incapable of amending the legislation that it has passed.
> Neither can we accept any argument that allowing the discharge of a
> debt in bankruptcy and preventing the recovery of a transfer made by
> insolvent debtors is beyond the authority of Congress.  We therefore
> conclude that Congress had the authority to enact RFRA and make it
> applicable to the law of bankruptcy.

*Young*, 141 F.3d at 861 (internal citations omitted).  Simply put, *Boerne* is no obstacle

to the application of RFRA in this case.  Applying RFRA to the Committee's claims

would not invalidate state law.

### A.     Government

Under RFRA, "government" may not "substantially burden a person's exercise

of religion even if the burden results from a rule of general applicability," unless it can

demonstrate that the burden is "in furtherance of a compelling governmental interest"

and is "the least restrictive means of furthering that compelling governmental interest."

42 U.S.C. §§ 2000bb-1(a), (b).  As an initial matter, the Trustee argues that RFRA

applies not just to claims against "government," as that term is defined by RFRA, but

also to actions between private parties.  The Seventh Circuit has indicated, albeit in

- 12 -

dicta, that RFRA "is applicable only to suits to which the government is a party." *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006). This is in accordance with the general weight of authority among other appellate courts. *See Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 411-12 (6th Cir. 2010) (citing then-Judge Sotomayor's dissent in *Hankins v. Lyght*, 441 F.3d 96 (2d Cir. 2006)); *Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1120-21 (9th Cir. 2000); *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 834-35 (9th Cir. 1999).

Therefore, the Court will proceed under the assumption that the Seventh Circuit would find RFRA inapplicable to suits between private parties. Nonetheless, the Court finds that the Committee falls within the definition of "government" because it acts under color of law pursuant to the authority granted to it by the bankruptcy court.

### B.    Color of Law

Under RFRA, "the term 'government' includes a branch, department, agency, instrumentality, and official (*or other person acting under color of law*) of the United States . . ." § 2000bb-2(1) (emphasis added). The "judicial interpretation of the phrase 'acting under color of law,' as used in 42 U.S.C. § 1983, applies equally in [a] RFRA action." *Sutton*, 192 F.3d at 835 (citing *Brownson v. Bogenschutz*, 966 F. Supp. 795, 797 (E.D. Wis. 1997)). Accordingly, the "ultimate issue" is whether "the alleged infringement of federal rights [is] fairly attributable to the [government]." *Rendell-*

- 13 -

*Baker v. Kohn*, 457 U.S. 830, 838 (1982). For the reasons that follow, the Committee's pursuit of claims against the Cemetery Trust is fairly attributable to the government.

The Supreme Court has described a two-part test on the issue of "fair attribution." First, the deprivation "must be caused by the exercise of some right or privilege created by the [government] or by a rule of conduct imposed by the [government] . . ." *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 937 (1982). The Committee does not dispute that this element is satisfied. *Id.* (describing cases where "a state statute provided the right to garnish or to obtain prejudgment attachment, as well as the procedure by which the rights could be exercised"). As explained above, the Committee is attempting to claim the assets in the Trust for the benefit of the bankruptcy estate pursuant to various provisions of the Bankruptcy Code. *See, e.g.,* 11 U.S.C. § § 541, 542, 544, and 548.

Second, "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Lugar*, 457 U.S. at 937. "Action by a private party pursuant to [a] statute, without something more, [is] not sufficient to justify characterization of that party as a 'state actor.'" *Id.* at 939. The Supreme Court has identified numerous situations when private conduct is fairly attributed to the government. For example, private action can become state action when private actors "conspire or are jointly engaged with state actors to deprive a person of constitutional rights;" when the state "compels the discriminatory action;" when the state "controls a

- 14 -

App 014

nominally private entity;" when the state is "entwined" with a private entity's "management or control;" when the state "delegates a public function to a private entity;" or when there is "such a close nexus between the state and the challenged action that seemingly private behavior may be treated as that of the state itself." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 815-16 (7th Cir. 2009) (internal citations omitted).

Confusion reigns in this area of the law, and the Supreme Court has questioned whether these different tests are "actually different in operation or simply different ways of characterizing the necessarily fact-bound inquiry that confronts the Court in such a situation . . ." *Lugar* at 939. For example, in *Hallinan*, the Seventh Circuit described the "close nexus" situation as a separate test; just under two months later, the Seventh Circuit wrote that at its "most basic level, the state action doctrine *requires* that a court find such a 'close nexus between the State and the challenged action' that the challenged action 'may be fairly treated as that of the State itself.'" *Rodriguez v. Plymouth Ambulance Service*, 577 F.3d 816, 823 (7th Cir. 2009) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974) (emphasis added)). The *Rodriguez* court then recognized that the various formulations are susceptible to "semantic variations, conflations and significant overlap in practical application; we further recognize that they 'lack rigid simplicity.' Nevertheless, we believe that it is useful to describe these tests as the symbiotic relationship test, the state command and encouragement test, the joint participation doctrine and the public function test." *Id.* at 823-24 (internal

- 15 -

citations and quotations omitted).  At the risk of placing this case in a category that may or may not be analytically distinct, the Court finds that it falls under the "delegation of a public function" rubric.  In turn, the Committee's performance of this public function, discussed below, demonstrates that the requirement of a "close nexus" has also been satisfied.

In the underlying Chapter 11 proceedings, the Archdiocese is acting as a debtor-in-possession with respect to the bankruptcy estate.  "In recognition of the fact that, in a reorganization, the appointment of a trustee is generally the exception, rather than the rule, the Bankruptcy Code vests a debtor-in-possession with the powers of a trustee in the event no trustee is appointed."  *In re iPCS, Inc.*, 297 B.R. 283, 287 (Bankr. N.D. Ga. 2003).  As a result, the Archdiocese has "the power to bring causes of action on behalf of the estate, such as avoidance actions."  *Id.*  More than that, the Archdiocese, as debtor-in-possession, is "duty-bound[] to assert cognizable claims in an effort to recover damages for the benefit of the estate."  *Id.*

Archbishop Listecki is the spiritual leader of the Archdiocese, and he is also the Trustee of the Cemetery Trust.  Because of this conflict of interest, the Archdiocese cannot bring avoidance actions against the Trust.   Accordingly, the Committee, consisting of five unsecured creditors previously appointed by the United States Trustee, 11 U.S.C. §§ 1102(a)(1), (b)(1), was granted derivative standing by the bankruptcy court to "assert and litigate the Avoidance and Turnover Claims against the Archbishop for the benefit of the Debtor's estate, including, but not limited to, any

- 16 -

App 016

Avoidance and Turnover Claims that, if not for the Court's order approving this Stipulation, the Committee would not have had standing to bring because those Avoidance and Turnover Claims belong to the Debtor's estate." Adversary Docket No. 39, ¶ 3. The "ability to confer derivative standing upon creditors' committees is a straightforward application of bankruptcy courts' equitable powers." *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003).

In the Court's view, the pursuit of claims on behalf of a bankruptcy estate is a traditional public function. As one court explained, the filing of a Chapter 11 petition causes a "fundamental *legal change* in the entity." *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 524 (Bankr. E.D.N.Y. 1989) (emphasis in original).

> The filing entity is legally different from what it was the moment before filing, as it now assumes the mantle of a new juridical entity, a debtor-in-possession. *As such it becomes an officer of the court subject to the supervision and control of the Bankruptcy Court and the provisions of the Bankruptcy Code. A debtor-in-possession in a Chapter 11 case has the same fiduciary duties as a trustee appointed by a court.* Indeed, the debtor-in-possession occupies the shoes of a trustee in every major way. As a *de jure* trustee, the debtor-in-possession holds its powers in trust for the benefit of creditors.

*Id.* (emphasis added). In other words, the debtor-in-possession is an officer of the court charged with the duty to act for the benefit of the bankruptcy estate. By giving the Committee derivative standing to bring claims on behalf of the estate, the bankruptcy court effectively transferred the responsibility for performing this public function from the Archdiocese, as debtor-in-possession, to the Committee. Stated

- 17 -

another way, because of its inability to pursue legal action against the Trust, the Archdiocese, in conjunction with the bankruptcy court, delegated this function to the Committee, a function that is "traditionally the exclusive prerogative" of the government. *Jackson*, 419 U.S. at 353.

Indeed, by analogy to the immunity of a bankruptcy trustee, courts have held that a creditors committee is entitled to qualified immunity. "Because of its central statutory role in the Chapter 11 process, and to assure the effective representation of its constituency, an official committee such as the Creditors Committee enjoys a qualified immunity that corresponds to, and is intended to further, the Committee's statutory duties and powers." *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 514 (S.D.N.Y. 1994); *see also In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 717, 722 (Bankr. S.D.N.Y. 1992). This immunity "extends to conduct within the scope of the committee's statutory or court-ordered authority." *Id.* The Committee concedes that it is entitled to qualified immunity, but then disclaims what necessarily follows: only parties acting under color of law are entitled to qualified immunity. *Wyatt v. Cole*, 504 U.S. 158, 167-68 (1992) ("Qualified immunity strikes a balance between compensating those who have been injured by official conduct and protecting government's ability to perform its traditional functions. . . . These rationales are not transferable to private parties"). The Committee cannot claim the benefits of qualified immunity while ignoring its downside in the matter at hand. *See, e.g., In re Walnut Equipment Leasing Co.*, No. 97-19699 DWS, 2000 WL 1456951, at *4 (Bankr. E.D.

- 18 -

Pa. Sept. 22, 2000) ("the Committee was authorized to commence avoiding actions. It did so, and is entitled to immunity for its actions. A contrary holding would chill the ability of the committee to properly exercise its obligation to maximize assets for the estate since it could easily find itself . . . the subject of suit . . .").

The conclusion that the Committee is acting under color of law is supported by the Supreme Court's delegation-of-a-public-function cases. For example, in *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 628 (1991), the Court held that a private litigant in a civil case may not use peremptory challenges to exclude jurors on account of their race because "the injury to excluded jurors would be the direct result of governmental delegation and participation." The Court framed its analysis around three guiding principles. First, the "extent to which the actor relies on governmental assistance and benefits;" second, "whether the actor is performing a traditional governmental function;" and third, "whether the injury caused is aggravated in a unique way by the incidents of governmental authority." *Id.* at 621-22 (internal citations omitted); *see also Georgia v. McCollum*, 505 U.S. 42, 51 (1992) (extending *Edmonson* to a criminal defendant's use of race-based peremptory challenges).

First, the Court explained that although "private use of state-sanctioned private remedies or procedures does not rise, by itself, to the level of state action, our cases have found state action when private parties make extensive use of state procedures with 'the overt, significant assistance of state officials.'" *Edmonson*, 500 U.S. at 622 (internal citations omitted). The Court continued: "It cannot be disputed that, without

- 19 -

App 019

the overt, significant participation of the government, the peremptory challenge system, as well as the jury trial system of which it is a part, simply could not exist." *Id.* at 622. Similarly, the Committee exists only because it was appointed by the bankruptcy trustee, and it is subject to oversight and control by the trustee and the bankruptcy court. 28 U.S.C. § 586(a)(3)(E) (trustee is responsible for "monitoring creditors' committees appointed under title 11"); 11 U.S.C. § 1103(a) (court must approve the hiring of any "attorneys, accountants, or other agents"); §§ 503(b)(2), (b)(3)(F), (b)(4) (allowance of administrative expenses);[1] § 1102(a)(4) (bankruptcy court may order the trustee to change the membership of a committee if it "determines that the change is necessary to ensure adequate representation of creditors").

Most important, the Committee is allowed to pursue claims on behalf of the bankruptcy estate only because the bankruptcy court gave the Committee standing to do so. This standing can be unilaterally withdrawn. *In re Adelphia Commc'n Corp.*, 544 F.3d 420, 423 (2d Cir. 2008) ("a court may withdraw a committee's derivative standing and transfer the management of its claims, even in the absence of that committee's consent, if the court concludes that such a transfer is in the best interests of the bankruptcy estate"). Accordingly, without the "direct and indispensable participation of the judge, who beyond all question is a state actor," *Edmonson* at 624, the Committee would not be able to serve its intended purpose. The bankruptcy court

---

[1] The bankruptcy court already suspended payment of the Committee's legal fees and expenses because of concern over the Archdiocese's ability to cover its operating expenses. Bankruptcy Docket Nos. 1464, 1784.

- 20 -

"'has not only made itself a party to the [violation], but has elected to place its power, property and prestige behind the [violation].'" *Id.* (internal citations omitted). "In so doing, the government has 'create[d] the legal framework governing the [challenged] conduct,' and in a significant way has involved itself with" violating the Trustee's right to free exercise of religion. *Id.* (internal citations omitted).

Second, as the Court already explained, the pursuit of claims on behalf of a bankruptcy estate is a traditional public function. *Jackson* at 352 ("We have . . . found state action present in the exercise by a private entity of powers traditionally exclusively reserved to the [government]"). As in *Edmonson*, this public function is not altered because the Committee is motivated by private interests. "Though the motive of a peremptory challenge may be to protect a private interest, the objective of jury selection proceedings is to determine representation on a governmental body. . . . The fact that the government delegates some portion of this power to private litigants does not change the governmental character of the power exercised." *Edmonson* at 626; *see also McCollum*, 505 U.S. at 54 ("that a defendant exercises a peremptory challenge to further his interest in acquittal does not conflict with a finding of state action. Whenever a private actor's conduct is deemed 'fairly attributable' to the government, it is likely that private motives will have animated the actor's decision").

Third, the injury in *Edmonson* was "made more severe" because the government "permit[ted] it to occur within the courthouse itself. Few places are a more real expression of the constitutional authority of the government than a

- 21 -

App 021

courtroom, where the law itself unfolds." *Edmonson* at 628. So it is here. Free exercise of religion, just like equal protection, is inherent in our constitutional system.

For the foregoing reasons, the Committee's actions are fairly attributable to the government. Therefore, the Committee is acting under color of law for purposes of RFRA.

### C.    Substantial Burden

Under RFRA, a "substantial burden on the free exercise of religion . . . is one that forces adherents of a religion to refrain from religiously motivated conduct, inhibits or constrains conduct or expression that manifests a central tenet of a person's religious beliefs, or compels conduct or expression that is contrary to those beliefs." *Mack v. O'Leary*, 80 F.3d 1175, 1179 (7th Cir. 1996). This "generous definition" is "sensitive to religious feeling. Many religious practices that clearly are not mandatory . . . are important to their practitioners, who would consider the denial of them a grave curtailment of their religious liberty." *Id.* It also reflects the "undesirability of making judges arbiters of religious law." *Id.*

In 2000, Congress enacted the Religious Land Use and Institutionalized Persons Act ("RLUIPA"),[2] which defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42

---

[2] RLUIPA was enacted in response to *Boerne*, discussed above. "So Congress went back to the drawing board, narrowed its focus, and began compiling a legislative record of free-exercise violations in two discrete areas: laws affecting land use by religious organizations and laws affecting the religious exercise of institutionalized person. RLUIPA was the result of this effort and was adopted in 2000, three years after" *Boerne*. *River of Live Kingdom Ministries v. Vill. Of Hazel Crest, Ill.*, 611 F.3d 367, 380 (7th Cir. 2010) (Sykes, J., dissenting).

- 22 -

U.S.C. § 2000cc-5(7)(A). The RLUIPA definition, now incorporated by RFRA, § 2000bb-2(4), "prompted a renewed consideration of what constitutes a substantial burden." *Koger v. Bryan*, 523 F.3d 789, 799 (7th Cir. 2008). In the "context of RLUIPA's broad definition of religious exercise, a land-use regulation that imposes a substantial burden on religious exercise is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise – including the use of real property for the purpose thereof within the regulated jurisdiction – effectively impracticable." *Civil Liberties for Urban Believers v. City of Chi.*, 342 F.3d 752, 761 (7th Cir. 2003). The Court is unsure as to whether this formulation is useful outside of a land use regulation. However, RLUIPA also applies to prisons that receive federal funding, *Ortiz v. Downey*, 561 F.3d 664, 670 (7th Cir. 2009), and *Koger* applied the *Civil Liberties* test to such a claim. In any event, the *Mack* standard apparently still applies to RFRA claims, and even if the *Civil Liberties* standard should apply, the difference is not outcome-determinative. *Koger*, 523 F.3d at 799 ("In determining when an exercise has become 'effectively impracticable,' it is helpful to remember that in the context of the Free Exercise Clause, the Supreme Court held that a government imposes a substantial burden on a person's beliefs when it 'put[s] substantial pressure on an adherent to modify his behavior and violate his beliefs'") (quoting *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981)); *Mack* at 1178 ("the more generous definition is more faithful both to the statutory language and to the approach that the courts took before *Smith*, in cases like . . . [*Thomas*] – which is the approach that Congress wanted

- 23 -

App 023

them to take under [RFRA]"); *Guerrero*, 290 F.3d at 1222 (applying *Thomas*'s "substantial pressure" test to an RFRA claim).

As explained by Archbishop Listecki, "the care and maintenance of Catholic cemeteries, cemetery property, and the remains of those interred is a fundamental exercise of the Catholic faith."  Adv. Docket No. 69-2, Declaration of Archbishop Listecki, ¶ 3.  Thus, if the Trust's funds are converted into the bankruptcy estate, there will be no funds or, at best, insufficient funds for the perpetual care of the Milwaukee Catholic Cemeteries.  *Id.* at ¶ 30.  Moreover, Archbishop Listecki would be forced to choose between obedience to church doctrine and obedience to a civil judicial authority:

> In my lay and ecclesiastical capacities, responsible for the religious, moral, and fiscal health of the Archdiocese – as well as the Trust – I have never been placed in a position of having to choose between a doctrinal directive or mandate from church authorities and a lawful order from a civil judicial authority.  No religious leader in American society should be compelled to make that choice, which is no choice at all in light of the overriding deference owed one's highest religious authority.

*Id.* at ¶ 44.

Archbishop Listecki's declaration unquestionably represents the authoritative church position regarding the central and sacred nature of cemeteries to the Catholic faith.  A secular court "may not take sides on issues of religious doctrine."  *McCarthy v. Fuller*, 714 F.3d 971, 975 (7th Cir. 2013).  The Court's only province is to decide "whether a party is correct in arguing that there is an authoritative church ruling on an

- 24 -

issue, a ruling that removes the issue from the jurisdiction of that court.  But once the court has satisfied itself that the authorized religious body has resolved the religious issue, the court may not question the resolution."  *Id.* at 976 (internal citations omitted).  In *Fuller*, a civil lawsuit "charging RICO, trademark, and copyright violations along with Indiana torts," *Id.* at 972, the defendant claimed that she was a member of a Roman Catholic religious order.  The district court held that this was a proper jury question, but on appeal, the Seventh Circuit elicited an *amicus* brief from the Holy See which concluded that Fuller "is not a nun . . ., not a member of the Catholic Sisterhood or of any Catholic religious order, and not entitled under Catholic law to call herself Sister Therese."  *Id.* at 976.  Judge Posner considered the brief to be the "unquestionably authentic statement of the Holy See.  In it the Holy See has spoken, laying to rest any previous doubts:  Fuller has not been a member of any Catholic religious order for more than 30 years.  Period.  The district judge has no authority to question that ruling.  A jury has no authority to question it.  We have no authority to question it."  *Id.* at 978.  In other words, "federal courts are not empowered to decide (or to allow juries to decide) religious questions."  *Id.* at 980.

The Committee argues, as discussed above, that further proceedings are required because substantial burden is an issue of fact that needs further development through discovery.  Procedurally, the Committee moved for partial summary judgment, and in response, the Trustee asked the bankruptcy court to not only deny the Committee's motion, but also to enter summary judgment in his favor.  Fed. R. Bankr.

App 025

P. 7056; Fed. R. Civ. P. 56(f)(1) (Judgment Independent of the Motion).  At a hearing which occurred before the Committee filed its reply brief, the parties agreed that the bankruptcy court would defer ruling on the substantial burden issue, at least with respect to how it was raised by the Trustee's request for summary judgment.  October 18, 2012 Hearing Transcript, ECF No. 13-14.  Accordingly, the bankruptcy court did not reach this issue because it concluded that RFRA did not apply to the Committee's actions in the first instance.  That being said, Archbishop Listecki's declaration stands unopposed, and on the issue of religious doctrine, it is unassailable.  Moreover, the issue of substantial burden is essentially coterminous with religious doctrine.  Canon law dictates that the funds in the Trust must be used for the perpetual care of those interred under the tenets of the Catholic faith.  Removing some or all of these funds from the Trust and placing them in the bankruptcy estate would undoubtedly put "substantial pressure" on Archbishop Listecki and the Trust to "modify [their] behavior" and "violate [their] beliefs."  *Koger* at 799.  No amount of discovery can change canon law.  In this context, any transfer of funds from the Trust to the estate would meet the substantial burden test.

###    D.    Compelling Governmental Interest; Least Restrictive Means

Because the Committee is "government," and because invading the Trust would substantially burden the Trustee's free exercise of religion, the Committee must establish that this burden is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest.   § 2000bb-1(b)(1), (2).

- 26 -

App 026

Compelling governmental interests are "interests of the highest order." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). Examples include maintaining the tax system, *Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989), enforcing participation in the social security system, *United States v. Lee*, 455 U.S. 252, 258-59 (1982), maintaining national security and public safety, *Gillette v. United States*, 401 U.S. 437, 462 (1971), and providing public education, *Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972).

With respect to the Bankruptcy Code, the Court agrees with the Eighth Circuit that the "interests advanced by the bankruptcy system are not compelling under the RFRA." *In re Young*, 82 F.3d 1407, 1420 (8th Cir. 1996), *vacated on other grounds*, 521 U.S. 1114 (1997), *reaff'd*, 141 F.3d 854 (8th Cir. 1998). "[B]ankruptcy is not comparable to interests of national security or public safety. . . . [A]llowing debtors to get a fresh start or protecting the interests of creditors is [also] not comparable to the collection of revenue through the tax system or the fiscal integrity of the social security system, which have been recognized as compelling governmental interests in the face of a religious exercise claim." *Id.*; *see also In re Roman Catholic Archbishop of Portland, Ore.*, 335 B.R. 842, 864 (Bankr. D. Or. 2005) ("the Bankruptcy Code itself contains various provisions that limit the breadth of the estate, . . . Thus, the Bankruptcy Code itself provides for exceptions that do not further the policies of the Code. In light of those exceptions, I conclude that there is no compelling governmental interest in applying § 544(a)(3) if doing so would impose a substantial

- 27 -

App 027

burden on the exercise of religion").

Furthermore, even if enforcement of the Bankruptcy Code could be considered a compelling governmental interest, enforcing the code in this particular case is not the least restrictive means of furthering that interest.  "If the compelling state goal can be accomplished despite the exemption of the particular individual, then a regulation which denies an exemption is not the least restrictive means of furthering the state interest." *Callahan v. Woods*, 736 F.2d 1269, 1272-73 (9th Cir. 1984).  Once again, as the Eighth Circuit explained:  "we cannot see how the recognition of what is in effect a free exercise exception to the avoidance of fraudulent transfers can undermine the integrity of the bankruptcy system as a whole; its effect will necessarily be limited to the debtor's creditors, who will as a result have fewer assets available to apply to the outstanding liabilities, and not all creditors or even all debtors."  *Young*, 82 F.3d at 1420

## IV.    First Amendment

The First Amendment provides that Congress shall make no law prohibiting the free exercise of religion.  The Free Exercise Clause "withdraws from legislative power, state and federal, the exertion of any restraint on the free exercise of religion. Its purpose is to secure religious liberty in the individual by prohibiting any invasions thereof by civil authority." *Jimmy Swaggart Ministries v. Bd. Of Equalization of Cal.*, 493 U.S. 378, 384 (1990).  When faced with a free exercise challenge, the first inquiry is whether the law being challenged is neutral and of general applicability.  Such a law

- 28 -

"need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi*, 508 U.S. at 531 (citing *Smith*). In this respect, the bankruptcy court held that the "purpose and effect of the Bankruptcy Code provisions at issue in this case are generally applicable and religion-neutral." 485 B.R. at 393.

This conclusion, even if correct, does not end the inquiry. *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 996 (7th Cir. 2006). "A regulation neutral on its face may, in its *application*, nonetheless offend the constitutional requirement for neutrality if it unduly burdens the free exercise of religion," in which case there must be a "compelling governmental interest justif[ying] the burden." *Id.* (quoting *Jimmy Swaggart Ministries*, 493 U.S. at 384-85) (emphasis added). As the Court already explained, the burden on the Trustee's free exercise of religion is substantial, and there is no compelling governmental interest which can justify the burden. *St. John's United Church of Christ v. City of Chi.*, 502 F.3d 616, 644 (7th Cir. 2007) ("a facially-neutral law that 'imposes a substantial burden on religion' offends the Free Exercise Clause and likewise is subject to strict scrutiny") (quoting *Vision Church* at 996).

## V.     Conclusion

RFRA and the First Amendment prevent the Committee from appropriating the funds in the Trust because doing so would substantially burden the Trustee's free exercise of religion.

Therefore, **IT IS HEREBY ORDERED THAT** the decision of the

App 029

bankruptcy court is **REVERSED**, and this matter is **REMANDED** for further

proceedings consistent with this opinion.

Dated at Milwaukee, Wisconsin, this 29th day of July, 2013.


**BY THE COURT:**


**HON. RUDOLPH T. RANDA**
**U.S. District Judge**

- 30 -

AO 450 (Rev. 5/85) Judgment in a Civil Case

# United States District Court

### EASTERN DISTRICT OF WISCONSIN

## JUDGMENT IN A CIVIL CASE

_____

**In re Archdiocese of Milwaukee,**

              **Debtor.**              **Bankruptcy Case No. 11-20059-SVK**
_____

**ARCHBISHOP JEROME E. LISTECKI,**
**As Trustee of the Archdiocese of Milwaukee**
**Catholic Cemetery Perpetual Care Trust,**

              **Appellant,**          **Adv. Proc. No. 11-2459-SVK**

          **V.**                 **CASE NUMBER:**    **13-C-179**

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS,**

              **Appellee.**
_____

☐    Jury Verdict.  This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

☒    **Decision by Court**.  This action came on for consideration and a decision has been rendered.

        IT IS ORDERED AND ADJUDGED that the **Official Committee of Unsecured Creditors cannot use the Bankruptcy Code to make the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust property of the bankruptcy estate because doing so would violate the Religious Freedom Restoration Act of 1993 (42 USC § 2000bb et seq.) ("RFRA") and the First Amendment to the United States Constitution.**

**The motion of Jerome E. Listecki, as Trustee of the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust for summary judgment, is GRANTED.**

**The motion of the Official Committee of Unsecured Creditors for partial summary judgment, is DENIED.**

**This action is hereby DISMISSED.**

    **August 1, 2013**
Date

    **JON W. SANFILIPPO**
Clerk

    **s/ Linda M. Zik**
(By) Deputy Clerk

Approved:

_Rudolph T. Randa_ (signature)

Hon. Rudolph T. Randa
U.S. District Judge

    August 1, 2013
Date

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| In re | Case No. 11-20059-svk |
| Archdiocese of Milwaukee, | Chapter 11 |
| Debtor. | |

| | |
|---|---|
| Archbishop Jerome E. Listecki, as Trustee of the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust, | |
| Plaintiff, | District Court Case No. 13-C-179 |
| v. | Adv. Proc. No. 11-02459 |
| Official Committee of Unsecured Creditors, | |
| Defendant. | |

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
PURSUANT TO REMAND

The Archdiocese of Milwaukee (the "Debtor") filed a Chapter 11 bankruptcy petition on January 4, 2011. This adversary proceeding was filed on June 28, 2011 by Archbishop Jerome E. Listecki, as Trustee of the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust (the "Archbishop") against the Official Committee of Unsecured Creditors (the "Committee") seeking a declaration that certain perpetual care funds that had been deposited in the "Cemetery Trust" were not property of the Debtor's bankruptcy estate. In 2012, the Archbishop amended the Complaint and added allegations that the Committee cannot use the Bankruptcy Code to make the Cemetery Trust property of the estate because doing so would violate the Religious Freedom Restoration Act of 1993 (42 U.S.C. § 200bb et. seq.) ("RFRA") and the First Amendment to the United States Constitution. The Committee filed a motion for partial summary judgment limited to the RFRA and the First Amendment claims.

App 033

On January 17, 2013, this Court issued a decision and order granting the Committee's motion, ruling that neither RFRA nor the First Amendment applied to prevent inclusion of the Cemetery Trust assets in the Debtor's bankruptcy estate. The Archbishop filed a timely motion for leave to appeal or to withdraw the reference or alternatively objections to this Court's proposed findings of fact and conclusions of Law. On April 10, 2013, the District Court granted the motion for leave to appeal. On July 29, 2013, the District Court reversed this Court's decision and remanded the matter for further proceedings.

In responding to the Committee's motion for summary judgment, the Archbishop asked the Court to grant summary judgment in the Archbishop's favor. *See* Fed. R. Bankr. P. 7056 incorporating Civ. P. 56(f)(1), cited in District Court Decision and Order at 25-26. Although the parties originally consented to this Court's entry of a final order on the entire adversary proceeding, after the Archbishop amended the Complaint, the parties withdrew their consent to this Court's entry of a final order on the RFRA and the First Amendment claims. The parties also stipulated that the RFRA and First Amendment claims are non-core under 28 U.S.C. § 157, a determination accepted by the District Court.

The District Court noted that the standard of review for proposed findings of fact and conclusions of law in non-core proceedings and questions of law on interlocutory appeals is the same -- *de novo* review – and used that standard in considering this Court's decision and order. After rejecting this Court's analysis that RFRA does not apply to a creditors' committee exercising a debtor-in-possession's standing to include property in a bankruptcy estate, the District Court concluded that RFRA and the First Amendment prevent the Committee from seeking to avoid, recover or include in the bankruptcy estate any portion of the Debtor's transfer of funds to the Cemetery Trust. In its decision, the District Court expressly denied the

2

App 034

Committee's argument that even if RFRA applies, a further factual determination of the substantial burden issue is necessary. (This argument claims that discovery might show that not all of the $55 million in the Cemetery Trust is needed to maintain the cemeteries.) Given this posture, there are no further issues to be determined on remand, and all that remains to be done is entry of a final order concluding this adversary proceeding.

However, the authority of this Bankruptcy Court to issue such a final order is unclear. Therefore, in order to facilitate the entry of a final appealable order, and consistent with the parties' stipulation and the District Court's instructions, this Court issues these proposed findings and conclusions of law for consideration by the District Court:

For the reasons stated in the District Court's July 29, 2013 Decision, the Committee's motion for summary judgment is denied and the Archbishop's motion for summary judgment is granted. This Court respectfully recommends that the District Court issue a final order to this effect without delay.

Dated: August 1, 2013

By the Court:

Susan V. Kelley
U.S. Bankruptcy Judge

3

App 035

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**In re Archdiocese of Milwaukee,**

        Debtor.           **Bankruptcy Case No. 11-20059-SVK**

---

**ARCHBISHOP JEROME E. LISTECKI,**
**as Trustee of the Archdiocese of Milwaukee**
**Catholic Cemetery Perpetual Care Trust,**

        Appellant,        **Adv. Proc. No.  11-2459-SVK**

        -vs-          **Case No.  13-C-179**

**OFFICIAL COMMITTEE OF UNSECURED**
**CREDITORS,**

        Appellee.

---

## DECISION AND ORDER

---

On July 29, 2013, the Court held that more than $50 million dollars being held in the Archdiocesan Cemetery Trust could not be brought into the underlying bankruptcy estate because the Committee of Unsecured Creditors, "in pursuing the claims of the unsecured creditors under the authority granted to it by the bankruptcy court, acts 'under color of law' and is subject to [the Religious Freedom Restoration Act]. Therefore, RFRA and the First Amendment prevent the Committee from appropriating the funds in the Trust because doing so would substantially burden the Trustee's free exercise of religion." ECF No. 24, at 2; --- B.R. ---, 2013 WL 3937021, at *1 (E.D. Wis. July 29, 2013).

In response, the Committee launched an investigation into my background in relation to the Milwaukee Catholic Cemeteries. First, the Committee learned (by searching publicly-available databases) that many of my relatives are buried in Archdiocesan cemeteries. Then, the Committee moved for an order directing the Archdiocese to search its business records to determine if I or my wife have any agreements for burial spaces at Archdiocesan cemeteries. The bankruptcy court granted this motion. As a result, the Committee learned that 38 years ago on August 1, 1975, I purchased a burial crypt for my parents in the Holy Cross Mausoleum.[1] Armed with this information, the Committee moves for recusal and to vacate the Court's judgment.

The Court is at a loss trying to understand why these motions were brought. The Committee is entitled to *de novo* review in the Seventh Circuit Court of Appeals. Instead of proceeding directly to the Seventh Circuit, the Committee decided to inject collateral issues into these proceedings for the stated purpose of vacating a prior ruling and sending the case to another district judge. This is a wasteful use of time, money, and judicial resources. The Seventh Circuit, if not the Supreme Court, will be the final word on the issues raised by the Cemetery Trust litigation. The last thing this case needs is another decision by another lower court federal judge before it reaches the

---

[1] The Holy Cross Mausoleum is located at 7301 West Nash Street. http://www.cemeteries.org/pdf/HolyCrossChapelMausoleum_July2004.pdf. The following article includes a picture of my parents' crypt. Bruce Vielmetti and Karen Herzog, *Records show judge in Milwaukee Archdiocese case has cemetery ties*, Milwaukee Journal Sentinel, Aug. 14, 2013. http://www.jsonline.com/features/religion/milwaukee-archdioceses-creditors-want-ruling-halted-judge-off-case-b9975543z1-219553341.html.

Seventh Circuit.

Questionable motives aside, the Court takes up the motion. The Committee argues that I have a "financial interest in the subject matter in controversy" by virtue of purchasing[2] my parents' crypt. 28 U.S.C. § 455(b)(4). The statute defines "financial interest" as "ownership of a legal or equitable interest, however small . . ." § 455(d)(4). The term "interest," as used in § 455(b)(4), means "an investment or other asset whose value depends on the outcome, or some other concrete financial effect." *Guardian Pipeline, LLC v. 950.80 Acres of Land*, 525 F.3d 554, 557 (7th Cir. 2008). My parents' burial crypt is not an investment or asset, much less an asset whose value depends upon the outcome of this litigation. This was a consumer purchase of my parents' rights of entombment from the Archdiocese of Milwaukee. Holy Cross Mausoleum Purchase Agreement, ECF No. 32, Ex. N ("SELLER hereby offers for sale the *right of entombment only* in said Mausoleum in the crypt space(s) hereinafter described. PURCHASER hereby agrees to purchase said right of entombment . . .") (emphasis added).

The Committee argues that I have a financial interest in this case because the burden for providing perpetual care could fall to me. The Purchase Agreement specifically precludes this type of arrangement. *Id.* at ¶ 15 ("All services about the crypt or Mausoleum requiring labor shall be performed only by the SELLER"); ¶ 19 ("The SELLER shall provide care and maintenance and such care and maintenance

---

[2] The crypt cost $3,800. Holy Cross Mausoleum Agreement, ECF No. 32, Exhibit N.

- 3 -

shall be performed only by the SELLER"). In any event, by analogy to cases involving judges as utility consumers, a possible adverse effect on the Trustee's ability to maintain my parents' crypt is not a financial interest within the meaning of § 455(b)(4). *In re N.M. Natural Gas Antitrust Litig.*, 620 F.2d 794, 796 (10th Cir. 1980) ("a remote, contingent benefit, such as a possible beneficial effect on future utility bills, is not a 'financial interest' within the meaning of the statute"); *In re Va. Elec. & Power Co.*, 539 F.2d 357, 366 (4th Cir. 1976) ("We think it demonstrable that [the district judge] did not 'own' a legal or equitable interest in the subject matter of the controversy. The only interest the judge has in the subject matter is the remote contingent possibility that he may *in futuro* share in any refund that might be ordered for all VEPCO customers").

The Committee also argues that I have a financial interest pursuant to the proof of claim filed on behalf of Cemetery Care Claimants in the underlying bankruptcy proceeding. ECF No. 44, Claim 179-1. This is incorrect. The rider to the claim explains that it "*does not constitute a request for payment* on behalf of any individual or entity," nor does it "constitute an assertion by the Debtor as to whether or not any individual Cemetery Care Claimants are 'creditors'[3] . . . with respect to the obligations of the Debtor to provide perpetual care." *Id.*, Rider to Proof of Claim Filed on Behalf

---

[3] Even if I could be considered a creditor to the bankruptcy estate, this does not make me a "party to the proceeding" for purposes of recusal. Committee on Codes of Conduct Advisory Opinion No. 100 (June 2009) (Identifying Parties in Bankruptcy Cases for Purposes of Disqualification) ("simply being a creditor or interest holder of the bankruptcy estate is not a sufficient interest to make that creditor 'a party to the proceeding'").

- 4 -

of the Cemetery Care Claimants, ¶¶ 8-9 (emphasis added).  Thus, the Committee's citation to *Tramonte v. Chrysler Corp.*, 136 F.3d 1025 (5th Cir. 1998) is inapposite. "[W]here a judge or an immediate family member is a member of a class *seeking monetary relief*, § 455(b)(4) requires recusal because of the judge's financial interest in the case." *Id.* at 1029 (emphasis added).

Because there is no financial interest, any interest requiring recusal falls under the second clause of § 455(b)(4), whereby I must recuse myself if I have "any other interest that could be substantially affected by the outcome of the proceeding."  My parents have been entombed for almost forty years; that will not change as a result of this lawsuit.  To the extent that I have an interest in the care and maintenance of my parents' crypt, the Milwaukee Catholic Cemeteries "encompass approximately 1,000 acres of land in which more than 500,000 individuals are interred."  ECF No. 24, at 3; 2013 WL 3937021, at *1.  In total, there are eight cemeteries and seven mausoleums.[4] Accordingly, if the Trustee's ability to provide perpetual care is diminished, there is no guarantee that the Holy Cross Mausoleum in general, or my parents' crypt in particular, would be impacted in any way, shape or form.  Moreover, the Trustee's moral and canonical obligation to provide perpetual care will not disappear if he loses this lawsuit.  His duty to provide perpetual care continues.  In the unlikely event that the Trustee completely fails to satisfy this duty, local municipalities can (and in some instances must) intervene.  Wis. Stat. § 157.115(1)(b)1.-2; *see, In re N.M. Natural Gas*

---

[4] http://www.cemeteries.org/aboutus0013.asp.

- 5 -

App 040

*Antitrust Litig.* at 796 ("independent intervention by the Commission cancelling any benefit is possible"). Therefore, my interest in the care and maintenance of my parents' burial crypt will not be substantially affected by the outcome of this lawsuit. *In re Va. Elec. & Power Co.* at 368 ("Thus a judge who is a customer of a company must necessarily consider the remoteness of the interest and its extent or degree. . . . [The judge's] interest here is remote and speculative. . . . whether he ever gets any refund benefit will not be determined by him nor by the result of this litigation").

Lastly, the Committee argues for recusal under § 455(a), a "catch-all" which provides that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." The inquiry under this section is objective, asking judges to analyze "whether a reasonable person perceives a significant risk that the judge will resolve the case on a basis other than the merits." *In re Mason*, 916 F.2d 384, 385 (7th Cir. 1990) (citing *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 865 (1988)). An objective standard is "essential when the question is how things appear to the well-informed, thoughtful observer rather than to a hypersensitive or unduly suspicious person. Because some people see goblins behind every tree, a subjective approach would approximate automatic disqualification." *Id.* at 386.

As discussed above, any interest that I may have in the maintenance of the Milwaukee Catholic Cemeteries is extremely remote. "Judges regularly sit in cases that could affect their well-being tangentially. A judge who owns a house could be

affected by a decision influencing the rate of interest, a judge who owns stock in the coal industry could be affected by a decision in a case concerning nuclear power, and so on. *These indirect effects do not cause informed, reasonable observers to doubt a judge's disinterest.*"  *In re Matter of Nat'l Union Fire Ins. Co.*, 839 F.2d 1226, 1229 (7th Cir. 1988) (emphasis added).

Going further, the Committee argues that I have a personal, emotional interest in the outcome of this case — yet at the same time, the Committee insists that it is not moving for recusal because I am Catholic.  The Committee cannot take the latter position because of the general recognition that a judge's religious affiliation is not grounds for disqualification. *See, e.g., Feminist Women's Health Ctr. v. Codispoti*, 69 F.3d 399 (9th Cir. 1995) (denying motion to recuse Catholic judge in action brought by abortion clinic against abortion protestors); *United States v. El-Gabrowny*, 844 F. Supp. 955 (S.D.N.Y. 1994) (denying motion to recuse Jewish judge in prosecution for World Trade Center bombing); *Singer v. Wadman*, 745 F.2d 606, 608 (10th Cir. 1984) (denying motion to recuse Mormon judge in case that involved the "theocratic power structure of Utah").  But, as to the former position, the Committee ascribes these personal and emotional interests to me because I am Catholic, describing my interest in the outcome of this case as religious and moral.  The Court fails to see the distinction between moving for recusal because I am Catholic and moving for recusal because of my religious interests.  There is none.

Whichever way my interest is characterized, a reasonable person would not

App 042

perceive a substantial risk of bias in this case. Given that my wife and I have both lived here for almost our entire lives, it should not have been surprising for anyone to learn that I have relatives who are interred in the Milwaukee Catholic Cemeteries. Most judges are old enough to have close relatives buried somewhere. Aging and death are facts of life, not just for judges. Over 500,000 individuals are interred in the Milwaukee Catholic Cemeteries, so my relation to some of those individuals is a characteristic that I share with countless members of this community. The logical conclusion of the Committee's argument is that none of these people could render an impartial decision this case. This is untenable, and it is objectively unreasonable. On top of that, the Committee's motion presumes that I would be personally upset or aggrieved by the remote possibility that a family member's gravesite might somehow fall into disrepair, so much so that I would ignore my duty to exercise impartial judgment. Again, a well-informed, thoughtful observer would not make this presumption. *See, e.g., Perry v. Schwarzenegger*, 790 F. Supp. 2d 1119, 1130 (N.D. Cal. 2011) (Regarding Judge Walker, who ruled against California's ban on same-sex marriage, a "well-informed, thoughtful observer would recognize that the mere fact that a judge is in a relationship" with someone of the same sex "does not *ipso facto* imply that the judge must be so interested in marrying that person that he would be unable to exhibit the impartiality which, it is presumed, all federal judges maintain").

For all of the foregoing reasons, recusal is unnecessary. *Laird v. Tatum*, 409 U.S. 824, 837 (1972) (Rehnquist, J., in chambers) ("a federal judge has a duty to sit

where not disqualified which is equally as strong as the duty to not sit where disqualified"). The Committee's motions to vacate [ECF No. 27] and for recusal [ECF No. 30] are **DENIED**.

Dated at Milwaukee, Wisconsin, this 1st day of October, 2013.

**BY THE COURT:**

**HON. RUDOLPH T. RANDA**
**U.S. District Judge**

- 9 -

☑

# CERTIFICATE OF SERVICE
### Certificate of Service When All Case Participants Are CM/ECF Participants

I hereby certify that on ___January 15, 2014___, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/___Megan J Wertz_____

☐

# CERTIFICATE OF SERVICE
### Certificate of Service When Not All Case Participants Are CM/ECF Participants

I hereby certify that on _____, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some of the participants in the case are not CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

counsel / party:                          address:

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

s/_____