189.     Archbishop Listecki, as trustee of the Cemetery Trust, was the initial transferee of the Subsequent Transfers.

190.     The Subsequent Transfers made within four years prior to the Petition Date should be avoided as fraudulent pursuant to subject to 544(b) of the Bankruptcy Code and Wis. Stat. § 242.05(1).  ADOM's estate is entitled to recover the Subsequent Transfers made within four years prior to the Petition Date, or the value thereof, pursuant to section 550 of the Bankruptcy Code and Wis. Stat. § 242.07.

## SIXTEENTH COUNTERCLAIM
### (Avoidance and Recovery of Preferential Subsequent Transfers Prior to the Petition Date Pursuant to 11 U.S.C. §§ 547 and 550)

191.     The Committee realleges and incorporates by reference each and every allegation set forth in paragraphs 1-73 above as if fully set forth here.

192.     The Subsequent Transfers that ADOM made to the Cemetery Trust in the one year prior to the Petition Date were made to the Cemetery Trust as a an alleged creditor of ADOM on account of an debt ADOM contends it owed to the Cemetery Trust which debt existed before the Subsequent Transfers were made.  The Committee is informed and believes that the Cemetery Trust contends it had a claim against ADOM for the amount of the Subsequent Transfers beginning in or about 2008 and continuing until the present.

193.     Section 101(31) of the Bankruptcy Code defines an "insider" of a corporation to include a director, officer, or person in control of the debtor, among other things.  Archbishop Listecki, the sole Corporate Member and President of ADOM and the

person in control of ADOM, is also the sole trustee of the Cemetery Trust and controls the Cemetery Trust.

194.    The Subsequent Transfers were made while the ADOM was insolvent.

195.    The Subsequent Transfers to the Cemetery Trust enabled the Cemetery Trust to receive more than it would have received if: (i) ADOM's bankruptcy case was a case under chapter 7 of the Bankruptcy Code; (ii) the Subsequent Transfers had not been made; and (iii) the Cemetery Trust received payment on the debt to the extent provided by the Bankruptcy Code.

196.    Archbishop Listecki, as trustee of the Cemetery Trust was the initial transferee of the Subsequent Transfers.

197.    Accordingly, the Subsequent Transfers made in the 90 days before the Petition Date, in the amount of not less than $71,055.00 (the "90-Day Preferential Transfers") are avoidable, and should be avoided, as preferential transfers pursuant to sections 547 and 550 of the Bankruptcy Code. ADOM's estate is entitled to recover the value of the 90-Day Preferential Transfers, in an amount of not less than $71,055.00, made during the 90 days before the Petition Date.

198.    In addition, the Subsequent Transfers made in the one year before the Petition Date, in the amount of not less than $292,365.00 (the "One-Year Preferential Transfers") are avoidable, and should be avoided, as preferential transfers pursuant to sections 547 and 550 of the Bankruptcy Code. ADOM's estate is entitled to recover the value of the

One-Year Preferential Transfers, in an amount of not less than $292,365.00, made during the one year before the Petition Date.

### SEVENTEENTH COUNTERCLAIM
#### (Avoidance and Recovery of Post Petition Transfers Pursuant to 11 U.S.C. §§ 549 and 550)

199.    The Committee realleges and incorporates by reference each and every allegation set forth in paragraphs 1-73 above as if fully set forth here.

200.    The Subsequent Transfers that ADOM made to the Trust after the Petition Date are unauthorized post petition transfers not made in the ordinary course of ADOM's business.

201.    Accordingly, the Subsequent Transfers that the Debtor made after the Petition Date are avoidable, and should be avoided, as unauthorized post petition transfers pursuant to sections 549 and 550 of the Bankruptcy Code.  ADOM's estate is entitled to recover the value of the Subsequent Transfers made after the Petition Date.

WHEREFORE, the Committee prays for judgment as follows:

1.    For turnover of the funds and assets in the Cemetery Trust to the ADOM chapter 11 estate.

2.    Declaring that the Cemetery Trust is void and unenforceable and the assets in the Cemetery Trust constitute property of ADOM's estate;

3.    Declaring that the Cemetery is void and unenforceable and the assets in the Cemetery Trust constitute property of ADOM's estate under the doctrine of merger

because ADOM holds both the legal and beneficial interests in the Cemetery Trust and its assets;

        4.     Declaring that the Cemetery Trust has no claims against the estate;

        5.     Declaring that even if the Cemetery Trust is valid, Archbishop Listecki, as trustee of the Cemetery Trust has not met his burden to trace the funds ADOM transferred to the Cemetery Trust Account that had been previously commingled with other non-trust funds prior to being transferred to the Cemetery Trust Account, and therefore all of the funds in the Cemetery Trust Account that cannot be traced under the Lowest Intermediate Balance Test constitute property of ADOM's bankruptcy estate under 11 U.S.C. § 541(a)(1);

        6.     That the Initial $55 Million Transfer, the Subsequent Transfers, the 90-Day Preferential Transfers, and the One-Year Preferential Transfers are avoidable as fraudulent and/or preferential transfers pursuant to 11 U.S.C. §§ 544, 547, and/or 548, and Wis. Stat. §§ 242.04 and 242.05;

        7.     That the ADOM's bankruptcy estate is entitled to recover the Initial $55 Million Transfer, or the value thereof, in an amount to be determined, but not less than $55 million, pursuant to 11 U.S.C. § 550 and Wis. Stat. § 242.07;

        8.     That ADOM's bankruptcy estate is entitled to recover the Subsequent Transfers, or the value thereof, in an amount to be determined, pursuant to 11 U.S.C. § 550 and Wis. Stat. § 242.07;

        9.     That ADOM's bankruptcy estate is entitled to recover the 90-Day Preferential Transfers, and the One-Year Preferential Transfers, or the value thereof, in an

amount to be determined, but believed not to be less than $71,055.00 with regard to the 90-Day Preferential Transfers and not less than $292,365.00 with regard to the One-Year Preferential Transfer, pursuant to 11 U.S.C. § 550;

       10.    That ADOM's bankruptcy estate is entitled to recover the post petition transfers, or the value thereof, pursuant to 11 U.S.C. §§ 549 and 550, in an amount to be determined, but believed not to be less than $298,000.00.

[remainder of page left intentionally blank]

11.    For prejudgment interest; and

12.    For such other and further relief as the Court may deem just and proper.

Dated:    April 11, 2012          Respectfully submitted,

PACHULSKI STANG ZIEHL & JONES LLP

By    _/s/ Kenneth H. Brown_
        James I. Stang (CA Bar No. 94435)
        Kenneth H. Brown (CA Bar No. 100396)
        Gillian N. Brown (CA Bar No. 205132)
        Pachulski Stang Ziehl & Jones LLP
        10100 Santa Monica Blvd., 13th Floor
        Los Angeles, CA 90067
        Telephone: (310) 277-6910
        Facsimile: (310) 201-0760
        E-mail: jstang@pszjlaw.com
                kbrown@pszjlaw.com
                gbrown@pszjlaw.com

        -and-

        Albert Solochek (State Bar No. 1011075)
        Jason R. Pilmaier (State Bar No. 1070638)
        Howard, Solochek & Weber, S.C.
        324 E. Wisconsin Ave., Suite 1100
        Milwaukee, WI 53202
        Telephone: (414) 272-0760
        Facsimile: (414) 272-7265
        E-mail: asolochek@hswmke.com
                jpilmaier@hswmke.com

        Attorneys for the Official Committee of
        Unsecured Creditors

B6F (Official Form 6F) (12/07)

In re __Archdiocese of Milwaukee__        Case No. __11-20059-svk__

Debtor

# SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS

    State the name, mailing address, including zip code, and last four digits of any account number, of all entities holding unsecured claims without priority against the debtor or the property of the debtor, as of the date of filing of the petition. The complete account number of any account the debtor has with the creditor is useful to the trustee and the creditor and may be provided if the debtor chooses to do so. If a minor child is a creditor, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m). Do not include claims listed in Schedules D and E. If all creditors will not fit on this page, use the continuation sheet provided.

    If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule H - Codebtors. If a joint petition is filed, state whether the husband, wife, both of them, or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community."

    If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

    Report the total of all claims listed on this schedule in the box labeled "Total" on the last sheet of the completed schedule. Report this total also on the Summary of Schedules and, if the debtor is an individual with primarily consumer debts, report this total also on the Statistical Summary of Certain Liabilities and Related Data.

☐   Check this box if debtor has no creditors holding unsecured claims to report on this Schedule F.

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions above.) | C O D E B T O R | Husband, Wife, Joint, or Community | | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE. | C O N T I N G E N T | U N L I Q U I D A T E D | D I S P U T E D | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|---|
| | | H W | J C | | | | | |
| Account No. | | | | | | | | |
| **Archdiocesan Cemeteries of Milwaukee Union Employees' Pension Plan 3501 South Lake Drive Milwaukee, WI 53207-0912** | | - | | | X | X | | 1,169,580.00 |
| Account No. | | | | | | | | |
| **Archdiocese of Milwaukee Lay Employees Pension Plan 3501 South Lake Drive Milwaukee, WI 53207-0912** | | - | | | X | X | | Unknown |
| Account No. | | | | | | | | |
| **Archdiocese of Milwaukee Priests' Retiree Health Plan 3501 South Lake Drive Milwaukee, WI 53207-0912** | | - | | | X | X | | 13,693,375.00 |
| Account No. | | | | | | | | |
| **Archdiocese of Milwaukee Priests' Pension Plan 3501 South Lake Drive Milwaukee, WI 53207-0912** | | - | | | X | X | | Unknown |
| _6_ continuation sheets attached | | | | | Subtotal (Total of this page) | | | 14,862,955.00 |

Software Copyright (c) 1996-2011 - CCH INCORPORATED - www.bestcase.com      S/N:29535-110113   Best Case Bankruptcy

B6F (Official Form 6F) (12/07) - Cont.

In re    **Archdiocese of Milwaukee**                                      Case No.   **11-20059-svk**
_____
                              Debtor

# SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS
### (Continuation Sheet)

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions above.) | C O D E B T O R | H W J C | Husband, Wife, Joint, or Community DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE. | C O N T I N G E N T | U N L I Q U I D A T E D | D I S P U T E D | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| Account No. | | | | | | | |
| **Certain Personal Injury Plaintiffs Case No. 2005CV1351... cons. c/o Jeff Anderson & Associates P.A. 366 Jackson St., Ste 100 Saint Paul, MN 55101-2989** | | - | | X | X | X | Unknown |
| Account No. | | | | | | | |
| **Certain Personal Injury Plaintiffs Case No. 2010CV15801 c/o Jeff Anderson & Associates P.A. 366 Jackson St., Ste 100 Saint Paul, MN 55101-2989** | | - | | X | X | X | Unknown |
| Account No. | | | | | | | |
| **Certain Personal Injury Plaintiffs Case No. 2007CV8390 c/o Jeff Anderson & Associates P.A. 366 Jackson St., Ste 100 Saint Paul, MN 55101-2989** | | - | | X | X | X | Unknown |
| Account No. | | | | | | | |
| **Certain Personal Injury Plaintiffs Case No. 2008CV10160 c/o Jeff Anderson & Associates P.A. 366 Jackson St., Ste 100 Saint Paul, MN 55101-2989** | | - | | X | X | X | Unknown |
| Account No. | | | | | | | |
| **Certain Personal Injury Plaintiffs Case No. 2008CV9050 c/o Jeff Anderson & Associates P.A. 366 Jackson St., Ste 100 Saint Paul, MN 55101-2989** | | - | | X | X | X | Unknown |

Sheet no. __1__ of __4__ sheets attached to Schedule of
Creditors Holding Unsecured Nonpriority Claims

Subtotal
(Total of this page)                                                                         0.00

Software Copyright (c) 1996-2011 - CCH INCORPORATED - www.bestcase.com                          Best Case Bankruptcy

B6F (Official Form 6F) (12/07) - Cont.

In re    **Archdiocese of Milwaukee**                                    Case No.  __11-20059-svk__
                                                    Debtor

## SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS
### (Continuation Sheet)

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions above.) | C O D E B T O R | H W J C | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE. | C O N T I N G E N T | U N L I Q U I D A T E D | D I S P U T E D | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| Account No. | | | | | | | |
| **Certain Personal Injury Plaintiffs Case No. 2009CV13945 c/o Jeff Anderson & Associates P.A. 366 Jackson St., Ste 100 Saint Paul, MN 55101-2989** | | - | | X | X | X | Unknown |
| Account No. | | | | | | | |
| **Certain Personal Injury Plaintiffs Case No. 2009CV12849 c/o Jeff Anderson & Associates P.A. 366 Jackson St., Ste 100 Saint Paul, MN 55101-2989** | | - | | X | X | X | Unknown |
| Account No. | | | | | | | |
| **Certain Personal Injury Plaintiffs Case No. 2009CV8128 c/o Jeff Anderson & Associates P.A. 366 Jackson St., Ste 100 Saint Paul, MN 55101-2989** | | - | | X | X | X | Unknown |
| Account No. | | | | | | | |
| **Certain Personal Injury Plaintiffs Case No. 2009CV16186 c/o Jeff Anderson & Associates P.A. 366 Jackson St., Ste 100 Saint Paul, MN 55101-2989** | | - | | X | X | X | Unknown |
| Account No. | | | | | | | |
| **Certain Personal Injury Plaintiffs Case No. 2009CV15678 c/o Jeff Anderson & Associates P.A. 366 Jackson St., Ste 100 Saint Paul, MN 55101-2989** | | - | | X | X | X | Unknown |

Sheet no. __2__ of __4__ sheets attached to Schedule of                                 Subtotal            0.00
Creditors Holding Unsecured Nonpriority Claims                                      (Total of this page)

Software Copyright (c) 1996-2011 - CCH INCORPORATED - www.bestcase.com                                      Best Case Bankruptcy

B6F (Official Form 6F) (12/07) - Cont.

In re     **Archdiocese of Milwaukee**                                          Case No.     **11-20059-svk**
_____
                                    Debtor

# SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS
### (Continuation Sheet)

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions above.) | C O D E B T O R | H W J C | Husband, Wife, Joint, or Community — DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE. | C O N T I N G E N T | U N L I Q U I D A T E D | D I S P U T E D | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| Account No. **Certain Personal Injury Plaintiffs Case No. 2009CV17444 c/o Jeff Anderson & Associates P.A. 366 Jackson St., Ste 100 Saint Paul, MN 55101-2989** | | - | | X | X | X | Unknown |
| Account No. **Certain Personal Injury Plaintiffs Case No. 2007CV10888 c/o Jeff Anderson & Associates P.A. 366 Jackson St., Ste 100 Saint Paul, MN 55101-2989** | | - | | X | X | X | Unknown |
| Account No. **In-Settlement Victims/Survivors** [1] | | - | Payments pursuant to terms of settlement agreements | | | | 702,000.00 |
| Account No. **In-Settlement Victims/Survivors** [2] | | - | On-going psychological counseling and therapy | | X | | Unknown |
| Account No. **John Doe Address & Contact information redacted at John Doe's request** | | - | | X | X | X | Unknown |

Sheet no. __3__ of __4__ sheets attached to Schedule of
Creditors Holding Unsecured Nonpriority Claims

Subtotal
(Total of this page)                                          702,000.00

Software Copyright (c) 1996-2011 - CCH INCORPORATED - www.bestcase.com                                     Best Case Bankruptcy

B6F (Official Form 6F) (12/07) - Cont.

In re    **Archdiocese of Milwaukee**                              Case No.    **11-20059-svk**
_____
                          Debtor

## SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS
(Continuation Sheet)

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions above.) | C O D E B T O R | H W J C | Husband, Wife, Joint, or Community | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE. | C O N T I N G E N T | U N L I Q U I D A T E D | D I S P U T E D | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|---|
| Account No.<br><br>**M.H.S., Inc.**<br>**742 West Capitol Drive**<br>**Milwaukee, WI 53206-3327** | | - | | | | | | 3,378,536.59 |
| Account No.<br><br>**Names as listed on the attached (15)**<br>**page list and on this form Schedule F** | | - | | | X | | | 470,020.53 |
| Account No. | | | | | | | | |
| Account No. | | | | | | | | |
| Account No. | | | | | | | | |

Sheet no. __4__ of __4__ sheets attached to Schedule of
Creditors Holding Unsecured Nonpriority Claims

| | |
|---|---|
| Subtotal (Total of this page) | 3,848,557.12 |
| Total (Report on Summary of Schedules) | 19,413,512.12 |

Software Copyright (c) 1996-2011 - CCH INCORPORATED - www.bestcase.com                                    Best Case Bankruptcy

| Vendor Name and Address | Document Type | Document Date | Amount of Claim | Contingent |
|---|---|---|---|---|
| 104.7FM WDDW RADIO,1138 S 108TH STREET,,WEST ALLIS,WISCONSIN,53214 | Invoice | 12/25/2010 | $510.00 | x |
| 104.7FM WDDW RADIO,1138 S 108TH STREET,,WEST ALLIS,WISCONSIN,53214 | Invoice | 1/1/2011 | $510.00 | x |
| **104.7FM WDDW RADIO,1138 S 108TH STREET,,WEST ALLIS,WISCONSIN,53214** | | **VARIOUS** | **$1,020.00** | x |
| 5 CORNERS PONTIAC,1266 WASHINGTON AVE.,,CEDARBURG,WI,53012-9370 | Invoice | 12/8/2010 | $118.72 | x |
| 5 CORNERS PONTIAC,1266 WASHINGTON AVE.,,CEDARBURG,WI,53012-9370 | Credit Memo | 12/14/2010 | ($297.00) | x |
| 5 CORNERS PONTIAC,1266 WASHINGTON AVE.,,CEDARBURG,WI,53012-9370 | Invoice | 12/14/2010 | $514.12 | x |
| **5 CORNERS PONTIAC,1266 WASHINGTON AVE.,,CEDARBURG,WI,53012-9370** | | **VARIOUS** | **$335.84** | x |
| ACTION GRAPHICS,5203 N 125TH STREET,,BUTLER,WI,53007 | Invoice | 12/29/2010 | $620.00 | x |
| **ACTION GRAPHICS,5203 N 125TH STREET,,BUTLER,WI,53007** | | **12/29/2010** | **$620.00** | x |
| AMBASSADOR STEEL FABRICATION LLC,75 REMITTANCE DRIVE,SUITE 1572,CHICAGO,IL,60675-1572 | Invoice | 12/7/2010 | $2,160.00 | x |
| **1572** | | **12/7/2010** | **$2,160.00** | x |
| AMERICAN EXPRESS-360001,PO BOX 360001,,FT. LAUDERDALE,FL,33336-0001 | Invoice | 12/28/2010 | $256.90 | x |
| **AMERICAN EXPRESS-360001,PO BOX 360001,,FT. LAUDERDALE,FL,33336-0001** | | **12/28/2010** | **$256.90** | x |
| AMERICAN FOUNDATION OF COUNSELING SERVICES,SERVICES,130 E WALNUT STREET 7TH FLOOR,GREEN BAY,WISCONSIN,54301 | Invoice | 12/23/2010 | $125.00 | x |
| AMERICAN FOUNDATION OF COUNSELING SERVICES,SERVICES,130 E WALNUT STREET 7TH FLOOR,GREEN BAY,WISCONSIN,54301 | Invoice | 1/27/2011 | $375.00 | x |
| **FLOOR,GREEN BAY,WISCONSIN,54301** | | **VARIOUS** | **$500.00** | x |
| ARAMARK,2885 S. 171ST STREET,,NEW BERLIN,WI,53151 | Invoice | 12/29/2010 | $655.70 | x |
| **ARAMARK,2885 S. 171ST STREET,,NEW BERLIN,WI,53151** | | **12/29/2010** | **$655.70** | x |
| ARCHDIOCESE OF MILWAUKEE,PERPETUAL CARE TRUST,PO BOX 070912,MILWAUKEE,WI,53207-0912 | Invoice | 1/21/2011 | $24,125.00 | x |
| **070912,MILWAUKEE,WI,53207-0912** | | **1/21/2011** | **$24,125.00** | x |
| ASSOCIATION OF CATHOLIC DIOCESAN ARCHIVISTS,114 BROAD STREET, REAR BUILDING,PO BOX 818,CHARLESTON,SC,29402-0818 | Invoice | 1/11/2011 | $0.21 | x |
| **BOX 818,CHARLESTON,SC,29402-0818** | | **1/11/2011** | **$0.21** | x |
| ASSURED PEST CONTROL LLC,PO BOX 14306,,WEST ALLIS,WISCONSIN,53214 | Invoice | 1/1/2011 | $19.84 | x |
| **ASSURED PEST CONTROL LLC,PO BOX 14306,,WEST ALLIS,WISCONSIN,53214** | | **1/1/2011** | **$19.84** | x |
| AT & T- 8100,PO BOX 8100,,AURORA,IL,60507-8100 | Invoice | 1/4/2011 | $52.21 | x |
| **AT & T- 8100,PO BOX 8100,,AURORA,IL,60507-8100** | | **1/4/2011** | **$52.21** | x |
| AT & T INTERNET SERVICES,PO BOX 5016,,CAROL STREAM,IL,60197-5016 | Invoice | 11/22/2010 | $799.00 | x |
| AT & T INTERNET SERVICES,PO BOX 5016,,CAROL STREAM,IL,60197-5016 | Invoice | 12/22/2010 | $386.61 | x |
| **AT & T INTERNET SERVICES,PO BOX 5016,,CAROL STREAM,IL,60197-5016** | | **VARIOUS** | **$1,185.61** | x |
| AT&T ADVERTISING & PUBLISHING,PO BOX 8112,,AURORA,IL,60507-8112 | Invoice | 12/27/2010 | $57.00 | x |
| AT&T ADVERTISING & PUBLISHING,PO BOX 8112,,AURORA,IL,60507-8112 | Invoice | 1/1/2011 | $1,368.06 | x |
| **AT&T ADVERTISING & PUBLISHING,PO BOX 8112,,AURORA,IL,60507-8112** | | **VARIOUS** | **$1,425.06** | x |
| AT&T-SBS,SBS,PO BOX 8101,AURORA,IL,60507-8101 | Invoice | 12/22/2010 | $3,795.50 | x |
| **AT&T-SBS,SBS,PO BOX 8101,AURORA,IL,60507-8101** | | **12/22/2010** | **$3,795.50** | x |
| B & H PHOTO - VIDEO, INC.,420 NINTH AVENUE,,NEW YORK,NY,10001 | Invoice | 12/9/2010 | $573.84 | x |
| B & H PHOTO - VIDEO, INC.,420 NINTH AVENUE,,NEW YORK,NY,10001 | Invoice | 12/16/2010 | $100.97 | x |
| **B & H PHOTO - VIDEO, INC.,420 NINTH AVENUE,,NEW YORK,NY,10001** | | **VARIOUS** | **$674.81** | x |
| NAME AND ADDRESS REDACTED | Invoice | 1/27/2011 | $281.35 | x |
| **NAME AND ADDRESS REDACTED** | | **1/27/2011** | **$281.35** | x |
| BECKER ELECTRICAL GROUP, INC.,4210 - 43RD AVENUE,,KENOSHA,WI,53144 | Invoice | 11/9/2010 | $247.11 | x |
| **BECKER ELECTRICAL GROUP, INC.,4210 - 43RD AVENUE,,KENOSHA,WI,53144** | | **11/9/2010** | **$247.11** | x |
| BIONDAN NORTH AMERICA INC.,2220-77AP MIDLAND AVENUE,,TORONTO,ON,M1P 3E6 | Invoice | 11/24/2010 | $2,359.80 | x |
| **BIONDAN NORTH AMERICA INC.,2220-77AP MIDLAND AVENUE,,TORONTO,ON,M1P 3E6** | | **11/24/2010** | **$2,359.80** | x |
| BISHOP DEBORAH L,1776 SOUTH JACKSON STREET,SUITE 1008,DENVER,CO,80210 | Invoice | 1/27/2011 | $800.00 | x |
| **BISHOP DEBORAH L,1776 SOUTH JACKSON STREET,SUITE 1008,DENVER,CO,80210** | | **1/27/2011** | **$800.00** | x |
| BLAKNEY JOHN,428 RENAISSANCE AVENUE,,MELBOURN,FLORIDA,32940 | Invoice | 1/4/2011 | $20.00 | x |
| **BLAKNEY JOHN,428 RENAISSANCE AVENUE,,MELBOURN,FLORIDA,32940** | | **1/4/2011** | **$20.00** | x |
| BLAST CRAFT SERVICE, INC.,750 INDUSTRIAL DRIVE,,SLINGER,WI,53086 | Invoice | 12/17/2010 | $1,205.00 | x |
| BLAST CRAFT SERVICE, INC.,750 INDUSTRIAL DRIVE,,SLINGER,WI,53086 | Invoice | 12/30/2010 | $3,662.50 | x |
| **BLAST CRAFT SERVICE, INC.,750 INDUSTRIAL DRIVE,,SLINGER,WI,53086** | | **VARIOUS** | **$4,867.50** | x |
| BOULANGER MARY,3303 N. BARTLETT AVENUE,,MILWAUKEE,WI,53211 | Invoice | 11/11/2010 | $50.00 | x |
| **BOULANGER MARY,3303 N. BARTLETT AVENUE,,MILWAUKEE,WI,53211** | | **11/11/2010** | **$50.00** | x |
| HENRY & PEGGY BOWLES,135 AVIE COURT,,BROOKFIELD,WI,53045 | Invoice | 1/27/2011 | $270.94 | x |
| **HENRY & PEGGY BOWLES,135 AVIE COURT,,BROOKFIELD,WI,53045** | | **1/27/2011** | **$270.94** | x |
| BP,P. O. BOX 70887,,CHARLOTTE,NC,28272-0887 | Invoice | 12/23/2010 | $400.98 | x |
| **BP,P. O. BOX 70887,,CHARLOTTE,NC,28272-0887** | | **12/23/2010** | **$400.98** | x |
| BREIDINGER, JOYCE M.,5608 CAMBRIDGE LANE, APT 6,,RACINE,WI,53406-2871 | Invoice | 12/30/2010 | $975.00 | x |

| Vendor | | Date | Amount | |
|---|---|---|---|---|
| BREIDINGER, JOYCE M.,5608 CAMBRIDGE LANE, APT 6,,RACINE,WI,53406-2871 | | 12/30/2010 | $975.00 | x |
| BRENNAN J M INC.,P. O. BOX 2127,,MILWAUKEE,WI,53201 | Invoice | 12/28/2010 | $905.24 | x |
| BRENNAN J M INC.,P. O. BOX 2127,,MILWAUKEE,WI,53201 | Invoice | 1/25/2011 | $3,937.08 | x |
| BRENNAN J M INC.,P. O. BOX 2127,,MILWAUKEE,WI,53201 | Invoice | 1/25/2011 | $1,893.70 | x |
| BRENNAN J M INC.,P. O. BOX 2127,,MILWAUKEE,WI,53201 | Invoice | 1/25/2011 | $1,542.61 | x |
| BRENNAN J M INC.,P. O. BOX 2127,,MILWAUKEE,WI,53201 | | VARIOUS | $8,278.63 | |
| CANON LAW PROFESSIONALS,29 LOWER COPELAND HILL ROAD,,FEURA BUSH,NY,12067 | Invoice | 12/1/2010 | $2,090.99 | x |
| CANON LAW PROFESSIONALS,29 LOWER COPELAND HILL ROAD,,FEURA BUSH,NY,12067 | Invoice | 1/3/2011 | $131.25 | x |
| CANON LAW PROFESSIONALS,29 LOWER COPELAND HILL ROAD,,FEURA BUSH,NY,12067 | | VARIOUS | $2,222.24 | x |
| CARDINAL STRITCH UNIVERSITY,SR. CANISE KOLBECK, OSF,6801 N. YATES RD. BOX 500,MILWAUKEE,WI,53217-3985 | Invoice | 12/9/2010 | $143.48 | x |
| 500,MILWAUKEE,WI,53217-3985 | | 12/9/2010 | $143.48 | |
| CARQUEST AUTO PARTS STORES,PO BOX 503589,,ST. LOUIS,MO,63150-3589 | Invoice | 1/3/2011 | $482.96 | x |
| CARQUEST AUTO PARTS STORES,PO BOX 503589,,ST. LOUIS,MO,63150-3589 | Invoice | 10/23/2010 | $9.17 | x |
| CARQUEST AUTO PARTS STORES,PO BOX 503589,,ST. LOUIS,MO,63150-3589 | Invoice | 11/15/2010 | $60.72 | x |
| CARQUEST AUTO PARTS STORES,PO BOX 503589,,ST. LOUIS,MO,63150-3589 | Invoice | 12/1/2010 | $14.15 | x |
| CARQUEST AUTO PARTS STORES,PO BOX 503589,,ST. LOUIS,MO,63150-3589 | Invoice | 12/1/2010 | $69.83 | x |
| CARQUEST AUTO PARTS STORES,PO BOX 503589,,ST. LOUIS,MO,63150-3589 | Invoice | 12/2/2010 | $37.99 | x |
| CARQUEST AUTO PARTS STORES,PO BOX 503589,,ST. LOUIS,MO,63150-3589 | Invoice | 12/3/2010 | $28.12 | x |
| CARQUEST AUTO PARTS STORES,PO BOX 503589,,ST. LOUIS,MO,63150-3589 | Invoice | 12/3/2010 | $16.35 | x |
| CARQUEST AUTO PARTS STORES,PO BOX 503589,,ST. LOUIS,MO,63150-3589 | Invoice | 12/6/2010 | $191.64 | x |
| CARQUEST AUTO PARTS STORES,PO BOX 503589,,ST. LOUIS,MO,63150-3589 | Invoice | 12/11/2010 | $14.60 | x |
| CARQUEST AUTO PARTS STORES,PO BOX 503589,,ST. LOUIS,MO,63150-3589 | Invoice | 12/11/2010 | $29.20 | x |
| CARQUEST AUTO PARTS STORES,PO BOX 503589,,ST. LOUIS,MO,63150-3589 | Invoice | 12/14/2010 | $2.98 | x |
| CARQUEST AUTO PARTS STORES,PO BOX 503589,,ST. LOUIS,MO,63150-3589 | Invoice | 12/14/2010 | $31.22 | x |
| CARQUEST AUTO PARTS STORES,PO BOX 503589,,ST. LOUIS,MO,63150-3589 | Invoice | 12/15/2010 | $10.25 | x |
| CARQUEST AUTO PARTS STORES,PO BOX 503589,,ST. LOUIS,MO,63150-3589 | Invoice | 12/27/2010 | $59.70 | x |
| CARQUEST AUTO PARTS STORES,PO BOX 503589,,ST. LOUIS,MO,63150-3589 | Invoice | 12/31/2010 | $53.85 | x |
| CARQUEST AUTO PARTS STORES,PO BOX 503589,,ST. LOUIS,MO,63150-3589 | | VARIOUS | $1,112.73 | x |
| CATHEDRAL OF ST JOHN THE,ATTN: MARY BENNETT,831 N. VAN BUREN ST.,MILWAUKEE,WI,53202 | Invoice | 12/14/2010 | $125.20 | x |
| CATHEDRAL OF ST JOHN THE,ATTN: MARY BENNETT,831 N. VAN BUREN ST.,MILWAUKEE,WI,53202 | Invoice | 1/1/2011 | $250.00 | x |
| CATHEDRAL OF ST JOHN THE,ATTN: MARY BENNETT,831 N. VAN BUREN ST.,MILWAUKEE,WI,53202 | Invoice | 1/11/2011 | $72.76 | x |
| ST.,MILWAUKEE,WI,53202 | | VARIOUS | $447.96 | |
| CATHOLIC CEMETERY CONFERENCE,1400 S. WOLF ROAD,BUILDING 3,HILLSIDE,IL,60162-2197 | Invoice | 12/30/2010 | $11.05 | x |
| CATHOLIC CEMETERY CONFERENCE,1400 S. WOLF ROAD,BUILDING 3,HILLSIDE,IL,60162-2197 | | 12/30/2010 | $11.05 | |
| CATHOLIC HERALD THE,P. O. BOX 070913,,MILWAUKEE,WI,53207-0913 | Invoice | 12/20/2010 | $285.00 | x |
| CATHOLIC HERALD THE,P. O. BOX 070913,,MILWAUKEE,WI,53207-0913 | Invoice | 12/20/2010 | $330.00 | x |
| CATHOLIC HERALD THE,P. O. BOX 070913,,MILWAUKEE,WI,53207-0913 | Invoice | 12/31/2010 | $630.00 | x |
| CATHOLIC HERALD THE,P. O. BOX 070913,,MILWAUKEE,WI,53207-0913 | Invoice | 12/31/2010 | $343.12 | x |
| CATHOLIC HERALD THE, P. O. BOX 070913,,MILWAUKEE,WI,53207-0913 | | VARIOUS | $1,588.12 | |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/21/2010 | $9.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/21/2010 | $19.60 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/21/2010 | $6.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/21/2010 | $16.52 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/21/2010 | $6.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/21/2010 | $9.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/21/2010 | $19.60 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/21/2010 | $19.60 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/21/2010 | $6.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/21/2010 | $19.60 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/21/2010 | $6.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/21/2010 | $16.52 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/21/2010 | $19.60 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/21/2010 | $6.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/21/2010 | $6.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/21/2010 | $19.60 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/21/2010 | $19.60 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/21/2010 | $6.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/21/2010 | $16.52 | x |

Archdiocese of Milwaukee
Open Prepetition Accounts Payables

| | | | | |
|---|---|---|---|---|
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/21/2010 | $6.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/21/2010 | $9.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/21/2010 | $6.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/21/2010 | $9.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/21/2010 | $6.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/21/2010 | $9.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/21/2010 | $16.52 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/21/2010 | $6.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/21/2010 | $16.52 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/21/2010 | $6.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/21/2010 | $6.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/21/2010 | $19.60 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/21/2010 | $19.60 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/21/2010 | $6.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/21/2010 | $9.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/28/2010 | $6.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/28/2010 | $16.52 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/28/2010 | $6.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/28/2010 | $6.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/28/2010 | $8.63 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/28/2010 | $19.60 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/28/2010 | $6.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/28/2010 | $9.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/28/2010 | $19.60 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/28/2010 | $6.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/28/2010 | $6.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/28/2010 | $19.60 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/28/2010 | $19.60 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/28/2010 | $16.52 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/28/2010 | $9.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/28/2010 | $19.60 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/28/2010 | $19.60 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/28/2010 | $6.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/28/2010 | $16.52 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/28/2010 | $6.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/28/2010 | $9.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 12/28/2010 | $9.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 1/4/2011 | $6.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 1/4/2011 | $6.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 1/4/2011 | $19.60 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 1/4/2011 | $19.60 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 1/4/2011 | $19.60 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 1/4/2011 | $16.52 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 1/4/2011 | $6.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 1/4/2011 | $16.52 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 1/4/2011 | $6.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 1/4/2011 | $19.60 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 1/4/2011 | $19.60 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 1/4/2011 | $9.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 1/4/2011 | $6.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 1/4/2011 | $9.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 1/4/2011 | $16.52 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 1/4/2011 | $19.60 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 1/4/2011 | $9.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 1/4/2011 | $6.90 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 1/4/2011 | $16.52 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 1/4/2011 | $19.60 | x |
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | Invoice | 1/4/2011 | $19.60 | x |

| Name/Address | Type | Date | Amount | |
|---|---|---|---|---|
| CDI LOGISTICS,PO BOX 264,,OAK CREEK,WISCONSIN,53154-0264 | | VARIOUS | $1,045.47 | x |
| CDW GOVERNMENT,INC.,75 REMITTANCE DRIVE,SUITE 1515,CHICAGO,IL,60675-1515 | Invoice | 12/14/2010 | $162.75 | x |
| **CDW GOVERNMENT,INC.,75 REMITTANCE DRIVE,SUITE 1515,CHICAGO,IL,60675-1515** | | **12/14/2010** | **$162.75** | x |
| CEDAR CREEK COUNSELING,1009 W GLEN OAKS LANE,SUITE 209,MEQUON,WI,53092 | Invoice | 12/23/2010 | $180.00 | x |
| **CEDAR CREEK COUNSELING,1009 W GLEN OAKS LANE,SUITE 209,MEQUON,WI,53092** | | **12/23/2010** | **$180.00** | x |
| NAME AND ADDRESS REDACTED | Invoice | 1/7/2011 | $150.00 | x |
| **NAME AND ADDRESS REDACTED** | | **1/7/2011** | **$150.00** | x |
| CGR BEACON CLINIC PA,PO BOX 496080,,PORT CHARLOTTE,FL,33949-6080 | Invoice | 12/23/2010 | $70.25 | x |
| CGR BEACON CLINIC PA,PO BOX 496080,,PORT CHARLOTTE,FL,33949-6080 | Invoice | 1/27/2011 | $70.25 | x |
| **CGR BEACON CLINIC PA,PO BOX 496080,,PORT CHARLOTTE,FL,33949-6080** | | **VARIOUS** | **$140.50** | x |
| CINTAS CORPORATION,6415 N 62ND STREET,,MILWAUKEE,WI,53223 | Invoice | 12/1/2010 | $152.30 | x |
| CINTAS CORPORATION,6415 N 62ND STREET,,MILWAUKEE,WI,53223 | Invoice | 12/8/2010 | $154.05 | x |
| CINTAS CORPORATION,6415 N 62ND STREET,,MILWAUKEE,WI,53223 | Invoice | 12/15/2010 | $154.05 | x |
| CINTAS CORPORATION,6415 N 62ND STREET,,MILWAUKEE,WI,53223 | Invoice | 12/22/2010 | $152.30 | x |
| CINTAS CORPORATION,6415 N 62ND STREET,,MILWAUKEE,WI,53223 | Invoice | 12/29/2010 | $166.80 | x |
| **CINTAS CORPORATION,6415 N 62ND STREET,,MILWAUKEE,WI,53223** | | **VARIOUS** | **$779.50** | x |
| CINTAS FIRE PROTECTION,N56 W13605 SILVER SPRING DR.,,MENOMONEE FALLS,WI,53051 | Invoice | 12/7/2010 | $151.10 | x |
| CINTAS FIRE PROTECTION,N56 W13605 SILVER SPRING DR.,,MENOMONEE FALLS,WI,53051 | Invoice | 1/3/2011 | $467.59 | x |
| **CINTAS FIRE PROTECTION,N56 W13605 SILVER SPRING DR.,,MENOMONEE FALLS,WI,53051** | | **VARIOUS** | **$618.69** | x |
| CITRIX ONLINE,FILE 50264,,LOS ANGELES,CA,90074-0264 | Invoice | 12/31/2010 | $48.47 | x |
| **CITRIX ONLINE,FILE 50264,,LOS ANGELES,CA,90074-0264** | | **12/31/2010** | **$48.47** | x |
| CITY OF ST FRANCIS,4235 S. NICHOLSON AVE,,ST. FRANCIS,WI,53235 | Invoice | 1/12/2011 | $198.90 | x |
| CITY OF ST FRANCIS,4235 S. NICHOLSON AVE,,ST. FRANCIS,WI,53235 | Invoice | 1/12/2011 | $3,776.42 | x |
| **CITY OF ST FRANCIS,4235 S. NICHOLSON AVE,,ST. FRANCIS,WI,53235** | | **VARIOUS** | **$3,975.32** | x |
| CITY OF MILWAUKEE-NEIGHBORHOOD,DEPT.OF NEIGHBORHOOD SERV.,841 N BROADWAY ROOM 105,MILWAUKEE,WI,53202 | Invoice | 9/22/2010 | $150.00 | x |
| CITY OF MILWAUKEE-NEIGHBORHOOD,DEPT.OF NEIGHBORHOOD SERV.,841 N BROADWAY ROOM 105,MILWAUKEE,WI,53202 | Invoice | 12/15/2010 | $100.00 | x |
| CITY OF MILWAUKEE-NEIGHBORHOOD,DEPT.OF NEIGHBORHOOD SERV.,841 N BROADWAY ROOM 105,MILWAUKEE,WI,53202 | Invoice | 12/15/2010 | $50.00 | x |
| CITY OF MILWAUKEE-NEIGHBORHOOD,DEPT.OF NEIGHBORHOOD SERV.,841 N BROADWAY ROOM 105,MILWAUKEE,WI,53202 | Invoice | 12/15/2010 | $100.00 | x |
| **ROOM 105,MILWAUKEE,WI,53202** | | **VARIOUS** | **$400.00** | x |
| CLEAR CHANNEL BROADCASTING, INC.,P. O. BOX 847304,,DALLAS,TX,75284-7304 | Invoice | 12/26/2010 | $3,400.00 | x |
| **CLEAR CHANNEL BROADCASTING, INC.,P. O. BOX 847304,,DALLAS,TX,75284-7304** | | **12/26/2010** | **$3,400.00** | x |
| ALISA COHEN-STEIN,5225 OLD ORCHARD RD SUITE 27A,,SKOKIE,IL,60077 | Invoice | 1/27/2011 | $120.00 | x |
| **ALISA COHEN-STEIN,5225 OLD ORCHARD RD SUITE 27A,,SKOKIE,IL,60077** | | **1/27/2011** | **$120.00** | x |
| COMMUNICATION LINK,10243 W. NATIONAL AVE.,,WEST ALLIS,WI,53227 | Invoice | 12/30/2010 | $232.00 | x |
| **COMMUNICATION LINK,10243 W. NATIONAL AVE.,,WEST ALLIS,WI,53227** | | **12/30/2010** | **$232.00** | x |
| CORNERSTONE COUNSELING SERVICES, INC.,16535 W. BLUEMOUND ROAD,SUITE 200,BROOKFIELD,WI,53005 | Invoice | 12/23/2010 | $588.00 | x |
| **200,BROOKFIELD,WI,53005** | | **12/23/2010** | **$588.00** | x |
| COUNTRY FLOWER SHOP,3101 E. LAYTON AVENUE,,CUDAHY,WI,53110-1397 | Invoice | 1/3/2011 | $364.00 | x |
| **COUNTRY FLOWER SHOP,3101 E. LAYTON AVENUE,,CUDAHY,WI,53110-1397** | | **1/3/2011** | **$364.00** | x |
| COUSINS SUBMARINES, INC.,N83 W13400 LEON RD,,MENOMONEE FALLS,WI,53051-3306 | Invoice | 12/2/2010 | $54.26 | x |
| **COUSINS SUBMARINES, INC.,N83 W13400 LEON RD,,MENOMONEE FALLS,WI,53051-3306** | | **12/2/2010** | **$54.26** | x |
| CREDENCE THERAPY ASSOCIATES,1 1/2 W. GENEVA STREET,,ELKHORN,WI,53121 | Invoice | 1/6/2011 | $485.00 | x |
| **CREDENCE THERAPY ASSOCIATES,1 1/2 W. GENEVA STREET,,ELKHORN,WI,53121** | | **1/6/2011** | **$485.00** | x |
| CRESPO MIGUEL SR.,C/O MARY SCHNEIDER,PO BOX 1881,MILWAUKEE,WI,53201-1881 | Invoice | 9/29/2010 | $150.00 | x |
| **CRESPO MIGUEL SR.,C/O MARY SCHNEIDER,PO BOX 1881,MILWAUKEE,WI,53201-1881** | | **9/29/2010** | **$150.00** | x |
| DATASTORE,DATASTORE,400 S. 5TH STREET,MILWAUKEE,WI,53204 | Invoice | 12/31/2010 | $159.80 | x |
| **DATASTORE,DATASTORE,400 S. 5TH STREET,MILWAUKEE,WI,53204** | | **12/31/2010** | **$159.80** | x |
| NAME AND ADDRESS REDACTED | Invoice | 12/23/2010 | $571.70 | x |
| **NAME AND ADDRESS REDACTED** | | **12/23/2010** | **$571.70** | x |
| DAVIS & KUELTHAU, S.C.,ATTORNEYS AT LAW,111 E. KILBOURN - STE. 1400,MILWAUKEE,WI,53202-6613 | Invoice | 12/21/2010 | $250.00 | x |
| **1400,MILWAUKEE,WI,53202-6613** | | **12/21/2010** | **$250.00** | x |
| DELL MARKETING,L.P.,C/O DELL USA L.P.,PO BOX 802816,CHICAGO,IL,60680-2816 | Invoice | 12/10/2010 | $505.98 | x |
| DELL MARKETING,L.P.,C/O DELL USA L.P.,PO BOX 802816,CHICAGO,IL,60680-2816 | Invoice | 12/19/2010 | $5,438.84 | x |
| **DELL MARKETING,L.P.,C/O DELL USA L.P.,PO BOX 802816,CHICAGO,IL,60680-2816** | | **VARIOUS** | **$5,944.82** | x |

| | | | | |
|---|---|---|---|---|
| DELUXE BUSINESS CHECKS AND SOLUTIONS,P. O. BOX 742572,,CINCINNATI,OH,45274-2572 | Invoice | 12/9/2010 | $267.65 | x |
| **DELUXE BUSINESS CHECKS AND SOLUTIONS,P. O. BOX 742572,,CINCINNATI,OH,45274-2572** | | **12/9/2010** | **$267.65** | x |
| DENTINO DIANNA,1075 GLENVIEW AVENUE,,WAUWATOSA,WISCONSIN,53213-3033 | Invoice | 12/8/2010 | $157.50 | x |
| **DENTINO DIANNA,1075 GLENVIEW AVENUE,,WAUWATOSA,WISCONSIN,53213-3033** | | **12/8/2010** | **$157.50** | x |
| DILLETT MECHANICAL SERVICE,21625 DORAL ROAD,,WAUKESHA,WI,53186-1817 | Invoice | 12/31/2010 | $1,039.60 | x |
| **DILLETT MECHANICAL SERVICE,21625 DORAL ROAD,,WAUKESHA,WI,53186-1817** | | **12/31/2010** | **$1,039.60** | x |
| DIVERSIFIED BENEFIT SERVICES, INC.,P. O. BOX 260,,HARTLAND,WI,53029 | Invoice | 12/17/2010 | $163.67 | x |
| DIVERSIFIED BENEFIT SERVICES, INC.,P. O. BOX 260,,HARTLAND,WI,53029 | Invoice | 1/7/2011 | $46.86 | x |
| DIVERSIFIED BENEFIT SERVICES, INC.,P. O. BOX 260,,HARTLAND,WI,53029 | Invoice | 1/17/2011 | $16.01 | x |
| **DIVERSIFIED BENEFIT SERVICES, INC.,P. O. BOX 260,,HARTLAND,WI,53029** | | **VARIOUS** | **$226.54** | x |
| DOUSMAN TRANSPORT CO., INC.,313 S. MAIN STREET,,DOUSMAN,WI,53118 | Invoice | 1/3/2011 | $102.72 | x |
| **DOUSMAN TRANSPORT CO., INC.,313 S. MAIN STREET,,DOUSMAN,WI,53118** | | **1/3/2011** | **$102.72** | x |
| ECONOMY LAMP COMPANY,4611 W NATIONAL AVE,,MILWAUKEE,WI,53214 | Invoice | 12/30/2010 | $192.50 | x |
| **ECONOMY LAMP COMPANY,4611 W NATIONAL AVE,,MILWAUKEE,WI,53214** | | **12/30/2010** | **$192.50** | x |
| EMERALD ISLE PR,INC.,17035 W GREENFIELD AVENUE,,NEW BERLIN,WI,53151-1364 | Invoice | 12/1/2010 | $3,970.00 | x |
| EMERALD ISLE PR,INC.,17035 W GREENFIELD AVENUE,,NEW BERLIN,WI,53151-1364 | Invoice | 12/20/2010 | $2,139.60 | x |
| EMERALD ISLE PR,INC.,17035 W GREENFIELD AVENUE,,NEW BERLIN,WI,53151-1364 | Invoice | 12/20/2010 | $2,115.75 | x |
| **EMERALD ISLE PR,INC.,17035 W GREENFIELD AVENUE,,NEW BERLIN,WI,53151-1364** | | **VARIOUS** | **$8,225.35** | x |
| ENVIRONMENTAL INNOVATIONS, INC.,9600 WEST FLAGG AVE.,,MILWAUKEE,WI,53225 | Invoice | 12/6/2010 | $160.95 | x |
| ENVIRONMENTAL INNOVATIONS, INC.,9600 WEST FLAGG AVE.,,MILWAUKEE,WI,53225 | Invoice | 12/9/2010 | $57.00 | x |
| **ENVIRONMENTAL INNOVATIONS, INC.,9600 WEST FLAGG AVE.,,MILWAUKEE,WI,53225** | | **VARIOUS** | **$217.95** | x |
| EPSTEIN MARGE PH,D LCSW,101 N MARION STREET,SUITE 211,OAK PARK,IL,60301 | Invoice | 1/27/2011 | $750.00 | x |
| **EPSTEIN MARGE PH,D LCSW,101 N MARION STREET,SUITE 211,OAK PARK,IL,60301** | | **1/27/2011** | **$750.00** | x |
| EXEDE CORP,W146 N5800 ENTERPRISE AVENUE,,MENOMONEE FALLS,WISCONSIN,53051 | Invoice | 12/21/2010 | $485.27 | x |
| **EXEDE CORP,W146 N5800 ENTERPRISE AVENUE,,MENOMONEE FALLS,WISCONSIN,53051** | | **12/21/2010** | **$485.27** | x |
| FASTENAL COMPANY,P O BOX 978,,WINONA,MN,55987-0978 | Invoice | 12/29/2010 | $132.19 | x |
| **FASTENAL COMPANY,P O BOX 978,,WINONA,MN,55987-0978** | | **12/29/2010** | **$132.19** | x |
| FDLC,415 MICHIGAN AVE., NE,SUITE 70,WASHINGTON,DC,20017 | Invoice | 10/8/2010 | $263.95 | x |
| FDLC,415 MICHIGAN AVE., NE,SUITE 70,WASHINGTON,DC,20017 | Invoice | 10/12/2010 | $36.40 | x |
| FDLC,415 MICHIGAN AVE., NE,SUITE 70,WASHINGTON,DC,20017 | Invoice | 12/8/2010 | $492.75 | x |
| **FDLC,415 MICHIGAN AVE., NE,SUITE 70,WASHINGTON,DC,20017** | | **VARIOUS** | **$793.10** | x |
| FEDEX,P. O. BOX 94515,,PALATINE,IL,60094-4515 | Invoice | 12/22/2010 | $70.83 | x |
| FEDEX,P. O. BOX 94515,,PALATINE,IL,60094-4515 | Invoice | 12/23/2010 | $44.73 | x |
| **FEDEX,P. O. BOX 94515,,PALATINE,IL,60094-4515** | | **VARIOUS** | **$115.56** | x |
| FIFTH FLOOR RECORDING COMPANY,316 N MILWAUKEE ST,SUITE 501,MILWAUKEE,WI,53202 | Invoice | 12/10/2010 | $192.00 | x |
| FIFTH FLOOR RECORDING COMPANY,316 N MILWAUKEE ST,SUITE 501,MILWAUKEE,WI,53202 | Invoice | 12/17/2010 | $112.00 | x |
| FIFTH FLOOR RECORDING COMPANY,316 N MILWAUKEE ST,SUITE 501,MILWAUKEE,WI,53202 | Invoice | 12/21/2010 | $16.00 | x |
| FIFTH FLOOR RECORDING COMPANY,316 N MILWAUKEE ST,SUITE 501,MILWAUKEE,WI,53202 | Invoice | 12/23/2010 | $64.00 | x |
| FIFTH FLOOR RECORDING COMPANY,316 N MILWAUKEE ST,SUITE 501,MILWAUKEE,WI,53202 | Invoice | 12/28/2010 | $32.00 | x |
| **FIFTH FLOOR RECORDING COMPANY,316 N MILWAUKEE ST,SUITE 501,MILWAUKEE,WI,53202** | | **VARIOUS** | **$416.00** | x |
| FILTRATION CONCEPTS, INC.,P. O. BOX 426,,LANNON,WI,53046 | Invoice | 12/23/2010 | $436.50 | x |
| FILTRATION CONCEPTS, INC.,P. O. BOX 426,,LANNON,WI,53046 | Invoice | 12/23/2010 | $120.75 | x |
| FILTRATION CONCEPTS, INC.,P. O. BOX 426,,LANNON,WI,53046 | Invoice | 12/23/2010 | $74.75 | x |
| FILTRATION CONCEPTS, INC.,P. O. BOX 426,,LANNON,WI,53046 | Invoice | 12/27/2010 | $212.75 | x |
| **FILTRATION CONCEPTS, INC.,P. O. BOX 426,,LANNON,WI,53046** | | **VARIOUS** | **$844.75** | x |
| FOUNDATION FOR RELIGIOUS RETIREMENT,3221 S. LAKE DRIVE,,ST. FRANCIS,WI,53235 | Invoice | 1/7/2010 | $100.00 | x |
| **FOUNDATION FOR RELIGIOUS RETIREMENT,3221 S. LAKE DRIVE,,ST. FRANCIS,WI,53235** | | **1/7/2010** | **$100.00** | x |
| NAME AND ADDRESS REDACTED | Invoice | 1/6/2011 | $1,501.08 | x |
| **NAME AND ADDRESS REDACTED** | | **1/6/2011** | **$1,501.08** | ,x |
| GEIS BUILDING PRODUCTS, INC.,P. O. BOX 622,,BROOKFIELD,WI,53008-0622 | Invoice | 11/30/2010 | $1,850.00 | x |
| **GEIS BUILDING PRODUCTS, INC.,P. O. BOX 622,,BROOKFIELD,WI,53008-0622** | | **11/30/2010** | **$1,850.00** | x |
| NAME AND ADDRESS REDACTED | Invoice | 1/27/2011 | $105.00 | x |
| **NAME AND ADDRESS REDACTED** | | **1/27/2011** | **$105.00** | x |
| GILLITZER FRANK ELECTRIC CO., LTD.,12304 W DONGES BAY RD,,MEQUON,WI,53097 | Invoice | 12/13/2010 | $1,409.18 | x |
| GILLITZER FRANK ELECTRIC CO., LTD.,12304 W DONGES BAY RD,,MEQUON,WI,53097 | Invoice | 12/27/2010 | $277.68 | x |
| GILLITZER FRANK ELECTRIC CO., LTD.,12304 W DONGES BAY RD,,MEQUON,WI,53097 | Invoice | 12/28/2010 | $55.00 | x |
| GILLITZER FRANK ELECTRIC CO., LTD.,12304 W DONGES BAY RD,,MEQUON,WI,53097 | Invoice | 12/29/2010 | $138.47 | x |

| | | | | |
|---|---|---|---|---|
| GILLITZER FRANK ELECTRIC CO., LTD.,12304 W DONGES BAY RD,,MEQUON,WI,53097 | | VARIOUS | $1,880.33 | x |
| GLACIER STATE DISTRIBUTION SERVICES INC,7517 60TH STREET,,KENOSHA,WISCONSIN,53144 | Invoice | 11/17/2010 | $365.60 | x |
| GLACIER STATE DISTRIBUTION SERVICES INC,7517 60TH STREET,,KENOSHA,WISCONSIN,53144 | Invoice | 12/28/2010 | $129.00 | x |
| GLACIER STATE DISTRIBUTION SERVICES INC,7517 60TH STREET,,KENOSHA,WISCONSIN,53144 | | VARIOUS | $494.60 | x |
| GLOBALCOM INC.,PO BOX 71-5248,,COLUMBUS,OHIO,43271-5248 | Invoice | 12/12/2010 | $334.19 | x |
| GLOBALCOM INC.,PO BOX 71-5248,,COLUMBUS,OHIO,43271-5248 | Invoice | 1/12/2011 | $264.80 | x |
| GLOBALCOM INC.,PO BOX 71-5248,,COLUMBUS,OHIO,43271-5248 | | VARIOUS | $598.99 | x |
| GOETZINGER, ANDREA,215 N. 70TH STREET,,MILWAUKEE,WI,53213 | Invoice | 11/17/2010 | $40.00 | x |
| GOETZINGER, ANDREA,215 N. 70TH STREET,,MILWAUKEE,WI,53213 | | 11/17/2010 | $40.00 | x |
| GOOD SHEPHERD,N88 W17658 CHRISTMAN ROAD,C/O LORRIE MAPLES,MENOMONEE FALLS,WI,53051-2630 | Invoice | 1/12/2011 | $13.42 | x |
| GOOD SHEPHERD,N88 W17658 CHRISTMAN ROAD,C/O LORRIE MAPLES,MENOMONEE FALLS,WI,53051-2630 | | 1/12/2011 | $13.42 | x |
| GRAINGER,DEPT. 806396057,,PALATINE,IL,60038-0001 | Invoice | 12/9/2010 | $190.90 | x |
| GRAINGER,DEPT. 806396057,,PALATINE,IL,60038-0001 | | 12/9/2010 | $190.90 | x |
| GRANITE RESOURCES CORP.,P O BOX 179,,NASHOTAH,WI,53058 | Invoice | 12/14/2010 | $226.00 | x |
| GRANITE RESOURCES CORP.,P O BOX 179,,NASHOTAH,WI,53058 | Invoice | 12/17/2010 | $404.00 | x |
| GRANITE RESOURCES CORP.,P O BOX 179,,NASHOTAH,WI,53058 | Invoice | 12/30/2010 | $1,185.00 | x |
| GRANITE RESOURCES CORP.,P O BOX 179,,NASHOTAH,WI,53058 | | VARIOUS | $1,815.00 | x |
| GRANT, WHITNEY & MARJORIE,C/O JUDITH L. DELANEY,1124 S. JOSEPHINE ST.,DENVER,CO,80210 | Invoice | 12/30/2010 | $703.43 | x |
| GRANT, WHITNEY & MARJORIE,C/O JUDITH L. DELANEY,1124 S. JOSEPHINE ST.,DENVER,CO,80210 | Invoice | 12/30/2010 | $600.33 | x |
| GRANT, WHITNEY & MARJORIE,C/O JUDITH L. DELANEY,1124 S. JOSEPHINE ST.,DENVER,CO,80210 | | VARIOUS | $1,303.76 | x |
| GREAT LAKES ROOFING,W194 N11095 KLEINMANN DRIVE,,GERMANTOWN,WISCONSIN,53022 | Invoice | 11/10/2010 | $20,000.00 | x |
| GREAT LAKES ROOFING,W194 N11095 KLEINMANN DRIVE,,GERMANTOWN,WISCONSIN,53022 | | 11/10/2022 | $20,000.00 | x |
| GREEN BAY DIOCESE TRIBUNIAL,PO BOX 23825,,GREEN BAY,WISCONSIN,54305-3825 | Invoice | 12/23/2010 | $525.00 | x |
| GREEN BAY DIOCESE TRIBUNIAL,PO BOX 23825,,GREEN BAY,WISCONSIN,54305-3825 | | 12/23/2010 | $525.00 | x |
| GREEN BAY GLACIER,5610 BEAVER DAM ROAD,,WEST BEND,WI,53090-9322 | Invoice | 12/15/2010 | $26.75 | x |
| GREEN BAY GLACIER,5610 BEAVER DAM ROAD,,WEST BEND,WI,53090-9322 | Invoice | 12/27/2010 | $64.85 | x |
| GREEN BAY GLACIER,5610 BEAVER DAM ROAD,,WEST BEND,WI,53090-9322 | Invoice | 12/29/2010 | $14.05 | x |
| GREEN BAY GLACIER,5610 BEAVER DAM ROAD,,WEST BEND,WI,53090-9322 | Invoice | 1/1/2011 | $30.00 | x |
| GREEN BAY GLACIER,5610 BEAVER DAM ROAD,,WEST BEND,WI,53090-9322 | Invoice | 1/1/2011 | $30.00 | x |
| GREEN BAY GLACIER,5610 BEAVER DAM ROAD,,WEST BEND,WI,53090-9322 | | VARIOUS | $165.65 | x |
| GREGS TRUE VALUE & JUST ASK RENTAL,3050 E. LAYTON AVE.,,ST FRANCIS,WI,53235 | Invoice | 11/30/2010 | $55.90 | x |
| GREGS TRUE VALUE & JUST ASK RENTAL,3050 E. LAYTON AVE.,,ST FRANCIS,WI,53235 | Invoice | 12/9/2010 | $21.86 | x |
| GREGS TRUE VALUE & JUST ASK RENTAL,3050 E. LAYTON AVE.,,ST FRANCIS,WI,53235 | Invoice | 12/20/2010 | $13.38 | x |
| GREGS TRUE VALUE & JUST ASK RENTAL,3050 E. LAYTON AVE.,,ST FRANCIS,WI,53235 | | VARIOUS | $91.14 | x |
| GUEST, DIANA L.,1767 GRAND AVENUE, SUITE #4,,SAN DIEGO,CA,92109 | Invoice | 12/23/2010 | $780.00 | x |
| GUEST, DIANA L.,1767 GRAND AVENUE, SUITE #4,,SAN DIEGO,CA,92109 | | 12/23/2010 | $780.00 | x |
| HAIG/JACKSON COMMUNICATIONS, INC.,1836 N. 51ST STREET,,MILWAUKEE,WI,53208 | Invoice | 12/23/2010 | $300.00 | x |
| HAIG/JACKSON COMMUNICATIONS, INC.,1836 N. 51ST STREET,,MILWAUKEE,WI,53208 | | 12/23/2010 | $300.00 | x |
| HEMSING VERY REV. JOHN,LUMEN CHRISTI,11300 N ST JAMES LANE,MEQUON,WI,53092 | Invoice | 11/23/2010 | $50.00 | x |
| HEMSING VERY REV. JOHN,LUMEN CHRISTI,11300 N ST JAMES LANE,MEQUON,WI,53092 | | 11/23/2010 | $50.00 | x |
| HOLBUS BRIAN,ST ROMAN CHURCH,1710 W BOLIVAR AVENUE,MILWAUKEE,WISCONSIN,53221-2334 | Invoice | 12/18/2010 | $183.40 | x |
| HOLBUS BRIAN,ST ROMAN CHURCH,1710 W BOLIVAR AVENUE,MILWAUKEE,WISCONSIN,53221-2334 | | 12/18/2010 | $183.40 | x |
| HOLY ANGELS PARISH,138 N. 8TH AVENUE,,WEST BEND,WI,53095 | Invoice | 9/10/2010 | $225.00 | x |
| HOLY ANGELS PARISH,138 N. 8TH AVENUE,,WEST BEND,WI,53095 | | 9/10/2010 | $225.00 | x |
| HOME DEPOT CREDIT SERVICES,DEPT 32-2502091337,PO BOX 6031,THE LAKES,NV,88901-6031 | Invoice | 12/13/2010 | $775.79 | x |
| HOME DEPOT CREDIT SERVICES,DEPT 32-2502091337,PO BOX 6031,THE LAKES,NV,88901-6031 | | 12/13/2010 | $775.79 | x |
| HORST FAMILY TRUST,1567 MAX AVENUE,,CHULA VISTA,CA,91911 | Invoice | 12/8/2010 | $2,920.00 | x |
| HORST FAMILY TRUST,1567 MAX AVENUE,,CHULA VISTA,CA,91911 | | 12/8/2010 | $2,920.00 | x |
| HSBC BUSINESS SOLUTIONS,PO BOX 5219,,CAROL STREAM,IL,60197-5219 | Invoice | 12/19/2010 | $698.85 | x |
| HSBC BUSINESS SOLUTIONS,PO BOX 5219,,CAROL STREAM,IL,60197-5219 | | 12/19/2010 | $698.85 | x |
| IMP, JEROME F.,1415 S 92ND STREET APT 102,,WEST ALLIS,WI,53214 | Invoice | 12/30/2010 | $177.50 | x |
| IMP, JEROME F.,1415 S 92ND STREET APT 102,,WEST ALLIS,WI,53214 | | 12/30/2010 | $177.50 | x |
| INDUSTRIAL CONTROLS DISTRIBUTORS LLC,PO BOX 827058,,PHILADELPHIA,PA,19182-7058 | Invoice | 12/6/2010 | $40.20 | x |
| INDUSTRIAL CONTROLS DISTRIBUTORS LLC,PO BOX 827058,,PHILADELPHIA,PA,19182-7058 | | 12/6/2010 | $40.20 | x |
| JACKLIN W.H.INCORPORATED,8835 W HEATHER AVE,,MILWAUKEE,WI,53224 | Invoice | 12/9/2010 | $13,645.00 | x |

| Name/Address | Type | Date | Amount | |
|---|---|---|---|---|
| JACKLIN W.H.INCORPORATED,8835 W HEATHER AVE,,MILWAUKEE,WI,53224 | | 12/9/2010 | $13,645.00 | x |
| JANI-KING - MILWAUKEE REGION,200 N. PATRICK BLVD. #900,,BROOKFIELD,WI,53045 | Invoice | 12/1/2010 | $1,255.00 | x |
| JANI-KING - MILWAUKEE REGION,200 N. PATRICK BLVD. #900,,BROOKFIELD,WI,53045 | Invoice | 1/1/2011 | $121.45 | x |
| **JANI-KING - MILWAUKEE REGION,200 N. PATRICK BLVD. #900,,BROOKFIELD,WI,53045** | | **12/1/2010** | **$1,376.45** | x |
| JOHNSTONE SUPPLY,1615 PARAMOUNT DR,,WAUKESHA,WI,53186 | Invoice | 12/1/2010 | $205.52 | x |
| JOHNSTONE SUPPLY,1615 PARAMOUNT DR,,WAUKESHA,WI,53186 | Invoice | 12/10/2010 | $25.94 | x |
| JOHNSTONE SUPPLY,1615 PARAMOUNT DR,,WAUKESHA,WI,53186 | Invoice | 12/14/2010 | $87.95 | x |
| **JOHNSTONE SUPPLY,1615 PARAMOUNT DR,,WAUKESHA,WI,53186** | | **VARIOUS** | **$319.41** | x |
| JOSEPH C.A.CO.,INC.,13712 OLD FREDERICKTOWN,,EAST LIVERPOOL,OH,43920 | Invoice | 12/29/2010 | $648.37 | x |
| **JOSEPH C.A.CO.,INC.,13712 OLD FREDERICKTOWN,,EAST LIVERPOOL,OH,43920** | | **12/29/2010** | **$648.37** | x |
| JOURNAL BROADCAST GROUP,BOX 689111,,MILWAUKEE,WI,53268-9111 | Invoice | 12/26/2010 | $3,260.00 | x |
| **JOURNAL BROADCAST GROUP,BOX 689111,,MILWAUKEE,WI,53268-9111** | | **12/26/2010** | **$3,260.00** | x |
| JOURNAL SENTINEL, INC.,BOX 78932,,MILWAUKEE,WI,53278-0932 | Invoice | 1/1/2011 | $120.00 | x |
| **JOURNAL SENTINEL, INC.,BOX 78932,,MILWAUKEE,WI,53278-0932** | | **1/1/2011** | **$120.00** | x |
| KARTHAUSER & SONS, INC.,W147 N11100 FOND DU LAC AVE,,GERMANTOWN,WI,53022 | Invoice | 12/16/2010 | $552.50 | x |
| KARTHAUSER & SONS, INC.,W147 N11100 FOND DU LAC AVE,,GERMANTOWN,WI,53022 | Invoice | 12/16/2010 | $966.70 | x |
| KARTHAUSER & SONS, INC.,W147 N11100 FOND DU LAC AVE,,GERMANTOWN,WI,53022 | Invoice | 12/16/2010 | $241.40 | x |
| KARTHAUSER & SONS, INC.,W147 N11100 FOND DU LAC AVE,,GERMANTOWN,WI,53022 | Invoice | 12/16/2010 | $1,136.45 | x |
| KARTHAUSER & SONS, INC.,W147 N11100 FOND DU LAC AVE,,GERMANTOWN,WI,53022 | Invoice | 12/16/2010 | $333.40 | x |
| KARTHAUSER & SONS, INC.,W147 N11100 FOND DU LAC AVE,,GERMANTOWN,WI,53022 | Invoice | 12/16/2010 | $267.60 | x |
| **KARTHAUSER & SONS, INC.,W147 N11100 FOND DU LAC AVE,,GERMANTOWN,WI,53022** | | **VARIOUS** | **$3,498.05** | x |
| KASER ROSE,1700 BOULDER COURT,,WAUKESHA,WISCONSIN,53189 | Invoice | 12/30/2010 | $40.00 | x |
| **KASER ROSE,1700 BOULDER COURT,,WAUKESHA,WISCONSIN,53189** | | **12/30/2010** | **$40.00** | x |
| KLEIN-DICKERT MILWAUKEE, INC.,P O BOX 444,,PEWAUKEE,WI,53072-0444 | Invoice | 12/14/2010 | $445.00 | x |
| **KLEIN-DICKERT MILWAUKEE, INC.,P O BOX 444,,PEWAUKEE,WI,53072-0444** | | **12/14/2010** | **$445.00** | x |
| KLUSMAN CHRISTOPHER,SAINT FRANCIS DE SALES SEMINARY,3257 S. LAKE DRIVE,ST. FRANCIS,WI,53235 | Invoice | 12/12/2010 | $142.20 | x |
| **FRANCIS,WI,53235** | | **12/12/2010** | **$142.20** | x |
| KNIGHTS SECURITY,6425 W NORWICH AVENUE #212,,GREENFIELD,WISCONSIN,53220 | Invoice | 12/28/2010 | $286.00 | x |
| KNIGHTS SECURITY,6425 W NORWICH AVENUE #212,,GREENFIELD,WISCONSIN,53220 | Invoice | 1/12/2011 | $39.00 | x |
| **KNIGHTS SECURITY,6425 W NORWICH AVENUE #212,,GREENFIELD,WISCONSIN,53220** | | **VARIOUS** | **$325.00** | x |
| KNIPPEL, VERY REV. KENNETH,ST JOHN VIANNEY,1755 N CALHOUN ROAD,BROOKFIELD,WI,53005-5036 | Invoice | 11/23/2010 | $50.00 | x |
| **ROAD,BROOKFIELD,WI,53005-5036** | | **11/23/2010** | **$50.00** | x |
| KOSTECHKA, PATTY,120 S. 7TH ST.,,DELAVAN,WI,53115 | Invoice | 1/17/2011 | $373.37 | x |
| **KOSTECHKA, PATTY,120 S. 7TH ST.,,DELAVAN,WI,53115** | | **1/17/2011** | **$373.37** | x |
| KRAUSE FUNERAL HOME,9000 W. CAPITOL DRIVE,,MILWAUKEE,WI,53222 | Invoice | 12/1/2010 | $675.00 | x |
| **KRAUSE FUNERAL HOME,9000 W. CAPITOL DRIVE,,MILWAUKEE,WI,53222** | | **12/1/2010** | **$675.00** | x |
| KRUEGER COMMUNICATIONS, INC.,P. O. BOX 618,,ELM GROVE,WI,53122 | Invoice | 12/30/2010 | $114.50 | x |
| KRUEGER COMMUNICATIONS, INC.,P. O. BOX 618,,ELM GROVE,WI,53122 | Invoice | 12/30/2010 | $229.00 | x |
| **KRUEGER COMMUNICATIONS, INC.,P. O. BOX 618,,ELM GROVE,WI,53122** | | **VARIOUS** | **$343.50** | x |
| KUJAWA ENTERPRISES, INC.,824 EAST RAWSON AVENUE,,OAK CREEK,WI,53154 | Invoice | 12/19/2010 | $1,762.50 | x |
| KUJAWA ENTERPRISES, INC.,824 EAST RAWSON AVENUE,,OAK CREEK,WI,53154 | Invoice | 12/27/2010 | $4,314.75 | x |
| KUJAWA ENTERPRISES, INC.,824 EAST RAWSON AVENUE,,OAK CREEK,WI,53154 | Invoice | 1/7/2011 | $570.00 | x |
| **KUJAWA ENTERPRISES, INC.,824 EAST RAWSON AVENUE,,OAK CREEK,WI,53154** | | **VARIOUS** | **$6,647.25** | x |
| LAKE SHORE BURIAL VAULT CO., INC.,12780 LISBON ROAD,,BROOKFIELD,WI,53005 | Invoice | 12/16/2010 | $420.00 | x |
| LAKE SHORE BURIAL VAULT CO., INC.,12780 LISBON ROAD,,BROOKFIELD,WI,53005 | Invoice | 12/22/2010 | $210.00 | x |
| LAKE SHORE BURIAL VAULT CO., INC.,12780 LISBON ROAD,,BROOKFIELD,WI,53005 | Invoice | 12/30/2010 | $420.00 | x |
| **LAKE SHORE BURIAL VAULT CO., INC.,12780 LISBON ROAD,,BROOKFIELD,WI,53005** | | **VARIOUS** | **$1,050.00** | x |
| LANGE SANDY,214 WEST MOUNT ROYAL,,GLENDALE,WISCONSIN,53217 | Invoice | 10/28/2010 | $125.00 | x |
| **LANGE SANDY,214 WEST MOUNT ROYAL,,GLENDALE,WISCONSIN,53217** | | **10/28/2010** | **$125.00** | x |
| LARRY'S AUTO CLINIC, LTD.,6373 N. 91ST STREET,,MILWAUKEE,WI,53225 | Invoice | 12/13/2010 | $139.95 | x |
| LARRY'S AUTO CLINIC, LTD.,6373 N. 91ST STREET,,MILWAUKEE,WI,53225 | Invoice | 12/28/2010 | $300.00 | x |
| LARRY'S AUTO CLINIC, LTD.,6373 N. 91ST STREET,,MILWAUKEE,WI,53225 | Invoice | 1/3/2011 | $1,123.42 | x |
| **LARRY'S AUTO CLINIC, LTD.,6373 N. 91ST STREET,,MILWAUKEE,WI,53225** | | **VARIOUS** | **$1,563.37** | x |
| LEE'S RENT IT,4502 - 38TH AVENUE,,KENOSHA,WI,53144 | Invoice | 11/24/2010 | $75.21 | x |
| **LEE'S RENT IT,4502 - 38TH AVENUE,,KENOSHA,WI,53144** | | **11/24/2010** | **$75.21** | x |
| LEISING,JERRY,7628 W WOODLAND AVENUE,,WAUWATOSA,WI,53213 | Invoice | 11/17/2010 | $40.00 | x |

| Name | | Date | Amount | |
|---|---|---|---|---|
| LEISING,JERRY,7628 W WOODLAND AVENUE,,WAUWATOSA,WI,53213 | | 11/17/2010 | $40.00 | x |
| LENNY'S POOL SERVICE INC.,12900 W SILVER SPRING DRIVE,,BUTLER,WI,53007 | Invoice | 12/27/2010 | $105.75 | |
| **LENNY'S POOL SERVICE INC.,12900 W SILVER SPRING DRIVE,,BUTLER,WI,53007** | | **12/27/2010** | **$105.75** | x |
| LINDNER BERNARD,4720 N CALHOUN ROAD,,BROOKFIELD,WISCONSIN,53005 | Invoice | 12/14/2010 | $10.00 | |
| **LINDNER BERNARD,4720 N CALHOUN ROAD,,BROOKFIELD,WISCONSIN,53005** | | **12/14/2010** | **$10.00** | x |
| LOEWEN & FONK, INC.,EXCAVATING & GRADING CONTRCTRS,4305 - 4TH ST,KENOSHA,WI,53144 | Invoice | 1/13/2011 | $1,635.00 | |
| **ST,KENOSHA,WI,53144** | | **1/13/2011** | **$1,635.00** | x |
| LP PHOTOCERAMICS INTERNATIONAL, INC.,93 DOUGLAS DRIVE,,TORONTO, ONTARIO,M4W 2B2, | Invoice | 12/15/2010 | $188.53 | |
| **2B2,** | | **12/15/2010** | **$188.53** | x |
| LUMEN CHRISTI PARISH,11300 N. ST. JAMES LANE,,MEQUON,WI,53092-3047 | Invoice | 11/23/2010 | $50.00 | |
| **LUMEN CHRISTI PARISH,11300 N. ST. JAMES LANE,,MEQUON,WI,53092-3047** | | **11/23/2010** | **$50.00** | x |
| MACHULAK DOROTHY,6093 N DENMARK STREET,,MILWAUKEE,WISCONSIN,53225 | Invoice | 11/22/2010 | $20.00 | |
| **MACHULAK DOROTHY,6093 N DENMARK STREET,,MILWAUKEE,WISCONSIN,53225** | | **11/22/2010** | **$20.00** | x |
| MANCILLA ALMA,1559 W LAPHAM BLVD,,MILWAUKEE,WISCONSIN,53204 | Invoice | 12/14/2010 | $100.00 | |
| **MANCILLA ALMA,1559 W LAPHAM BLVD,,MILWAUKEE,WISCONSIN,53204** | | **12/14/2010** | **$100.00** | x |
| NAME AND ADDRESS REDACTED | Invoice | 12/23/2010 | $410.59 | |
| **NAME AND ADDRESS REDACTED** | | **12/23/2010** | **$410.59** | x |
| MAPA,ST THOMAS MORE SCHOOL,2601 E MORGAN AVENUE,MILWAUKEE,WI,53207 | Invoice | 10/22/2010 | $280.24 | |
| **MAPA,ST THOMAS MORE SCHOOL,2601 E MORGAN AVENUE,MILWAUKEE,WI,53207** | | **10/22/2010** | **$280.24** | x |
| MARANOWICZ BETHANY,N51 W34987 LAKE DRIVE,,OKAUCHEE,WISCONSIN,53069 | Invoice | 11/17/2010 | $150.00 | |
| **MARANOWICZ BETHANY,N51 W34987 LAKE DRIVE,,OKAUCHEE,WISCONSIN,53069** | | **11/17/2010** | **$150.00** | x |
| MARQUETTE UNIVERSITY COLLEGE OF EDUCATION,561 N 15TH STREET,ROOM 126A,MILWAUKEE,WISCONSIN,53233 | Invoice | 11/29/2010 | $10.00 | |
| **126A,MILWAUKEE,WISCONSIN,53233** | | **11/29/2010** | **$10.00** | x |
| MARTENS MARY,4000 S 43RD STREET,,GREENFIELD,WISCONSIN,53220 | Invoice | 12/19/2010 | $150.00 | |
| **MARTENS MARY,4000 S 43RD STREET,,GREENFIELD,WISCONSIN,53220** | | **12/19/2010** | **$150.00** | x |
| MATENAER THERESA V.,3457 NICHOLSON ROAD,,FRANKSVILLE,WI,53126 | Invoice | 12/1/2010 | $374.00 | |
| **MATENAER THERESA V.,3457 NICHOLSON ROAD,,FRANKSVILLE,WI,53126** | | **12/1/2010** | **$374.00** | x |
| MATTHEWS INTERNATIONAL-BRONZE,1315 WEST LIBERTY AVENUE,,PITTSBURGH,PA,15226-1097 | Invoice | 11/30/2010 | $163.45 | |
| MATTHEWS INTERNATIONAL-BRONZE,1315 WEST LIBERTY AVENUE,,PITTSBURGH,PA,15226-1097 | Invoice | 12/17/2010 | $797.35 | |
| MATTHEWS INTERNATIONAL-BRONZE,1315 WEST LIBERTY AVENUE,,PITTSBURGH,PA,15226-1097 | Invoice | 12/20/2010 | $679.21 | |
| MATTHEWS INTERNATIONAL-BRONZE,1315 WEST LIBERTY AVENUE,,PITTSBURGH,PA,15226-1097 | Invoice | 12/22/2010 | $251.83 | |
| **1097** | | **VARIOUS** | **$1,891.84** | x |
| MATTHEWS INTERNATIONAL-CORPORATE,2 NORTH SHORE CENTER,,PITTSBURGH,PA,15212 | Invoice | 12/23/2010 | $257.46 | |
| MATTHEWS INTERNATIONAL-CORPORATE,2 NORTH SHORE CENTER,,PITTSBURGH,PA,15212 | Invoice | 12/28/2010 | $162.17 | |
| **MATTHEWS INTERNATIONAL-CORPORATE,2 NORTH SHORE CENTER,,PITTSBURGH,PA,15212** | | **VARIOUS** | **$419.63** | x |
| MB BROOKFIELD LLC,4215 N 124TH STREET,,BROOKFIELD,WISCONSIN,53005 | Invoice | 12/17/2010 | $25.00 | |
| MB BROOKFIELD LLC,4215 N 124TH STREET,,BROOKFIELD,WISCONSIN,53005 | Invoice | 1/3/2011 | $50.00 | |
| **MB BROOKFIELD LLC,4215 N 124TH STREET,,BROOKFIELD,WISCONSIN,53005** | | **VARIOUS** | **$75.00** | x |
| MBUYI-BANDUKU CHARLES,7600 N PORT WASHINGTON ROAD,,FOX POINT,WISCONSIN,53217 | Invoice | 11/23/2010 | $50.00 | |
| MBUYI-BANDUKU CHARLES,7600 N PORT WASHINGTON ROAD,,FOX POINT,WISCONSIN,53217 | Invoice | 11/23/2010 | $50.00 | |
| **POINT,WISCONSIN,53217** | | **VARIOUS** | **$100.00** | x |
| MCI SMALL BUSINESS SERVICE,PO BOX 650355,,DALLAS,TX,75265-0355 | Invoice | 12/16/2010 | $85.19 | |
| MCI SMALL BUSINESS SERVICE,PO BOX 650355,,DALLAS,TX,75265-0355 | Invoice | 1/16/2011 | $52.57 | |
| **MCI SMALL BUSINESS SERVICE,PO BOX 650355,,DALLAS,TX,75265-0355** | | **VARIOUS** | **$137.76** | x |
| MEJIA AMALIA,1559 W LAPHAM BLVD,,MILWAUKEE,WISCONSIN,53204 | Invoice | 12/14/2010 | $100.00 | |
| **MEJIA AMALIA,1559 W LAPHAM BLVD,,MILWAUKEE,WISCONSIN,53204** | | **12/14/2010** | **$100.00** | x |
| MEYER STEVEN C,1140 LAKE STREET,SUITE 302,OAK PARK,IL,60301 | Invoice | 12/23/2010 | $350.00 | |
| MEYER STEVEN C,1140 LAKE STREET,SUITE 302,OAK PARK,IL,60301 | Invoice | 1/27/2011 | $90.00 | |
| **MEYER STEVEN C,1140 LAKE STREET,SUITE 302,OAK PARK,IL,60301** | | **VARIOUS** | **$440.00** | x |
| MIDWEST ARCHIVES CONFERENCE,4440 PGA BOULEVARD,SUITE 600,PALM BEACH,FL,33410 | Invoice | 1/11/2011 | $0.25 | |
| **MIDWEST ARCHIVES CONFERENCE,4440 PGA BOULEVARD,SUITE 600,PALM BEACH,FL,33410** | | **1/11/2011** | **$0.25** | x |
| MILWAUKEE WATER WORKS,P. O. BOX 3268,,MILWAUKEE,WI,53201-3268 | Invoice | 12/29/2010 | $528.36 | |
| MILWAUKEE WATER WORKS,P. O. BOX 3268,,MILWAUKEE,WI,53201-3268 | Invoice | 1/4/2011 | $190.53 | |

| | | | | |
|---|---|---|---|---|
| MILWAUKEE WATER WORKS,P. O. BOX 3268,,MILWAUKEE,WI,53201-3268 | Invoice | 1/10/2011 | $1,375.00 | x |
| **MILWAUKEE WATER WORKS,P. O. BOX 3268,,MILWAUKEE,WI,53201-3268** | | **VARIOUS** | **$2,093.89** | x |
| NAME AND ADDRESS REDACTED | Invoice | 12/23/2010 | $1,084.49 | x |
| **NAME AND ADDRESS REDACTED** | | **12/23/2010** | **$1,084.49** | |
| MORK MAUSOLEUM CONSTRUCTION,W235 S4479 AMBER CT,,WAUKESHA,WI,53189 | Invoice | 12/30/2010 | $70,200.00 | x |
| **MORK MAUSOLEUM CONSTRUCTION,W235 S4479 AMBER CT,,WAUKESHA,WI,53189** | | **12/30/2010** | **$70,200.00** | |
| ROBERT MUCHA,9430 EAST LURLENE DRIVE,,TUCSON,AZ,85730 | Invoice | 1/24/2011 | $480.00 | x |
| **ROBERT MUCHA,9430 EAST LURLENE DRIVE,,TUCSON,AZ,85730** | | **1/24/2011** | **$480.00** | |
| NATIONAL ASSOCIATION OF CHURCH PERSONNEL ADMISTRATORS,100 E 8TH STREET,,CINCINNATI,OH,45202-2129 | Invoice | 1/11/2011 | $1.32 | x |
| **STREET,,CINCINNATI,OH,45202-2129** | | **1/11/2011** | **$1.32** | |
| NATL FEDERATION FOR CATHOLIC YOUTH MINISTRY, INC.,415 MICHIGAN AVE. NE,SUITE 40,WASHINGTON,DC,20017-4503 | Invoice | 1/13/2011 | $5.42 | x |
| **40,WASHINGTON,DC,20017-4503** | | **1/13/2011** | **$5.42** | x |
| NAWROCKI REV. ROBERT,3589A S. 14TH STREET,,MILWAUKEE,WI,53221 | Invoice | 12/31/2010 | $44.20 | x |
| **NAWROCKI REV. ROBERT,3589A S. 14TH STREET,,MILWAUKEE,WI,53221** | | **12/31/2010** | **$44.20** | |
| NEHER ELECTRIC SUPPLY,INC.,P. O. BOX 16519,,MILWAUKEE,WI,53216-0519 | Invoice | 12/10/2010 | $7.90 | x |
| NEHER ELECTRIC SUPPLY,INC.,P. O. BOX 16519,,MILWAUKEE,WI,53216-0519 | Invoice | 12/17/2010 | $23.00 | x |
| NEHER ELECTRIC SUPPLY,INC.,P. O. BOX 16519,,MILWAUKEE,WI,53216-0519 | Invoice | 12/17/2010 | $212.67 | x |
| **NEHER ELECTRIC SUPPLY,INC.,P. O. BOX 16519,,MILWAUKEE,WI,53216-0519** | | **VARIOUS** | **$243.57** | |
| NEHLS ZARA,6801 N. YATES RD,,MILWAUKEE,WI,53217 | Invoice | 12/20/2010 | $180.00 | x |
| **NEHLS ZARA,6801 N. YATES RD,,MILWAUKEE,WI,53217** | | **12/20/2010** | **$180.00** | |
| NET RESULTS,INC.,1210 VILLA TERRACE,,WAUKESHA,WI,53186 | Invoice | 1/4/2011 | $560.00 | x |
| **NET RESULTS,INC.,1210 VILLA TERRACE,,WAUKESHA,WI,53186** | | **1/4/2011** | **$560.00** | |
| NEUMAN POOLS INC,W9684 BEAVERLAND PARKWAY,P O BOX 413,BEAVER DAM,WI,53916 | Invoice | 12/9/2010 | $2,490.98 | x |
| **NEUMAN POOLS INC,W9684 BEAVERLAND PARKWAY,P O BOX 413,BEAVER DAM,WI,53916** | | **12/9/2010** | **$2,490.98** | |
| NORTH ROXANE,416 PATRICIA STREET,,ELKHORN,WISCONSIN,53121 | Invoice | 12/19/2010 | $201.30 | x |
| **NORTH ROXANE,416 PATRICIA STREET,,ELKHORN,WISCONSIN,53121** | | **12/19/2010** | **$201.30** | |
| NORTH SIDE COAL AND OIL CO.,P O BOX 170793,,MILWAUKEE,WI,53217-8065 | Invoice | 12/8/2010 | $552.48 | x |
| NORTH SIDE COAL AND OIL CO.,P O BOX 170793,,MILWAUKEE,WI,53217-8065 | Invoice | 12/8/2010 | $640.59 | x |
| NORTH SIDE COAL AND OIL CO.,P O BOX 170793,,MILWAUKEE,WI,53217-8065 | Invoice | 12/8/2010 | $296.00 | x |
| NORTH SIDE COAL AND OIL CO.,P O BOX 170793,,MILWAUKEE,WI,53217-8065 | Invoice | 12/15/2010 | $731.76 | x |
| NORTH SIDE COAL AND OIL CO.,P O BOX 170793,,MILWAUKEE,WI,53217-8065 | Invoice | 12/15/2010 | $353.71 | x |
| NORTH SIDE COAL AND OIL CO.,P O BOX 170793,,MILWAUKEE,WI,53217-8065 | Invoice | 12/15/2010 | $411.63 | x |
| NORTH SIDE COAL AND OIL CO.,P O BOX 170793,,MILWAUKEE,WI,53217-8065 | Invoice | 12/15/2010 | $465.00 | x |
| NORTH SIDE COAL AND OIL CO.,P O BOX 170793,,MILWAUKEE,WI,53217-8065 | Invoice | 12/15/2010 | $457.35 | x |
| NORTH SIDE COAL AND OIL CO.,P O BOX 170793,,MILWAUKEE,WI,53217-8065 | Invoice | 12/17/2010 | $65.85 | x |
| NORTH SIDE COAL AND OIL CO.,P O BOX 170793,,MILWAUKEE,WI,53217-8065 | Invoice | 12/24/2010 | $479.85 | x |
| NORTH SIDE COAL AND OIL CO.,P O BOX 170793,,MILWAUKEE,WI,53217-8065 | Invoice | 12/30/2010 | $232.50 | x |
| NORTH SIDE COAL AND OIL CO.,P O BOX 170793,,MILWAUKEE,WI,53217-8065 | Invoice | 12/30/2010 | $382.28 | x |
| NORTH SIDE COAL AND OIL CO.,P O BOX 170793,,MILWAUKEE,WI,53217-8065 | Invoice | 12/30/2010 | $559.84 | x |
| NORTH SIDE COAL AND OIL CO.,P O BOX 170793,,MILWAUKEE,WI,53217-8065 | Invoice | 12/30/2010 | $143.97 | x |
| **NORTH SIDE COAL AND OIL CO.,P O BOX 170793,,MILWAUKEE,WI,53217-8065** | | **VARIOUS** | **$5,772.81** | |
| NORTHRIDGE HOSPITAL - ROSCOE,18300 ROSCOE BOULEVARD,,NORTHRIDGE,CA,91328 | Invoice | 1/27/2011 | $329.00 | x |
| **NORTHRIDGE HOSPITAL - ROSCOE,18300 ROSCOE BOULEVARD,,NORTHRIDGE,CA,91328** | | **1/27/2011** | **$329.00** | |
| NOVO 1,DEPT CH 16468,,PALATINE,IL,60055-6468 | Invoice | 1/1/2011 | $48.82 | x |
| **NOVO 1,DEPT CH 16468,,PALATINE,IL,60055-6468** | | **1/1/2011** | **$48.82** | |
| O'DONNELL FR. RICHARD,3345 S. 10TH STREET,,MILWAUKEE,WI,53215 | Invoice | 12/31/2010 | $41.00 | x |
| **O'DONNELL FR. RICHARD,3345 S. 10TH STREET,,MILWAUKEE,WI,53215** | | **12/31/2010** | **$41.00** | |
| OFFICEMAX INCORPORATED,75 REMITTANCE DRIVE #2698,,CHICAGO,IL,60675-2698 | Invoice | 12/13/2010 | $9.32 | x |
| OFFICEMAX INCORPORATED,75 REMITTANCE DRIVE #2698,,CHICAGO,IL,60675-2698 | Invoice | 12/17/2010 | $16.07 | x |
| OFFICEMAX INCORPORATED,75 REMITTANCE DRIVE #2698,,CHICAGO,IL,60675-2698 | Invoice | 12/28/2010 | $59.97 | x |
| **OFFICEMAX INCORPORATED,75 REMITTANCE DRIVE #2698,,CHICAGO,IL,60675-2698** | | **VARIOUS** | **$85.36** | |
| ONE COMMUNICATIONS,PO BOX 415721,,BOSTON,MA,02241-5721 | Invoice | 1/8/2011 | $769.43 | x |
| **ONE COMMUNICATIONS,PO BOX 415721,,BOSTON,MA,02241-5721** | | **1/8/2011** | **$769.43** | |
| OROSO REV. AUGUSTIN,3345 S 10TH STREET,,MILWAUKEE,WI,53215-5116 | Invoice | 11/23/2010 | $50.00 | x |
| **OROSO REV. AUGUSTIN,3345 S 10TH STREET,,MILWAUKEE,WI,53215-5116** | | **11/23/2010** | **$50.00** | |
| ORTIZ TERESA,TRILLIUM CARE GROUP,PO BOX 180680,DELAFIELD,WISCONSIN,53018 | Invoice | 1/27/2011 | $200.00 | x |
| **ORTIZ TERESA,TRILLIUM CARE GROUP,PO BOX 180680,DELAFIELD,WISCONSIN,53018** | | **1/27/2011** | **$200.00** | |
| OTIS ELEVATOR COMPANY,P O BOX 73579,,CHICAGO,IL,60673-7579 | Invoice | 12/20/2010 | $63.15 | x |
| **OTIS ELEVATOR COMPANY,P O BOX 73579,,CHICAGO,IL,60673-7579** | | **12/20/2010** | **$63.15** | x |

| | | | | |
|---|---|---|---|---|
| OUR LADY OF LOURDES PARISH,3722 S 58TH STREET,,MILWAUKEE,WI,53220-2053 | Invoice | 11/23/2010 | $50.00 | x |
| **OUR LADY OF LOURDES PARISH,3722 S 58TH STREET,,MILWAUKEE,WI,53220-2053** | | **11/23/2010** | **$50.00** | x |
| PARK BANK,CREDIT CARD PROCESSING CENTER,PO BOX 3052,MILWAUKEE,WISCONSIN,53201-3052 | Invoice | 1/6/2011 | $168.01 | x |
| **3052** | | **1/6/2011** | **$168.01** | x |
| PARTNERSHIP FOR PHILANTHROPIC PLANNING,PGCEW,PO BOX 702,ELM GROVE,WISCONSIN,53122 | Invoice | 12/7/2010 | $8.38 | x |
| **GROVE,WISCONSIN,53122** | | **12/7/2010** | **$8.38** | x |
| PFEIFER, ROBERT L.,3420 S. MONTEREY DR.,,NEW BERLIN,WI,53151 | Invoice | 12/30/2010 | $425.00 | x |
| **PFEIFER, ROBERT L.,3420 S. MONTEREY DR.,,NEW BERLIN,WI,53151** | | **12/30/2010** | **$425.00** | x |
| PHILLIPS ANDREA VELLA,526 MAXWELL STREET,,LAKE GENEVA,WISCONSIN,53147 | Invoice | 12/21/2010 | $75.00 | x |
| **PHILLIPS ANDREA VELLA,526 MAXWELL STREET,,LAKE GENEVA,WISCONSIN,53147** | | **12/21/2010** | **$75.00** | x |
| PHOTOS BY MIKE,4070 N. 94TH STREET,,WAUWATOSA,WI,53222 | Invoice | 11/9/2010 | $446.50 | x |
| **PHOTOS BY MIKE,4070 N. 94TH STREET,,WAUWATOSA,WI,53222** | | **11/9/2010** | **$446.50** | x |
| PITNEY BOWES GLOBAL FINANCIAL SERVICES LLC,PO BOX 371887,,PITTSBURGH,PA,15250-7887 | Invoice | 12/13/2010 | $127.75 | x |
| PITNEY BOWES GLOBAL FINANCIAL SERVICES LLC,PO BOX 371887,,PITTSBURGH,PA,15250-7887 | Invoice | 12/13/2010 | $37.91 | x |
| **7887** | | **VARIOUS** | **$165.66** | x |
| PITNEY BOWES, INC.,PO BOX 371896,,PITTSBURGH,PA,15250-7896 | Invoice | 11/30/2010 | $164.70 | x |
| **PITNEY BOWES, INC.,PO BOX 371896,,PITTSBURGH,PA,15250-7896** | | **11/30/2010** | **$164.70** | x |
| PLEASANT PRAIRIE UTILITIES,9915 - 39TH AVE.,,PLEASANT PRAIRIE,WI,53158 | Invoice | 12/31/2010 | $338.01 | x |
| **PLEASANT PRAIRIE UTILITIES,9915 - 39TH AVE.,,PLEASANT PRAIRIE,WI,53158** | | **12/31/2010** | **$338.01** | x |
| POFF BROS. LAND CARE,801 MARION AVE.,,SO MILWAUKEE,WI,53172 | Invoice | 12/3/2010 | $296.75 | x |
| **POFF BROS. LAND CARE,801 MARION AVE.,,SO MILWAUKEE,WI,53172** | | **12/3/2010** | **$296.75** | x |
| POSTMASTER - BAY VIEW STATION,BAY VIEW/ST. FRANCIS STATION,1603 E. OKLAHOMA AVENUE,MILWAUKEE,WI,53207-9998 | Invoice | 12/9/2010 | $6.33 | x |
| **AVENUE,MILWAUKEE,WI,53207-9998** | | **12/9/2010** | **$6.33** | x |
| PRAXAIR DISTRIBUTION, INC.,DEPT 0812,PO BOX 120812,DALLAS,TEXAS,75312-0812 | Invoice | 12/20/2010 | $89.64 | x |
| PRAXAIR DISTRIBUTION, INC.,DEPT 0812,PO BOX 120812,DALLAS,TEXAS,75312-0812 | Invoice | 12/20/2010 | $17.25 | x |
| PRAXAIR DISTRIBUTION, INC.,DEPT 0812,PO BOX 120812,DALLAS,TEXAS,75312-0812 | Invoice | 1/20/2011 | $45.10 | x |
| **PRAXAIR DISTRIBUTION, INC.,DEPT 0812,PO BOX 120812,DALLAS,TEXAS,75312-0812** | | **VARIOUS** | **$151.99** | x |
| PRINTGRAPHIX,4749 S. 76TH STREET,,GREENFIELD,WI,53220 | Invoice | 12/16/2010 | $1,104.00 | x |
| PRINTGRAPHIX,4749 S. 76TH STREET,,GREENFIELD,WI,53220 | Invoice | 12/20/2010 | $442.00 | x |
| **PRINTGRAPHIX,4749 S. 76TH STREET,,GREENFIELD,WI,53220** | | **VARIOUS** | **$1,546.00** | x |
| PROFESSIONAL INTERPRETING ENTERPRISE, INC.,6510 W. LAYTON AVE., SUITE 2,GREENFIELD,WI,53220 | Invoice | 12/26/2010 | $155.00 | x |
| **2,GREENFIELD,WI,53220** | | **12/26/2010** | **$155.00** | x |
| PROVEN DIRECT,1301 W. CANAL STREET,,MILWAUKEE,WI,53233 | Invoice | 12/8/2010 | $1,908.83 | x |
| PROVEN DIRECT,1301 W. CANAL STREET,,MILWAUKEE,WI,53233 | Invoice | 12/8/2010 | $674.92 | x |
| PROVEN DIRECT,1301 W. CANAL STREET,,MILWAUKEE,WI,53233 | Invoice | 12/16/2010 | $270.53 | x |
| **PROVEN DIRECT,1301 W. CANAL STREET,,MILWAUKEE,WI,53233** | | **VARIOUS** | **$2,854.28** | x |
| PURCHASE POWER,P O BOX 371874,,PITTSBURGH,PA,15250-7874 | Invoice | 12/12/2010 | $7,500.00 | x |
| PURCHASE POWER,P O BOX 371874,,PITTSBURGH,PA,15250-7874 | Invoice | 12/20/2010 | $2,000.00 | x |
| **PURCHASE POWER,P O BOX 371874,,PITTSBURGH,PA,15250-7874** | | **VARIOUS** | **$9,500.00** | x |
| QUARLES & BRADY TRUST,411 E. WISCONSIN AVE.,,MILWAUKEE,WI,53202 | Settlement Payment | 1/7/2011 | $10,000.00 | x |
| **QUARLES & BRADY TRUST,411 E. WISCONSIN AVE.,,MILWAUKEE,WI,53202** | | **1/7/2011** | **$10,000.00** | x |
| QUILL CORPORATION, P. O. BOX 37600,,PHILADELPHIA,PA,19101-0600 | Invoice | 12/28/2010 | $16.07 | x |
| **QUILL CORPORATION,P. O. BOX 37600,,PHILADELPHIA,PA,19101-0600** | | **12/28/2010** | **$16.07** | x |
| RADETSKI FR JOHN,219 E FOLLETT STREET,,FOND DU LAC,WISCONSIN,54935-3542 | Invoice | 9/25/2010 | $420.15 | x |
| **RADETSKI FR JOHN,219 E FOLLETT STREET,,FOND DU LAC,WISCONSIN,54935-3542** | | **9/25/2010** | **$420.15** | x |
| RAMAKER & ASSOCIATES,INC.,1120 DALLAS STREET,,SAUK CITY,WI,53583 | Invoice | 12/23/2010 | $4,079.75 | x |
| **RAMAKER & ASSOCIATES,INC.,1120 DALLAS STREET,,SAUK CITY,WI,53583** | | **12/23/2010** | **$4,079.75** | x |
| RANK ARVILLA,4744 WEST MAPLE LEAF CIRCLE,,GREENFIELD,WISCONSIN,53220 | Invoice | 12/19/2010 | $471.48 | x |
| **RANK ARVILLA,4744 WEST MAPLE LEAF CIRCLE,,GREENFIELD,WISCONSIN,53220** | | **12/19/2010** | **$471.48** | x |
| REBORI THOMAS MD LTD,1200 SHERMER ROAD,SUITE 208,NORTHBROOK,IL,60061 | Invoice | 1/27/2011 | $105.00 | x |
| **REBORI THOMAS MD LTD,1200 SHERMER ROAD,SUITE 208,NORTHBROOK,IL,60061** | | **1/27/2011** | **$105.00** | x |
| REINDERS BROTHERS, INC.,P.O. BOX 825,13400 WATERTOWN PLANK RD.,ELM GROVE,WI,53122-0825 | Invoice | 12/6/2010 | $478.96 | x |
| REINDERS BROTHERS, INC.,P.O. BOX 825,13400 WATERTOWN PLANK RD.,ELM GROVE,WI,53122-0825 | Invoice | 12/8/2010 | $171.07 | x |
| REINDERS BROTHERS, INC.,P.O. BOX 825,13400 WATERTOWN PLANK RD.,ELM GROVE,WI,53122-0825 | Invoice | 12/14/2010 | $14.83 | x |

| | | | | |
|---|---|---|---|---|
| REINDERS BROTHERS, INC.,P.O. BOX 825,13400 WATERTOWN PLANK RD.,ELM GROVE,WI,53122-0825 | Invoice | 12/30/2010 | $23.07 | x |
| **GROVE,WI,53122-0825** | | **VARIOUS** | **$687.93** | x |
| REUTEBUCH MARY SUE,ST PATRICK PARISH,1225 W MAIN STREET,WHITEWATER,WISCONSIN,53190 | Invoice | 12/21/2010 | $75.00 | x |
| **STREET,WHITEWATER,WISCONSIN,53190** | | **12/21/2010** | **$75.00** | x |
| RICHETTA JOHN,4014 - 81ST STREET,,KENOSHA,WI,53142-4924 | Invoice | 12/31/2010 | $41.50 | x |
| **RICHETTA JOHN,4014 - 81ST STREET,,KENOSHA,WI,53142-4924** | | **12/31/2010** | **$41.50** | x |
| RICOH AMERICAS CORPORATION 73210,PO BOX 73210,,CHICAGO,IL,60673-7210 | Invoice | 12/10/2010 | $11.90 | x |
| RICOH AMERICAS CORPORATION 73210,PO BOX 73210,,CHICAGO,IL,60673-7210 | Invoice | 12/31/2010 | $52.50 | x |
| RICOH AMERICAS CORPORATION 73210,PO BOX 73210,,CHICAGO,IL,60673-7210 | Invoice | 12/31/2010 | $52.50 | x |
| RICOH AMERICAS CORPORATION 73210,PO BOX 73210,,CHICAGO,IL,60673-7210 | Invoice | 1/3/2011 | $265.57 | x |
| RICOH AMERICAS CORPORATION 73210,PO BOX 73210,,CHICAGO,IL,60673-7210 | Invoice | 1/18/2011 | $71.71 | x |
| **RICOH AMERICAS CORPORATION 73210,PO BOX 73210,,CHICAGO,IL,60673-7210** | | **VARIOUS** | **$506.68** | x |
| RICOH AMERICAS CORPORATION-21146,21146 NETWORK PLACE,,CHICAGO,IL,60673-1211 | Invoice | 12/23/2010 | $143.41 | x |
| RICOH AMERICAS CORPORATION-21146,21146 NETWORK PLACE,,CHICAGO,IL,60673-1211 | Invoice | 12/23/2010 | $281.87 | x |
| **RICOH AMERICAS CORPORATION-21146,21146 NETWORK PLACE,,CHICAGO,IL,60673-1211** | | **VARIOUS** | **$425.28** | x |
| RIGHT CHOICE JANITORIAL SUPPLY, L.L.C.,P. O. BOX 090553,,MILWAUKEE,WI,53209 | Invoice | 12/14/2010 | $511.72 | x |
| RIGHT CHOICE JANITORIAL SUPPLY, L.L.C.,P. O. BOX 090553,,MILWAUKEE,WI,53209 | Invoice | 12/23/2010 | $211.59 | x |
| RIGHT CHOICE JANITORIAL SUPPLY, L.L.C.,P. O. BOX 090553,,MILWAUKEE,WI,53209 | Invoice | 1/3/2011 | $432.02 | x |
| **RIGHT CHOICE JANITORIAL SUPPLY, L.L.C.,P. O. BOX 090553,,MILWAUKEE,WI,53209** | | **VARIOUS** | **$1,155.33** | x |
| RIVER RUN COMPUTERS,INC.,2320 W. CAMDEN ROAD,,GLENDALE,WI,53209-3712 | Invoice | 12/13/2010 | $488.36 | x |
| **RIVER RUN COMPUTERS,INC.,2320 W. CAMDEN ROAD,,GLENDALE,WI,53209-3712** | | **12/13/2010** | **$488.36** | x |
| RODDICK GAYLE,6853 HORIZON DRIVE,,GREENDALE,WISCONSIN,53129 | Invoice | 12/17/2010 | $825.00 | x |
| **RODDICK GAYLE,6853 HORIZON DRIVE,,GREENDALE,WISCONSIN,53129** | | **12/17/2010** | **$825.00** | x |
| ROMO JAIME DR,933C S SANTA FE AVENUE,PMB 133,VISTA,CA,92083 | Invoice | 11/2/2010 | $20.68 | x |
| **ROMO JAIME DR,933C S SANTA FE AVENUE,PMB 133,VISTA,CA,92083** | | **11/2/2010** | **$20.68** | x |
| ROSECKY, GEORGE A.,7934 S 66TH STREET,,FRANKLIN,WI,53132 | Invoice | 12/30/2010 | $565.00 | x |
| **ROSECKY, GEORGE A.,7934 S 66TH STREET,,FRANKLIN,WI,53132** | | **12/30/2010** | **$565.00** | x |
| RSPMG,DR JEFFREY MAX,10505 SORRENTO VALLEY ROAD #450,SAN DIEGO,CA,92121 | Invoice | 12/23/2010 | $320.00 | x |
| **RSPMG,DR JEFFREY MAX,10505 SORRENTO VALLEY ROAD #450,SAN DIEGO,CA,92121** | | **12/23/2010** | **$320.00** | x |
| RUFFALOCODY,ATTN CONTROLLER,PO BOX 3018,CEDAR RAPIDS,IA,52406-3018 | Invoice | 9/15/2010 | $4,605.00 | x |
| **RUFFALOCODY,ATTN CONTROLLER,PO BOX 3018,CEDAR RAPIDS,IA,52406-3018** | | **9/15/2010** | **$4,605.00** | x |
| SAFETY-KLEEN SYSTEMS, INC.,PO BOX 382066,,PITTSBURGH,PA,15250-8066 | Invoice | 12/15/2010 | $256.15 | x |
| **SAFETY-KLEEN SYSTEMS, INC.,PO BOX 382066,,PITTSBURGH,PA,15250-8066** | | **12/15/2010** | **$256.15** | x |
| SAINT FRANCIS SEMINARY,3257 S. LAKE DRIVE,,ST. FRANCIS,WI,53235 | Invoice | 12/9/2010 | $28.00 | x |
| SAINT FRANCIS SEMINARY,3257 S. LAKE DRIVE,,ST. FRANCIS,WI,53235 | Invoice | 12/9/2010 | $3,874.24 | x |
| SAINT FRANCIS SEMINARY,3257 S. LAKE DRIVE,,ST. FRANCIS,WI,53235 | Invoice | 1/5/2011 | $127.02 | x |
| SAINT FRANCIS SEMINARY,3257 S. LAKE DRIVE,,ST. FRANCIS,WI,53235 | Invoice | 1/5/2011 | $104.00 | x |
| SAINT FRANCIS SEMINARY,3257 S. LAKE DRIVE,,ST. FRANCIS,WI,53235 | Invoice | 1/5/2011 | $549.36 | x |
| SAINT FRANCIS SEMINARY,3257 S. LAKE DRIVE,,ST. FRANCIS,WI,53235 | Invoice | 1/5/2011 | $2,901.79 | x |
| SAINT FRANCIS SEMINARY,3257 S. LAKE DRIVE,,ST. FRANCIS,WI,53235 | Invoice | 1/5/2011 | $140.72 | x |
| SAINT FRANCIS SEMINARY,3257 S. LAKE DRIVE,,ST. FRANCIS,WI,53235 | Invoice | 1/6/2011 | $250.00 | x |
| SAINT FRANCIS SEMINARY,3257 S. LAKE DRIVE,,ST. FRANCIS,WI,53235 | Invoice | 1/11/2011 | $744.89 | x |
| SAINT FRANCIS SEMINARY,3257 S. LAKE DRIVE,,ST. FRANCIS,WI,53235 | Invoice | 1/11/2011 | $1,165.96 | x |
| SAINT FRANCIS SEMINARY,3257 S. LAKE DRIVE,,ST. FRANCIS,WI,53235 | Invoice | 1/11/2011 | $149.00 | x |
| SAINT FRANCIS SEMINARY,3257 S. LAKE DRIVE,,ST. FRANCIS,WI,53235 | Invoice | 1/12/2011 | $1,410.04 | x |
| **SAINT FRANCIS SEMINARY,3257 S. LAKE DRIVE,,ST. FRANCIS,WI,53235** | | **VARIOUS** | **$11,445.02** | x |
| SALENTINE PUMP & EQUIPMENT, INC.,P. O. BOX 44348,,MILWAUKEE,WI,53214 | Invoice | 12/29/2010 | $260.00 | x |
| **SALENTINE PUMP & EQUIPMENT, INC.,P. O. BOX 44348,,MILWAUKEE,WI,53214** | | **12/29/2010** | **$260.00** | x |
| SANDROLINI MARC MD,1140 LAKE STREET,SUITE 302,OAK PARK,IL,60301 | Invoice | 12/23/2010 | $350.00 | x |
| SANDROLINI MARC MD,1140 LAKE STREET,SUITE 302,OAK PARK,IL,60301 | Invoice | 1/27/2011 | $175.00 | x |
| **SANDROLINI MARC MD,1140 LAKE STREET,SUITE 302,OAK PARK,IL,60301** | | **VARIOUS** | **$525.00** | x |
| SCHOOL SISTERS OF ST. FRANCIS,1501 S. LAYTON BLVD.,,MILWAUKEE,WI,53215 | Invoice | 1/17/2011 | $1,284.87 | x |
| **SCHOOL SISTERS OF ST. FRANCIS,1501 S. LAYTON BLVD.,,MILWAUKEE,WI,53215** | | **1/17/2011** | **$1,284.87** | x |
| SCHUERMAN REV. JIM-1099,714 E WALWORTH AVENUE,,DELAVAN,WI,53115 | Invoice | 9/10/2010 | $100.00 | x |
| **SCHUERMAN REV. JIM-1099,714 E WALWORTH AVENUE,,DELAVAN,WI,53115** | | **9/10/2010** | **$100.00** | x |
| SCRIPTLOGIC CORPORATION,6000 BROKEN SOUND PARKWAY NW,,BOCA RATON,FL,33487-2742 | Invoice | 12/13/2010 | $7,161.12 | x |
| **2742** | | **12/13/2010** | **$7,161.12** | x |
| SELKEY KAREN M,1600 LOOKOUT LANE,,BROOKFIELD,WISCONSIN,53045 | Invoice | 12/14/2010 | $45.00 | x |

| Name/Address | Type | Date | Amount | |
|---|---|---|---|---|
| SELKEY KAREN M,1600 LOOKOUT LANE,,BROOKFIELD,WISCONSIN,53045 | | 12/14/2010 | $45.00 | x |
| SENIOR FR. DONALD,CATHOLIC THEOLOGICAL UNION,5416 SOUTH CORNELL AVE,CHICAGO,IL,60615-5604 | Invoice | 11/4/2010 | $1,300.00 | |
| **AVE,CHICAGO,IL,60615-5604** | | **11/4/2010** | **$1,300.00** | |
| SEXAUER,J.A.,INC.,P. O. BOX 404284,,ATLANTA,GA,30384-4284 | Invoice | 12/15/2010 | $243.48 | x |
| SEXAUER,J.A.,INC.,P. O. BOX 404284,,ATLANTA,GA,30384-4284 | Invoice | 12/29/2010 | $117.69 | x |
| **SEXAUER,J.A.,INC.,P. O. BOX 404284,,ATLANTA,GA,30384-4284** | | **VARIOUS** | **$361.17** | |
| SHESTO SAFE & LOCK WORKS, LLC,1030 RIVER PLACE BLVD. #1,,WAUKESHA,WI,53189-7897 | Invoice | 12/8/2010 | $99.00 | x |
| **SHESTO SAFE & LOCK WORKS, LLC,1030 RIVER PLACE BLVD. #1,,WAUKESHA,WI,53189-7897** | | **12/8/2010** | **$99.00** | |
| SHORE COUNSELING AND CONSULTING CLINIC,2600 N. MAYFAIR ROAD,SUITE 650,WAUWATOSA,WI,53226 | Invoice | 12/23/2010 | $550.00 | |
| **650,WAUWATOSA,WI,53226** | | **12/23/2010** | **$550.00** | |
| SMITH,CI, SANDI,5612 WESTWAY,,GREENDALE,WI,53129-1620 | Invoice | 1/2/2011 | $180.00 | |
| **SMITH,CI, SANDI,5612 WESTWAY,,GREENDALE,WI,53129-1620** | | **1/2/2011** | **$180.00** | |
| SOBCZYK BRYAN,4823 S 19TH STREET,,MILWAUKEE,WISCONSIN,53221 | Invoice | 1/4/2011 | $65.98 | x |
| **SOBCZYK BRYAN,4823 S 19TH STREET,,MILWAUKEE,WISCONSIN,53221** | | **1/4/2011** | **$65.98** | |
| SOFTCHOICE CORPORATION,16609 COLLECTIONS CENTER DRIVE,,CHICAGO,IL,60693 | Invoice | 12/17/2010 | $321.89 | x |
| **SOFTCHOICE CORPORATION,16609 COLLECTIONS CENTER DRIVE,,CHICAGO,IL,60693** | | **12/17/2010** | **$321.89** | |
| SPAAY JOHN & RUTHANN,2025 - 12TH STREET,,KENOSHA,WI,53144 | Invoice | 11/22/2010 | $75.00 | x |
| **SPAAY JOHN & RUTHANN,2025 - 12TH STREET,,KENOSHA,WI,53144** | | **11/22/2010** | **$75.00** | |
| SPEEDWAY SUPERAMERICA LLC,CREDIT SERVICES, P O BOX 740587,CINCINNATI,OH,45274-0587 | Invoice | 12/9/2010 | $39.00 | x |
| SPEEDWAY SUPERAMERICA LLC,CREDIT SERVICES, P O BOX 740587,CINCINNATI,OH,45274-0587 | Invoice | 12/13/2010 | $48.13 | x |
| SPEEDWAY SUPERAMERICA LLC,CREDIT SERVICES, P O BOX 740587,CINCINNATI,OH,45274-0587 | Invoice | 12/15/2010 | $41.00 | x |
| SPEEDWAY SUPERAMERICA LLC,CREDIT SERVICES, P O BOX 740587,CINCINNATI,OH,45274-0587 | Credit Memo | 12/20/2010 | ($0.29) | x |
| SPEEDWAY SUPERAMERICA LLC,CREDIT SERVICES, P O BOX 740587,CINCINNATI,OH,45274-0587 | Invoice | 12/22/2010 | $46.00 | x |
| **0587** | | **VARIOUS** | **$173.84** | |
| SPIC AND SPAN, INC.,4301 N RICHARDS ST,,MILWAUKEE,WI,53212-1097 | Invoice | 12/21/2010 | $3.96 | x |
| SPIC AND SPAN, INC.,4301 N RICHARDS ST,,MILWAUKEE,WI,53212-1097 | Invoice | 12/24/2010 | $50.00 | x |
| **SPIC AND SPAN, INC.,4301 N RICHARDS ST,,MILWAUKEE,WI,53212-1097** | | **VARIOUS** | **$53.96** | |
| SPRING VALLEY,1891 SPRING VALLEY RD.,,JACKSON,WI,53037 | Invoice | 12/15/2010 | $1,517.25 | |
| **SPRING VALLEY,1891 SPRING VALLEY RD.,,JACKSON,WI,53037** | | **12/15/2010** | **$1,517.25** | |
| SPRINT-BOX 4181,PO BOX 4181,,CAROL STREAM,IL,60197-4181 | Invoice | 1/10/2011 | $1.20 | x |
| **SPRINT-BOX 4181,PO BOX 4181,,CAROL STREAM,IL,60197-4181** | | **1/10/2011** | **$1.20** | |
| ST FRANCIS XAVIER CATHOLIC CHURCH,1704 240TH AVENUE,,KANSASVILLE,WISCONSIN,53139 | Invoice | 1/10/2011 | $1,239.40 | |
| **AVENUE,,KANSASVILLE,WISCONSIN,53139** | | **1/10/2011** | **$1,239.40** | |
| ST LOUIS CONSULTATION CENTER,2039 NORTH GEYER ROAD,,ST LOUIS,MO,63131 | Invoice | 12/22/2010 | $2,220.00 | |
| ST LOUIS CONSULTATION CENTER,2039 NORTH GEYER ROAD,,ST LOUIS,MO,63131 | Invoice | 1/18/2011 | $2,460.00 | |
| **ST LOUIS CONSULTATION CENTER,2039 NORTH GEYER ROAD,,ST LOUIS,MO,63131** | | **VARIOUS** | **$4,680.00** | |
| ST. CAMILLUS,CAMILLUS COURTS,10100 W. BLUEMOUND RD.,WAUWATOSA,WI,53226 | Invoice | 12/31/2010 | $29.04 | x |
| **ST. CAMILLUS,CAMILLUS COURTS,10100 W. BLUEMOUND RD.,WAUWATOSA,WI,53226** | | **12/31/2010** | **$29.04** | |
| ST. CATHERINE CONGREGATION-OCONOMOWOC,W359 N8512 BROWN STREET,,OCONOMOWOC,WI,53066 | Invoice | 1/24/2011 | $4,200.50 | |
| **STREET,,OCONOMOWOC,WI,53066** | | **1/24/2011** | **$4,200.50** | |
| ST. JOHN VIANNEY CONGREGATION BRK,1755 N CALHOUN ROAD,,BROOKFIELD,WI,53005 | Invoice | 11/23/2010 | $50.00 | |
| **ST. JOHN VIANNEY CONGREGATION BRK,1755 N CALHOUN ROAD,,BROOKFIELD,WI,53005** | | **11/23/2010** | **$50.00** | |
| ST. JOSEPH CENTER-MOTHERHOUSE,1501 S LAYTON BLVD,,MILWAUKEE,WI,53215-1924 | Invoice | 12/31/2010 | $35.00 | |
| **ST. JOSEPH CENTER-MOTHERHOUSE,1501 S LAYTON BLVD,,MILWAUKEE,WI,53215-1924** | | **12/31/2010** | **$35.00** | |
| ST. MARTIN DE PORRES,128 W BURLEIGH STREET,,MILWAUKEE,WI,53212-2046 | Invoice | 11/22/2010 | $75.00 | |
| **ST. MARTIN DE PORRES,128 W BURLEIGH STREET,,MILWAUKEE,WI,53212-2046** | | **11/22/2010** | **$75.00** | |
| ST.ALPHONSUS PARISH-GRNDL,6060 W LOOMIS ROAD,,GREENDALE,WI,53129-1824 | Invoice | 11/23/2010 | $50.00 | |
| **ST.ALPHONSUS PARISH-GRNDL,6060 W LOOMIS ROAD,,GREENDALE,WI,53129-1824** | | **11/23/2010** | **$50.00** | |
| ST.ROSE OF LIMA PARISH-MILW,528 N. 31ST ST.,,MILWAUKEE,WI,53208 | Invoice | 1/6/2011 | $800.00 | |
| **ST.ROSE OF LIMA PARISH-MILW,528 N. 31ST ST.,,MILWAUKEE,WI,53208** | | **1/6/2011** | **$800.00** | |
| STAPLES ADVANTAGE,PO BOX 95708,,CHICAGO,IL,60694-5708 | Invoice | 12/11/2010 | $19.32 | x |
| STAPLES ADVANTAGE,PO BOX 95708,,CHICAGO,IL,60694-5708 | Invoice | 12/18/2010 | $315.77 | x |
| STAPLES ADVANTAGE,PO BOX 95708,,CHICAGO,IL,60694-5708 | Invoice | 12/31/2010 | $1,105.06 | x |

| Name/Address | Type | Date | Amount | |
|---|---|---|---|---|
| STAPLES ADVANTAGE,PO BOX 95708,,CHICAGO,IL,60694-5708 | | VARIOUS | $1,440.15 | x |
| STARR PHIL,11103 W WELLS STREET,,WAUWATOSA,WISCONSIN,53266 | Invoice | 11/17/2010 | $40.00 | x |
| **STARR PHIL,11103 W WELLS STREET,,WAUWATOSA,WISCONSIN,53266** | | **11/17/2010** | **$40.00** | x |
| STEIGER FREDERIC, MD SC,P. O. BOX 222,,CEDARBURG,WI,53012 | Invoice | 1/27/2011 | $150.00 | x |
| **STEIGER FREDERIC, MD SC,P. O. BOX 222,,CEDARBURG,WI,53012** | | **1/27/2011** | **$150.00** | x |
| STEMPER, T. H. COMPANY,1125 E. POTTER AVE.,,MILWAUKEE,WI,53207-1896 | Invoice | 12/21/2010 | $16.25 | x |
| **STEMPER, T. H. COMPANY,1125 E. POTTER AVE.,,MILWAUKEE,WI,53207-1896** | | **12/21/2010** | **$16.25** | x |
| STOFFEL, GERALD & MARTHA,C/O 4673 STATE ROAD 28,,KEWASKUM,WI,53040-9409 | Invoice | 12/30/2010 | $315.00 | x |
| STOFFEL, GERALD & MARTHA,C/O 4673 STATE ROAD 28,,KEWASKUM,WI,53040-9409 | Invoice | 12/30/2010 | $360.00 | x |
| STOFFEL, GERALD & MARTHA,C/O 4673 STATE ROAD 28,,KEWASKUM,WI,53040-9409 | Invoice | 12/30/2010 | $170.00 | x |
| **STOFFEL, GERALD & MARTHA,C/O 4673 STATE ROAD 28,,KEWASKUM,WI,53040-9409** | | **VARIOUS** | **$845.00** | x |
| STUDIO GEAR LLC,511 EAST CHICAGO STREET,,MILWAUKEE,WI,53202 | Invoice | 12/17/2010 | $150.00 | x |
| **STUDIO GEAR LLC,511 EAST CHICAGO STREET,,MILWAUKEE,WI,53202** | | **12/17/2010** | **$150.00** | x |
| TDS METROCOM,PO BOX 94510,,PALATINE,IL,60094-4510 | Invoice | 1/1/2011 | $55.96 | x |
| **TDS METROCOM,PO BOX 94510,,PALATINE,IL,60094-4510** | | **1/1/2011** | **$55.96** | x |
| TEUTEBERG INCORPORATED,12200 W WIRTH STREET,,WAUWATOSA,WISCONSIN,53222 | Invoice | 12/30/2010 | $3,484.65 | x |
| TEUTEBERG INCORPORATED,12200 W WIRTH STREET,,WAUWATOSA,WISCONSIN,53222 | Invoice | 1/24/2011 | $1,852.25 | x |
| **TEUTEBERG INCORPORATED,12200 W WIRTH STREET,,WAUWATOSA,WISCONSIN,53222** | | **12/30/2010** | **$5,336.90** | x |
| THE ZALKIN LAW FIRM,12555 HIGH BLUFF DR, SUITE 260,,SAN DIEGO,CA,92130 | Invoice | 1/7/2011 | $10,000.00 | x |
| **THE ZALKIN LAW FIRM,12555 HIGH BLUFF DR, SUITE 260,,SAN DIEGO,CA,92130** | | **1/7/2011** | **$10,000.00** | x |
| THEYS TOM,S76 W19414 PROSPECT DRIVE,,MUSKEGO,WISCONSIN,53150 | Invoice | 8/9/2010 | $50.00 | x |
| **THEYS TOM,S76 W19414 PROSPECT DRIVE,,MUSKEGO,WISCONSIN,53150** | | **8/9/2010** | **$50.00** | x |
| THOMAS ROBERT,7124 PLEASANT VALLEY ROAD,,SAUKVILLE,WI,53080 | Invoice | 12/9/2010 | $630.00 | x |
| **THOMAS ROBERT,7124 PLEASANT VALLEY ROAD,,SAUKVILLE,WI,53080** | | **12/9/2010** | **$630.00** | x |
| THREE HOLY WOMEN PARISH,1716 N HUMBOLDT AVE,,MILWAUKEE,WI,53202-1697 | Invoice | 12/30/2010 | $300.00 | x |
| **THREE HOLY WOMEN PARISH,1716 N HUMBOLDT AVE,,MILWAUKEE,WI,53202-1697** | | **12/30/2010** | **$300.00** | x |
| TIKALSKY RUSSELL REV.,1138 S 25TH STREET,,MILWAUKEE,WI,53204 | Invoice | 1/26/2011 | $3,046.92 | x |
| **TIKALSKY RUSSELL REV.,1138 S 25TH STREET,,MILWAUKEE,WI,53204** | | **1/26/2011** | **$3,046.92** | x |
| TIME WARNER CABLE-BOX 3237,PO BOX 3237,,MILWAUKEE,WI,53201-3237 | Invoice | 12/25/2010 | $52.40 | x |
| TIME WARNER CABLE-BOX 3237,PO BOX 3237,,MILWAUKEE,WI,53201-3237 | Invoice | 12/29/2010 | $15.22 | x |
| **TIME WARNER CABLE-BOX 3237,PO BOX 3237,,MILWAUKEE,WI,53201-3237** | | **VARIOUS** | **$67.62** | x |
| T-MOBILE,PO BOX 742596,,CINCINNATI,OHIO,45274-2596 | Invoice | 12/27/2010 | $31.67 | x |
| **T-MOBILE,PO BOX 742596,,CINCINNATI,OHIO,45274-2596** | | **12/27/2010** | **$31.67** | x |
| TOWN & COUNTRY MART,WALDSCHMIDT & SONS, INC.,N94 W17937 APPLETON AVENUE,MENOMONEE FALLS,WI,53051 | Invoice | 12/6/2010 | $229.38 | x |
| TOWN & COUNTRY MART,WALDSCHMIDT & SONS, INC.,N94 W17937 APPLETON AVENUE,MENOMONEE FALLS,WI,53051 | Invoice | 12/13/2010 | $624.42 | x |
| TOWN & COUNTRY MART,WALDSCHMIDT & SONS, INC.,N94 W17937 APPLETON AVENUE,MENOMONEE FALLS,WI,53051 | Invoice | 12/21/2010 | $90.76 | x |
| TOWN & COUNTRY MART,WALDSCHMIDT & SONS, INC.,N94 W17937 APPLETON AVENUE,MENOMONEE FALLS,WI,53051 | Invoice | 12/21/2010 | $19.56 | x |
| TOWN & COUNTRY MART,WALDSCHMIDT & SONS, INC.,N94 W17937 APPLETON AVENUE,MENOMONEE FALLS,WI,53051 | Invoice | 12/23/2010 | $24.48 | x |
| **AVENUE,MENOMONEE FALLS,WI,53051** | | **VARIOUS** | **$988.60** | x |
| TRANSFORMATIONS INCORPORATED,JIM MORNINGSTAR,4200 W GOOD HOPE ROAD,MILWAUKEE,WISCONSIN,53209 | Invoice | 12/23/2010 | $450.00 | x |
| TRANSFORMATIONS INCORPORATED,JIM MORNINGSTAR,4200 W GOOD HOPE ROAD,MILWAUKEE,WISCONSIN,53209 | Invoice | 1/27/2011 | $150.00 | x |
| **ROAD,MILWAUKEE,WISCONSIN,53209** | | **VARIOUS** | **$600.00** | x |
| TRILLIUM CARE GROUP LLC,500 ELM GROVE ROAD,SUITE 100,ELM GROVE,WI,53122 | Invoice | 12/23/2010 | $180.00 | x |
| **TRILLIUM CARE GROUP LLC,500 ELM GROVE ROAD,SUITE 100,ELM GROVE,WI,53122** | | **12/23/2010** | **$180.00** | x |
| UNITED PARCEL SERVICE,LOCK BOX 577,,CAROL STREAM,IL,60132-0577 | Invoice | 1/8/2011 | $19.60 | x |
| **UNITED PARCEL SERVICE,LOCK BOX 577,,CAROL STREAM,IL,60132-0577** | | **1/8/2011** | **$19.60** | x |
| UNITED STATES CONFERENCE OF CATHOLIC BISHOPS,P. O. BOX 73140,,BALTIMORE,MD,21273 | Invoice | 1/26/2011 | $1,034.20 | x |
| **73140,,BALTIMORE,MD,21273** | | **1/26/2011** | **$1,034.20** | x |
| USCCB PUBLISHING,PO BOX 96429,,WASHINGTON,DC,20090-6429 | Invoice | 12/22/2010 | $98.91 | x |
| **USCCB PUBLISHING,PO BOX 96429,,WASHINGTON,DC,20090-6429** | | **12/22/2010** | **$98.91** | x |
| UW-WHITEWATER,CASHIERS OFFICE,PO BOX 88,WHITEWATER,WISCONSIN,53190 | Invoice | 12/16/2010 | $513.40 | x |
| **UW-WHITEWATER,CASHIERS OFFICE,PO BOX 88,WHITEWATER,WISCONSIN,53190** | | **12/16/2010** | **$513.40** | x |
| VALLEY NATIONAL GASES, INC.,P. O. BOX 6378,,WHEELING,WV,26003-0615 | Invoice | 12/31/2010 | $30.65 | x |
| **VALLEY NATIONAL GASES, INC.,P. O. BOX 6378,,WHEELING,WV,26003-0615** | | **12/31/2010** | **$30.65** | x |

| | | | |
|---|---|---|---|
| VEOLIA ES SOLID WASTE MIDWEST, INC. C6,PO BOX 6484,,CAROL STREAM,IL,60197-6484 | Invoice | 12/25/2010 | $572.61 | x |
| VEOLIA ES SOLID WASTE MIDWEST, INC. C6,PO BOX 6484,,CAROL STREAM,IL,60197-6484 | Invoice | 12/25/2010 | $1,369.69 | x |
| VEOLIA ES SOLID WASTE MIDWEST, INC. C6,PO BOX 6484,,CAROL STREAM,IL,60197-6484 | Invoice | 12/25/2010 | $92.38 | x |
| **VEOLIA ES SOLID WASTE MIDWEST, INC. C6,PO BOX 6484,,CAROL STREAM,IL,60197-6484** | | **VARIOUS** | **$2,034.68** | |
| WAGNER PLUMBING CO ,INC, GENE,2017 S 60TH ST,,MILWAUKEE,WI,53219 | Invoice | 12/31/2010 | $848.11 | |
| **WAGNER PLUMBING CO ,INC, GENE,2017 S 60TH ST,,MILWAUKEE,WI,53219** | | **12/31/2010** | **$848.11** | |
| WASTE MANAGEMENT OF MILWAUKEE,PO BOX 4648,,CAROL STREAM,IL,60197-4648 | Invoice | 1/1/2011 | $134.10 | |
| **WASTE MANAGEMENT OF MILWAUKEE,PO BOX 4648,,CAROL STREAM,IL,60197-4648** | | **1/1/2011** | **$134.10** | |
| WE ENERGIES,333 W. EVERETT ST.,,MILWAUKEE,WI,53290-1000 | Invoice | 12/14/2010 | $405.83 | |
| WE ENERGIES,333 W. EVERETT ST.,,MILWAUKEE,WI,53290-1000 | Invoice | 12/22/2010 | $37,696.46 | |
| WE ENERGIES,333 W. EVERETT ST.,,MILWAUKEE,WI,53290-1000 | Invoice | 12/26/2010 | $33,465.48 | |
| WE ENERGIES,333 W. EVERETT ST.,,MILWAUKEE,WI,53290-1000 | Invoice | 12/27/2010 | $2,267.01 | |
| WE ENERGIES,333 W. EVERETT ST.,,MILWAUKEE,WI,53290-1000 | Invoice | 12/29/2010 | $11,744.25 | |
| WE ENERGIES,333 W. EVERETT ST.,,MILWAUKEE,WI,53290-1000 | Invoice | 12/29/2010 | $790.20 | |
| WE ENERGIES,333 W. EVERETT ST.,,MILWAUKEE,WI,53290-1000 | Invoice | 12/29/2010 | $231.51 | |
| WE ENERGIES,333 W. EVERETT ST.,,MILWAUKEE,WI,53290-1000 | Invoice | 1/9/2011 | $1,047.62 | |
| WE ENERGIES,333 W. EVERETT ST.,,MILWAUKEE,WI,53290-1000 | Invoice | 1/10/2011 | $1,092.51 | |
| WE ENERGIES,333 W. EVERETT ST.,,MILWAUKEE,WI,53290-1000 | Invoice | 1/11/2011 | $447.85 | |
| WE ENERGIES,333 W. EVERETT ST.,,MILWAUKEE,WI,53290-1000 | Invoice | 1/16/2011 | $736.96 | |
| **WE ENERGIES,333 W. EVERETT ST.,,MILWAUKEE,WI,53290-1000** | | **VARIOUS** | **$89,925.68** | |
| WEEK OF PRAYER-GRAYMOOR ECUM.,GRAYMOOR - ROUTE 9,PO BOX 300,GARRISON,NY,10524-0300 | Invoice | 12/9/2010 | $80.95 | x |
| **300,GARRISON,NY,10524-0300** | | **12/9/2010** | **$80.95** | |
| WESTED,PUBLICATIONS CENTER,730 HARRISON STREET,SAN FRANCISCO,CA,94107-1242 | Invoice | 12/22/2010 | $19.65 | |
| **WESTED,PUBLICATIONS CENTER,730 HARRISON STREET,SAN FRANCISCO,CA,94107-1242** | | **12/22/2010** | **$19.65** | |
| WILL ENTERPRISES,7474 N WILL ENTERPRISES COURT,,MILWAUKEE,WISCONSIN,53224 | Invoice | 12/9/2010 | $325.95 | |
| **WILL ENTERPRISES,7474 N WILL ENTERPRISES COURT,,MILWAUKEE,WISCONSIN,53224** | | **12/9/2010** | **$325.95** | |
| WISCONSIN DEPT.OF JUSTICE,P O BOX 2688,123 W WASHINGTON AVE RM 190,MADISON,WI,53701-2688 | Invoice | 11/1/2010 | $21.00 | x |
| **190,MADISON,WI,53701-2688** | | **11/1/2010** | **$21.00** | |
| WISCONSIN GRIEF EDUCATION CENTER, INC.,C/O PATRICK DEAN,29205 ELM ISLAND DRIVE,WATERFORD,WI,53185 | Invoice | 12/8/2010 | $3,120.00 | |
| WISCONSIN GRIEF EDUCATION CENTER, INC.,C/O PATRICK DEAN,29205 ELM ISLAND DRIVE,WATERFORD,WI,53185 | Invoice | 1/8/2011 | $3,120.00 | |
| **DRIVE,WATERFORD,WI,53185** | | **VARIOUS** | **$6,240.00** | |
| WISCONSIN STRESS CNTRL CTR,9401 W. BELOIT RD., SUITE 314,,MILWAUKEE,WI,53227 | Invoice | 12/14/2010 | $65.00 | |
| **WISCONSIN STRESS CNTRL CTR,9401 W. BELOIT RD., SUITE 314,,MILWAUKEE,WI,53227** | | **12/14/2010** | **$65.00** | |
| WISCONSIN WHOLESALE TIRE,3655 N 126TH STREET UNIT D,,BROOKFIELD,WISCONSIN,53005 | Invoice | 12/16/2010 | $148.00 | |
| **WISCONSIN WHOLESALE TIRE,3655 N 126TH STREET UNIT D,,BROOKFIELD,WISCONSIN,53005** | | **12/16/2010** | **$148.00** | |
| WITTLIFF REV TOM,2260 S 4TH STREET,,MILWAUKEE,WISCONSIN,53207 | Invoice | 12/31/2010 | $58.00 | |
| **WITTLIFF REV TOM,2260 S 4TH STREET,,MILWAUKEE,WISCONSIN,53207** | | **12/31/2010** | **$58.00** | |
| YELLOW BOOK OF ILLINOIS, LLC,P. O. BOX 660052,,DALLAS,TX,75266-0052 | Invoice | 1/15/2011 | $521.77 | |
| **YELLOW BOOK OF ILLINOIS, LLC,P. O. BOX 660052,,DALLAS,TX,75266-0052** | | **1/15/2011** | **$521.77** | |
| YOUNG DR. TERRY,16355 W. CRESCENT DR.,,NEW BERLIN,WI,53151 | Invoice | 12/23/2010 | $50.00 | |
| YOUNG DR. TERRY,16355 W. CRESCENT DR.,,NEW BERLIN,WI,53151 | Invoice | 1/27/2011 | $150.00 | |
| **YOUNG DR. TERRY,16355 W. CRESCENT DR.,,NEW BERLIN,WI,53151** | | **VARIOUS** | **$200.00** | |
| ZANIN BRIAN-1099,330 MONROE STREET,,FORT ATKINSON,WI,53538 | Invoice | 12/21/2010 | $75.00 | |
| **ZANIN BRIAN-1099,330 MONROE STREET,,FORT ATKINSON,WI,53538** | | **12/21/2010** | **$75.00** | |
| NAME AND ADDRESS REDACTED | Invoice | 1/27/2011 | $615.82 | |
| **NAME AND ADDRESS REDACTED** | | **1/27/2011** | **$615.82** | |
| ZERKEL, FR. DONALD,PO BOX 74,,NEWBURG,WI,53060 | Invoice | 12/31/2010 | $155.00 | |
| **ZERKEL, FR. DONALD,PO BOX 74,,NEWBURG,WI,53060** | | **12/31/2010** | **$155.00** | |
| ZIELINSKI CINDY,ALVERNO COLLEGE,3400 S 43RD STREET,,MILWAUKEE,WISCONSIN,53234 | Invoice | 10/10/2010 | $50.00 | x |
| **ZIELINSKI CINDY,ALVERNO COLLEGE,3400 S 43RD STREET,,MILWAUKEE,WISCONSIN,53234** | | **10/10/2010** | **$50.00** | |
| ZIEN INC,2303 WEST MILL ROAD,,GLENDALE,WISCONSIN,53209 | Invoice | 12/14/2010 | $4,683.00 | |
| ZIEN INC,2303 WEST MILL ROAD,,GLENDALE,WISCONSIN,53209 | Invoice | 12/30/2010 | $1,829.13 | |
| ZIEN INC,2303 WEST MILL ROAD,,GLENDALE,WISCONSIN,53209 | Invoice | 12/31/2010 | $231.00 | |
| **ZIEN INC,2303 WEST MILL ROAD,,GLENDALE,WISCONSIN,53209** | | **VARIOUS** | **$6,743.13** | |
| ZIRKEL KIP, PH.D.,W5927 HILLCREST DRIVE,,LA CROSSE,WI,54601 | Invoice | 1/27/2011 | $70.00 | x |

| | | | | |
|---|---|---|---|---|
| ZIRKEL KIP, PH.D.,W5927 HILLCREST DRIVE,,LA CROSSE,WI,54601 | | | 1/27/2011 | $70.00 | x |
| ZOZAKIEWICZ, DANIEL,8547 NORTH MEADOWSIDE CT.,,BROWN DEER,WI,53223 | Invoice | | 12/31/2010 | $39.00 | x |
| ZOZAKIEWICZ, DANIEL,8547 NORTH MEADOWSIDE CT.,,BROWN DEER,WI,53223 | Invoice | | 12/31/2010 | $57.00 | x |
| ZOZAKIEWICZ, DANIEL,8547 NORTH MEADOWSIDE CT.,,BROWN DEER,WI,53223 | | | VARIOUS | $96.00 | x |

$470,020.53

**FOOTNOTES TO ARCHDIOCESE OF MILWAUKEE SCHEDULES & STATEMENT OF FINANCIAL AFFAIRS**

**Schedule F**

| Schedule F Footnote No. | Description |
|---|---|
| 1 | In-Settlement Victims/Survivors (Settlement Agreements) are those individuals who have participated in the Archdiocese of Milwaukee Mediation System.  The amount of the claim reflects the total remaining outstanding obligations to these individuals pursuant to their Settlement Agreements. |
| 2 | In-Settlement Victims/Survivors (counseling) are (i) those individuals who have participated in the Archdiocese of Milwaukee Mediation System and have a Settlement Agreement and are receiving psychological counseling and therapy and (ii) those individuals who have not participated in the Mediation System but are receiving psychological counseling and therapy services without a settlement agreement. |

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

In re

Archdiocese of Milwaukee,          Bankruptcy Case No. 11-20059-SVK

      Debtor.

Archdiocese of Milwaukee Catholic
Cemetery Perpetual Care Trust, on behalf of
itself and its beneficiaries

                                  Adv. Proc. No. 11-_____-SVK

      Plaintiff,

v.

Official Committee of Unsecured Creditors,

      Defendant.

## COMPLAINT

Now comes the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust (the "Trust"), on behalf of itself and the beneficiaries of the Trust, by its attorneys, Godfrey & Kahn, S.C., and seeks as follows:

### PARTIES

### The Trust

1.     Since 1857, the Archdiocese of Milwaukee (the "Debtor") has owned various Catholic cemeteries in Southeastern Wisconsin.

2.     A portion of the money which individuals pay to the Debtor to utilize such cemeteries as burial grounds has been held in trust for the perpetual care of such cemeteries.

Drafted by:
William E. Duffin
Timothy F. Nixon
GODFREY & KAHN, S.C.
780 North Water Street
Milwaukee, WI 53202-3590
Phone: 414-273-3500
Fax: 414-273-5198

3.      On April 2, 2007, the Trust was formally established under the statutes of the State of Wisconsin in order to more publicly recognize the status of the funds held in trust for the posterity of those interred in the Debtor's cemeteries.

4.      In addition to its status under the civil law of the State of Wisconsin, the Trust constitutes a juridic person under the Codex Iuris Canonici ("Canon Law").  As such, the Trust acts in conjunction with the vision of the Catholic Church; however, it functions as an autonomous body with independent decision-making authority, separate and distinct from that of the Church. See 1983 Code C. 113-123.

5.      The Trust functions as a corporal work of mercy to maintain and preserve cemetery property and, as such, holds funds for the perpetual care of cemetery property.

6.      The Trust has a fiduciary and religious responsibility to adequately provide for the future care of cemetery property.

## The Committee

7.      The Defendant is the Official Committee of Unsecured Creditors, which was appointed to the above-referenced bankruptcy proceeding on January 24, 2011, pursuant to 11 U.S.C. § 1102(a)(1).

## JURISDICTION

8.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b)(1) and 1334, 11 U.S.C. § 105 and Fed. R. Bankr. Pro. 7001(2) & (9).

9.      Venue is proper under 28 U.S.C. § 1409, as this matter relates to the above-referenced bankruptcy proceeding, which is pending in this district.

10.     This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

## BACKGROUND

## Basis for the Trust

11.     The Debtor is a Wisconsin nonstock corporation subject to treatment as a public juridic person under the Canon Law.

12.     The Debtor was established on November 28, 1843, and was created an archbishopric on February 12, 1875.

13.     The Debtor's mission is to serve Catholic parishes, schools and institutions so that they may effectively carry out their mission, to serve the people of God in Southeastern Wisconsin and to serve the broader community.

14.     In furtherance of its mission, the Debtor has owned various Catholic cemeteries and mausoleums (collectively, the "Milwaukee Catholic Cemeteries") since its inception. Currently, the Debtor owns the following cemeteries and/or mausoleums: All Saints, Calvary, Holy Cross, Holy Trinity, Mount Olivet, Resurrection, Saint Adalbert, and Saint Joseph.

15.     The Debtor's ownership of the Milwaukee Catholic Cemeteries includes all burial facilities within the geographic boundaries of the Debtor including, without limitation, individual burial plots, crypts, niches and property dedicated for future use as burial facilities (collectively, the "Cemetery Property").

16.     The Cemetery Property currently consists of 1,000 acres of land, in which over 500,000 remains are interred.  An estimated 3,000 new burials take place each year.

17.     Parties wishing to utilize the Cemetery Property deliver payments to the Debtor (the "Cemetery Payment").

18.     A portion of each Cemetery Payment (currently 50% of each Cemetery Payment related to burial plots and $100 of each Cemetery Payment related to crypts) is paid in exchange

for perpetual caretaking services of the Cemetery Property, including preservation and maintenance of the Cemetery Property; this portion is held in trust for the perpetual care of the Milwaukee Catholic Cemeteries.

19.    In 2008, funds then held in trust for the benefit of the perpetual care of the Milwaukee Catholic Cemeteries (historically referred to as the "Income Care Funds" and hereinafter referred to as the "Initial Trust Funds") were used to fund the Trust, which was established under both Wisconsin law and Canon Law to formalize the existing trust relationship under which the Debtor held such funds.

20.    Funds designated for perpetual care continue to be deposited into the Trust for such purposes (the "New Trust Funds" and, collectively with the Initial Trust Funds, the "Perpetual Care Funds").

21.    The Trust constitutes a separate and distinct legal entity from the Debtor, rather than a division or asset of the Debtor, as evidenced by all accounting related to the Trust, its independent creation and management, and its unique tax identification.

22.    The Debtor does not have any rights to terminate or revoke the Trust; it holds no supervisory or other authority over the Trust.  The Trust is solely controlled by the terms set forth in its formation documents.

## Application of Trust Funds

23.    Since 2008, the New Trust Funds have been deposited into a bank account.  The New Trust Funds are reconciled on a monthly basis, at which time such funds are sent to the Trust Custodian, U.S. Bank, for deposit.

24.    On a quarterly basis, the Trust wires a payment from the Perpetual Care Funds to the Debtor for the maintenance and preservation of, as well as the expenditures related to, the Cemetery Property.

25.    In its bankruptcy schedules, the Debtor indicates no beneficial interest in the Trust or the Perpetual Care Funds (except to the extent the Debtor receives such funds as income in exchange for the perpetual caretaking services it provides).

26.    Despite the Debtor's position, the Committee has indicated its intent to pursue the Trust's funds as assets of the Debtor's estate.  See Official Committee of Unsecured Creditors' Motion for an Order Pursuant to Federal Rule of Bankruptcy Procedure 2004 Directing Debtor's Production of Documents, filed March 31, 2011 [Docket No. 176].

27.    Consequently, the Trust is obligated to bring this action, on behalf of itself and its beneficiaries, to preserve the interests of the beneficiaries in the Trust assets and the related perpetual care of the Cemetery Property.

## TRUST ASSETS ARE NOT PROPERTY OF THE ESTATE UNDER 11 U.S.C. § 541(a)(1)

28.    Pursuant to 11 U.S.C. § 541(a)(1), the Debtor's estate is comprised of all of its legal or equitable interests as of the commencement of its bankruptcy.

29.    Although bankruptcy law defines what is property of the bankruptcy estate, property interests are created and defined by state law.  Butner v. U.S., 440 U.S. 48, 55, 99 S.Ct. 914 (1979).

30.    According to Wisconsin law, a charitable trust is a trust in which the income or principal presently or in the future must be used by the trustee exclusively for a charitable purpose.  Wis. Stat. § 701.01(2).  Charitable purposes include the advancement of religion or any

other purpose the accomplishment of which is beneficial to the community.  Wis. Stat. §
701.10(1).

31.    At all times, the Perpetual Care Funds constituted a charitable trust under
Wisconsin law.  The Trust merely formalized the existence of said charitable trust in writing
pursuant to the terms set forth in the trust agreement creating the Trust, which specifically
prescribes that the Trust assets (which are entirely comprised of the Perpetual Care Funds) must
be used exclusively for the charitable purpose of perpetual care of the Cemetery Property.

32.    Alternatively, prior to the establishment of the Trust, the Initial Trust Funds
constituted a resulting charitable trust.  The Initial Trust Funds were used for the exclusive
purpose of perpetual care of the Cemetery Property, which is classified as a charitable purpose
under Wisconsin law.  Additionally, parties who contributed funds to the Initial Trust Funds did
so with the explicit understanding that such funds would be paid to the Debtor in furtherance of
its mission to provide such perpetual care.

33.    A resulting trust is one implied from law and the intentions of the parties with
respect to the underlying transaction.  See Shevel v. Warter, 256 Wis. 503, 41 N.W.2d 603 (Wis.
1950) (citing Krzysko v. Gaudynski, 207 Wis. 608, 242 N.W. 186, 188. (Wis. 1932)).

34.    The Debtor does not have any interest of record in the Perpetual Care Funds
(which, again, are comprised of the Initial Trust Funds and the New Trust Funds) or the Trust, as
neither the benefit of, nor the interest in, the Perpetual Care Funds and the Trust is held with the
Debtor.

35.    Having neither legal nor equitable interests in the Perpetual Care Funds or the
Trust, the Debtor's interest is, at best, limited to income the Debtor receives in exchange for the
perpetual caretaking services it provides.

36.     Thus, the Perpetual Care Funds are held exclusively by the Trust and subject to its complete dominion and control.  Accordingly, the Perpetual Care Funds, like the Trust itself, do not constitute property of the Debtor's estate under 11 U.S.C. § 541(a)(1).

## TRUST ASSETS ARE SPECIFICALLY EXCLUDED AS ESTATE PROPERTY UNDER 11 U.S.C. § 541(b)(1)

37.     Under 11 U.S.C. § 541(b)(1), property of the Debtor's estate does not include any property that the debtor may exercise solely for the benefit of an entity other than itself.

38.     Though the Debtor held the Perpetual Care Funds for a period of time prior to the transfer to the Trust, the Debtor had and continues to have no rights in the Perpetual Care Funds; rather, the Debtor receives Perpetual Care Funds from parties solely for the benefit of the Trust.

39.     Consequently, the Perpetual Care Funds are not an estate asset pursuant to 11 U.S.C. § 541(b)(1).

## RELIEF REQUESTED

WHEREFORE, the Trust requests that the Court enter an order:

A.     Declaring that the Trust is not property of the Debtor's estate;

B.     Declaring that the Perpetual Care Funds are not property of the Debtor's estate; and

C.     Granting such other relief as the Court deems just and appropriate

*Signatures appear on the following page*

Dated this 28th day of June, 2011.

GODFREY & KAHN, S.C.

_/s/ Timothy F. Nixon_
Timothy F. Nixon
William E. Duffin
780 North Water Street
Milwaukee, WI  53202-3590
Phone:   414-273-3500
Fax:       414-273-5198
Email:   tnixon@gklaw.com
            weduffin@gklaw.com

_Attorneys for Plaintiff, Archdiocese of Milwaukee_
_Catholic Cemetery Perpetual Care Trust_

6136122_7

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ARCHDIOCESE OF MILWAUKEE, | ) Bankruptcy Case No. 11-20059-SVK |
| | ) |
| Debtors, | ) (Jointly Administered) |
| | ) |
| Archbishop Jerome E. Listecki, as Trustee of the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust, | ) ) ) ) |
| | ) |
| Plaintiff, | ) Adv. No. 11-02459 |
| | ) |
| v. | ) |
| | ) |
| Official Committee of Unsecured Creditors, | ) ) |
| | ) |
| Defendant. | |

**SECOND STIPULATION REGARDING THE OFFICIAL COMMITTEE OF UNSECURED CREDITOR'S STANDING TO DEFEND THE ADVERSARY PROCEEDING, BRING AVOIDANCE CLAIMS RELATED TO THE AMENDED COMPLAINT, AND LITIGATE AND PROPOSE OR ACCEPT A SETTLEMENT OF THE ADVERSARY PROCEEDING, OR PART THEREOF**

The Archdiocese of Milwaukee (the "Debtor"); Plaintiff Archbishop Jerome E. Listecki, as Trustee of the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust (the "Archbishop" or the "Plaintiff"); and Defendant, the Official Committee of Unsecured Creditors (the "Committee," and collectively with the Debtor and the Trustee, the "Parties"), hereby state and stipulate as follows (the "Stipulation"):

## RECITALS

A.    Whereas, on June 28, 2011, the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust (the "Trust"), on behalf of itself and its alleged beneficiaries, commenced

the above-referenced adversary proceeding (the "Adversary Proceeding") by filing a complaint against the Committee, which asserted declaratory relief claims that the alleged trust is not property of the Debtor's estate, that funds designated for perpetual care of the Milwaukee Catholic Cemeteries are not property of the Debtor's estate, and for such other relief as the Court deemed just and appropriate; and

B.     Whereas, on January 13, 2012, the Archbishop filed an Amended Complaint (the "Amended Complaint") against the Committee, substituting the Archbishop for the Trust as plaintiff, and asserting declaratory relief claims that the alleged trust and the assets of the alleged trust are not property of the Debtor's estate, and for violation of the First Amendment and/or the Religious Freedom and Restoration Act; and

C.     Whereas, the Committee believes there are valid defenses to the claims for relief set forth in the Amended Complaint, including potential counterclaims and affirmative defenses under 11 U.S.C. §§ 542, 544, 547, 548, 549, and 550, and Wisconsin law, that directly relate to the property in dispute (the "Avoidance and Turnover Claims"); and the Committee has analyzed those Avoidance and Turnover Claims, and provided its analysis to the Debtor; and the Committee has also analyzed potential counterclaims and affirmative defenses other than the Avoidance Claims (the "Other Claims"); and

D.     Whereas, the Debtor has analyzed the Amended Complaint and does not dispute the arguments of the Archbishop as asserted in the Amended Complaint; and

E.     Whereas, the Debtor also believes it and/or its officers and directors may have the duty under applicable state law to use the funds that comprise the alleged trust for the purposes allegedly intended by the donors or contributors of those funds which is inconsistent with the Committee's position on the Amended Complaint; and

F.      Whereas, the Parties believe the Committee, not the Debtor, is in the best position to defend against the allegations and claims for relief in the Amended Complaint, and pursue the Avoidance and Turnover Claims and Other Claims.

## STIPULATION

Consistent with the recitals set forth in paragraphs A through F, above, the Parties agree and stipulate as follows:

1.      The Debtor is not required to assert any Avoidance and Turnover Claims in the Adversary Proceeding.

2.      The Committee may defend against the allegations and claims for relief in the Amended Complaint on behalf of the Debtor's estate.

3.      The Committee is granted derivative standing to assert and litigate the Avoidance and Turnover Claims against the Archbishop for the benefit of the Debtor's estate, including, but not limited to, any Avoidance and Turnover Claims that, if not for the Court's order approving this Stipulation, the Committee would not have had standing to bring because those Avoidance and Turnover Claims belong to the Debtor's estate.

4.      The Committee is the party authorized to propose or accept a settlement of this Adversary Proceeding, or part of this Adversary Proceeding, by entering into a settlement agreement subject to Court approval pursuant to Federal Rule of Bankruptcy Procedure 9019.

5.      The Debtor is not foreclosed from objecting to any proposed settlement of this Adversary Proceeding, or part of this Adversary Proceeding.  The Debtor's objection to any portion of a settlement shall not be based on the Committee's inability to exercise business judgment in place of the Debtor.

WHD/8079708.4
DOCS_LA:250011.4 05058-003

Sapp 157

6.      Any Court determination in this Adversary Proceeding is binding as to the Debtor

and its estate notwithstanding that the Committee is currently the only defendant to this

Adversary Proceeding.

7.      Nothing contained in this Stipulation prohibits the Debtor from participating in

this Adversary Proceeding pursuant to the Federal Rules of Bankruptcy Procedure.


Dated at Milwaukee, Wisconsin this 30th day of January, 2012.


                                         ARCHDIOCESE OF MILWAUKEE
                                         Debtor and Debtor-in-Possession
                                         By its counsel,
                                         Whyte Hirschboeck Dudek S.C.


                                         By:   /s/Daryl L. Diesing
                                                Daryl L. Diesing
                                                State Bar No. 1005793
                                                Bruce G. Arnold
                                                State Bar No. 1002833
                                                Michael E. Gosman
                                                State Bar No. 1078872

POST OFFICE ADDRESS:
555 East Wells Street, Suite 1900
Milwaukee, WI 53202
Telephone:  (414) 273-2100
Facsimile:  (414) 223-5000
E-mail:  ddiesing@whdlaw.com
          barnold@whdlaw.com
          mgosman@whdlaw.com


4

Dated at Milwaukee, Wisconsin this 30th day of January, 2012.

GODFREY & KAHN, S.C.


By:   /s/ William E. Duffin
      Timothy F. Nixon
      William E. Duffin
      780 North Water Street
      Milwaukee, WI 53202-3590
      Phone:  (414) 273-3500
      Fax:  (414) 273-5198
      Email:  tnixon@gklaw.com
             weduffin@gklaw.com


*Attorneys for Plaintiff Archbishop*
*Jerome E. Listecki, as Trustee of the*
*Archdiocese of Milwaukee Catholic*
*Cemetery Perpetual Care Trust*

WHD/8079708.4
DOCS_LA:250011.4  05058-003

Sapp 159

Dated at San Francisco, California this 30th day of January, 2012.

PACHULSKI STANG ZIEHL & JONES LLP

By:   /s/ Kenneth H. Brown
   James I. Stang (CA Bar No. 94435)
   Kenneth H. Brown (CA Bar No. 100396)
   Gillian N. Brown (CA Bar No. 205132)
   10100 Santa Monica Blvd., 13th Floor
   Los Angeles, CA 90067
   Tel:  (310) 277-6190
   Fax:  (310) 201-0760
   E-mail:  jstang@pszjlaw.com
      kbrown@pszjlaw.com
      gbrown@pszjlaw.com

   -and-

   Albert Solochek
   (State Bar No. 1011075)
   Jason R. Pilmaier
   (State Bar No. 1070638)
   Howard, Solochek & Weber, S.C.
   324 East Wisconsin Ave., Suite 1100
   Milwaukee, WI 53202
   Tel:  (414) 272-0760
   Fax:  (414) 272-7265
   E-mail:  asolochek@kswmke.com
      jpilmaier@kswmke.com

   *Attorneys for the Committee of*
   *Unsecured Creditors*

6

THE FOLLOWING ORDER
IS APPROVED AND ENTERED
AS THE ORDER OF THIS COURT:



DATED: February 2, 2012

_Susan V. Kelley_

Honorable Susan V. Kelley
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ARCHDIOCESE OF MILWAUKEE, | ) Bankruptcy Case No. 11-20059-SVK |
| | ) |
| Debtors, | ) (Jointly Administered) |
| | ) |
| | ) |
| Archbishop Jerome E. Listecki, as Trustee | ) |
| of the Archdiocese of Milwaukee Catholic | ) |
| Cemetery Perpetual Care Trust, | ) |
| | ) |
| Plaintiff, | ) Adv. No. 11-02459 |
| | ) |
| v. | ) |
| | ) |
| Official Committee of Unsecured Creditors, | ) |
| | ) |
| Defendant. | ) |

**ORDER APPROVING SECOND STIPULATION REGARDING THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS' STANDING TO DEFEND THE
ADVERSARY PROCEEDING, BRING AVOIDANCE CLAIMS RELATED TO THE
AMENDED COMPLAINT, AND LITIGATE AND PROPOSE OR ACCEPT A
SETTLEMENT OF THE ADVERSARY PROCEEDING, OR PART THEREOF**

This matter having come before the Court on the *Second Stipulation Regarding the Official Committee of Unsecured Creditors' Standing to Defend the Adversary Proceeding, Bring Avoidance Claims Related to the Amended Complaint, and Litigate and Propose or Accept a Settlement of the Adversary Proceeding, or Part Thereof,* filed by the Archdiocese of Milwaukee (the "Debtor"); Plaintiff Archbishop Jerome E. Listecki, as Trustee of the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust (the "Archbishop" or the "Plaintiff"); and Defendant, the Official Committee of Unsecured Creditors (the "Committee," and collectively with the Debtor and the Trustee, the "Parties"), hereby state and stipulate as follows (the "Stipulation"):[1]

IT IS HEREBY ORDERED AS FOLLOWS:

1.      The Debtor is not required to assert any Avoidance and Turnover Claims in the Adversary Proceeding.

2.      The Committee may defend against the allegations and claims for relief in the Amended Complaint on behalf of the Debtor's estate.

3.      The Committee is granted derivative standing to assert and litigate the Avoidance and Turnover Claims against the Archbishop for the benefit of the Debtor's estate, including, but not limited to, any Avoidance and Turnover Claims that, if not for the Court's order approving this Stipulation, the Committee would not have had standing to bring because those Avoidance and Turnover Claims belong to the Debtor's estate.

---

[1]  All terms not otherwise defined in this Order shall have the meanings ascribed to them in the Stipulation.

WHD/8079708.4
DOCS_LA:250014.2  05058-003

Sapp 162

4.      The Committee is the party authorized to propose or accept a settlement of this Adversary Proceeding, or part of this Adversary Proceeding, by entering into a settlement agreement subject to Court approval pursuant to Federal Rule of Bankruptcy Procedure 9019.

5.      The Debtor is not foreclosed from objecting to any proposed settlement of this Adversary Proceeding, or part of this Adversary Proceeding.  The Debtor's objection to any portion of a settlement shall not be based on the Committee's inability to exercise business judgment in place of the Debtor.

6.      Any Court determination in this Adversary Proceeding is binding as to the Debtor and its estate notwithstanding that the Committee is currently the only defendant to this Adversary Proceeding.

7.      Nothing contained in this Stipulation prohibits the Debtor from participating in this Adversary Proceeding pursuant to the Federal Rules of Bankruptcy Procedure.


#####

WHD/8079708.4
DOCS_LA:250014.2  05058-003

Sapp 163

| UNITED STATES BANKRUPTCY COURT   EASTERN DISTRICT OF WISCONSIN | PROOF OF CLAIM |
|---|---|

**Name of Debtor:**  Archdiocese of Milwaukee

**Case Number:** 11-20059-svk

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. §503. This form should also not be used in connection with claims of alleged sexual abuse.

**Name of Creditor** (The person or other entity to whom the debtor owes money or property):

Cemetery Care Claimants, as such term is defined in the attached rider.

☐ Check this box to indicate that this claim amends a previously filed claim.

Name and address where notices should be sent:     Cemetery Care Claimants
                        c/o John Marek, Archdiocese of Milwaukee
                        3501 South Lake Drive, P.O. Box 070912, Milwaukee, WI 53207
        With copy to: Daryl Diesing, Whyte Hirschboeck Dudek S.C.
                        555 East Wells St, Ste 1900, Milwaukee, WI 53202
        Telephone number: 414-978-5523

**Court Claim Number:** _____
(if known)

Filed on: _____

Name and address where payment should be sent (if different from above):

Telephone number:

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☒ Check this box if you are the debtor or trustee in this case.

**1.   Amount of Claim as of Date Case Filed:**          Unknown

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest charges.

**2.   Basis for Claim:**    *See attached rider
    (See instruction #2 on reverse side.)

**3.   Last four digits of any number by which creditor identifies debtor:** _____

    **3a. Debtor may have scheduled account as:** _____
        (See instruction #3a on reverse side.)

**4.   Secured Claim** (see instruction #4 on reverse side).

Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

**Nature of property or right of setoff:** ☐ Real Estate   ☐ Motor Vehicle   ☐ Other _____
**Describe:**

**Value of Property:** $_____   **Annual Interest Rate:** _____%

**Amount of arrearage and other charges as of time case filed included in secured claim,**

**if any:** $_____   **Basis for perfection:** _____

**Amount of Secured Claim:** $_____   **Amount Unsecured:** $_____

**6.   Credits**: The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7.   Documents**: Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (See instruction 7 and definition of "redacted" on reverse side.)
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

**5.   Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725 *) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507(a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507(a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507(a) (____)

**Amount entitled to priority:**

$_____

*Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**Date:**

11/16/2011

**Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

Daryl Diesing, Attorney

FOR COURT USE ONLY

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**INSTRUCTIONS FOR PROOF OF CLAIM FORM**

The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.

### Items to be completed in Proof of Claim form

**Court, Name of Debtor and Case Number:**
Fill in the federal judicial district where the bankruptcy case was filed (for example, Central District of California), the bankruptcy debtor's name, and the bankruptcy case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is located at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1.    Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2.    Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if the trustee or another party in interest files an objection to your claim.

**3.    Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a.    Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4.    Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5.    Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitle to priority.

**6.    Credits:**
An authorized signature on this proof of claim serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7.    Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). If the claim is based on the delivery of health care goods or services, see instruction 2. Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

---

### DEFINITIONS

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is a person, corporation, or other entity owed a debt by the debtor that arose on or before the date of the bankruptcy filing. See 11 U.S.C. §101 (10)

**Claim**
A claim is the creditor's right to receive payment on a debt owed by the debtor that arose on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the clerk of the same bankruptcy court in which the bankruptcy case was filed.

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car.

A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax-identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

### INFORMATION

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim or you may access the court's PACER system (www.pacer.psc.uscourts.gov) for a small fee to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provision of the Bankruptcy Code (11 U.S.C. § 101 et seq.), and any applicable orders of the bankruptcy court.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| In re: | Case No.  11-20059-svk |
| **ARCHDIOCESE OF MILWAUKEE,** | Chapter 11 |
| | Hon. Susan V. Kelley |
| Debtor. | |

## RIDER TO PROOF OF CLAIM FILED ON BEHALF OF
## THE CEMETERY CARE CLAIMANTS

The Archdiocese of Milwaukee (the "Archdiocese" or "Debtor") hereby files this unliquidated proof of claim (the "Cemetery Care POC") in the above-captioned chapter 11 case on behalf of purchasers of graves, crypts, mausoleum space, income care, endowment care, perpetual care and the estates, legal representatives, heirs, successors, assigns and beneficiaries of decedents buried, interred, or otherwise preserved in the cemeteries of the Archdiocese of Milwaukee (the "Cemetery Care Claimants"), and represents as follows:

**A.    Cemetery Perpetual Care Claims**

1.    The Roman Catholic Church considers church cemeteries to be sacred places. The Archdiocese has continuously provided sacred burial places in Catholic cemeteries for the burial of the faithful departed since 1857.

2.    The Debtor owns and operates eight (8) cemeteries and seven (7) mausoleums. The Archdiocese provides sacred burial places through its non-profit cemetery operations on over 1,000 acres of land in Southeast Wisconsin in which over 500,000 remains are interred.

3.    In making cemeteries and mausoleums available to Catholic faithful, the Archdiocese entered into hundreds of thousands of contracts that contain the Archdiocese's promises to maintain the cemeteries and mausoleums on a continuing basis, and to set aside a

portion of the sale price in trust for the perpetual care of the cemeteries. Over the years, the contracts referred to this obligation variously as income care or perpetual care. The Archdiocese currently spends millions of dollars per year on perpetual care.

4.    In the Catholic tradition, perpetual care means much more than maintaining the grounds. The cemeteries are considered sacred places, and Catholic cemeteries are arranged, adorned, and maintained in a way that expresses Catholics' core beliefs about death and the resurrection of the body. In addition to features commonly found in secular cemeteries, the Archdiocese's cemeteries and mausoleums contain evocative religious art and special devotional features and meditation areas.

**B.    Unique Position of Cemetery Care Claimants**

5.    The Debtor files this proof of claim pursuant to Rule 3004 of the Federal Rules of Bankruptcy Procedure in recognition of the unique position of the Cemetery Care Claimants. The Cemetery Care Claimants include deceased persons with no direct voice in these bankruptcy proceedings, and other claimants that may not know or understand the potential effect of the Debtor's chapter 11 proceeding. The Cemetery Care Claimants had or have a simple and straightforward expectation – that the graves, crypts and mausoleums will be maintained forever. The Debtor believes that it is important to administer as many claims as possible in connection with the Debtor's chapter 11 proceeding including the claims of the Cemetery Care Claimants who are likely unaware of the potential impact of these chapter 11 proceedings on the Archdiocese's cemeteries. Moreover, to be viable, any plan of reorganization must address these perpetual care obligations.

6.    In filing this claim, the Debtor acknowledges that the Cemetery Care POC may be affected by the existence of funds that are currently held by the Archdiocese of Milwaukee

2

Catholic Cemetery Perpetual Care Trust (the "Trust"), which is currently the subject of an

Adversary Proceeding in the chapter 11 case known as *Adversary Proceeding No. 11-02459.*

### C.     Funds Needed to Provide Perpetual Care

7.      To fulfill its perpetual care obligations, the Archdiocese places a portion of every

sale of a mausoleum, crypt and grave site in trust to assure the perpetual care of these sacred

grounds and to maintain their continuous operation.  These perpetual care funds are held in the

Trust.  The Debtor does not have a current actuarial estimate of the cost of providing perpetual

care.  On information and belief, the amount likely exceeds the amount set aside in the Trust.[1]

### D.     Reservation of Rights re: "Creditor" Status

8.      Filing of this Cemetery Care POC by the Archdiocese does not constitute a

request for payment on behalf of any individual or entity, and is without prejudice to the rights, if

any, of any individual or entity filing a proof of claim for perpetual care, or to amend this

Cemetery Care POC.

9.      Filing of this Cemetery Care POC by the Archdiocese does not constitute an

assertion by the Debtor as to whether or not individual Cemetery Care Claimants are "creditors"

as defined in 11 U.S.C. § 101(10) with respect to the obligations of the Debtor to provide

perpetual care.  All rights of the Debtor, its estate, and all parties in interest to contest liability or

the amount of liability are expressly reserved on this point and are in no way affected by this

Cemetery Care POC.

---

[1]     As of June 30, 2011, the Trust held $57,715,013 for the purposes of providing perpetual care for the Debtor's cemeteries.
        The Trust makes distributions to offset the costs of care for the cemeteries.  To the extent that the Trust continues to make distributions to the Debtor, the Debtor will have less financial responsibility for the care of the cemeteries.

WHD/8229220.10

Sapp 168

**E.    Notices**

10.    Notices regarding this Cemetery Care POC should be addressed to

Cemetery Care Claimants
c/o Archdiocese of Milwaukee
3501 South Lake Drive
Milwaukee, WI 53207
Attn: John Marek, Chief Financial Officer

With a copy (which shall not constitute notice) to:

Whyte Hirschboeck Dudek S.C.
Attn: Daryl L. Diesing
555 East Wells Street
Milwaukee, WI 53202

Dated at Milwaukee, Wisconsin, this _16th_ day of November, 2011.

ARCHDIOCESE OF MILWAUKEE
Debtor and Debtor-in-Possession
by its counsel,
Whyte Hirschboeck Dudek S.C.

By:    _____
Daryl L. Diesing
Wisconsin State Bar No. 1005793
Bruce G. Arnold
Wisconsin State Bar No. 1002833
Michael E. Gosman
Wisconsin State Bar No. 1078872

POST OFFICE ADDRESS:
555 East Wells Street, Suite 1900
Milwaukee, WI  53202
Telephone:  (414) 978-5523
Facsimile: (414) 223-5000
Email: ddiesing@whdlaw.com
        barnold@whdlaw.com
        mgosman@whdlaw.com

4

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| In re: | Chapter 11 |
| Archdiocese of Milwaukee, | Bankruptcy Case No. 11-20059-SVK |
| Debtor. | |

| | |
|---|---|
| Archbishop Jerome E. Listecki, as Trustee of the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust, | Adv. Proc. No. 11-02459-SVK |
| Plaintiff, | |
| vs. | |
| Official Committee of Unsecured Creditors, | |
| Defendant. | |

| |
|---|
| Official Committee of Unsecured Creditors, |
| Counterclaimant, |
| vs. |
| Archbishop Jerome E. Listecki, as Trustee of the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust, |
| Counterdefendant. |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION FOR SUMMARY JUDGMENT ON COUNT III OF AMENDED COMPLAINT**

James I. Stang (CA Bar No. 94435)
Kenneth H. Brown (CA Bar No. 100396)
Gillian N. Brown (CA Bar No. 205132)
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA  90067
Telephone:  (310) 277-6910
Facsimile:  (310) 201-0760
E-mail:  jstang@pszjlaw.com
        kbrown@pszjlaw.com
        gbrown@pszjlaw.com

DOCS_LA:254200.2  05058-003

The Official Committee of Unsecured Creditors (the "Committee") moves this Court for an order granting partial summary judgment to the Committee pursuant Federal Rule of Civil Procedure 56, which is applicable to this adversary proceeding through Federal Rule of Bankruptcy Procedure 7056.  This motion seeks a summary adjudication of Count III of the *Amended Complaint* [Docket No. 34] (the "Amended Complaint") filed by the Archbishop of the Archdiocese of Milwaukee (the "Debtor"), in his capacity as trustee of an alleged trust the Debtor contends it established for the perpetual care of its cemeteries (the "Cemetery Trust") and into which the Debtor transferred approximately $55 million in 2008.  The Committee contends, among other things, that the transfer is both actually and constructively fraudulent under the Bankruptcy Code and Wisconsin law, that the Cemetery Trust is a voidable self-settled trust in which the Debtor is a beneficiary, and that the funds transferred into the Cemetery Trust are property of the Debtor's estate.  In Count III of the Amended Complaint, the Cemetery Trust contends that avoiding the transfer of the funds to the Cemetery Trust pursuant to Wisconsin fraudulent transfer law or applying any provision of the Bankruptcy Code by which the Cemetery Trust funds could be determined to be property of the Debtor's estate would substantially burden its free exercise of religion in violation of the Religious Freedom Restoration Act of 1993 (42 U.S.C. § 2000bb *et seq*.)  ("RFRA") and the First Amendment to the United States' Constitution (the "First Amendment").

The Committee also seeks a summary adjudication on the Committee's Seventeenth Affirmative Defense (Federal bankruptcy laws (and particularly sections 541, 542, 544, 547, 548, 549 and 550) are neutral, generally applicable laws, which are valid under the Religion

Clauses of the First Amendment to the United States' Constitution), Twentieth Affirmative Defense ( RFRA  is unconstitutional as applied to state law) and Twenty-Second Affirmative Defense (RFRA is not applicable when the government is not party to the suit).

As is set forth in detail in the *Memorandum of Law in Support of Motion for Summary Judgment on Count III of Amended Complaint* filed concurrently herewith, the Committee is entitled to summary judgment because there is no genuine issue as to a material fact and the Committee is entitled to judgment as a matter of law.

Dated:     May 25, 2012                          Respectfully submitted,

                                                 PACHULSKI STANG ZIEHL & JONES LLP


                                      By     */s/ Kenneth H. Brown*
                                             James I. Stang (CA Bar No. 94435)
                                             Kenneth H. Brown (CA Bar No. 100396)
                                             Gillian N. Brown (CA Bar No. 205132)
                                             Pachulski Stang Ziehl & Jones LLP
                                             10100 Santa Monica Blvd., 13th Floor
                                             Los Angeles, CA  90067
                                             Telephone:  (310) 277-6910
                                             Facsimile:  (310) 201-0760
                                             E-mail:     jstang@pszjlaw.com
                                                         kbrown@pszjlaw.com
                                                         gbrown@pszjlaw.com

                                             -and-

                                             Albert Solochek (State Bar No. 1011075)
                                             Jason R. Pilmaier (State Bar No. 1070638)
                                             Howard, Solochek & Weber, S.C.
                                             324 E. Wisconsin Ave., Suite 1100
                                             Milwaukee, WI  53202
                                             Telephone:  (414) 272-0760
                                             Facsimile:  (414) 272-7265
                                             E-mail:     asolochek@hswmke.com
                                                         jpilmaier@hswmke.com

                                             Attorneys for the Official Committee of Unsecured Creditors

2

Dated:      May 25, 2012

By      /s/ Marci A. Hamilton, Esq.
              Marci A. Hamilton, Esq.
              36 Timber Knoll Drive
              Washington Crossing, PA  18977
              (215) 353-8984
              Hamilton.marci@gmail.com

              Special Counsel to the Official Committee of
              Unsecured Creditors

3

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| In re: | Chapter 11 |
| Archdiocese of Milwaukee, | Bankruptcy Case No. 11-20059-SVK |
| Debtor. | |

| | |
|---|---|
| Archbishop Jerome E. Listecki, as Trustee of the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust, | Adv. Proc. No. 11-02459-SVK |
| Plaintiff, | |
| vs. | |
| Official Committee of Unsecured Creditors, | |
| Defendant. | |

Official Committee of Unsecured Creditors,

Counterclaimant,

vs.

Archbishop Jerome E. Listecki, as Trustee of the
Archdiocese of Milwaukee Catholic
Cemetery Perpetual Care Trust,

Counterdefendant.

## MEMORANDUM OF LAW IN SUPPORT OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION FOR SUMMARY JUDGMENT ON COUNT III OF AMENDED COMPLAINT

James I. Stang (CA Bar No. 94435)
Kenneth H. Brown (CA Bar No. 100396)
Gillian N. Brown (CA Bar No. 205132)
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail: jstang@pszjlaw.com
         kbrown@pszjlaw.com
         gbrown@pszjlaw.com
DOCS_LA:254121.1 05058-003

## Table of Contents

INTRODUCTION ................................................................................................................................ 1

FACTS .............................................................................................................................................. 2

ARGUMENT ...................................................................................................................................... 5

I.      Legal Standard ................................................................................................................. 5

II.     Summary Judgment Should Be Granted Against the Plaintiff on the
Claims Under the Religious Freedom Restoration Act ......................................... 6

        A.    RFRA Does Not Create a Cause of Action Against Non-
Government Actors. .............................................................................. 6

        B.    RFRA May Not Be Applied to Modify, Preempt or Trump State
Law. ...................................................................................................... 12

III.    Summary Judgment Should Be Granted Against the Plaintiff for Claims
Under the First Amendment Free Exercise Clause ............................................. 15

CONCLUSION ................................................................................................................................. 21

i

## Table of Authorities
### CASES

*Alexander v. Sandoval,*
  532 U.S. 275 (2001)................................................................................................................. 9
*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986)................................................................................................................. 5
*Boerne v. Flores,*
  521 U.S. 507 (1997)............................................................................................................... 12
*Brownson v. Bogenschutz,*
  966 F. Supp. 795 (E.D. Wis. 1997)......................................................................................... 9
*Butner v. United States,*
  440 U.S. 48 (1979)................................................................................................................. 13
*Caminetti v. U.S.,*
  242 U.S. 470 (1917)................................................................................................................. 8
*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986)................................................................................................................. 5
*Church of Lukumi Babalu Aye v. City of Hialeah,*
  508 U.S. 520 (1993)............................................................................................................... 17
*City of Cleburne v. Cleburne Living Ctr.,*
  473 U.S. 432 (1985)............................................................................................................... 16
*Civil Liberties for Urban Believers v. City of Chicago,*
  342 F.3d 752 (7th Cir. 2003) ............................................................................................ 16, 17
*Employm't Div. v. Smith,*
  494 U.S. 872 (1990)............................................................................................................... 17
*Fuel Oil Supply and Terminaling v. Gulf Oil Corp.,*
  762 F.2d 1283 (5th Cir.1985) ................................................................................................ 11
*Hartford Underwriters Ins. Co. v. Union Planters Bank,*
  530 U.S. 1 (2000)..................................................................................................................... 8
*Hosanna-Tabor Evangelical Lutheran Church School v. EEOC,*
  ___ U.S. ___, 132 S.Ct. 694, 181 L.Ed. 2d 650 (2012)...................................................... 1, 9
*In re Bloch,*
  207 B.R. 944 (Bankr. D. Colo. 1997).................................................................................... 17
*In re Dow Corning Corp.,*
  255 B.R. 445 (E.D. Mich. 2000)............................................................................................ 11
*In re Gomes,*
  219 B.R. 286 (Bankr. D. Or. 1998)........................................................................................ 17
*In re Meyer,*
  467 B.R. 451 (Bankr. E.D. Wis. 2012) .................................................................................. 20
*In re Navarro,*
  83 B.R. 348 (Bankr. E.D. Pa. 1988) ...................................................................................... 20
*In Re Newman,*
  183 B.R. 239 (Bankr. D. Kan. 1995) ..................................................................................... 19
*In re Roman Catholic Archbishop of Portland in Oregon,*
  335 B.R. 842 (Bankr. D. Or. 2005)................................................................................... 13, 18
*In re Smart World Technologies, LLC,*
  423 F.3d 166 (2d Cir. 2005)................................................................................................... 10

*In re Turner,*
193 B.R. 548 (Bankr. N.D. Cal. 1996) ................................................................................ 20
*Int'l Union of Operating Eng'rs, Local 150 v. Ward,*
563 F.3d 276 (7th Cir. 2009) .................................................................................................. 9
*Lamie v. U.S. Trustee,*
540 U.S. 526 (2004)................................................................................................................ 8
*McNeal v. Macht,*
763 F. Supp. 1458 (E.D. Wis. 1991)....................................................................................... 6
*Sherbert v. Verner,*
374 U.S. 398 (1963)....................................................................................................... 16, 17
*St. Johns United Church of Christ,*
502 F.3d 616 (7ᵗʰ Cir. 2007) ............................................................................................... 16
*Starnes v. Capital Cities Media, Inc.,*
39 F.3d 1394 (7ᵗʰ Cir. 1994) .............................................................................................. 10
*Tate v. Jenkins,*
No. 09-CV-169, 2010 U.S. Dist. LEXIS 108263 (E.D. Wis. Sept. 24, 2010)............................ 5
*Tomic v. Catholic Diocese of Peoria,*
442 F.3d 1036 (7ᵗʰ Cir. 2006) .......................................................................................... 1, 9
*Touche Ross & Co. v. Redington,*
442 U.S. 560 (1979)................................................................................................................ 8
*United States v. Kras,*
409 U.S. 434 (1973)............................................................................................................. 19
*Vision Church v. Vill. Of Long Grove,*
468 F.3d 975 (7ᵗʰ Cir. 2006) .............................................................................................. 16

## STATUTES

11 U.S.C. § 101................................................................................................................ 7
11 U.S.C. § 110.............................................................................................................. 20
11 U.S.C. § 1103............................................................................................................ 10
11 U.S.C. § 330.............................................................................................................. 11
11 U.S.C. § 503.............................................................................................................. 10
11 U.S.C. § 541....................................................................................................... passim
11 U.S.C. § 542......................................................................................................... 3, 4
11 U.S.C. § 544....................................................................................................... passim
11 U.S.C. § 547....................................................................................................... 4, 18
11 U.S.C. § 548.................................................................................................. 4, 17, 18
11 U.S.C. § 549....................................................................................................... 4, 18
11 U.S.C. § 550....................................................................................................... 4, 13
42 U.S.C. § 2000...................................................................................................... passim
U.S. Const. amend. I....................................................................................... 1, 4, 16, 20
Wis. Stat. § 242...................................................................................................... 4, 13
Wis. Stat. § 701...................................................................................................... 3, 13

## OTHER AUTHORITIES

Mary Jo Newborn Wiggins, *A Statute of Disbelief?: Clashing Ethical Imperatives in Fraudulent Transfer Law,*
48 S.C. L. Rev. 771, 784 (1997) ....................................................................................... 18, 19

# RULES

Fed. R. Bankr. P. 7056..................................................................................................................... 5
Fed. R. Civ. P. 56............................................................................................................................ 5

iv

## INTRODUCTION

In 2008, the Archdiocese of Milwaukee (the "Debtor") transferred approximately fifty-five million dollars into a trust it contends it established for the perpetual care of its cemeteries (the "Cemetery Trust"). The Official Committee of Unsecured Creditors (the "Committee") contends, among other things, that the transfer is both actually and constructively fraudulent under the Bankruptcy Code and Wisconsin law, that the Cemetery Trust is a voidable self-settled trust in which the Debtor is a beneficiary and that the funds transferred into the Cemetery Trust are property of the Debtor's estate. The Cemetery Trust contends that avoiding the transfer of the funds to the Cemetery Trust pursuant to Wisconsin fraudulent transfer law or applying any provision of the Bankruptcy Code by which the Cemetery Trust funds could be determined to be property of the Debtor's estate would substantially burden its free exercise of religion in violation of the Religious Freedom Restoration Act of 1993 (42 U.S.C. § 2000bb *et seq.*) ("RFRA") and the First Amendment to the United States' Constitution (the "First Amendment").

As a matter of law, summary judgment should be granted against the Cemetery Trust's RFRA and First Amendment claims for three reasons. First, RFRA provides a cause of action only against "a government." Based on this plain language providing that relief under the statute can only be obtained against "***a government***," the United States Court of Appeals for the Seventh Circuit has stated that "***RFRA is applicable only to suits to which the government is party.***" *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006) ) (emphasis added), *cert. denied*, 549 U.S. 881 (2006), *abrogated on other grounds, Hosanna-Tabor Evangelical Lutheran Church School v. EEOC*, ___ U.S. ___, 132 S.Ct. 694, 181 L.Ed. 2d 650 (2012). The

Committee is a private non-government actor standing in the shoes of the Debtor's estate which is also a non-government actor. Therefore, the Cemetery Trust cannot state a RFRA claim against it. Nor may RFRA be applied to state law, such as the Wisconsin fraudulent transfer and trust laws that are at issue in the litigation. Finally, the Cemetery Trust's claims that the application of neutral, generally applicable provisions of the Bankruptcy Code violate its First Amendment free exercise claims are without merit as a matter of law.

## FACTS

1.    On April 2, 2007, the Archdiocese of Milwaukee (the "Debtor"), as trustor, and Timothy M. Dolan, the former Archbishop of Milwaukee, in his official capacity as Archbishop, as trustee, executed the Trust Agreement Creating the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust (the "Cemetery Trust Agreement").[1] [*Declaration of Kenneth H. Brown In Support of Motion for Summary Judgment on Count II of Amended Complaint*, ¶ 2, Exhibit A thereto (the "Brown Declaration").] In March 2008, the Debtor transferred over $55 million into a Cemetery Trust account at U.S. Bank. [*See First Amended Answer to Amended Complaint and Affirmative Defenses; And First Amended Counterclaims* [Docket No. 50] (the "Committee's Answer & Counterclaims"), ¶ 43; *Answer and Affirmative Defenses to First Amended Counterclaims* [Docket No. 56] (the "Cemetery Trust's Answer"), ¶ 34.]

2.    On January 4, 2011, the Debtor filed a petition under chapter 11 of the United States Bankruptcy Code.

---

[1] The Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust shall be referred to as the "Cemetery Trust."

3.     On January 13, 2012, the current Archbishop of the Archdiocese of Milwaukee, ("Plaintiff") filed the *Amended Complaint* [Docket No. 34] (the "Cemetery Trust's Amended Complaint") in his capacity as trustee of the Cemetery Trust against the Committee. The Amended Complaint seeks a declaration that neither the Cemetery Trust, nor the assets in the Cemetery Trust are property of the Debtor's estate under Bankruptcy Code section 541. Pursuant to Count III of the Amended Complaint, Plaintiff also seeks a declaration that the use of the Bankruptcy Code to make the assets of the Cemetery Trust property of the estate would violate RFRA and/or the First Amendment to the United States' Constitution.

4.     Pursuant to the authority granted to the Committee by the Order Approving Second Stipulation Regarding the Official Committee of Unsecured Creditors' Standing to Defend the Adversary Proceeding, Bring Avoidance Claims Related to the Adversary Complaint, and Litigate and Propose or Accept a Settlement of the Adversary Proceeding, or Part Thereof [Docket No. 39], on April 11, 2012, the Committee filed its First Amended Answer to Amended Complaint and Affirmative Defenses; and First Amended Counterclaims [Docket No. 50], in which it contends, among other things, that the Cemetery Trust is void under state law (Wis. Stat. section 701.06.(6)) because it is a self-settled trust in which the Debtor is a beneficiary and that that the assets in the Cemetery Trust are therefore property of the estate and subject to turnover under Bankruptcy Code section 542 (First Counterclaim). The Committee also contends that it is entitled to declaratory relief that the assets in the Cemetery Trust are property of the estate pursuant to sections 541(a)(1) and 544(a) of the Bankruptcy Code and Wisconsin Statutes section 701.06.(6) (Second Counterclaim). In addition, the Committee seeks the avoidance and

recovery of the $55 million transfer as a fraudulent transfer pursuant to Bankruptcy Code

sections 548(e)(1) and 550. (Ninth Counterclaim). Pursuant to the powers granted to the estate

under section 544(b), the Committee seeks to avoid the transfer to the Cemetery Trust under

Wisconsin Statutes sections 242.04(1)(a), 242.04(1)(b), 242.05(1) and 242.07 (Sixth-Eighth

Counterclaims). It also seeks to recover subsequent transfers to the Cemetery Trust prior to the

Petition Date as fraudulent transfers (Tenth-Fifteenth Counterclaims) and as preferential and

unauthorized post petition transfers pursuant to sections 547 and 549 of the Bankruptcy Code

(Sixteenth-Seventeenth Counterclaims).

5.    Furthermore, in its affirmative defenses to Count III of the Cemetery Trust's

Amended Complaint, the Committee contends that federal bankruptcy laws (and specifically

Bankruptcy Code sections 541, 542, 544, 547, 548, 549 and 550) are neutral, generally

applicable laws which are valid under the Religion Clauses of the First Amendment of the

United States' Constitution (Affirmative Defense 17), RFRA is unconstitutional as applied to

state law (Affirmative Defense 20), and RFRA is not applicable when the government is not

party to the suit. (Affirmative Defense 22).

6.    On May 2, 2012, Plaintiff filed his *Answer and Affirmative Defenses to First

Amended Counterclaims* [Docket No. 56] (the "Cemetery Trust's Answer").

7.    This Motion seeks a summary adjudication of Count III of Plaintiff's Amended

Complaint and the Committee's Seventeenth Affirmative Defense (Federal bankruptcy laws (and

particualry sections 541, 542, 544, 547, 548, 549 and 550) are neutral, generally applicable laws,

which are valid under the Religion Clauses of the First Amendment to the United States'

Constitution); Twentieth Affirmative Defense (RFRA is unconstitutional as applied to state law)

and Twenty-Second Affirmative Defense (RFRA is not applicable when the government is not

party to the suit).

## ARGUMENT

### I.    Legal Standard

8.    Federal Rule of Civil Procedure 56 (which applies in bankruptcy proceedings by

virtue of Federal Rule of Bankruptcy Procedure 7056) provides that the court shall grant

summary judgment if the movant shows that there is "no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Fed. R. Bankr.

P. 7056(a). A fact is "material" for summary judgment purposes if, under the applicable

substantive law, it might affect the outcome of the lawsuit. *See Tate v. Jenkins*, No. 09-CV-169,

2010 U.S. Dist. LEXIS 108263, at *2 (E.D. Wis. Sept. 24, 2010). A dispute over material facts is

"genuine" if " 'the evidence is such that a reasonable jury could return a verdict for the

nonmoving party.' " *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

9.    The party seeking summary judgment has the burden of showing the absence of a

genuine issue of material fact and its entitlement to judgment as a matter of law. *Tate*, 2010 U.S.

Dist. LEXIS 108263, at *2-*3. When the party opposing summary judgment has the ultimate

burden of proof at trial, however, that party retains its burden of producing evidence that would

support a reasonable verdict. *Id.* at *3; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (Rule

56 mandates the entry of summary judgment against a party "who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial."); *McNeal v. Macht*, 763 F. Supp. 1458, 1461 (E.D.

Wis. 1991). As is set forth below, the Committee is entitled to summary judgment with respect

to Plaintiff's RFRA and First Amendment claims because there is no genuine issue of material

fact and the Committee is entitled to judgment as a matter of law.

## II. Summary Judgment Should Be Granted Against the Plaintiff on the Claims Under the Religious Freedom Restoration Act.

10. The Cemetery Trust's RFRA claims fail as a matter of law for two reasons. First,

RFRA does not create a cause of action against private non-government actors. Second, RFRA

may not be applied to modify, preempt or trump state law.

### A. RFRA Does Not Create a Cause of Action Against Non-Government Actors.

11. The Cemetery Trust has asserted claims under RFRA against the Committee.

These claims may not go forward because RFRA only creates a cause of action against "a

government," and the Committee is a private party.

#### 1. The plain language of RFRA only permits relief against "a government."

12. RFRA provides:

- (a) General. Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

- (b) Exception. Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person-(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

- (c) Judicial relief. A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain

appropriate relief *against a government*. Standing to assert a
claim or defense under this section shall be governed by the
general rules of standing under article III of the Constitution.

42 U..S.C. § 2000bb-1 (2012) (emphasis supplied).

## 2. The Committee is not a government actor subject to a claim under RFRA.

13. A creditors' committee in a bankruptcy proceeding is not included in the

definition of "government" under RFRA. *Id.* § 2000bb-2(1) ("The term 'government' includes a

branch, department, agency, instrumentality and official (or other person acting under color of

law) of the United States, or of a covered entity."). The Committee is not a branch, department,

agency or instrumentality of the United States. Nor is it an official (or other person acting under

color of law) of any of the foregoing. Furthermore, there are no cases holding that a creditors'

committee is "a government" under RFRA.

14. The Bankruptcy Code also treats creditors' committees as private, non-

governmental actors. For example, a creditors' committee is not included in the Bankruptcy

Code's definition of "governmental unit," which provides:

The term "governmental unit" means United States; State; Commonwealth;
District; Territory; municipality; foreign state; department, agency, or
instrumentality of the United States (but not a United States trustee while serving
as a trustee in a case under this title), a State, a Commonwealth, a District, a
Territory, a municipality, or a foreign state; or other foreign or domestic
government.

11 U.S.C. § 101(27).[2]

---

[2] The Bankruptcy Code's treatment of a creditors' committee as a nongovernmental entity is underscored by the fact that only "persons" are eligible to serve on a creditors' committee and the Bankruptcy Code's definition of "person" specifically excludes "governmental units," with a narrow exception that permits only certain government creditors to serve on committees. *See* 11 U.S.C. § 101(45). No governmental units are members of the Committee. [*See Notice of Appointment of Committee of Unsecured Creditors* [Bankruptcy Case Docket No. 86].]

### 3.  The RFRA claims against the Committee fail as a matter of law.

15.     As the plain language of RFRA creates a cause of action only against "a

government" and a creditors' committee is a private party, Plaintiff's RFRA claims must fail as a

matter of law.  The plain language of a statute controls its interpretation, and federal courts must

first look to the language of a statute to determine its meaning. *See e.g., Caminetti v. U.S.*, 242

U.S. 470, 485 (1917) ("It is elementary that the meaning of a statute must, in the first instance,

be sought in the language in which the act is framed..."); *Lamie v. U.S. Trustee*, 540 U.S. 526,

534 (2004) (holding that when the language of a statute is clear, courts should enforce it pursuant

to its literal meaning).

16.     It is particularly important for courts to follow a legislature's plain meaning when

the subject is the existence of a cause of action. *Hartford Underwriters Ins. Co. v. Union

Planters Bank,* 530 U.S. I, 6 (2000) ("[W]hen the statute's language is plain, the sole function of

the courts--at least where the disposition required by the text is not absurd--is to enforce it

according to its terms."); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 571 (1979) (noting that

where plain language of the statute did not provide for a cause of action, courts must assume

Congress did not intend to create one).

17.     The fundament principle of separation of powers is violated if courts ignore the

plain language of the statute and create a right of action where it is not provided for in the statute.

This is an impermissible judicial rewrite of the statute. *See, e.g., Touche Ross  v. Redington*, 442

U.S. at 568 ("The question of the existence of a statutory cause of action is, of course, one of

statutory construction. . . . And as with any case involving the interpretation of a statute, our

analysis must begin with the language of the statute itself."); *Int'l Union of Operating Eng'rs,*

*Local 150 v. Ward*, 563 F.3d 276, 282 (7th Cir. 2009) ("Whether express or implied, however,

we remain mindful that it is Congress, not this or any other court, that creates private causes of

action to enforce federal law."), *cert. denied*, ___ U.S. ___, 130 S.Ct. 442, 175 L.Ed.2d 271

(2009); *Alexander v. Sandoval*, 532 U.S. 275, 285-86 (2001) (Without plain congressional intent,

"a cause of action does not exist and courts may not create one, no matter how desirable that

might be as a policy matter, or how compatible with the statute.").

18.    To permit the Plaintiff to assert RFRA against a private party (or as a defense to

claims by a private party) would require this Court to create a new cause of action in violation of

the plain meaning of the statute and the constitutionally mandated separation of powers. The

Seventh Circuit has articulated precisely this view, succinctly stating in dictum that ***"RFRA is***

***applicable only to suits to which the government is a party."*** *Tomic v. Catholic Diocese of*

*Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006), *cert. denied*, 549 U.S. 881 (2006), *abrogated on*

*other grounds, Hosanna-Tabor Evangelical Lutheran Church School v. EEOC*, ___ U.S. ___,

132 S.Ct. 694, 181 L.Ed. 2d 650 (2012). Accordingly, the Seventh Circuit Court of Appeals has

never entertained a RFRA claim against a non-government actor.

### 4. The Committee, as a private party, was neither acting "under color of law" or nor "willfully participating in joint action with government officials.

19.    There are only two instances in which a private party might be construed to be a

government actor; neither is implicated here. First, a private party might be subject to RFRA if

"acting under color of law." 42 U.S.C. § 2000bb-2(1); *Brownson v. Bogenschutz*, 966 F. Supp.

795, 798 (E.D. Wis. 1997). That occurs *only* when the "state has so implicated itself in the

defendant's action that the state has in effect compelled the action. " *Starnes v. Capital Cities Media, Inc.*, 39 F.3d 1394, 1396 (7th Cir. 1994). Simply following and/or enforcing generally applicable law such as the provisions of the Bankruptcy Code, as the Committee does in the performance of its duties, does not constitute acting under color of law. Plaintiff's Amended Complaint does not and cannot allege that the Committee has acted under color of law, and it has not done so. Rather, the Committee has and is acting solely as a private actor.

20.    Second, a private actor might be subject to a RFRA claim if it "willfully participated in joint action with state officials." *Starnes*, 39 F.3d. at 1396. Plaintiff's Amended Complaint does not allege that the Committee has acted with any state official, let alone willfully participated in joint action with state officials. Nor could it prove that the Committee had done so. The Committee is a collection of independent, individual, private creditors of the Debtor who represent the interests of a larger class of unsecured creditors. A committee acts on behalf of the members of its constituent class and has a fiduciary duty to protect the interests of that class. *See In re Smart World Technologies, LLC*, 423 F. 3d 166, 175 n. 12 (2d Cir. 2005). While the United States Trustee's Office appoints the members of a committee (subject to their agreement to serve), a committee elects its own chairperson, enacts its own bylaws, and functions entirely independently of the Office of the United States Trustee. It acts independently to, among other things, consult with the debtor in possession on administration of the case, investigate the debtor's conduct, business operations, assets and liabilities, and participate in formulating a plan. 11 U.S.C. § 1103. The committee's expenses (11 U.S.C. § 503(b)(3)(f)) and

the fees and expenses of its professionals (11 U.S.C. §§ 330(a)(1), 503(b)(2)) are paid by the debtor's estate, not by any governmental entity.

21.    Courts have held, in other contexts, that creditors' committees are non-government private parties, and that their actions in connection with a bankruptcy cannot be viewed as governmental actions or as part of a government action. *See In re Dow Corning Corp.*, 255 B.R. 445, 524 (E.D. Mich. 2000) (rejecting the argument that an approved joint plan of reorganization proposed by the debtor and the creditors' committee violated a creditor's constitutional rights and noting, "Appellants have cited no authority that a Bankruptcy Court or any court's approval of an order establishes a governmental action. A governmental action is required to state a constitutional claim and a mere approval of or acquiescence in the initiatives of a **private party** is not sufficient to justify holding the government responsible for those initiatives.") (emphasis added); *In Fuel Oil Supply and Terminaling v. Gulf Oil Corp.*, 762 F.2d 1283, 1284-85 (5th Cir.1985) (holding that a creditors' committee did not have an unconditional right to intervene in an adversary proceeding and stating, "Courts have been hesitant to find unconditional statutory rights of intervention . . . . [t]he statutes that do confer an absolute right to intervene generally confer that right upon the United States or a federally regulatory commission; **private parties** are rarely given an unconditional statutory right to intervene.") (emphasis added).[3]

---

[3] Plaintiff appears to have conceded that the Committee is a private, nongovernmental party. If the Committee were an instrumentality or branch of the United States, Federal Rule of Bankruptcy Procedure 7004 would have required Plaintiff to serve the summons on the Office of the United States Attorney and the Attorney General. Fed. R. Bankr. P. 7004(i). It did not do so. Instead, the summons was served on counsel to the Committee under the rule for non-government private actors. Fed. R. Bankr. P. 7004(e). [*Certificate of Service of Summons in An Adversary Proceeding* [Docket No. 3]].

22.    This Amended Complaint by the Cemetery Trust against the Committee is not a suit against the government, or against a private actor acting under color of state law or jointly with the government. To allow the Cemetery Trust's RFRA claims to proceed against a non-government actor like the Committee would require the Court to create a new federal cause of action which is not provided for in the statute. The creation of this new cause of action is the sole province of Congress. On the basis of the plain language of the statute, the Cemetery Trust may not assert RFRA claims against the Committee. The Committee respectfully requests this Court enter summary judgment against the Cemetery Trust on all of its RFRA claims.

### B. RFRA May Not Be Applied to Modify, Preempt or Trump State Law.

23.    The Cemetery Trust also attempts to use RFRA to modify, preempt, or trump state law. [Plaintiff's Amended Complaint ¶ 72]. These arguments fail as a matter of law. In *Boerne v. Flores*, 521 U.S. 507 (1997), the Supreme Court held that RFRA was a violation of (1) the inherent limitations of federalism (*Id.* at 534); (2) the separation of powers (*Id.* at 536), and (3) the procedures for constitutional amendment in Article V of the Constitution (*Id.* at 529).[4] At a bare minimum, RFRA is beyond Congress's power to regulate the states and any attempt to modify, preempt, or trump state law through RFRA is unconstitutional.

24.    At issue in this adversary proceeding is whether the funds held in the Cemetery Trust and/or the Cemetery Trust itself are property of the estate and whether transfers of property from the Debtor to the Cemetery Trust may be avoided. While Bankruptcy Code section 541 defines what property of the debtor's becomes part of the bankruptcy estate, the nature and

---

[4] Were this Court to deny summary judgment on the RFRA issues, the Creditors' Committee reserves its rights to contest whether RFRA is constitutional as applied to federal law.

extent of the debtor's interest in that property is governed by state law. *See Butner v. United States,* 440 U.S. 48, 55 (1979). In order to determine whether funds transferred to the Cemetery Trust are property of the Debtor's estate, the Court will have to determine, for example, whether the funds transferred by the Debtor to the Cemetery Trust were held in a resulting trust under Wisconsin law prior to the time they were transferred as alleged by the Debtor and the Cemetery Trust and whether the Cemetery Trust is void as a self-settled trust in which the Debtor is a beneficiary pursuant to Wisconsin Statutes section 701.06(6). RFRA cannot apply to a determination of a status of property that is governed solely by state law. *In re Roman Catholic Archbishop of Portland in Oregon,* 335 B.R. 842, 860 (Bankr. D. Or. 2005) ("I question whether RFRA applies at all to a determination of what is property of the estate under section 541. Section 541 merely defines what property is included in a bankruptcy estate; issues such as ownership of property are determined by application of state law. It is not clear to me how RFRA applies to a determination of a status, that is, ownership of property, that is a result of application of state law.").

  25.  In addition, five of the fraudulent transfer couterclaims are brought under Wisconsin state law (in conjunction with the standing granted to the Committee pursuant to Bankruptcy Code section 544(b)), specifically: the Seventh Counterclaim (Bankruptcy Code §§ 544(b), 550 and Wis. Stats. §§ 242.04(1)(b), 242.07), the Eight Counterclaim (Bankruptcy Code §§ 544(b), 550 and Wis. Stats. §§ 242.05(1), 242.07), the Twelfth Counterclaim (Bankruptcy Code §§ 544(b), 550 and Wis. Stats. §§ 242.04(1)(a), 242.07), the Fourteenth Counterclaim

(Bankruptcy Code §§ 544(b), 550 and Wis. Stats. §§ 242.04(1)(b), 242.07), and the Fifteenth

Counterclaim (Bankruptcy Code §§ 544(b), 550 and Wis. Stats. §§ 242.05(1), 242.07).

26.    While a federal law (Bankruptcy Code section 544(b))[5] enables the trustee (and

here, by permission, the Committee) to stand in the shoes of a creditor who can assert a

fraudulent conveyance action under state law, the underlying cause of action for the recovery of

the fraudulent conveyance itself is brought under state law. Any "substantial" burden that is

placed on a transferee's religious practice is imposed on it by the recovery of the transfer itself,

which is effectuated under state law, not on the grant of standing to the trustee/committee.[6]

*Boerne* prohibits the application of RFRA. The transferee suffers the same burden irrespective

of the application of section 544(b) because outside of bankruptcy any creditor of the Debtor

could sue the Cemetery Trust to avoid the transfers from the Debtor under Wisconsin law

unimpeded by RFRA . Allowing the Cemetery Trust to obtain insulation from avoidance actions

---

[5] Bankruptcy Code section 544 provides, "(1) Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502 (e) of this title." 11 U.S.C. 544(b)(1).

[6] In *In re Roman Catholic Archbishop of Portland in Oregon, supra,* the creditors committee sought to use Bankruptcy Code section 544 to avoid the unrecorded interests that the parishes were claiming in real property. The committee argued that the Archdiocese failed to prove there was a substantial burden under RFRA. The Court found that there was a question of fact on whether a substantial burden had been imposed, and denied summary judgment on the section 544 claims. The committee did not argue that RFRA could not be applied because the underlying cause of action was a state law cause of action. However, the court did note that 544(a)(3) was a federal law that had the potential "to alter the property rights of the debtor and a third party in property titled in the debtor's name on the date of bankruptcy. It gives to the bankruptcy trustee (or someone authorized to exercise the powers of the trustee) the ability to avoid certain interests in real property that would not be avoidable under state law if there were no actual bona fide purchaser of real property." *Id.* at 863. The Committee respectfully suggests that the Archbishop of Portland case was incorrectly decided on this issue in light of *Boerne.* In addition, it is distinguishable. Section 544(a)(3) actually creates a substantive right by giving the trustee the rights of a bona fide purchaser of real popery, **whether or not one actually exists.** This federally created right is qualitatively different than that granted by section 544(b)(1) which simply permits the trustee to step into the shoes of an actual creditor who had the right to file a fraudulent transfer action under state law outside of bankruptcy. In the former, the federal statute arguably grants a substantive right by creating a hypothetical BFP. In the latter, the trustee is merely asserting a right under state law as the representative of a creditor who actually exists.

as the result of the Debtor's election to file a chapter 11 petition flies in the face of logic,

common sense and the clear purpose of the Bankruptcy Code and section 544 which is to

expand the estate's rights to recover transfers by the Debtor not contract them.[7] As state law may

not be not be re-interpreted through the lens of RFRA, summary judgment should be granted on

the RFRA claims.

### III.  Summary Judgment Should Be Granted Against the Plaintiff for Claims Under the First Amendment Free Exercise Clause

27.     The Cemetery Trust also argues its rights to the free exercise of religion are

unconstitutionally burdened by any provision of the Bankruptcy Code whose application would

result in the funds held in the Cemetery Trust becoming property of the Debtor's estate. [8]

[Cemetery Trust's Amended Complaint, ¶¶ 72-76.] While the Plaintiff did not identify these

allegedly unconstitutional provisions of the Bankruptcy Code, the Plaintiff appears to argue, for

example, that even if the Cemetery Trust was not validly formed or is voidable under Wisconsin

law, Bankruptcy Code section 541 cannot be constitutionally applied to determine the status of

the assets in the Cemetery Trust as property of the estate. The Plaintiff also appears to argue that

even assuming that the Debtor fraudulently transferred the $55 million (and/or other funds) to the

---

[7] See *Committee of Tort Litigants v. Catholic Diocese of Spokane (In re Catholic Diocese of Spokane)* , 329 B.R. 304, 324 n.5 (Bankr. E.D. Wash. 2005). ("If application of a particular Code section would constitute a substantial burden on religion, the appropriate remedy would be dismissal of the bankruptcy case. The Code is an integrated statutory scheme. Bankruptcy debtors who voluntarily choose to participate in that statutory scheme, even those of a religious nature, should not be able to pick and choose among Code sections."), *reversed in part*, 364 B.R. 81, (E.D. Wash. 2006).

[8] The First Amendment provides, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. CONST. amend 1.

Cemetery Trust, the avoidance provisions, including section 544 of the Bankruptcy Code and/or Wisconsin law cannot be constitutionally applied to recover the fraudulently transferred funds.[9]

28.    This is an indefensible argument. It is well settled that neutral, generally applicable laws are subject to rationality review under the First Amendment's Free Exercise Clause. *Vision Church v. Vill. Of Long Grove*, 468 F.3d 975, 1001 (7th Cir. 2006) (finding that the municipal ordinances challenged by the church did not classify on the bases of race, national origin, or religion, and therefore applying only rational basis scrutiny to the Church's claims, noting that the Church must demonstrate "governmental action wholly impossible to relate to legitimate governmental objectives"); *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752,762-65 (7th Cir. 2003) (holding Chicago Zoning Ordinance, as a law of neutral general applicability did not violate Free Exercise Clause with respect to churches required to apply for special use permit and affirmed the district court's holding that the zoning ordinance satisfied rationality review).

29.    Rationality review requires no more than a showing that the government has a rational basis for the law. *See Sherbert v. Verner*, 374 U.S. 398, 406 (1963); *St. Johns United Church of Christ*, 502 F.3d 616, 637-38 (7th Cir. 2007) ("If no fundamental rights or suspect categories are at issue, '[t]he general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.'") (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)).

---

[9] The Committee assumes that the Debtor's constitutional argument applies to, at the very least, sections 541, 542, 544, 547, 548 and 549 (the "Challenged Bankruptcy Provisions").

30.    A more exacting standard – strict scrutiny -- is reserved for instances in which the law is either not neutral or not generally applicable. *See Employm't Div. v. Smith*, 494 U.S. 872, 879-80 (1990); *Sherbert v. Verner*, 374 U.S. at 406; *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 542 (1993) ("These ordinances are not neutral, and the court below committed clear error in failing to reach this conclusion." Therefore, strict scrutiny was required.). Strict scrutiny requires the government to show that there is a compelling interest supporting the law and that the law is narrowly tailored to the ends sought. *See Lukumi,* 508 U.S. at 531-32.

31.    The Challenged Bankruptcy Provisions are neutral and generally applicable and, therefore, constitutional under the Free Exercise Clause. *See Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752 (7th Cir. Ill. 2003) (municipal zoning ordinance that was amended to treat churches equally with secular assemblies was found to be both neutral and generally applicable, and thus not in violation of statutory and constitutional prohibitions on the free exercise of religion, and plaintiff churches found locations in the city), *cert. denied*, 541 U.S. 1096 (2004); *In re Gomes*, 219 B.R. 286, 295-96 (Bankr. D. Or. 1998) (finding sections 548(a)(2) and 544(b) neutral and generally applicable, because each has a clear secular purpose, the primary effect of which neither advances nor inhibits religion, the statutes are constitutional); *In re Bloch*, 207 B.R. 944, 950 (Bankr. D. Colo. 1997) (finding section 548(a) to be both "neutral and generally applicable and its effect on the practice of tithing purely incidental to the practice of equal distribution to an insolvent debtor's creditors.").

32.    Section 541 is also neutral with respect to any religion as it merely defines what state-defined property is included in the bankruptcy estate. As was noted above, in *In re Roman Catholic Archbishop of Portland in Oregon*, 335 B.R. 842, 860 (Bankr. D. Or. 2005), the court questioned how enforcing bankruptcy and state law to determine what property was part of the bankruptcy estate could substantially burden religion at all. "A determination under §541 is simply a determination of status, that is, who owns property. It is hard to understand how the court's determination of what constitutes property of the bankruptcy estate under §541 could impose a substantial burden on the exercise of religion." *Id.* at 861.

33.    With regard to the Bankruptcy Code's strong-arm and avoiding powers (sections 544, 547, 548, 549), their neutral purpose has been characterized as follows:

> One of the underlying notions of avoiding powers [within bankruptcy law] is the idea that private agreements that might be good for the debtor and a single creditor (in this case, the church) might not be good for creditors as a whole. Advocates for churches sometimes seem to forget that the money recovered by the trustee is intended for unsecured creditors whom, after all, the debtor has also promised to repay.

Mary Jo Newborn Wiggins, *A Statute of Disbelief?: Clashing Ethical Imperatives in Fraudulent Transfer Law*, 48 S.C. L. Rev. 771, 784 (1997). None of the Challenged Bankruptcy Provisions were drafted to target religious actors, and they do not operate to single out religious actors. Quite to the contrary, they operate neutrally and generally across all those debtors, religious or not religious, who would choose to file for voluntary bankruptcy, and all creditors affected by such filings and/or other transferees that might be the target of an avoidance action. Thus, under the Free Exercise Clause, rationality review governs their constitutionality.

34.    Without a doubt, the avoidance provisions serve a rational interest:

> At the heart of bankruptcy's fraudulent transfer law lies the notion that creditors
> should be protected from attempts (actually or constructively fraudulent) to
> deplete assets that would have otherwise gone to deserving creditors. Because of
> this notion, even innocent actions that would be permissible outside of bankruptcy
> are not permissible inside of bankruptcy, or when a bankruptcy is likely.

Wiggins, *supra, A Statute of Disbelief?*, 48 S.C. L. Rev. at 780. Therefore, the Challenged

Bankruptcy Provisions can be applied to the Cemetery Trust without concern that the First

Amendment is being abridged. *See United States v. Kras*, 409 U.S. 434, 446-47 (1973) (holding

that in general, right to discharge in bankruptcy proceeding is "legislatively created benefit," not

fundamental right); Wiggins, *supra, A Statute of Disbelief?*, 48 S.C. L. Rev. at 787 (noting as to

First Amendment exemptions from neutral bankruptcy conveyance law "[o]ne problem with this

approach is that it has the effect of diverting value that would otherwise go to creditors, but for

the exemption. Because this exemption covers only religious transfers, private and public

creditors are being forced to subsidize the churches of bankrupt debtors.").

35.    Even if strict scrutiny were applied, the Challenged Bankruptcy Provisions would

stand because they serve a compelling interest. *See In Re Newman*, 183 B.R. 239, 252 (Bankr.

D. Kan. 1995) ("The compelling nature of the interest is reflected in the fact that recovery of

fraudulent transfers has been a basic tenet of bankruptcy law for 400 years."), *aff'd*, 203 B.R.

468 (D. Kan. 1996). They are also the least restrictive means to serve the fairness interests at the

base of the fraudulent conveyance provisions. As the *Newman* court noted:

> Section 548(a)(2) draws a line between proper and improper diminution in what
> would seem to be the only practical way: by determining whether the quantifiable
> economic value received by the debtor is reasonably equivalent to that of the
> property transferred. As stated above, this standard is neutral toward religion and
> can operate to avoid non-religious transfers where no economic value is received
> by the debtor.

*Newman*, 203 B.R. 468, 475, n.4 (Bankr. D. Kan. 1996). *See also In re Meyer*, 467 B.R. 451,

460-61 (Bankr. E.D. Wis. 2012) (finding that even if strict scrutiny were necessary, the Code

withstands "the highest test for constitutionality" and that Congress "demonstrated a compelling

interest in maintaining an equitable system for the protection of creditors and for permitting

debtors to obtain a fresh start from overwhelming debt."); *In re Navarro*, 83 B.R. 348, 353

(Bankr. E.D. Pa. 1988) (pre-RFRA; administration of bankruptcy system and protection of

legitimate interests of creditors are compelling governmental interests); *In re Turner*, 193 B.R.

548, 555-56 (Bankr. N.D. Cal. 1996) (upholding against RFRA challenge § 110(c) of

Bankruptcy Code requiring petition preparers to place social security numbers on documents for

filing, while noting compelling governmental interest in preventing widespread fraud and abuse

at expense of poor and unsophisticated). Accordingly, the application of the Challenged

Bankruptcy Provisions violates no rights under the Free Exercise Clause of the First

Amendment.[10]

---

[10] The Eighth Circuit found in *In re Young*, 141 F.3d 854 (8th Cir. 1998), *cert denied*, 525 U.S. 811 (1998), that RFRA amended the Bankruptcy Code and "engrafted the additional clause to section 548(a)(2)(A) that a recovery that places a substantial burden on a debtor's free exercise will not be allowed unless it is the least restrictive means to satisfy a compelling governmental interest." *Id.* at 861. Although the Court there found that avoiding tithes as fraudulent transfers violated RFRA because protecting the interests of creditors and allowing a debtor a fresh start were not compelling interests, Young is distinguishable on several grounds. First, the Committee is suing under state law grounds pursuant to section 544 so not only is Young inapplicable, but under Boerne, RFRA is inapplicable to a state law cause of action. Additionally, Young was decided prior to Congress's subsequent amendment to the Bankruptcy Code under the Religious Liberty and Charitable Donation Protection Act of 1998 ("RLCDPA"), which amended numerous Bankruptcy Code sections to limit the ability of a trustee to recover charitable donations made by a natural person to qualified charitable or religious organizations. *See* 11 U.S.C. §§ 548(a)(2), 548(d)(3), 544(b)(2). If Congress had intended RFRA to amend Section 548 or any other section of the Bankruptcy Code, as the Young court claimed, RLCDPA would not have been necessary. Furthermore, tithing cases can be distinguished from avoidance issues in the Cemetery Trust litigation because in the tithing cases, the individual debtor had no choice about how to give the money to the church and no matter how tithing was accomplished, the transfer could be avoided by the trustee. Here, the Debtor could have avoided the application of the fraudulent transfer law by properly holding funds received from the purchasers of the burial rights in a segregated account pursuant to an express written trust agreement under state law.

## CONCLUSION

The Committee respectfully requests this Court grant partial summary judgment against

the Cemetery Trust on the alleged First Amendment and RFRA claims.

Dated:   May 25, 2012                       Respectfully submitted,

                                            PACHULSKI STANG ZIEHL & JONES LLP

                                    By      */s/ Kenneth H. Brown*
                                            James I. Stang (CA Bar No. 94435)
                                            Kenneth H. Brown (CA Bar No. 100396)
                                            Gillian N. Brown (CA Bar No. 205132)
                                            Pachulski Stang Ziehl & Jones LLP
                                            10100 Santa Monica Blvd., 13th Floor
                                            Los Angeles, CA  90067
                                            Telephone:  (310) 277-6910
                                            Facsimile:  (310) 201-0760
                                            E-mail:  jstang@pszjlaw.com
                                                     kbrown@pszjlaw.com
                                                     gbrown@pszjlaw.com

                                            -and-

                                            Albert Solochek (State Bar No. 1011075)
                                            Jason R. Pilmaier (State Bar No. 1070638)
                                            Howard, Solochek & Weber, S.C.
                                            324 E. Wisconsin Ave., Suite 1100
                                            Milwaukee, WI  53202
                                            Telephone:  (414) 272-0760
                                            Facsimile:  (414) 272-7265
                                            E-mail:  asolochek@hswmke.com
                                                     jpilmaier@hswmke.com

                                            Attorneys for the Official Committee of
                                            Unsecured Creditors

Dated:    May 25, 2012

By    */s/ Marci A. Hamilton, Esq.*
      Marci A. Hamilton, Esq.
      36 Timber Knoll Drive
      Washington Crossing, PA  18977
      (215) 353-8984
      Hamilton.marci@gmail.com

      Special Counsel to the Official Committee
      of Unsecured Creditors

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| In re: | Chapter 11 |
| Archdiocese of Milwaukee, | Bankruptcy Case No. 11-20059-SVK |
| Debtor. | |
| Archbishop Jerome E. Listecki, as Trustee of the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust, | Adv. Proc. No. 11-02459-SVK |
| Plaintiff, | |
| vs. | |
| Official Committee of Unsecured Creditors, | |
| Defendant. | |
| Official Committee of Unsecured Creditors, | |
| Counterclaimant, | |
| vs. | |
| Archbishop Jerome E. Listecki, as Trustee of the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust, | |
| Counterdefendant. | |

## AFFIDAVIT OF KENNETH H. BROWN IN SUPPORT OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION FOR SUMMARY JUDGMENT ON COUNT III OF AMENDED COMPLAINT

James I. Stang (CA Bar No. 94435)
Kenneth H. Brown (CA Bar No. 100396)
Gillian N. Brown (CA Bar No. 205132)
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail: jstang@pszjlaw.com
        kbrown@pszjlaw.com
        gbrown@pszjlaw.com
DOCS_LA:254203.5 05058-003

I, Kenneth H. Brown, submit this affidavit and declare under penalty of perjury as follows:

1.     I am an attorney and a shareholder in the law firm of Pachulski Stang Ziehl & Jones LLP, counsel to the Official Committee of Unsecured Creditors (the "Committee") in the chapter 11 bankruptcy case of the Archdiocese of Milwaukee. I am over the age of 18 and am licensed to practice before this Court. I submit this affidavit in support of the *Official Committee of Unsecured Creditors' Motion for Summary Judgment on Count III of Amended Complaint* (the "Motion"). The following facts are within my personal knowledge, and, if called as a witness, I could and would competently testify thereto under oath.

2.     Attached hereto as **Exhibit A** is a true copy of the Trust Agreement Creating the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust (the "Cemetery Trust Agreement") which was produced by the Debtor. The Cemetery Trust Agreement shows that it was executed on April 2, 2007, by the Archdiocese of Milwaukee (the "Debtor"), as trustor, and Timothy M. Dolan, the former Archbishop of Milwaukee, in his official capacity as Archbishop, as trustee.

Dated this 25th day of May, 2012 at San Francisco, California.

Kenneth H. Brown

# CALIFORNIA JURAT WITH AFFIANT STATEMENT

☑ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–5 to be completed only by document signer[s], *not* Notary)

*NA*

_____     _____
Signature of Document Signer No. 1          Signature of Document Signer No. 2 (if any)

State of California

County of *San Francisco*

Subscribed and sworn to (or affirmed) before me on this

*25th* day of *May*, 20*12*, by
Date              Month                    Year

(1) *Kenneth H. Brown*,
Name of Signer

proved to me on the basis of satisfactory evidence
to be the person who appeared before me (.) (,)

(and
(2) _____*NA*_____,
Name of Signer

proved to me on the basis of satisfactory evidence
to be the person who appeared before me.)

**ADRIANA ZARAGOZA**
Commission # 1939144
Notary Public - California
San Francisco County
My Comm. Expires Jun 26, 2015

Signature *Adriana Zaragoza*
Signature of Notary Public

Place Notary Seal Above

──────────── **OPTIONAL** ────────────

*Though the information below is not required by law, it may prove
valuable to persons relying on the document and could prevent
fraudulent removal and reattachment of this form to another document.*

**Further Description of Any Attached Document**

Title or Type of Document: *Affidavit of Kenneth H. Brown*

Document Date: *5/25/2012*          Number of Pages: *2*

Signer(s) Other Than Named Above: *NA*

| RIGHT THUMBPRINT OF SIGNER #1 | RIGHT THUMBPRINT OF SIGNER #2 |
|---|---|
| Top of thumb here | Top of thumb here |

©2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org     Item #5910   Reorder: Call Toll-Free 1-800-876-6827

# EXHIBIT A

**TRUST AGREEMENT**
Creating The
**ARCHDIOCESE OF MILWAUKEE**
**CATHOLIC CEMETERY PERPETUAL CARE TRUST**

THIS TRUST AGREEMENT is made and entered into as of April 2, 2007, by and between the Archdiocese of Milwaukee ("Archdiocese"), as Trustor, and The Most Reverend Timothy M. Dolan, Archbishop of Milwaukee ("Archbishop"), in his official capacity as Archbishop, as Trustee, as follows:

**RECITALS**

WHEREAS, the Archdiocese holds certain funds designated for the perpetual care of Cemeteries and Mausoleums within the geographic boundaries of the Archdiocese ("Perpetual Care Funds"); and

WHEREAS, the Archdiocese desires and intends to formalize the trust relationship in which the Perpetual Care Funds are held by creating the trust hereinafter described; and

WHEREAS, the Archbishop, in his official capacity as Archbishop, is willing to serve as Trustee for the Perpetual Care Funds as hereinafter provided.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual promises contained herein, the parties hereto agree as follows:

1. **INTRODUCTION**

    1.1. **Definitions.** When used herein with initial capital letters, the following words have the following meanings:

    1.1.1. **Trust Agreement** – this written document creating the trust, and as the same may be amended from time to time.

    1.1.2. **Archbishop** – the person duly appointed as the Archbishop of Milwaukee, according to the norm of the Code of Canon Law, or if the See of the Archdiocese of Milwaukee is impeded or vacant, that person to whom belongs the governance of the Archdiocese, in accordance with the provisions of the Code of Canon Law.

    1.1.3. **Archdiocese** – the Archdiocese of Milwaukee, civilly, a nonstock corporation organized under the laws of Wisconsin, and, ecclesiastically, a public juridic person under the Code of Canon Law.

1.1.4. **Archdiocese Of Milwaukee Catholic Cemetery Perpetual Care Trust** – the name of the trust hereby created.

1.1.5. **Cemeteries and Mausoleums** – burial facilities (including without limitation individual graves, crypts and niches and property dedicated for future use as burial facilities) owned by the Archdiocese as part of the ministry of the Roman Catholic Church or by a separate entity that has undertaken such function as a corporal work of mercy to maintain and preserve the same as sacred places within the meaning of Can. 1205 of the Code of Canon Law. The term shall include, but shall not be limited to, the following facilities:

    1.1.5.1.    All Saints Cemetery & Mausoleum

    1.1.5.2.    Calvary Cemetery & Mausoleum

    1.1.5.3.    Holy Cross Cemetery & Mausoleum

    1.1.5.4.    Holy Trinity Cemetery

    1.1.5.5.    Mount Olivet Cemetery & Mausoleum

    1.1.5.6.    Resurrection Cemetery & Mausoleum

    1.1.5.7.    Saint Adalbert Cemetery & Mausoleum

    1.1.5.8.    Saint Joseph Cemetery & Mausoleum

1.1.6. **Charitable Organization** – an organization that is (i) described in either Section 170(c)(1) through (5) of the Internal Revenue Code or in Section 501(c)(3) of the Internal Revenue Code, and (ii) exempt from taxation under Section 501(c)(3) of the Internal Revenue Code.

1.1.7. **Code of Canon Law** – the body of ecclesiastical laws promulgated for the Latin Rite Church by the Supreme Pontiff of the Roman Catholic Church.

1.1.8. **Fund** – The assets (including principal and income) held hereunder in trust by the Trustee for the restricted purposes set forth herein.

1.1.9. **Internal Revenue Code** - the Internal Revenue Code of 1986, including applicable regulations for the specified section of the Internal Revenue Code. Any reference in this Trust Agreement to a section of the Internal Revenue Code, including the applicable regulation, shall be considered also to mean and refer to any subsequent amendment or replacement of that section or regulation.

1.1.10. **Investment Manager** - the person or persons, other than the Trustee, appointed as permitted hereunder to manage all or a portion of the Fund.

2

WHD\122422.7

ADOM000017.002

1.1.11. **Trustee** - the Trustee originally named hereunder and his successor or successors in trust, which shall be the Archbishop (as herein defined) serving from time to time. The Trustee is a "trustee" within the meaning of Wisconsin Statutes Section 701.01(8), including as that section may be modified or amended from time to time.

1.1.12. **Trustor** – the Archdiocese of Milwaukee.

1.2. **Rules of Interpretation and Governing Law.** Whenever appropriate, words used herein in the singular may be read in the plural, or words used herein in the plural may be read in the singular; the masculine may include the feminine; and the words "hereof," "herein" or "hereunder" or other similar compounds of the word "here" shall mean and refer to this entire Trust Agreement and not to any particular paragraph or section of this Trust Agreement unless the context clearly indicates to the contrary. The titles given to the various sections of this Trust Agreement are inserted for convenience of reference only and are not part of this Trust Agreement, and they shall not be considered in determining the purpose, meaning or intent of any provision hereof. Any reference in this Trust Agreement to a statute or regulation shall be considered also to mean and refer to any subsequent amendment or replacement of that statute or regulation. This instrument has been executed and delivered in the State of Wisconsin and shall be governed, enforced and interpreted in accordance with the laws of the State of Wisconsin, except where federal law preempts state law.

1.3. **Charitable Purpose.** The trust hereby created is organized and shall be operated exclusively for religious, benevolent, or charitable purposes, and no part of the net earnings thereof shall inure to the benefit of any private shareholder or individual.

2. **TRUST FUND**

2.1. **Fund Established; Restricted Purpose.** A Fund shall be established upon the initial contribution hereto by the Trustor. The Fund shall be held by the Trustee in trust and dealt with in accordance with the provisions of this Trust Agreement. At no time shall any part of the corpus or income of the Fund be used for or diverted to purposes other than (i) for the exclusive benefit, in perpetuity, of the Cemeteries and Mausoleums in such manner and at such times as the Trustee, in his discretion, determines to be reasonable and proper consistent with status of the Cemeteries and Mausoleums as sacred places within the meaning of Can. 1205 of the Code of Canon Law, or (ii) for payment of the reasonable expenses of administration of the Fund, which shall be payable out of the Fund.

2.2. **Management and Investment of Fund.** The Fund in the hands of the Trustee, together with all additional contributions made thereto and all net income thereof, shall be controlled, managed, invested, reinvested and ultimately paid and distributed for the use and benefit of the Cemeteries and Mausoleums by the Trustee with all the powers, rights and discretion generally possessed by trustees, and with all the additional powers, rights and discretion conferred upon the Trustee under this Trust Agreement.

3

WHDA\122422.7

ADOM000017.003
Sapp 207

2.3. **Other Trust Powers.** Except to the extent that the Trustee is subject to the authorized and properly given investment directions of an Investment Manager (and in extension, but not in limitation, of the rights, powers and discretions conferred upon the Trustee herein), the Trustee shall have and may exercise from time to time in the administration of the Fund, without order or license of any court, any one or more or all of the following rights, powers and discretions:

2.3.1. **Investments.** To invest and reinvest the assets of the Fund in accord with applicable policies of the Archdiocese in effect from time to time, the provisions of which are incorporated herein by reference, consistent with its socially responsible investment guidelines periodically reviewed and promulgated.

2.3.2. **Power of Sale.** To sell, exchange or otherwise dispose of any asset of whatsoever character at any time held by the Trustee in trust hereunder.

2.3.3. **Segregation, Etc.** To segregate any part or portion of the Fund for the purpose of administration or distribution thereof and to hold the Fund uninvested whenever and for so long as the same is likely to be required for the payment in cash of distributions normally expected to be made in the near future, or whenever, and for as long as, market conditions are uncertain, or for any other reason which requires such action or makes such action advisable.

2.3.4. **Uninvested Cash.** To hold uninvested reasonable amounts of cash whenever it is deemed advisable to do so to facilitate disbursements or for other operational reasons, and to deposit the same, with or without interest.

2.3.5. **Holding Title.** To register any investment held in the Fund in the name of the Trustee, without trust designation, or in the name of a nominee or nominees, and to hold any investment in bearer form, but the records of the Trustee shall at all times show that all such investments are part of the Fund.

2.3.6. **Servants and Agents.** To retain and employ such attorneys, custodians, consultants, accountants and agents as may be necessary or desirable, in the opinion of the Trustee, in the administration of the Fund, and to pay them such reasonable compensation for their services as an expense of administration of the Fund, including, but not by way of limitation, power to employ and retain counsel upon any matter of doubt as to the meaning of or interpretation to be placed upon the Trust Agreement or any provisions thereof with reference to any question arising in the administration of the Fund or pertaining to the distribution thereof or pertaining to the rights and liabilities of the Trustee hereunder. The Trustee, in any such event, may act in reliance upon the advice, opinions, records, statements and computations of any attorneys and agents and on the records, statements and computations of any servants so selected by him in good faith.

2.3.7. **Claims.** To institute, prosecute and maintain, or to defend, any proceeding at law or in equity concerning the Fund or the assets thereof or any claims thereto, or the interests of Cemeteries and Mausoleums at the sole cost and expense of the Fund.

4

ADOM000017.004

The Trustee shall be under no duty or obligation to institute, prosecute, maintain or defend any suit, action or other legal proceeding unless he shall be indemnified to his satisfaction against all expenses and liabilities which he may sustain or anticipate by reason thereof.

2.3.8. **Reorganizations, Etc.** To institute, participate and join in any plan of reorganization, readjustment, merger or consolidation with respect to the issuer of any securities held by the Trustee hereunder, and to use any other means of protecting and dealing with any of the assets of the Fund which he believes reasonably necessary or proper and, in general, to exercise each and every other power or right with respect to each asset or investment held by him hereunder as individuals generally have and enjoy with respect to their own assets and investment, including power to vote upon any securities or other assets having voting power which he may hold from time to time and to give proxies with respect thereto, with or without power of substitution or revocation, and to deposit assets or investments with any protective committee, or with trustees or depositaries designated by any such committee or by any such trustees or any court. Notwithstanding the foregoing, an Investment Manager shall have any or all of such powers and rights with respect to Fund assets for which it has investment responsibility but only if (and only to the extent that) such powers and rights are expressly given to such Investment Manager in a written agreement signed by it and copied to the Trustee. Furthermore, neither the Trustee nor the Investment Manager, as the case may be, shall vote or take similar actions with respect to any security in which it may have an interest, direct or indirect. In such case, the Trustee or Investment Manager shall retain an independent fiduciary to vote or take such similar action, as applicable. In all other cases, such powers and rights shall be exercised solely by the Trustee.

2.3.9. **Determination of Intent.** In any matter of doubt affecting the meaning, purpose or intent of any provision of this Trust Agreement, which directly affects his duties, to determine such meaning, purpose or intent.

2.3.10. **Releases, Etc.** To collect, receive, receipt and give quittance for all payments that may be or become due and payable on account of any asset in trust hereunder which has not, by act of the Trustee taken pursuant thereto, been made payable to others; and payment thereof by the company issuing the same, or by the party obligated thereon, as the case may be, when made to the Trustee hereunder or to any person or persons designated by the Trustee, shall acquit, release and discharge such company or obligated party from any and all liability on account thereof.

2.3.11. **Borrowing.** To borrow such sum or sums from time to time as the Trustee considers necessary or desirable and in the best interest of the Fund, and for that purpose to mortgage or pledge any part of the Fund.

2.3.12. **Withhold Payment.** To retain any funds or property subject to any dispute without liability for payment of interest, and to withhold payment or delivery thereof until final adjudication of the dispute by a court of competent jurisdiction.

5

WHD\1123422.7

2.3.13. **Lend Securities.** To engage in the lending of securities.

2.3.14. **Delegation.** To delegate to an Investment Committee of the Archdiocese decisions relative to the investment and reinvestment of the assets of the Fund and the selection, retention and discharge of Investment Managers and Custodians, incurring no liability in so doing.

2.3.15. **General.** To have and to exercise such other and additional powers as may be advisable for the effective and economical administration of the Fund as the Trustee may determine in his discretion consistent with the purpose of the Fund as described herein.

2.4. **Limitation on Certain Investments; Exculpation.** In the case of the Trustee or any Investment Manager acting hereunder, such persons shall observe and follow (and shall incur no liability in so doing) all guidelines for socially responsible investing established and communicated in writing by the Archdiocese from time to time, notwithstanding the provisions of any law now or hereafter in effect relating to prudent investing.

2.5. **Custodian.** The Trustee may designate one or more banks or trust companies to act as custodian of the assets of the Fund, in which event the Trustee and custodian shall enter into a written agreement with terms and provisions acceptable to the Trustee and the following shall apply:

2.5.1. **Appointment.** The Trustee shall enter into an agreement with the bank or trust company so named employing it as agent of the Trustee and a custodian of the Fund delegating to the custodian substantially similar powers, rights and duties otherwise reserved to the Trustee in regard to the retention and administration of the Fund, it being intended that, the conditions and limitations otherwise applicable to the Trustee shall be applicable to the custodian, but only with respect to the portion of the Fund in its custody, and the custodian shall have responsibility for the holding and safekeeping of those assets of the Fund, and shall maintain the records and accounts, and shall submit to the appropriate party or parties the periodic reports, otherwise required of the Trustee as to the Fund.

2.5.2. **Resignation; Termination.** The provisions of such agreement shall include the right reserved to the custodian to resign as such at any time by giving prior written notice to the Trustee and the right reserved to the Trustee to terminate the employment of the custodian by giving prior written notice to the custodian.

2.5.3. **Compensation.** The custodian shall be entitled to reasonable compensation for its duties as such as may be agreed upon from time to time between the custodian and the Trustee, which compensation shall be payable out of the Fund.

2.5.4. **Agent for Trustee.** At the Trustee's discretion, the Trustee shall transfer to the custodian assets of the Fund and, until its appointment as custodian ends and all assets held by the custodian have been returned to the possession of the Trustee, the custodian shall hold and be responsible for the retention and administration of the assets of the Fund as agent of the Trustee.

6

ADOM000019

**2.6.** **Limitation on Use of Fund.** The Fund hereunder shall at all times be a trust fund separate and apart from the assets of the Archdiocese, which may not contribute assets to the Fund other than assets designated for perpetual care and support of the Cemeteries and Mausoleums. No part of the corpus or income of the Fund shall be used for, or diverted to, purposes other than for the exclusive benefit of the Cemeteries and Mausoleums (except as specifically provided herein).

3. **CONCERNING THE TRUSTEE**

3.1. **Dealings with Trustee.**

3.1.1. **No Duty to Inquire.** No person, firm or corporation dealing with the Trustee shall be required to take cognizance of the provisions of this Trust Agreement or be required to make inquiry as to the authority of the Trustee to do any act which the Trustee shall do hereunder. No person, firm or corporation dealing with the Trustee shall be required to see to the faithful performance by the Trustee of its duties hereunder. Any such person, firm or corporation shall be entitled to assume conclusively that the Trustee is properly authorized to do any act that he shall do hereunder. Any such person, firm or corporation shall be under no liability to anyone whomsoever for any act done hereunder pursuant to the written direction of the Trustee.

3.1.2. **Assumed Authority.** Any such person, firm or corporation may conclusively assume that the Trustee has full power and authority to receive any money or property becoming due and payable to the Trustee. No such person shall be bound to inquire as to the disposition or application of any money or property paid to the Trustee or paid in accordance with the written directions of the Trustee.

3.1.3. **Payments by Trustee.** The Trustee shall not be obligated to inquire whether any payee of funds is entitled thereto or whether any payment, allocation or distribution requested by Cemeteries and Mausoleums is proper, or within the terms of this Trust Agreement, and shall not be accountable for any payment, allocation or distribution made by the Trustee in good faith. The Trustee shall not be liable or responsible for any payment made by him in good faith without actual notice or knowledge of the changed condition or status of the payee.

3.2. **Compensation of Trustee.** The Trustee shall serve without compensation hereunder, but shall be entitled to pay from or be reimbursed from the trust for his reasonable expenses, fees, costs and other charges incurred by him or payable by him on account of services rendered in administering the trust.

3.3. **Accountings by Trustee.** The Trustee shall render to the Trustor an accounting with respect to the administration of the trust on an annual basis.

3.4. **Investment Managers.**

3.4.1. **Appointment and Qualifications.** The Trustee (or his delegate per Section 2.3.14 hereof) shall have the power to appoint and may from time to time appoint

7

ADOM000020

one or more Investment Managers to direct the Trustee (or his delegate per Section 2.3.14 hereof) in the investment of, or to assume complete investment responsibility over, all or any portion of the Fund. An Investment Manager may be any person or firm which is either (1) registered as an investment adviser under the Investment Advisers Act of 1940, (2) a bank, or (3) an insurance company which is qualified to perform the services of an Investment Manager under the laws of more than one state.

3.4.2. **Investment Objective.** The Trustee (or his delegate per Section 2.3.14 hereof) with the advice of the Investment Manager or Managers shall determine the general investment characteristics and objectives of the Fund.

3.4.3. **Removal.** The Trustee (or his delegate per Section 2.3.14 hereof) may remove any such Investment Manager and shall have the power to appoint a successor or successors from time to time in succession to any Investment Manager who shall be removed, resign or otherwise cease to serve hereunder.

3.4.4. **Relation to Other Fiduciaries.** The Trustee (including his delegate per Section 2.3.14 hereof), acting in good faith, may rely on investment directions given to the Trustee (or his delegate per Section 2.3.14 hereof) with respect to the designated portion of the Fund, and, provided he has acted in good faith, the Trustee (including his delegate per Section 2.3.14 hereof) shall be released, indemnified, and held harmless from all liability (including legal and other professional fees) for any loss arising out of or on account of any action taken or not taken by him pursuant to the directions of such Investment Manager. This section shall survive the termination of this Trust Agreement.

3.4.5. **Fees and Expenses.** The fees and expenses of any Investment Manager, as agreed upon from time to time between the Investment Manager and the Trustee (or his delegate per Section 2.3.14 hereof), shall be charged to and paid from the Fund as determined by the Trustee in good faith.

3.4.6. **Policies to be Provided.** Any Investment Manager serving hereunder shall maintain a copy of the investment policies of the Archdiocese in effect from time to time.

## 4. PROTECTIVE PROVISIONS

4.1. **No Voluntary Assignment.** This Trust Agreement is intended for the protection and benefit of the Cemeteries and Mausoleums, and no interest hereunder shall be susceptible of pledge, assignment, anticipation, hypothecation or other voluntary alienation.

4.2. **Involuntary Alienation.** No beneficial interest in the Fund herein shall be subject to attachment, garnishment, execution following judgment or other legal process while in the possession or control of the Trustee.

WHD\11122492.7

ADOM000021

5. **AMENDMENT AND TERMINATION**

5.1. **Amendment.** The Trustor with the consent of the Trustee hereby reserves the power to amend this Trust Agreement in order to further the tax-exempt charitable purposes described herein. In addition, the Trustee, acting alone, may amend administrative provisions of the trust deemed advisable for the more efficient administration of the trust provided that no such amendment may adversely affect the tax-exempt charitable purpose of the trust. In all other respects, this Trust Agreement shall be irrevocable and not subject to amendment or revocation.

5.2. **Termination.** If for any reason the trust terminates, the remaining assets hereof shall be distributed to one or more Catholic Charitable Organizations designated by the Trustee having public charity status under the Internal Revenue Code and which carry out a purpose which, in the discretion of the Trustee, is compatible with the purpose for which the trust was established.

6. **GENERAL MATTERS**

6.1. **Limitation on Authority.**

6.1.1. **Fiduciaries Generally.** No action taken by any fiduciary hereunder shall be the responsibility of any other fiduciary and no fiduciary shall have the duty to question whether any other fiduciary is fulfilling all of the responsibility imposed upon such other fiduciary by this Trust Agreement.

6.1.2. **Trustee.** The duties, responsibilities and obligations of the Trustee shall be those set forth in this Trust Agreement.

6.2. **Determinations, Rules and Regulations.** The Trustee shall make such determinations, rules or regulations as may be required from time to time in the administration of this trust. The Trustee and other interested parties may act and rely upon all information reported to them hereunder and need not inquire into the accuracy thereof, nor be charged with any notice to the contrary.

     **IN WITNESS WHEREOF,** the undersigned has caused these presents to be executed, all as of the day and year first above written.

Archdiocese of Milwaukee, Trustor      Archbishop of Milwaukee, Trustee

By: _____      By: _____
The Most Reverend Timothy M. Dolan,     The Most Reverend Timothy M. Dolan
President

Attest: _____
Barbara Anne Cusack,
Secretary

9

WHDM\122422.7

ADOM000022

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| In re: | Chapter 11 |
| Archdiocese of Milwaukee, | Bankruptcy Case No. 11-20059-SVK |
| Debtor. | |

| | |
|---|---|
| Archbishop Jerome E. Listecki, as Trustee of the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust, | Adv. Proc. No. 11-02459-SVK |
| Plaintiff, | |
| vs. | |
| Official Committee of Unsecured Creditors, | |
| Defendant. | |

Official Committee of Unsecured Creditors,

Counterclaimant,

vs.

Archbishop Jerome E. Listecki, as Trustee of the
Archdiocese of Milwaukee Catholic
Cemetery Perpetual Care Trust,

Counterdefendant.

## CERTIFICATE OF SERVICE

Jason Pilmaier, being first duly sworn on oath deposes and says that on May 25, 2012, I caused to file and serve via CM/ECF in the above captioned Adversary Proceeding a copy of the following:

- Official Committee of Unsecured Creditors' Motion to Enlarge Page Limit
- Official Committee of Unsecured Creditors' Motion for Summary Judgment on Count III of Amended Complaint
- Memorandum of Law in Support of Official Committee of Unsecured Creditors Motion for Summary Judgment on Count III of Amended Complaint

- Affidavit of Kenneth H. Brown in Support of Official Committee of Unsecured Creditors' Motion For Summary Judgment on Count III of Amended Complaint

and that CM/ECF will cause electronic notice of the filing to be sent to the following:

Timothy Nixon:         tnixon@gklaw.com
Matthew M. Wuest       mwuest@gklaw.com
Bruce G. Arnold        barnold@whdlaw.com
Daryl L. Diesing       ddiesing@whdlaw.com
Francis H. LoCoco      flococo@whdlaw.com
Micahel E. Gosman      mgosman@whdlaw.com


                              _____/s/_____
                              Albert Solochek
                              Jason Pilmaier
                              Howard Solochek & Weber, S.C.
                              324 E. Wisconsin Ave., Suite 1100
                              Milwaukee, WI 53202
                              (414) 272-0760
                              (414) 272-7265
                              asolochek@hswmke.com
                              jpilmaier@hswmke.com

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

In re:

Archdiocese of Milwaukee,                    Chapter 11

          Debtor.                            Bankruptcy Case No. 11-20059-SVK

Archbishop Jerome E. Listecki, as Trustee
of the Archdiocese of Milwaukee Catholic
Cemetery Perpetual Care Trust,

          Plaintiff,
                                             Adv. Proc. No. 11-2459-SVK
v.

Official Committee of Unsecured Creditors,

          Defendant.

## TRUSTEE'S RESPONSE TO CREDITORS' COMMITTEE'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT III OF AMENDED COMPLAINT

Brady C. Williamson (WI Bar No. 1013896)
Linda S. Schmidt (WI Bar No. 1054943)

Godfrey & Kahn, S.C.
780 North Water Street
Milwaukee, WI 53202-3590
Phone: 414-273-3500
Email: lschmidt@gklaw.com

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................... ii

INTRODUCTION ...................................................................................... 1

FACTUAL BACKGROUND ......................................................................... 2

    Catholic Cemeteries in Catholic Belief and Practice .............................. 3

    The Threatened Loss of The Trust's Funds .......................................... 4

RELEVANT PROCEDURAL HISTORY ......................................................... 5

    Adversary Proceeding ...................................................................... 6

    The Amended Complaint/Response ................................................... 6

ARGUMENT .......................................................................................... 7

I.     THE COMMITTEE'S MOTION IS INSUFFICIENT BECAUSE IT FAILS TO
       COMPLY WITH LOCAL RULES. .......................................................... 8

II.    THE RELIGIOUS FREEDOM RESTORATION ACT BARS THE
      COMMITTEE'S EFFORTS TO DEPRIVE THE TRUST OF FUNDS TO
      MAINTAIN THE ARCHDIOCESE'S BURIAL GROUNDS. ......................... 9

      A.    RFRA Applies To Suits Between Private Parties ............................. 10

      B.    Regardless, The Committee Is A Government Actor Under RFRA.......... 14

      C.    RFRA Precludes The Committee's Counterclaims Because Those Claims
         Rely On Federal, Not State, Law .............................................. 19

      D.    Conversion Of The Trust's Assets Would Substantially Burden The
         Trustee And Trust's Free Exercise Of Religion In Violation Of RFRA ............ 23

III.   THE FREE EXERCISE CLAUSE ALSO PREVENTS THE CREDITORS'
      COMMITTEE FROM ATTACKING THE TRUST...................................... 28

CONCLUSION........................................................................................ 30

APPENDIX:  RELEVANT STATUTES/RULES .............................................. 31

i

# TABLE OF AUTHORITIES

**Page**

## CASES

*Blixseth v. Brown*, 470 B.R. 562 (D. Mont. 2012)................................................................ 16, 18

*Brownson v. Bogenschutz*, 966 F. Supp. 795 (E.D. Wis. 1997) ............................................ 15, 17

*Butner v. United States*, 440 U.S. 48 (1979)................................................................................ 21

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................................... 27

*Church of Lukumi Babalu Aye v. Hialeah*, 508 U.S. 520 (1993) ......................................... 28, 29

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ................................................................ 12, passim

*EEOC v. Catholic Univ. of Am.*, 83 F.3d 455 (D.C. Cir. 1996)................................................... 11

*Employment Div. v. Smith*, 494 U.S. 872 (1990) ............................................................. 11, passim

*Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976) .................................................................................. 14

*FOP Newark Lodge No. 12 v. Newark*, 170 F.3d 359 (3d Cir. 1999) ........................................ 29

*Fowler v. Rhode Island*, 345 U.S. 67 (1953) .............................................................................. 29

*Gay Rights Coalition of Georgetown Univ. Law Center v. Georgetown Univ.*, 536
   A.2d 1 (D.C. Cir. 1987) ........................................................................................................ 13

*Guinan v. Roman Catholic Archdiocese of Indianapolis*, 42 F. Supp. 2d 849 (S.D.
   Ind. 1998).............................................................................................................................. 11

*Hankins v. Lyght*, 441 F.3d 96 (2d Cir. 2006) ....................................................................... 13, 14

*Hanover Nat'l Bank v. Moyses*, 186 U.S. 181 (1902).................................................................. 21

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, __ U.S. __,
   132 S. Ct. 694 (2012)................................................................................................... 1, 10, 13

*In Fuel Oil Supply and Terminaling v. Gulf Oil Corp.*, 762 F.2d 1283 (5th Cir.
   1985) ..................................................................................................................................... 17

*In re Acequia, Inc.*, 34 F.3d 800 (9th Cir. 1994)......................................................................... 22

*In re Barman*, 252 B.R. 403 (Bankr. E.D. Mich. 2000) ......................................................... 17, 18

*In re Bloch*, 207 B.R. 944 (D. Colo. 1997) ................................................................................. 29

ii

*In re Bursztyn*, 366 B.R. 353 (Bankr. D.N.J. 2007)..................................................... 18

*In re Dow Corning Corp.*, 255 B.R. 445 (E.D. Mich. 2000)........................................ 17

*In re Drexel Burnham Lambert Grp.*, 138 B.R. 717 (Bankr. S.D.N.Y.) ....................... 17

*In re Gomes*, 219 B.R. 286 (Bankr. D. Or. 1998)........................................................ 29

*In re Linton*, 136 F.3d 544 (7th Cir. 1998) ................................................................ 18

*In re Meyer*, 467 B.R. 451 (Bankr. E.D. Wis. 2012) ................................................... 26

*In re Navarro*, 83 B.R. 348 (Bankr. E.D. Pa. 1988) ................................................... 26

*In re Newman*, 183 B.R. 239 (Bankr. D. Kan. 1995)................................................... 26

*In re Newman,* 203 B.R. 468 (D. Kan. 1996) ............................................................. 27

*In re Roman Catholic Archbishop of Portland in Oregon*, 335 B.R. 842 (Bankr.
    D. Or. 2005) ....................................................................................... 22, 23, 26

*In re SPM Mfg. Corp.*, 984 F.2d 1305 (1st Cir. 1993).................................................. 16

*In re Turner,* 193 B.R. 548 (Bankr. N.D. Cal. 1996).................................................... 26

*In re Young*, 141 F.3d 854 (8th Cir. 1998)........................................................ 21, 22, 27

*In re Young*, 152 B.R. 939 (D. Minn 1993) ............................................................... 26

*In re Young*, 82 F.3d 1407 (8th Cir. 1996) ........................................................ 26, 27

*INS v. Chadha*, 462 U.S. 919 (1983) ........................................................................ 21

*Lawrence v. Goldberg*, 573 F.3d 1265 (11th Cir. 2009) ............................................. 16

*Lonneker Farms, Inc. v. Klobucher*, 804 F.2d 1096 (9th Cir.1986) ............................. 17

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982)............................................... 15, 16

*Lukaszewski v. Nazareth Hosp.*, 764 F. Supp. 57 (E.D. Penn. 1991) ......................... 13

*Mack v. O'Leary*, 80 F.3d 1175 (7th Cir. 1996), *vacated on other grounds*, 522
    U.S. 801 (1997)....................................................................................... 24, 25

*McDaniel v. Paty*, 435 U.S. 618 (1978)..................................................................... 12

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ............................................... 12

*O'Bryan v. Bureau of Prisons*, 349 F.3d 399 (7th Cir. 2003)..................................... 23

*Official Comm. of Equity Secured Holders v. Official Comm. of Unsecured Creditor* (*In re Adelphia Communications Corp.*), 544 F.3d 420 (2d Cir. 2008).................... 16

*Paul v. Watchtower Bible & Tract Soc.*, 819 F.2d 875 (9th Cir. 1987)........................................ 13

*Sherbert v. Verner*, 374 U.S. 398 (1963) ..................................................................... 11

*Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826 (9th Cir. 1999).................................... 11

*Szeklinski v. Neary*, 07-C-222, 2007 WL 777539 (E.D. Wis. Mar. 12, 2007)............................. 17

*Thomas v. Review Board*, 450 U.S. 707 (1981)................................................................ 24

*Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036 (7th Cir. 2006) ............................ 10, 11, 13

*UA Local 343 of the United Ass'n of Journeymen & Apprentices v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465 (9th Cir.1994)........................................................... 27

*United States v. Ali*, No. 11-3512, ___ F.3d ___, 2012 WL 1970776 (8th Cir. Jun 4, 2012)......................................................................................... 25

*Wisconsin v. Yoder*, 406 U.S. 205 (1972) .................................................................... 11

*Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110 (9th Cir. 2000)......................................................................... 11

## STATUTES

Wis. Stat. § 242.07(1) ............................................................................................ 22

## OTHER AUTHORITIES

11 U.S.C. § 503(b)(2) ............................................................................................ 16

11 U.S.C. § 503(b)(3)(F) ........................................................................................ 16

11 U.S.C. § 541(b) ..................................................................................... 23, 28, 29

11 U.S.C. § 542 .................................................................................................... 19

11 U.S.C. § 544(b) ............................................................................... 19, 20, 22, 24

11 U.S.C. § 544(b)(1) ...................................................................................... 21, 22

11 U.S.C. § 544(b)(2) ............................................................................. 21, 22, 27, 28

11 U.S.C. § 548(a)(2) ...................................................................................... 27, 28

11 U.S.C. § 548(d)(3) ...................................................................................... 27, 28

iv

11 U.S.C. § 550 ............................................................................................ 21, 22

11 U.S.C. § 1102 .................................................................................................. 5

11 U.S.C. § 1102(4) ........................................................................................... 16

11 U.S.C. § 1102(a)(1) ...................................................................................... 16

11 U.S.C. § 1102(a)(4) ...................................................................................... 16

11 U.S.C. § 1103(a) ........................................................................................... 16

42 U.S.C. § 1983 ................................................................................................ 15

42 U.S.C. § 2000bb(b) ...................................................................................... 12

42 U.S.C. § 2000bb-1 .................................................................................. 14, 22

42 U.S.C. § 2000bb-1(a) ............................................................................. 10, 23

42 U.S.C. § 2000bb-1(b) ....................................................................... 10, 23, 26

42 U.S.C. § 2000bb-1(c) ............................................................................. 10, 11

42 U.S.C. § 2000bb-2(1) ............................................................................. 15, 17

42 U.S.C. § 2000bb-2(4) ................................................................................... 24

42 U.S.C. § 2000bb-3(a) ............................................................................. 12, 23

42 U.S.C. § 2000cc-5(7)(A) ........................................................................ 12, 24

5 *Collier on Bankruptcy* (Alan N. Resnick & Henry J. Sommer eds. 16th ed.) ........................... 21

143 Cong. Rec. S10294 (daily ed. Oct. 1, 1997) ............................................. 27

Civil Local Rule 56 ......................................................................................... 8, 9

Civil Local Rule 56(b)(1)(C)(iii) ...................................................................... 8

Civil Local Rule 56(b)(8) .................................................................................. 7

Fed. R. Bankr. P. 7004(i) ................................................................................. 19

Fed. R. Bankr. P. 7056 ................................................................................. 7, 30

Fed. R. Civ. P. 56(f)(1) ...................................................................................... 9

H.R. Rep. No. 103-88, 8 (1993) ....................................................................... 13

H.R. Rep. No. 105-556 (1998)................................................................................ 27

*Religious Freedom Restoration Act of 1991: Hearings on H.R. 2797 Before the Subcomm. on Civil and Constitutional Rights of the H. Comm. on the Judiciary*, 102nd Cong. 361-69 (1992)................................................................................ 13

Religious Liberty and Charitable Donation Protection Act of 1998............................................. 27

The plaintiff, Archbishop Jerome E. Listecki ("Archbishop Listecki"), as Trustee of the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust (the "Trust"), submits this memorandum in response to the Official Committee of Unsecured Creditors' (the "Committee") Motion for Summary Judgment on Count III of Amended Complaint. The Trustee also submits the Declaration of Archbishop Listecki ("Decl.") in support of the memorandum.

## INTRODUCTION

Bankruptcy law is a crucible, a single intersection where everyone's claims, interests, and status are reconciled. Federal bankruptcy law, directly or by reference to state law, defines the relevant property interests and provides for their disposition—substantively and procedurally. The Committee's motion for partial summary judgment asks the Court to bypass the intersection and ignore both relevant federal law and the very nature of the principal parties in interest.

This, of course, is not the first time a religious organization has filed a Chapter 11 petition. Nor, while a diocesan bankruptcy remains unusual, are the questions presented by the intersection of faith and civil law uncommon. In this term alone, the U.S. Supreme Court has provided dispensation for faith-based organizations from employment law in the cause of the First Amendment. *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, __ U.S. __, 132 S. Ct. 694 (2012). Here, the Committee's ultimate goal is the appropriation of $55 million held *not* by the Debtor, but by the Trust, to maintain, under canon law, the grave sites of Catholics buried in church cemeteries as long ago as 1857.

Are the trust funds property of the estate? To answer that question, the Court necessarily would have to make a series of decisions of fact and law. At the threshold, however, the Trust itself filed this adversary proceeding, asserting, among other claims, that the Religious Freedom Restoration Act ("RFRA" or "the Act") and the First Amendment bar the Committee's reach. They do. Indeed, whatever the factual and legal issues involving the law of trusts, RFRA and the

1

Free Exercise Clause pre-empt them at the outset because the Trust here adheres to ecclesiastical precepts as well as those grounded in civil law.

The Committee's partial summary judgment motion, putting two more "facts" before the Court gives the Court little context. On this record, the Court should neither rule against the Trust nor even begin to reach the ultimate question—let alone the answer—sought by the Committee.[1] Yet it can and should decide RFRA's application in the Trust's favor as a matter of law.

## FACTUAL BACKGROUND

The Archdiocese of Milwaukee (the "Archdiocese" or "Debtor") was established on November 28, 1843 and created an archbishopric almost 32 years later. Proposed Findings of Fact ("PFOF") ¶ 1. The Archdiocese is both a Wisconsin non-stock corporation and a public juridic person under *Codex Iuris Canonici* or the Code of Canon Law (the "Code"). (*Id.* ¶ 2.)

Its mission is to serve Catholic parishes, schools and institutions so that they, too, may effectively carry out their mission to serve the people of God in Southeastern Wisconsin and the broader community. (*Id.* ¶ 3.) The Archbishop is Jerome E. Listecki, successor to former Archbishop, now Cardinal, Timothy M. Dolan. (*Id.* ¶ 4.)

The Archdiocese has operated and maintained Catholic cemeteries and mausoleums since as early as 1857 (collectively, the "Milwaukee Catholic Cemeteries"). (*Id.* ¶ 5.) Those cemeteries consist of Catholic burial facilities within the geographic boundaries of the Archdiocese, including individual burial plots, crypts, niches, and property dedicated to future use as burial facilities. (*Id.* ¶ 6.) The Milwaukee Catholic Cemeteries encompass approximately 1,000 acres of land in which more than 500,000 individuals are interred. (*Id.* ¶ 7.) An estimated 3,000 burials take place each year. (*Id.* ¶ 8.)

---

[1] "The Committee is seeking to recover in excess of $55 million" that, it argues, the Debtor and the Trust "are attempting to shield from the Debtors' [*sic*] creditors...." Reply to the Debtor's Opposition to the Official Committee of Unsecured Creditors Application to Employ Marci Hamilton, Dkt. No. 703, at 1.

2

In 2007, the Trust was formed under Wisconsin law by then Archbishop Dolan.  (*Id*. ¶ 9.) Its trustee is Archbishop Listecki (the "Trustee").  (*Id*. ¶ 10.)  The funds that comprise the Trust's principal took nearly a century to accumulate and include approximately $55 million that had been held in trust for the perpetual care of the Milwaukee Catholic Cemeteries even prior to being transferred to the Trust in or around March 2008 (collectively, with any later earned or received Trust funds, the "Perpetual Care Funds").  (*Id*. ¶ 11.)  The Archdiocese receives quarterly distributions from the Trust to cover costs incurred in providing for the perpetual care of the Milwaukee Catholic Cemeteries.  (*Id*. ¶ 12.)

### *Catholic Cemeteries in Catholic Belief and Practice*

Under church law, Catholic cemeteries are land that is blessed and consecrated for the specific use of Christian burial.  (*Id*. ¶ 13.)  Church law includes canon law, issued or authorized by the Pope, the Church's supreme legislator, and serves as the universal law of the Church, applicable to Catholics world-wide.  (*Id*. ¶ 14.)[2]  It also includes particular law, or law governing the specific territorial area for which it was promulgated.  (*Id*. ¶ 15.)

When the Archdiocese established its first cemetery in the mid-1800s, church law in the United States forbade priests from providing funeral services for Catholics being buried in non-Catholic cemeteries.  (*Id*. ¶ 17.)  Although this prohibition was eased slightly in later years, allowing Catholic funerals for those being buried in non-Catholic cemeteries under certain conditions, the Church continued to emphasize the sanctity of Catholic burial sites and the importance of the Church-owned cemeteries.  (*Id*. ¶ 18.)  It also required, among other things, that Catholic cemeteries be maintained in a manner befitting their sacred purpose with money set aside to provide the necessary maintenance.  (*Id*. ¶ 19.)

---

[2] The Greek word "canon" (κανών) means "rule, standard or measure."  (*Id*. ¶ 14 n.1.)

These expectations and requirements are reflected in the universal law of the Church, first codified in 1917 as the Code of Canon Law (the "Code"), and in the particular law of the Archdiocese. (*Id.* ¶ 20.) The placement of the canons governing cemeteries in the 1917 and the later 1983 Code emphasizes the Catholic belief that Catholic cemeteries are sacred places, not mere property, succinctly expressed in the Archdiocese's 1979 "Guidelines for Christian Burial":

> Not only is the Catholic cemetery a sacred place, a place of prayer, and a place reflecting our beliefs and traditions, it is also for the community a sign of the link among all the faithful, living and dead. It is recognition of that Faith which is shared by the dead buried there and the living who commit their deceased to this holy ground.

(*Id.* ¶ 22.) For the Church, Catholic cemeteries reflect the Catholic belief in the resurrection of Jesus from the dead and the community's commitment to the corporal work of mercy of burying the dead. (*Id.* ¶ 23.) Resurrection of the dead, of course, always has been an essential element of the Christian faith, beginning with Jesus' own resurrection. (*Id.* ¶ 24.) For Catholics in particular, the belief in resurrection is a belief in the resurrection of one's *own* body. (*Id.* ¶ 25.) According to this belief, the soul separates from the body at death to meet God, while awaiting reunion with its body, transformed and resurrected through the power of Jesus' resurrection, on the last day. (*Id.* ¶ 26.)

The sacred nature of Catholic cemeteries and compliance with the Church's historical and religious traditions and mandates requiring their perpetual care are understood as a fundamental exercise of this core belief. (*Id.* ¶ 27.) Theologically, bodies must be treated with respect and charity in the Catholic faith and hope of resurrection. (*Id.* ¶ 28.)

### *The Threatened Loss of The Trust's Funds*

Although Archbishop Listecki is the administrator of both the Trust and the Archdiocese in civil and canon law, the Trust is separate and distinct from the Archdiocese. (*Id.* ¶ 29.) Under

4

the Code, therefore, if not also civil law, ownership of the Trust funds is in the Trust, not the Archdiocese or the Archbishop.  (*Id*. ¶ 30.)

By administering and holding funds for the ongoing care of the Milwaukee Catholic Cemeteries, the Archdiocese and, subsequently, the Trust and Trustee assumed canonical and moral responsibility for that perpetual care.  (*Id*. ¶ 31.)  Under the Code, offerings given by the faithful for a particular purpose may only be applied for that purpose.  (*Id*. ¶ 32.)  Further, the Code requires that the Trust's funds be used only for the Trust's designated purposes.  (*Id*. ¶ 33.)  If funds are alienated from the Trust without the required canonical approval, the Archbishop as Trustee may well face a religious penalty from the Church.  (*Id*. ¶ 34.)  Depending on the value of the property proposed to be alienated, canonical norms require consultation or consent from Church authorities—and may also require approval from the Vatican.  (*Id*. ¶ 35.)

Archbishop Listecki, as Archbishop and Trustee, adheres to the belief in resurrection of the body and that belief's exercise through, among other things, the perpetual care of the Milwaukee Catholic Cemeteries.  (*Id*. ¶ 36.)  If the Trust is legally compelled to turn over its funds to the estate, there will be no funds or, at best, insufficient funds, for that perpetual care. (*Id*. ¶ 37.)  As a result, neither the Archdiocese nor the Trust and its Trustee will be able to exercise their canonical and moral obligations to provide the appropriate care for these sacred sites or assure the requisite permanence, reverence and respect for those buried there.  (*Id*. ¶ 38.)

## RELEVANT PROCEDURAL HISTORY

The Debtor filed its petition on January 4, 2011.  The Committee was appointed 20 days later pursuant to 11 U.S.C. § 1102.  Dkt. No. 86.  The retention of the Committee's counsel, co-counsel, special counsel, financial advisor and consultants soon followed, *e.g.*, Dkt. No. 154, as did discovery and a series of other requests and objections by the Committee.

On March 8, 2012, the Committee filed an application to employ a "special constitutional and federal statutory law counsel."  Dkt. No. 667.  The Debtors' objected, Dkt. No. 679, and the

Court granted the application on April 20, 2012, imposing several limitations.  Dkt. No. 732.[3]  It is fair to characterize the Committee's role in these proceedings as active.

***Adversary Proceeding***

The Trust, on behalf of itself and its beneficiaries, filed the present adversary proceeding on June 28, 2011, seeking a declaration that neither it nor the funds it holds are property of the estate.  Dkt. No. 307; Adv. Proc. Dkt. No. 1.  The Court approved a stipulation giving the Committee standing to respond to the complaint, Adv. Proc. Dkt. No. 12; and the Committee subsequently filed an answer, affirmative defenses and counterclaims.  The Trust answered the Committee's counterclaims, denying any right to relief.  Adv. Proc. Dkt. No. 24.

***The Amended Complaint/Response***

An amended complaint was filed on January 13, 2012, substituting the Trustee, Archbishop Listecki, as plaintiff and adding certain claims.  Adv. Proc. Dkt. No. 34.  With its third claim, the Trustee alleges that both the First Amendment and RFRA preclude any conclusion that the Trust or its funds are property of the estate.  The Trustee alleges, among other things, that "[u]sing the Perpetual Care Funds to pay the Debtor's creditors would substantially burden a sincere religious exercise."  *Id.*, ¶¶ 74-75.  "In short, the care and maintenance of Catholic cemeteries, cemetery property, and the remains of those interred therein is [sic] a fundamental exercise of the Catholic faith, which cannot be substantially burdened by even a generally applicable, neutral government law."  *Id.*, ¶ 86.  There followed a second procedural stipulation, a response to the amended complaint and the Trustee's response to the Committee's reasserted counterclaims.  Adv. Proc. Dkt. Nos. 37-39, 50, 56.

The Committee filed its partial summary judgment motion, limited to the Trustee's third claim, on May 25, 2012.  Adv. Proc. Dkt. No. 57.  The Committee further seeks a determination

---

[3] The special counsel joined five other lawyers on the memorandum submitted with the Committee's partial summary judgment motion.  Dkt. No. 57-1, 22.

on several of its related affirmative defenses. *Id.*, 1-2 (requesting adjudication on the Committee's seventh, twentieth and twenty-second affirmative defenses). The Committee filed with its motion a memorandum, a single affidavit, and a motion to extend beyond 15 pages the length of its memorandum.[4] The parties have stipulated to the Court's status with respect to the resolution of the motion. Adv. Proc. Dkt. No. 61.

## ARGUMENT

For both procedural and substantive reasons, the Court should deny the Committee's motion. The Committee has not provided a factual or procedural predicate for its requested relief, having submitted *not one* proposed finding of fact as required by local court rules. Under Rule 7056, the Court can respond to the Committee's motion by granting the Trustee summary judgment instead. Even if the Court chooses not to do that, it will have to leave to another day any disputes of fact disclosed here as well as the myriad other defenses to the Committee's effort to appropriate Trust funds.

This much is certain. The Church manages and maintains its cemeteries through the Trust under rules civil and ecclesiastical. Yet the ultimate relief sought by the Committee could well place the Trust and its Trustee in the position of facing competing and irreconcilable mandates: an order from the Court that the Trust transfer all or part of its funds to the estate and a directive from the Church's highest authority, based on canon law and conscience, that it not. The First amendment commands that the Trust and its Trustee not be made to face that choice under the circumstances presented here. Even if it did not, this is precisely the dilemma that Congress enacted RFRA to avoid.

---

[4] Civil Local Rule 56(b)(8) already provides for briefs not to exceed 30 pages without prior court approval in support of or in opposition to motions for summary judgment. Nevertheless, the Trust has filed a provisional motion that parallels the Committee's motion for additional pages for this brief.

## I. THE COMMITTEE'S MOTION IS INSUFFICIENT BECAUSE IT FAILS TO COMPLY WITH LOCAL RULES.

The Trustee's complaint, together with the Committee's answer, affirmatives defenses and now this motion, present significant issues. Yet the Court carries a handicap as it begins to address them. The Committee's motion does not comply with the local rules for pleading, and it has failed to provide a factual context for the motion and any subsequent decision.

The Local Rules for the U.S. Bankruptcy Court for the Eastern District of Wisconsin require, in Rule 9013(b), that "[w]hen a motion relies in whole or in part upon matters of fact, the motion shall be served and filed with supporting documents." Rule 9029 adopts by reference the Local Rules of the U.S. District Court for the Eastern District of Wisconsin, noting the adjunct status of the bankruptcy court. Those rules are quite specific in the requirements for summary judgment motions. Among them are the requirement that a movant file a statement setting forth any stipulated material facts, and a statement of proposed material facts that are, according to the moving party, undisputed. Civil L.R. 56, Summary Judgment. Under Local Rule 56(b)(1)(C)(iii), the failure to submit a statement of proposed material facts itself "constitutes grounds for denial of the motion."

Here, the Committee made no effort to reach an agreement on stipulated facts. It filed no proposed statements or findings. It submitted but a single affidavit that, in turn, attaches only a copy of the trust agreement. *See* Adv. Proc. Dkt. No. 57-2. The failure to submit the materials required by the local rules limits the Court's ability to determine whether or not there are disputed facts that, in turn, foreclose summary judgment. Moreover, the failure deprives the Court of a factual context for a reasoned decision. The Trust does not quarrel with the generic statements of law by the Committee on the standards of review governing summary judgment, Dkt. No. 57-1 (Mem. of Law in Support of Official Comm. of Unsecured Creditor's Mtn. for

Summ. J. on Count III of Am. Compl. ("Comm. Br."), ¶¶ 5-6), but with the Committee's own compliance with the law.

Does it matter?

This is not a "technical" oversight. Putting aside the need to comply with local rules, the absence of a factual context matters because it directly affects the burden of proof. There is, indeed, a question of law at issue here. It could have been raised, perhaps, with a motion to dismiss under Rule 12(b)(6) or a motion for judgment on the pleadings under Rule 12(c). Under either rule, all of the well-pled factual allegations of the complaint would be taken as true. If, instead, this were an appropriately-supported motion under Rule 56, the Trustee would have been able to respond, factual allegation by factual allegation, to the affidavits, depositions or other materials filed by the Committee. There is nothing factual, however, to which the Trustee can respond. The district court that will review this Court's conclusions will not recognize this as a summary judgment motion consistent with local rules and its practice. Nor should it.

In the absence of compliance, the Court could treat the Committee's pleading as a motion to dismiss those allegations of the complaint that incorporate the Trustee's assertion of RFRA and the First Amendment, specifically paragraphs 71 through 87. The Trustee, however, has submitted his own Declaration that permits the Court, in addition to denying the Committee's motion, to grant summary judgment in the Trustee's favor. *See* Fed. R. Civ. P. 56(f)(1).

## II. THE RELIGIOUS FREEDOM RESTORATION ACT BARS THE COMMITTEE'S EFFORTS TO DEPRIVE THE TRUST OF FUNDS TO MAINTAIN THE ARCHDIOCESE'S BURIAL GROUNDS.

The Committee argues that RFRA does not prevent the inclusion of the Trust's perpetual care funds as property of the estate because the Act does not provide a claim or defense against private parties, including the Committee itself. Comm. Br. 6-12. The Committee is mistaken, regardless of whether or not the Act extends to actions between private parties.

**A.**  **RFRA Applies To Suits Between Private Parties**.

The Committee asserts that RFRA's "plain language" creates a claim or defense *only* against government actors, not private parties.  Comm. Br. 8-9; *see id.*, 7 (asserting the Committee is not a government actor).  Yet while the Committee spends paragraphs reiterating the basic principle of statutory construction—courts first look to the language of the act itself (*id.*, 8-9 (¶¶ 15-18))—it fails to provide any meaningful analysis of the statutory provisions at issue.  So much less so does the Committee explain how the terms of those provisions so "plainly" limit the scope of relief provided.  They do not.

Under RFRA, "[g]overnment" may not "substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless it can demonstrate that the burden furthers a compelling governmental interest using the least restrictive means.  42 U.S.C. § 2000bb-1(a)-(b) (2012).  Anyone whose religious exercise has been burdened in violation of RFRA "*may assert that violation as a claim or defense in a judicial proceeding* and obtain appropriate relief against a government...."  § 2000bb-1(c) (emphasis added).

The Committee places great weight on *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036 (7th Cir. 2006), for its position that RFRA applies "'only to suits to which the government is a party.'"  Comm. Br. 9, quoting 442 F.3d at 1042.  For all of the Committee's reliance on a handful of words in a single case, now abrogated by the U.S. Supreme Court,[5] *Tomic* does not provide the support the Committee seeks.  To the contrary, as the Committee reluctantly acknowledges, the language of *Tomic* is dictum.  Comm. Br. 9.  The plaintiff-appellant in that case did not argue RFRA, 442 F.3d at 1043, and, thus, the question of whether the Act applies solely to private suits was never briefed or fully presented.

It is unsurprising then that the foundation for *Tomic*'s cursory comment is flawed.  *Tomic* cites *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1120-21

---

[5] *Hosanna-Tabor*, __ U.S. __, 132 S. Ct. 694.

(9th Cir. 2000). *Id.* at 1042. Yet that case simply does not address whether RFRA applies, as a general matter, to suits between private parties. *See Worldwide Church*, 227 F.3d at 1121 (questioning, but expressly declining to decide, whether RFRA applies to intellectual property rights and holding, instead, that the defendant failed to demonstrate that federal copyright laws imposed a substantial burden on the exercise of its religion).

Nor does *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826 (9th Cir. 1999), stand for a different proposition. *See Tomic*, 442 F.3d at 1042, citing 192 F.3d at 834-35. Rather, the court there made clear it was not holding that, in all instances, a party could not bring a RFRA claim against a private entity. *Sutton*, 192 F.3d at 834 (holding that the plaintiff "cannot state a valid claim under RFRA against … a private employer, *in the circumstances presented*") (emphasis added); *cf. EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 468–69 (D.C. Cir. 1996) (permitting defendant to assert RFRA defense against private plaintiff as well as EEOC); *Guinan v. Roman Catholic Archdiocese of Indianapolis*, 42 F. Supp. 2d 849, 853 (S.D. Ind. 1998) (permitting RFRA defense against private party but rejecting it after finding rights not burdened).

To the extent the Committee also relies on RFRA's language that allows parties to "obtain ... relief against a government," § 2000bb-1(c), that reliance is similarly misplaced. *See* Comm. Br. 6-7. In *Employment Div. v. Smith*, 494 U.S. 872 (1990), the Supreme Court reversed prior case law and held that neutral, generally applicable laws *can* be applied to religious practices, even when not supported by a compelling government interest. In direct response to that decision, Congress enacted RFRA with a stated purpose:

> (1) to restore the compelling government interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963)[,] and *Wisconsin v. Yoder*, 406 U.S. 205 (1972)[,] and *to guarantee its application in all cases where free exercise of religion is substantially burdened*; and
>
> (2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government.

11

42 U.S.C. § 2000bb(b) (emphasis added); *see also* § 2000cc-5(7)(A) (defining "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief"). Confirming its sweeping reach, the Act explicitly "applies to *all Federal law, and the implementation of that law*, whether statutory or otherwise...." § 2000bb-3(a) (emphasis added).

The Committee's efforts to limit the scope of relief under RFRA to "government" cannot be squared with this broad mandate. As the Supreme Court has observed,

> [s]weeping coverage ensures [the Act's] intrusion at every level of government, displacing laws and prohibiting official actions of almost every description and regardless of subject matter.... *Any law is subject to challenge at any time by any individual* who alleges a substantial burden on his or her free exercise of religion.

*City of Boerne v. Flores*, 521 U.S. 507, 532 (1997) (ultimately holding RFRA unconstitutional as applied to the states) (emphasis added); *see also id.* at 516 ("The Act's universal coverage is confirmed in § 2000bb-3(a).").

Nor is the Committee's position supported by the Free Exercise Clause case law at the heart of RFRA. The Supreme Court long ago recognized that a court's application of a legal rule which impermissibly burdens constitutional rights is no less a state action because it occurs within a civil lawsuit between private parties:

> It matters not that [the offending] law has been applied in a civil action and that it is common law only, though supplemented by statute. The test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised.

*New York Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964) (rejecting argument that First Amendment's Free Exercise Clause did not apply to civil libel action between private parties). Courts, accordingly, have not hesitated to apply the First Amendments Free Exercise Clause to suits between private parties. *See, e.g.*, *McDaniel v. Paty*, 435 U.S. 618, 629 (1978) (in suit by competing delegation candidate, state constitution barring ministers from serving as delegates to

12

state constitutional convention violated free exercise rights); *Paul v. Watchtower Bible & Tract Soc.*, 819 F.2d 875, 879 (9th Cir. 1987) (defendant's practice of "shunning" disassociated members protected by Free Exercise Clause against former church member's tort action).

Congress was very aware of the First Amendment's reach in this regard when it enacted RFRA in direct response to *Smith* and its oppressive effect on religious exercise. *See Religious Freedom Restoration Act of 1991: Hearings on H.R. 2797 Before the Subcomm. on Civil and Constitutional Rights of the H. Comm. on the Judiciary*, 102nd Cong. 361-69 (1992) (testimony of Prof. Douglas Laycock, University of Texas, Austin), citing as reasons for the statute, *inter alia*, *Gay Rights Coalition of Georgetown Univ. Law Center v. Georgetown Univ.*, 536 A.2d 1, 5 (D.C. Cir. 1987) (in action by student group, holding that District of Columbia's interest in ending discrimination outweighed any burden on defendant's free exercise by forced equal access to facilities and services); *Lukaszewski v. Nazareth Hosp.*, 764 F. Supp. 57, 61 (E.D. Penn. 1991) (holding application of Age Discrimination in Employment Act ("ADEA") in former employee's suit did not violate defendant's free exercise rights); *see also* H.R. Rep. No. 103-88, 2 (n.2) (1993) (reporting H.R. 1308) (citing Prof. Laycock's written testimony).

"It is hardly to be imagined ... that in seeking to broaden the protection of religious rights, Congress, dropping nary a hint, wiped out a long-established doctrine that gives greater protection to religious autonomy...." *Tomic*, 442 F.3d at 1042; *but see Hankins v. Lyght*, 441 F.3d 96, 114-15 (2d Cir. 2006) (Sotomayor, C.J., dissenting) (finding RFRA implicitly limited to disputes in which the government is a party).[6] To the contrary, RFRA's broad protective mandate finds reinforcement in express Congressional statements:

---

[6] In *Tomic*, the Seventh Circuit held that the "ministerial exception" doctrine under the First Amendment precluded the exercise of federal jurisdiction over employment discrimination claims by ministers against their churches. 442 F.3d at 1039. The Seventh Circuit was concerned with an application of RFRA that would appear to displace the ministerial exception's jurisdictional hurdle and, impermissibly, require courts to wade into religious disputes. *See id.* at 1042 (criticizing *Hankins*, 441 F.3d at 99). The U.S. Supreme Court has recently concluded that the ministerial exception is an affirmative defense, not a jurisdictional bar, abrogating *Tomic* and eliminating the concern expressed there. *See Hosanna-Tabor Evangelical Lutheran Church*, 132 S. Ct. 694.

> To be absolutely clear, the bill does not expand, contract or
> alter the ability of a claimant to obtain relief in a manner
> consistent with free exercise jurisprudence, including Supreme
> Court jurisprudence, under the compelling government test **prior
> to *Smith***.

H.R. Rep. No. 103-88, 8 (1993) (reporting H.R. 1308) (emphasis added).

Indeed, the Committee's "plain meaning" argument is not plain at all; its construction requires a rearrangement of the statute. Contrary to the Committee's suggestion, the phrase "against a government" does not modify the phrase "judicial proceeding." Instead, the Act provides distinct remedial rights. A party "may assert that violation [of the Act] as a claim or defense in a judicial proceeding," and she may "obtain appropriate relief against a government." Congress separately specified "relief against a government" to provide relief in the face of sovereign immunity. The additional reference to "relief against a government" is not language of limitation but, rather, words of supplementation and specificity.[7]

Accordingly, the only reasonable interpretation of the phrase "and obtain appropriate relief against a government," 42 U.S.C. § 2000bb-1, is one "broadening, rather than narrowing, the rights of a party asserting the RFRA." *Hankins*, 441 F.3d at 103 (RFRA applied to private actions based on the ADEA). And the Committee's efforts to escape RFRA's mandate fail for this additional reason.

### B.    Regardless, The Committee Is A Government Actor Under RFRA.

The Committee further asserts that it is not a "government," or a government actor whose actions are subject to RFRA. Rather, it is merely "a collection of independent, individual, private creditors of the Debtor." Comm. Br. 10, ¶ 20. The Committee's assertion ignores both fact and law. Even if RFRA applies *only* to "government," it applies to the Committee.

---

[7] The intended broadening effect of "and obtain appropriate relief against a government" is readily evident in light of Congress' (failed) effort to also reach state action under the Act. *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 451-52 (1976) (the necessary predicate for federal waiver of state sovereign immunity is express congressional intent).

14

RFRA's definition of "government" embraces any person "acting under color of law," 42 U.S.C. § 2000bb-2(1), and the state action required to trigger RFRA is tested under the same standard as state action under the Civil Rights Act, 42 U.S.C. § 1983.  *Brownson v. Bogenschutz*, 966 F. Supp. 795, 797 (E.D. Wis. 1997).  A party is "acting under color of law" when its conduct may be "fairly attributable" to the state.  *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). Conduct is fairly attributable to the state "by the exercise of some right or privilege created by the [s]tate" and the party charged with the deprivation "may fairly be said to be a state actor." *Id*.  A party may be a state actor "because he is a ... [government] official, because he has acted together with or has obtained significant aid from state officials, *or* because his conduct is otherwise chargeable" to the government.  *Id*. (emphasis added).

The first element is met here:  the Committee asserts claims under provisions of the Bankruptcy Code, both separately and in reference to related state law, seeking to claim the Trust's funds for the estate.  *See* Adv. Proc. Dkt. No. 50 ("First Am. Countercls."), ¶¶ 74-201. The Bankruptcy Code is unmistakably a product of state—here, congressional—action.  *See Lugar*, 457 U.S. at 941 (procedures for obtaining prejudgment attachment are the "product of state action").

The second element is also satisfied because the Committee is fairly considered a state actor implementing the law.  Action by a private party pursuant to statute, without "something more," is arguably insufficient alone to justify characterizing the party a "state actor."  *Id*. at 939. The Committee has identified two tests, the "state compulsion" and the "joint action" tests, used by the courts to determine whether a party's conduct has that "something more," making it chargeable to the government.  Comm. Br. 9-10.  Yet notwithstanding the Committee's representations, there are other state actor standards.  *Lugar*, 457 U.S. at 939 (courts have articulated a number of factors in different contexts, including the "public function," "state compulsion," "nexus," and "joint action" tests).  Indeed, the Supreme Court has questioned

whether these different "tests" are, in fact, "simply different ways of characterizing the necessarily fact-bound inquiry that confronts" courts in these situations. *Id.*

Regardless of how one characterizes the inquiry, that "something more" is unmistakably present here. Indeed, the Committee would not exist but for the operation of federal law and the exercise of discretion by federal employees and judicial officials—to create the Committee and, once created, to empower it to bring this very motion.

The Committee is appointed by the U.S. Trustee, subject to court approval. 11 U.S.C. § 1102(a)(1), (4); *see also Blixseth v. Brown*, 470 B.R. 562 (D. Mont. 2012) (appointed with bankruptcy court approval, committee members are functionally equivalent to court-appointed officers), citing *Lawrence v. Goldberg*, 573 F.3d 1265, 1269 (11th Cir. 2009). The Court may order the U.S. Trustee to change the Committee's membership after notice and hearing. 11 U.S.C. § 1102(a)(4); *see also In re SPM Mfg. Corp.*, 984 F.2d 1305, 1317 (1st Cir. 1993) ("the bankruptcy court always retains the power to monitor and control the tenor of reorganization proceedings," including through its powers under section 1102(4)).

The Committee members' expenses are subject to court approval, which by law may only include reasonable and necessary costs and expenses incurred in the performance of committee duties. 11 U.S.C. § 503(b)(3)(F). The Committee may employ attorneys or other professionals but only with court approval, 11 U.S.C. § 1103(a); and those professionals' expenses are similarly subject to court approval. 11 U.S.C. § 503(b)(2). Critically, the Court also may withdraw the Committee's derivative standing in this adversary proceeding, even in the absence of the Committee's consent, if the Court concludes that the Committee's role is no longer in the best interests of the estate. *Official Comm. of Equity Secured Holders v. Official Comm. of Unsecured Creditor* (*In re Adelphia Communications Corp.*), 544 F.3d 420, 423 (2d Cir. 2008).

In short, "every aspect of [the Committee's] position and function is subject to either statutory obligation or to federal executive or judicial branch control." *In re Barman*, 252 B.R.

403, 412 (Bankr. E.D. Mich. 2000); *cf. Brownson v. Bogenschutz*, 966 F. Supp. 795 (defendant

TV station and its employees not acting under color of law, despite court rule permitting

televised proceedings, where court not informed of plaintiffs' religious objections to

photography). [8]

The close and concentric connection between the Committee and "government," and the

bankruptcy court in particular, finds confirmation in case law governing the "derived judicial

immunity" doctrine.  It has long been recognized that

> a trustee in bankruptcy *or an official acting under the authority of*
> *the bankruptcy judge*, is entitled to derived judicial immunity
> because he is performing an integral part of the judicial process.

*Lonneker Farms, Inc. v. Klobucher*, 804 F.2d 1096, 1097 (9th Cir.1986) (emphasis added), cited

in *Szeklinski v. Neary*, 07-C-222, 2007 WL 777539, at *1 (E.D. Wis. Mar. 12, 2007).

Accordingly, committees, like trustees, enjoy immunity for conduct within the scope of their

statutory or court-ordered authority.  *See In re Drexel Burnham Lambert Grp.*, 138 B.R. 717, 722

(Bankr. S.D.N.Y.), *aff'd*, 140 B.R. 347 (S.D.N.Y. 1992).  The Committee cannot have it both

ways—power and immunity but "private" status for RFRA—though surely it wants it so. [9]

The Committee points to *In re Dow Corning Corp.*, 255 B.R. 445, 524 (E.D. Mich.

2000), for a contrary conclusion.  *See* Comm. Br. 11.  Yet the claimants in that case simply did

not argue—and the court, thus, did not consider—whether the committee was acting under color

of law.  *See generally In re Dow Corning* (nowhere discussing color of law analysis). The same

is true for *In Fuel Oil Supply and Terminaling v. Gulf Oil Corp.*, 762 F.2d 1283 (5th Cir. 1985).

Comm. Br. 11.  Indeed, the court there considered the limits of an appointed committee's

---

[8] The Court, of course, is "a branch ... of the United States."  42 U.S.C. § 2000bb-2(1) (defining "government"); *see also*, *e.g.*, U.S. Const., art. I, § 8 (granting Congress authority "[t]o constitute tribunals" inferior to the Supreme Court); 28 U.S.C. §§ 151, 130 (designation of bankruptcy courts and judicial districts).

[9] These same factors also support a finding that the Committee is acting as an "instrumentality or official" of a branch of the United States—namely, the bankruptcy court—and thus is "government" under RFRA.  *See* 42 U.S.C. § 2000bb-2(1) (defining "government").

authority, not the effect of such authority's exercise. Those cases are, therefore, simply inapposite.

All of this should be sufficient to charge the Committee's acts to "government" under RFRA. Yet the Committee's status here is not only defined merely by its general status and existence under bankruptcy law; it is more particularly established by court orders governing this adversary proceeding. Indeed, the Committee is pursuing its counterclaims and this motion pursuant *only* to the authority granted it directly by this Court. *See generally* Adv. Proc. Dkt. No. 39.[10] The relevant order gives the Committee "permission," using the Committee's own word, Comm. Br. ¶ 26, to stand in the shoes of the Debtor, requiring it to exercise its rights "for the benefit of the Debtor's estate." *Id.*

Consequently, the Committee "'*is working in effect for the court that appointed or approved [it]*, administering property that has come under the court's control by virtue of the Bankruptcy Code.'" *Blixseth*, 470 B.R. at 565-66 (refusing to exercise subject matter jurisdiction over claims against creditors' committee chair absent leave of bankruptcy court), quoting *In re Linton*, 136 F.3d 544, 545 (7th Cir. 1998) (precluding suit against Chapter 7 trustee). The fact is, courts have recognized that a bankruptcy trustee acts under color of law for purposes of claims arising out of his or her official duties, citing the same factors. *E.g.*, *In re Barman*, 252 B.R. at 413 (Chapter 7 trustee under color of federal law in inspecting debtor's property pursuant to *ex parte* order); *In re Bursztyn*, 366 B.R. 353 (Bankr. D.N.J. 2007) (same). And there is no reasonable basis for distinguishing the Committee's court-authorized actions, taken pursuant to or in the stead of a trustee's traditional power, here.

---

[10] Order Approving Second Stip. Regarding the Committee's Standing to Defend the Adversary Proceeding, Bring Avoidance Claims Related to the Am. Compl., and Litigate and, Propose or Accept A Settlement of the Adversary Proceeding, Or Part Thereof.

In short, the Committee is acting "under color of law" in pursuing its claims; it is

"government" under RFRA; and its motion to block RFRA's application should be denied.[11]

### C.   RFRA Precludes The Committee's Counterclaims Because Those Claims Rely On Federal, Not State, Law.

Equally unavailing is the Committee's assertion that application of RFRA to turnover and

avoidance claims pursuant to 11 U.S.C. §§ 542 and 544(b) would unconstitutionally "modify,

preempt, or trump state law."  Comm. Br. 12.[12]  The Committee relies on *City of Boerne v.*

*Flores*, 521 U.S. 507, but that case supports the Trustee, not the Committee.  There, the

Archbishop of San Antonio was denied a building permit to enlarge a church in Boerne, Texas,

to accommodate a growing parish.  The Archbishop challenged the denial, under a zoning

ordinance intended to preserve historic landmarks, as a violation of RFRA.  *Id.* at 512.  On

appeal, the Supreme Court asked whether Congress had exceeded the scope of its enforcement

power under section 5 of the Fourteenth Amendment when it enacted RFRA.  The Supreme

Court determined it had.  *Id.*

In reaching that conclusion, the Supreme Court observed that RFRA was enacted in

direct response to its decision in *Employment Division v. Smith*, 494 U.S. 872, where the

Supreme Court had abandoned the compelling government interest test to hold that neutral laws

of general applicability do not violate the First Amendment.  521 U.S. at 512-13.  Congress'

power under section 5 is, however, solely remedial—limited to "'enforc[ing]' the provisions of

---

[11] The Committee halfheartedly suggests that the Trustee conceded the Committee is a nongovernmental actor when it served the summons on counsel to the Committee.  Comm. Br. 11 n.3, citing Fed. R. Bankr. P. 7004(i) [sic].  This argument is a red herring.  Rule (4)(i) of the Federal Rules of Civil Procedure, the rule the Committee presumably intended to cite, applies only to service of the United States and its agencies, corporations, officers and employees.  The Trustee has brought suit against none of these.  Simply because the Committee is acting under color of law, or otherwise is an "instrumentality or official" of the bankruptcy court for RFRA and this adversary proceeding, does not alter that conclusion—or the prescribed methods for service.

[12] The Committee does not cite section 542 in its challenge to RFRA as a purportedly unconstitutional effort to amend state law, referencing instead only section 541.  *See* Comm. Br. 12-15.  However, the Committee does not want merely a determination that the Trust's principal is included within the estate, but that it must also be *turned over* to the estate, pursuant to section 542 and the Committee's counterclaims.  *See* First Am. Countercls. ¶¶ 74-86.  The Committee is wrong with respect to both sections.

19

the Fourteenth Amendment." Congress had no power to "decree" or determine "what constitutes

a constitutional violation" by a state. *Id.* at 517-19. The Supreme Court found RFRA not merely

remedial—that is, preventive legislation—but a "substantive alteration" to *Smith*'s holding, *id.*

at 534, and, as a result, unconstitutional when applied to a state. *See id.* at 536.

The Committee notably does not explain how application of RFRA to its counterclaims

involves Congressional power under the Fourteenth Amendment and, accordingly, how *Boerne*

is even applicable here. *See generally*, Comm. Br. 12-15. It is not. To the contrary, it is

section 542 of the Bankruptcy Code—enacted pursuant to the Bankruptcy Clause in Article I,

Section 8—that can mandate the turnover of property to the estate or otherwise give a trustee,

and here (through the court's order) the Committee, the authority to seek such turnover. And it

is section 544, similarly enacted under the Bankruptcy Clause, that provides the trustee, here the

Committee, the power to try to "avoid any transfer of an interest of the debtor in property ...

voidable under applicable law by [an unsecured creditor]." 11 U.S.C. § 544(b)(1).

In *Boerne*, state and local law applied of their own force, and the church invoked RFRA

in response. Here, in contrast, state law is relevant only because, and to the extent that, the

Bankruptcy Code makes it relevant. The decision in *Boerne*, accordingly, does not impose a

sovereign immunity obstacle to RFRA's application by this Court.

To enact RFRA, Congress relied on all of its Article I authority. *See* H.R. Rep.

No. 103-88, at 17 (1993) ("Congress has the constitutional authority to enact [RFRA] ....

[p]ursuant to Section 5 ... *and* the Necessary and Proper Clause embodied in Article I, Section 8

....). That includes, of course, the power to establish "uniform Laws on the subject of

bankruptcies throughout the United States." U.S. Const. art. I, § 8, cl. 4. Unlike the limited

scope of authority under section 5, "'Congress has plenary authority in all cases in which it has

substantive legislative jurisdiction, so long as the exercise of that authority does not offend some

other constitutional restriction.'" *In re Young*, 141 F.3d 854, 860 (8th Cir. 1998) (*Young III*), quoting *INS v. Chadha*, 462 U.S. 919, 941 (1983).

It is long settled that Congress may lawfully exercise its legislative power under the Bankruptcy Clause through reference to local law. *Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 190 (1902) ("Nor can we perceive in the recognition of the local law in the matter of exemptions, dower, priority of payments, and the like, any attempt [*sic*] by Congress to unlawfully delegate its legislative power."). It has done so by allowing trustees to pursue avoidance of transfers otherwise voidable under "applicable law." 11 U.S.C. § 544(b)(1). What Congress gives, however, it may also take away. The Supreme Court has explained Congress' power:

> [It] extends to all cases where the law causes to be distributed, the property of the debtor among his creditors; this is its least limit. Its greatest, is the discharge of a debtor from his contracts. And all intermediate legislation, affecting substance and form, but tending to further the great end of the subject-distribution and discharge-are in the competency and discretion of Congress.

*Moyses*, 186 U.S. at 186; *see also Butner v. United States*, 440 U.S. 48, 54 (1979) (Congress' power under the Bankruptcy Clause "would clearly encompass a federal statute defining [a] mortgagee's interest in the rents and profits earned by property in a bankrupt estate. But Congress has not [yet] chosen to exercise its power to fashion any such rule.").

Indeed, Congress has specifically limited a trustee's avoidance powers with respect to, for example, religious tithing and other charitable contributions. *See* 11 U.S.C. § 544(b)(2) (excluding from avoidance under section 544(b)(1) transfers made to qualified religious entities); *see also* 5 *Collier on Bankruptcy* ¶ 544.06[3] (Alan N. Resnick & Henry J. Sommer eds. 16th ed.) ("[e]ven if there is time under state law to assert the claim, the trustee is subject to the limitations period in section 546 applicable to the commencement of avoidance actions generally"). The Committee fails to explain how the application of RFRA to sections 544(b)(1) and 550 could impermissibly "modify, preempt, or trump" state law, Comm. Br. 12, in light of

the similar, if more narrow, limitations imposed by section 544(b)(2). The Committee does not because it cannot. *See Young III*, 141 F.3d at 861 ( "RFRA is an appropriate means by Congress to modify ... bankruptcy laws," precluding recovery of debtor's religious tithes from a church as an avoidable transaction).

The Committee's suggestion that there could be no substantial burden from its counterclaims "because outside of bankruptcy any creditor of the Debtor could sue the [Trust] to avoid the transfers from the Debtor under Wisconsin law unimpeded by RFRA," Comm. Br. 14, is easily rejected. A trustee's powers under sections 544(b)(1) and 550 generally exceed those available under state law. While a creditor may avoid a transfer or obligation under Wisconsin law only "to the extent necessary to satisfy the creditor's claim," Wis. Stat. § 242.07(1) (2009-10), a recovery under section 544(b) is not limited by the amount of actual unsecured claims. *In re Acequia, Inc.*, 34 F.3d 800 (9th Cir. 1994).[13] More importantly, simply because the state theoretically could engage in conduct that substantially burdens free exercise, that does not mean the court may countenance such burdens here—absent a compelling government interest furthered by the least restrictive means. RFRA demands that it not. 42 U.S.C. § 2000bb-1.

The Committee's request for a determination, here and now, that RFRA cannot apply to state law repeatedly relies on a seven-year-old decision in another diocesan bankruptcy. *In re Roman Catholic Archbishop of Portland in Oregon*, 335 B.R. 842 (Bankr. D. Or. 2005); *see* Comm. Br. 13-14, 18. Yet not only is the relevant discussion in that case dicta, Comm. Br. 14 n.6 (conceding the committee there did not argue constitutionality), the court there also denied

---

[13] The Committee concedes that section 544(a) creates substantive rights not present in state law by giving the trustee the rights of bona fide purchasers (and other specified creditors) whether or not such a person exists. Comm. Br. 14 (n.6).

summary judgment precisely because it found "there was a question of fact on whether a substantial burden had been imposed."  Comm. Br. 14 n.6.[14]

Moreover, to the extent that *In re Roman Catholic Archbishop* questioned RFRA's application because "[s]ection 541 merely defines what property is included in a bankruptcy estate" while issues of status or ownership "are determined by application of state law," 335 B.R. at 860, the court missed the point.  RFRA expressly "applies to *all* Federal law, and the implementation of that law," 42 U.S.C. § 2000bb-3(a) (emphasis added), including section 541.  As a result, that property otherwise includible in the estate must be excluded if, as here, its taking would substantially burden a person's free exercise of religion.  42 U.S.C. § 2000bb-1(a)-(b).[15]  Congress has the prerogative to make that choice, and it has.  *Cf.* 11 U.S.C. § 541(b) (excluding various property interests from the estate including, for example, funds placed in individual retirement accounts and deferred compensation plans).  The application of RFRA to the Committee's counterclaims does not implicate the federalism, separation of powers and states' rights concerns at issue in *Boerne*—and the Committee's challenge to RFRA should be rejected.[16]

**D.    Conversion Of The Trust's Assets Would Substantially Burden The Trustee And Trust's Free Exercise Of Religion In Violation Of RFRA.**

Not only is the Committee incorrect in its assertion that RFRA does not apply to its turnover and avoidance claims against the Trust, it has failed to raise any fact or dispute of fact

---

[14] At the same time the Committee relied on *In re Roman Catholic Archbishop*, it argues the case "was incorrectly decided."  Comm. Br. 14 n.6.  The declaration submitted with this memorandum for the Trustee addresses the substantial burden question—though in a vacuum because the Committee has not submitted any admissible evidence to the contrary.  *See supra* at I.  Whatever the "correct" legal standard and decision here, the Committee has not provided a factual context for either the Trustee to respond to these issues—or for the Court to decide them.

[15] The Trustee, of course, disputes that any of the Trust's funds are properly included in the estate under section 541.

[16] In a footnote, the Committee hopes to reserve its rights to contest RFRA's constitutionality as applied to federal law should its motion be denied.  Comm. Br. 12 n.4.  If the Committee had additional arguments to support its position, it should have made them, and the Court should reject the Committee's serial approach to motion practice.  Regardless, any motion would be futile.  *See O'Bryan v. Bureau of Prisons*, 349 F.3d 399 (7th Cir. 2003) (holding RFRA constitutional as to Congress' exercise of its Article I powers).

23

concerning the substantial burden those claims impose on the free exercise of religion here.

Indeed, the Committee's only argument in this regard is that there could be no substantial burden

in allowing its counterclaims to go forward "because outside of bankruptcy any creditor of the

Debtor could sue the [Trust] to avoid the transfers … unimpeded by RFRA."  Comm. Br. 14.

This argument, of course, applies at best to only some of the Committee's 17 counterclaims.  *See*

1st Am. Countercls. (asserting its Sixth, Seventh, Eighth, Twelfth, Fourteenth and Fifteenth

Counterclaims under section 544(b)).  It is also wrong for reasons already explained.  *See supra*

section II.C.

The Seventh Circuit has held that a substantial burden on the free exercise of religion,

within the meaning of RFRA, is one that

> forces adherents of a religion to refrain from religiously motivated
> conduct, inhibits or constrains conduct or expression that manifests
> a central tenet of a person's religious beliefs, or compels conduct
> or expression that is contrary to those beliefs.

*Mack v. O'Leary*, 80 F.3d 1175, 1179 (7th Cir. 1996), *vacated on other grounds*, 522 U.S. 801

(1997).  Courts evaluating substantial burden must be "sensitive to religious feeling."  *Id.*

Religious practices that may not be mandatory may nonetheless be "important to their

practitioners, who would consider the denial of them a grave curtailment of their religious

liberty."  *Id.*; *see also Thomas v. Review Board*, 450 U.S. 707, 718 (1981) (holding pre-*Smith*

that a substantial burden exists under the First Amendment where the state "put[s] substantial

pressure on an adherent to modify his behavior and to violate his beliefs").

Subsequent to *Mack*, Congress bolstered the Seventh Circuit's view of "substantial

burden" by amending RFRA's definition of "religious exercise" to include "*any exercise of

religion*, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C.

§ 2000cc-5(7)(A) (emphasis added); *see also* § 2000bb-2(4).  RFRA's expansive conception of

religious exercise leaves no question that a judicial order granting the relief the Committee seeks

would constitute an immeasurable burden on the Archbishop's and the Trust's (as well as the Archdiocese's) free exercise of religious beliefs.

A, if not *the*, central feature of Christian faith is the belief in the resurrection of the dead. PFOF ¶ 24.  For Catholics, this is not only a theoretical belief.  It is grounded in the anticipation of the resurrection of one's own body.  *Id.* ¶ 25.  Pursuant to this belief, the soul separates from the body at death to meet God, while awaiting reunion with its body, transformed and resurrected through the power of Jesus' resurrection, on the last day.  *Id.* ¶ 26.  Bodies of the dead, therefore, must be treated with respect and charity.  *Id.* ¶ 28.

Catholic cemeteries are sacred places under canon law, blessed and consecrated by the Church; they are not mere property.  *Id.* ¶ 21.  The creation and maintenance of Catholic cemeteries are an expression of Catholics' belief in the resurrection and commitment to the corporal work of mercy of burying the dead.  *Id.* ¶ 23.  The Church's laws, as well as its historical and religious traditions, require the perpetual care of Catholic cemeteries in a manner befitting their sacred purposes and that money be set aside for this purpose.  *Id.* ¶ 19.

If this Court were to order the Trust to turn over its funds to the estate for the benefit of the Archdiocese's creditors, there would be no remaining funds (or, at best, insufficient funds) for the Milwaukee Catholic Cemeteries' perpetual care.  *Id.* ¶ 37.  As a consequence, the Archdiocese, the Trust and the Archbishop (including as Trustee) will be not merely "inhibit[ed] or constrain[ed]" from exercising their ecclesiastical obligations to provide for these sacred sites, *Mack*, 80 F.3d at 1179, they will be entirely unable to do so.  PFOF ¶ 38.  Moreover, an order requiring turnover would compel the Archbishop to use funds given by the faithful, and otherwise set aside for perpetual care of the cemeteries, for the payment of the Archdiocese's creditors, contrary to his and the Trust's beliefs as well as canon law—and at the risk of religious penalty.  *Id.* ¶¶ 31-36; *see United States v. Ali*, No. 11-3512, ___ F.3d ___, 2012 WL 1970776 (8th Cir. Jun 4, 2012) (pretrial order requiring criminal defendant to stand when court convened

25

and recessed in contravention of her religious beliefs constituted substantial burden under RFRA).

In light of this substantial burden, it is incumbent upon the Committee to demonstrate that application of the applicable Bankruptcy Code sections to the Trust "(1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling government interest." 42 U.S.C. § 2000bb-1(b). This, the Committee cannot do. It has not even tried. Instead, the Committee cites a string of cases, without explanation, for the proposition that the Bankruptcy Code provisions on which it relies serve a compelling government interest. Comm. Br. 19-20. All but one of those cases, however, do not even involve the Bankruptcy Code provisions at issue here. *See In re Meyer*, 467 B.R. 451 (Bankr. E.D. Wis. 2012) (free exercise challenge to § 707(b)); *In re Navarro*, 83 B.R. 348 (Bankr. E.D. Pa. 1988) (establishment challenge to § 1325(b)); *In re Turner,* 193 B.R. 548 (Bankr. N.D. Cal. 1996) (RFRA challenge to § 110(c)).

Those cases may speak to the general interest advanced by the bankruptcy system in "allowing debtors to get a fresh start while … protecting the interests of creditors by maximizing the debtor's estate." *In re Young*, 82 F.3d 1407, 1419 (8th Cir. 1996) (*Young II*). Yet that interest alone is not sufficiently compelling. *Id*. at 1420. This is particularly true in light of the provisions in the Bankruptcy Code itself that limit the breadth of the estate or otherwise create exceptions that do not further the articulated interest. *In re Roman Catholic Archbishop*, 335 B.R. at 864 (citing § 541(d) (excluding from estate property to which debtor holds legal but not equitable title)); *cf. In re Newman*, 183 B.R. 239, 252 (Bankr. D. Kan. 1995) (*Newman I*) (relying on *In re Young*, 152 B.R. 939 (D. Minn 1993) (*Young I*), reversed, and holding the Bankruptcy Code furthers a compelling government interest), cited in Comm. Br. 19.

For the same reason, it also cannot be said that the Bankruptcy Code utilizes the "least restrictive means" of furthering the interest the Committee articulates. 42 U.S.C. § 2000bb-1(b).

26

The Committee points to *In re Newman,* 203 B.R. 468 (D. Kan. 1996) (*Newman II*), in support of its fraudulent conveyance claim under section 548. There, the court held that a Chapter 7 trustee could recover monies tithed by the debtors to their church under section 548 without violating RFRA's "least restrictive means" requirement: "[T]he statute balances the potentially conflicting interests of debtor and creditor in what is the only practical manner available." *Id.,* 203 B.R. at 478. The Committee's reliance on *Newman II* is curious—and entirely misplaced—in light of the subsequent enactment of the Religious Liberty and Charitable Donation Protection Act of 1998 ( "RLCDPA"). With RLCDPA, Congress engrafted onto section 548 a specific exception for religious tithes and other charitable donations, precisely like those at issue in *Newman II. See* 11 U.S.C. §§ 544(b)(2), 548(a)(2), 548(d)(3).[17]

The Committee notably also does not even attempt to argue that the other Bankruptcy Code sections on which it relies meet the "least restrictive means" requirement. *See generally* Comm. Br. 19-20. It, thereby, concedes that they do not. *See UA Local 343 of the United Ass'n of Journeymen & Apprentices v. Nor-Cal Plumbing, Inc.,* 48 F.3d 1465, 1471 (9th Cir.1994) (when the moving party also has the burden of proof in an element of a claim, it has the "burden of establishing a prima facie case on [the] motion for summary judgment"), citing *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). Even if the Committee could successfully prove its claims against the Trust (it cannot), the Archbishop, as Trustee, and the Trust would be put to a choice

---

[17] The Committee points to the enactment of RLCDPA as evidence that Congress did not intend RFRA "to amend ... any ... section of the Bankruptcy Code." Comm. Br. 20 n.10. However, RLCDPA was intended to reinforce RFRA's protections in the specific context of tithing, thereby saving religious organizations from "the substantial litigation costs that can be incurred ... in defending against a fraudulent conveyance action under section 548 of the Bankruptcy Code." H.R. Rep. No. 105-556, at 4 (1998). Congress introduced RLCDPA to supplement RFRA in the immediate aftermath of the Supreme Court's decision in *Boerne.* 143 Cong. Rec. S10294 (daily ed. Oct. 1, 1997) (statement of Sen. Grassley). Senator Grassley, the bill's sponsor, expressed "particular concern" because the Eighth Circuit's decision in *Young II,* holding that "RFRA protected churches from bankruptcy lawsuits seeking the return of money given as a tithe," had been vacated by the Supreme Court and remanded for reconsideration in light of *City of Boerne. Id.* Accordingly, that *Young II* was decided (as the Committee stresses) prior to RLCDPA's passage is of no consequence. *See also In re Young,* 141 F.3d 854 (8th Cir. 1998) (affirming its decision in *Young II,* including RFRA's applicability to the Bankruptcy Code).

between fidelity to religious belief and ecclesiastical directive or compliance with the Court's

order.  RFRA commands that they not be compelled to make that choice.

### III.     THE FREE EXERCISE CLAUSE ALSO PREVENTS THE CREDITORS' COMMITTEE FROM ATTACKING THE TRUST.

There is little doubt that RFRA provides greater, certainly more explicit, protection than

the First Amendment to religious practices, and the Court need not reach the constitutional issue

if it can, as it should, resolve these issues under the federal statute.  Nonetheless, the

Committee's contention that the First Amendment does not bar its claims also can be rejected.

RFRA aside, the Supreme Court has established that a law that is neutral and of general

applicability need not be justified by a compelling governmental interest, even if it has the

incidental effect of burdening a particular religious practice.  *Smith*, 494 U.S. 872.  The

Committee understandably wishes that its claims meet *Smith*'s requirements.  They do not.

Indeed, the Bankruptcy Code provisions that the Committee seeks to apply are riddled with

exceptions and exclusions that belie neutrality and general applicability.  *See*, *e.g.*, 11 U.S.C.

§ 541(b) (excluding from the estate property interests in, *inter alia*, funds placed in IRAs,

qualifying college savings accounts, and wages withheld as contributions to employee benefit

plans); § 548(a)(2), (d)(3) (excluding qualified religious and charitable contributions); *see also*

11 U.S.C. § 544(b)(2) (incorporating the religious and charitable contributions exclusion in

§ 548(a)(2)).

The Committee nonetheless argues that the Court should apply rational basis review, not

suspect classification analysis, asserting that section 541 is also "neutral with respect to any

religion as it merely defines what state-defined property is included in the bankruptcy estate."

Comm. Br. 18.  Of course, to avoid heightened scrutiny, a law must not only be neutral but also

"of general applicability."  *Church of Lukumi Babalu Aye v. Hialeah*, 508 U.S. 520, 531 (1993).

Indeed, "[n]eutrality and general applicability are interrelated, and ... failure to satisfy one

requirement is a likely indication that the other has not been satisfied." *Id*. The Committee does not even attempt to argue that section 541 is generally applicable, *see* Comm. Br. 18, nor could it in light of the exceptions in subsection 541(b).

The Committee cites *In re Gomes*, 219 B.R. 286 (Bankr. D. Or. 1998), and *In re Bloch*, 207 B.R. 944 (D. Colo. 1997), for its argument that sections 544 and 548 are neutral and generally applicable. Comm. Br. 17. Notably, both cases were decided before the 1998 enactment of RLCDPA, carving out religious and charitable contributions from the reach of sections 544 and 548. *See* 219 B.R. at 290-91 (provisions of pre-RLCDPA sections); 207 B.R. at 947 (pre-RLCDPA section 548). They, thus, do not provide the support the Committee seeks.

"All laws are selective to some extent, but categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice." *Church of Lukumi*, 508 U.S. at 542 (invalidating municipal ordinances precluding ritual sacrifice of animals where ordinance included exclusions for similar practices, religious and non-religious). Here, the provisions on which the Committee relies contain numerous provisions excluding various funds and their uses from the reach of the estate. While those exceptions may reflect valid policy concerns of Congress, the Free Exercise Clause does not permit a determination that "secular motivations are more important than religious motivations." *FOP Newark Lodge No. 12 v. Newark*, 170 F.3d 359, 365 (3d Cir. 1999) (invalidating, under heightened scrutiny, "no-beard" policy where police department chose to provide medical, but not religious, exemptions).[18]

In a last ditch effort, the Committee argues that even if the compelling governmental interest test were applied, the challenged provisions still would withstand the strict scrutiny that test requires. Comm. Br. 19-20. The Committee is mistaken on this point for reasons that need

---

[18] That sections 544 and 548 provide an exception for certain religious as well as charitable contributions does not save them from heightened scrutiny. It is well-established that the government may not prefer certain religious practices, such as tithing, over others—here, the maintenance and use of funds for the perpetual care of Catholic cemeteries. *See Fowler v. Rhode Island*, 345 U.S. 67, 70 (1953) ("it is no business of courts to say that what is a religious practice or activity for one group is not religion under the protection of the First Amendment").

not be repeated here.  *See supra* section II.D.  The fact is, just as a creditors' committee could not discriminate in its advocacy or its membership based on religion, or ignore the need of its members to avoid meetings on Friday for religious reasons, it cannot ignore the requirements imposed by the Catholic religion on the maintenance of its cemeteries and the complementary requirement for funds to meet those requirements.  The Committee's motion should, therefore, be denied—and the Court should grant judgment in the Archbishop's favor.

## CONCLUSION

For the reasons stated above, the Court should deny the Committee's motion for partial summary judgment.  It has not provided a factual or legal basis to strip the Trust of the protection provided by the Religious Freedom and Restoration Act or the First Amendment.  The Court need not stop there, however.  On the arguments and declaration presented by the Trust, it should grant the Trust summary judgment under Rule 7056, applying RFRA to end—at the threshold— the Committee's crusade to appropriate the Trust's funds in satisfaction of its own and other creditors' interests.

Dated:  July 9, 2012.                    GODFREY & KAHN, S.C.


By:      *s/ Linda S. Schmidt*_____
            Brady C. Williamson
            Linda S. Schmidt

            780 North Water Street
            Milwaukee, WI 53202-3590
            Phone: 414-273-3500
            Fax: 414-273-5198
            Email: lschmidt@gklaw.com

            Attorneys for Archbishop Jerome E. Listecki, as
            Trustee of the Archdiocese of Milwaukee Catholic
            Cemetery Perpetual Care Trust

8007273_3

## APPENDIX:  RELEVANT STATUTES/RULES

**U.S. Const., amend. I.**

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . .

**42 U.S.C. § 2000bb. Congressional findings and declaration of purposes**

**(a) Findings**
The Congress finds that--

**(1)** the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution;

**(2)** laws "neutral" toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise;

**(3)** governments should not substantially burden religious exercise without compelling justification;

**(4)** in *Employment Division v. Smith*, 494 U.S. 872 (1990) the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion; and

**(5)** the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests.

**(b) Purposes**
The purposes of this chapter are--

**(1)** to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and

**(2)** to provide a claim or defense to persons whose religious exercise is substantially burdened by government.

**42 U.S.C. § 2000bb-1. Free exercise of religion protected**

**(a) In general**.
Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).

**(b) Exception**.

Government may substantially burden a person's exercise of
religion only if it demonstrates that application of the burden to the
person—

> **(1)** is in furtherance of a compelling governmental interest;
> and

> **(2)** is the least restrictive means of furthering that
> compelling governmental interest.

**(c) Judicial relief**.
A person whose religious exercise has been burdened in violation
of this section may assert that violation as a claim or defense in a
judicial proceeding and obtain appropriate relief against a
government.

## 42 U.S.C. §2000bb-2.  Definitions.

As used in this chapter--

> **(1)** the term "government" includes a branch, department, agency,
> instrumentality, and official (or other person acting under color of law) of
> the United States, or of a covered entity;

> **(2)** the term "covered entity" means the District of Columbia, the
> Commonwealth of Puerto Rico, and each territory and possession of the
> United States;

> **(3)** the term "demonstrates" means meets the burdens of going forward
> with the evidence and of persuasion; and

> **(4)** the term "exercise of religion" means religious exercise, as defined in
> section 2000cc-5 of this title.

## 42 U.S.C. § 2000bb-3.  Applicability.

**(a) In general**
This chapter applies to all Federal law, and the implementation of that law,
whether statutory or otherwise, and whether adopted before or after November 16,
1993.

**(b) Rule of construction**
Federal statutory law adopted after November 16, 1993 is subject to this chapter
unless such law explicitly excludes such application by reference to this chapter.

**(c) Religious belief unaffected**
Nothing in this chapter shall be construed to authorize any government to burden
any religious belief.

**42 U.S.C. § 2000cc-55.  Definitions.**

In this chapter:

.        .        .

**(7) Religious exercise**

**(A) In general**
The term "religious exercise" includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief.

**2012 Fed. R. Civ. P. 56. Summary Judgment**

(a)        MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT.  A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

. . . .

(c)        PROCEDURES.  (1) *Supporting Factual Positions*.  A party asserting that a fact cannot be or is genuinely disputed must support the assertions by:

(A)        citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or

(B)        showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

. . . .

(f)        JUDGMENT INDEPENDENT OF THE MOTION.  After giving notice and a reasonable time to respond, the court may:

(1)        grant summary judgment for a nonmovant;

. . . .

(3)        consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute.

*See also* Civil Local Rule 56; Rule 7056, Fed. R. Bankruptcy Procedure.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

In re:

Archdiocese of Milwaukee,            Chapter 11

        Debtor.               Bankruptcy Case No. 11-20059-SVK

Archbishop Jerome E. Listecki, as Trustee
of the Archdiocese of Milwaukee Catholic
Cemetery Perpetual Care Trust,

        Plaintiff,

v.                        Adv. Proc. No. 11-2459-SVK

Official Committee of Unsecured Creditors,

        Defendant.

**TRUSTEE'S STATEMENT OF PROPOSED MATERIAL FACTS**

Brady C. Williamson (WI Bar No. 1013896)
Linda S. Schmidt (WI Bar No. 1054943)

Godfrey & Kahn, S.C.
780 North Water Street
Milwaukee, WI 53202-3590
Phone: 414-273-3500
Email: lschmidt@gklaw.com

The Plaintiff, Archbishop Jerome E. Listecki, as the Trustee of the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust (the "Trust"), by his counsel, Godfrey & Kahn, S.C., submits the following statement of proposed material facts in support of his memorandum in response to the *Official Committee of Unsecured Creditors' Motion for Summary Judgment on Count III of Amended Complaint*.

## PROPOSED FINDINGS OF FACT

1.      The Archdiocese of Milwaukee (the "Archdiocese" or "Debtor") was established on November 28, 1843 and created an archbishopric almost 32 years later, on February 12, 1875. (Declaration of Archbishop Jerome E. Listecki ("Decl.") ¶ 10.)

2.      The Archdiocese is both a Wisconsin non-stock corporation and a public juridic person under Codex Iuris Canonici or the Code of Canon Law (the "Code").  (Am. Compl. (Adv. Dkt. No. 34), ¶ 1; First Am. Answer (Adv. Dkt. No. 48), ¶ 1; Decl. ¶ 22.)

3.      The Archdiocese's mission is to serve Catholic parishes, schools and institutions so that they, too, may effectively carry out their mission to serve the people of God in Southeastern Wisconsin and the broader community.  (Decl. ¶ 10.)

4.      The Archbishop is Jerome E. Listecki, successor to former Archbishop, now Cardinal, Timothy M. Dolan.  (Decl. ¶¶ 1, 22.)

5.      The Archdiocese has operated and maintained Catholic cemeteries and mausoleums since as early as 1857 (collectively, the "Milwaukee Catholic Cemeteries").  (Decl. ¶ 11.)

6.      The Milwaukee Catholic Cemeteries consist of Catholic burial facilities within the geographic boundaries of the Archdiocese, including individual burial plots, crypts, niches, and property dedicated to future use as burial facilities.  (Decl. ¶ 12.)

7.    The Milwaukee Catholic Cemeteries encompass approximately 1,000 acres of land, in which more than 500,000 individuals are interred.  (Decl. ¶ 12.)

8.    An estimated 3,000 burials take place each year.  (Decl. ¶ 12.)

9.    In 2007, the Trust was formed under Wisconsin law by then Archbishop Dolan. (Decl. ¶ 22; *see also* Adv. Dkt. No. 57-2, Ex. A (the "Trust Agreement"), p. 1.)

10.    Its trustee is the Archbishop of the Archdiocese of Milwaukee, currently Arbishop Listecki (the "Trustee").  (Decl. ¶ 1; *see also* Trust Agreement, p. 3.)

11.    The funds that comprise the Trust's principal took nearly a century to accumulate and include approximately $55 million that had been held in trust for the perpetual care of the Milwaukee Catholic Cemeteries even prior to being transferred to the Trust in or around March 2008 (collectively, with any later earned or received Trust funds, the "Perpetual Care Funds"). (Decl. ¶¶ 29, 42.)

12.    The Archdiocese receives quarterly distributions from the Trust to cover costs incurred in providing for the perpetual care of the Milwaukee Catholic Cemeteries.  (Decl. ¶ 29.)

13.    Under church law, Catholic cemeteries are land that is blessed and consecrated for the specific use of Christian burial.  (Decl. ¶ 9.)

14.    Church law includes canon law, issued or authorized by the Pope, the Church's supreme legislator, and serves as the universal law of the Church, applicable to Catholics world-wide.  (Decl. ¶¶ 4-6.) [1]

15.    Church law also includes particular law, or law governing the specific territorial area for which it was promulgated.  (Decl. ¶ 5.)

16.    Catholic burial and cemeteries are governed by both universal and particular law. (Decl. ¶ 7.)

---

[1] The Greek word "canon" (κανών) means "rule, standard or measure."  (Decl. ¶ 4.)

3

17.     When the Archdiocese established its first cemetery in the mid-1800s, church law in the United States forbade priests from providing funeral services for Catholics being buried in non-Catholic cemeteries.  (Decl. ¶ 13.)

18.     Although this prohibition was eased slightly in later years, allowing Catholic funerals for those being buried in non-Catholic cemeteries under certain conditions, the Church continued to emphasize the sanctity of Catholic burial sites and the importance of the Church-owned cemeteries.  (Decl. ¶ 14.)

19.     The Church also required, among other things, that Catholic cemeteries be maintained in a manner befitting their sacred purpose with that money set aside to provide the necessary maintenance.  (Decl. ¶ 15.)

20.     These expectations and requirements are reflected in the universal law of the Church, first codified in 1917 as the Code of Canon Law (the "Code"), and in particular law of the Archdiocese.  (Decl. ¶¶ 4, 20.)

21.     The placement of the canons governing cemeteries in the 1917 and, later, the 1983 Code emphasizes the Catholic belief that Catholic cemeteries are sacred places, not mere property.  (Decl. ¶¶ 16, 20.)

22.     As expressed in the Archdiocese's 1979 "Guidelines for Christian Burial":

> Not only is the Catholic cemetery a sacred place, a place of prayer, and a place reflecting our beliefs and traditions, it is also for the community a sign of the link among all the faithful, living and dead.  It is recognition of that Faith which is shared by the dead buried there and the living who commit their deceased to this holy ground.

(Decl. ¶ 17.)

23.     For the Church, Catholic cemeteries reflect the Catholic belief in the resurrection of Jesus from the dead and the community's commitment to the corporal work of mercy of burying the dead.  (Decl. ¶ 18.)

24.     Resurrection of the dead, of course, is and always has been an essential element of the Christian faith, beginning with Jesus' own resurrection.  (*See* Decl. ¶ 2(a)-(b).)

25.     For Catholics in particular, the belief in resurrection is a belief in the resurrection of one's own body.  (Decl. ¶ 2(c).)

26.     According to this belief, the soul separates from the body at death to meet God, while awaiting reunion with its body, transformed and resurrected through the power of Jesus' resurrection, on the last day.  (Decl. ¶ 2(d)-(g).)

27.     The sacred nature of Catholic cemeteries and compliance with the Church's historical and religious traditions and mandates requiring their perpetual care are understood as a fundamental exercise of this core belief in resurrection.  (*See*, *e.g.*, Decl. ¶¶ 3, 9, 15, 21, 31.)

28.     Theologically, bodies must be treated with respect and charity in the Catholic faith and hope of resurrection.  (Decl. ¶ 31.)

29.     Although Archbishop Listecki is the administrator of both in civil and canon law, the Trust is a separate and distinct legal entity from the Archdiocese.  (Decl. ¶¶ 22-24.)

30.     Under the Code, therefore, if not also civil law, ownership of the Trust funds is in the Trust, not the Archdiocese or the Archbishop.  (Decl. ¶ 26.)

31.     By administering and holding funds for the ongoing care of the Milwaukee Catholic Cemeteries, the Archdiocese and, subsequently, the Trust and Trustee assumed canonical and moral responsibility for that perpetual care.  (Decl. ¶ 34.)

5

32.     Under the Code, offerings given by the faithful for a particular purpose may only be applied for that purpose.  (Decl. ¶ 34.)

33.     Further, the Code requires that the Trust's funds be used only for the Trust's designated purposes.  (Decl. ¶ 35.)

34.     If funds are alienated from the Trust without the required canonical approval, the Archbishop as Trustee may well face a religious penalty from the Church.  (*See* Decl. ¶¶ 25, 39.)

35.     Depending on the value of the property proposed to be alienated, canonical norms require consultation or consent from Church authorities—and may also require approval from the Vatican.  (Decl. ¶ 25.)

36.     Archbishop Listecki, as Archbishop and Trustee, adheres to the belief in resurrection of the body and that belief's exercise through, among other things, the perpetual care of the Milwaukee Catholic Cemeteries.  (*See*, *e.g.*, Decl. ¶¶ 21, 40.)

37.     If the Trust is legally compelled to turn over its funds to the estate, there will be no funds or, at best, insufficient funds, for that perpetual care.  (Decl. ¶ 30.)

38.     As a result, neither the Archdiocese, nor the Trust and its Trustee, the Archbishop, will be able to exercise their canonical and moral obligations to provide the appropriate care for these sacred sites or assure the requisite permanence, reverence and respect for those buried there.  (Decl. ¶¶ 18, 40-41, 43.)

Dated:  July 9, 2012.

GODFREY & KAHN, S.C.

By:     *s/Linda S. Schmidt*
        Brady C. Williamson
        Linda S. Schmidt

        780 North Water Street
        Milwaukee, WI 53202-3590
        Phone: 414-273-3500
        Fax: 414-273-5198
        Email: lschmidt@gklaw.com

        Attorneys for Archbishop Jerome E. Listecki, as
        Trustee of the Archdiocese of Milwaukee Catholic
        Cemetery Perpetual Care Trust

8159590_1

7

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

In re

Archdiocese of Milwaukee,
   Debtor.

Bankruptcy Case No. 11-20059-SVK

---

Archbishop Jerome E. Listecki, as Trustee
of the Archdiocese of Milwaukee Catholic
Cemetery Perpetual Care Trust,

   Plaintiff,

v.

Official Committee of Unsecured Creditors,

   Defendant.

Adv. Proc. No. 11-02459-SVK

---

## DECLARATION OF ARCHBISHOP JEROME E. LISTECKI

Archbishop Jerome E. Listecki HEREBY DECLARES AS FOLLOWS:

1.  I am the Archbishop of the Archdiocese of Milwaukee and Trustee of the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust (the "Trust"). I have personal knowledge of the matters in this Declaration and, if called upon as a witness, I could and would competently testify as to those facts. I make this Declaration in support of *Archbishop Jerome E. Listecki's, as Trustee of the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust, Opposition to Defendant's Motion for Partial Summary Judgment.*

## CORE BELIEFS OF THE CATHOLIC FAITH

2.    The following are basic and immutable tenets of the Roman Catholic religion:

(a)    "Belief in the resurrection of the dead has been an essential element of the Christian faith from its beginnings." *Catechism of the Catholic Church,* Libreria Editrice Vaticana, 1994 ("CCC") § 991.

(b)    "If there is no resurrection of the dead, then Christ has not been raised; if Christ has not been raised then our preaching is in vain and your faith is in vain." 1 Cor. 15:12-14; CCC § 651.

(c)    Resurrection theology does not refer to some other body. "We believe in the true resurrection of this flesh that we now possess." Church Council of Lyons II (1274); CCC § 1017.

(d)    The Credo—the very profession of a Roman Catholic's faith— "culminates in the proclamation of the resurrection of the dead on the last day and in life everlasting." CCC § 988.

(e)    "In death, the separation of the soul from the body, the human body decays and the soul goes to meet God, while awaiting its reunion with its glorified body. God, in his almighty power, will definitively grant incorruptible life to our bodies by reuniting them with our souls, through the power of Jesus' Resurrection." CCC § 997.

(f)    "In expectation of [the last] day, the believer's body and soul already participate in the dignity of belonging to Christ. This dignity entails the demand that he should treat with respect his own body, but also the body of every other person." CCC § 1004.

(g)    The soul "will be reunited with the body on the day of the resurrection of the dead." CCC § 1005; *see also* CCC § 650.

3.    Canon law, particular laws, universal laws, and Catholic practice all serve and support these fundamental tenets of our faith. In short, the care and maintenance of Catholic cemeteries, cemetery property, and the remains of those interred is a fundamental exercise of the Catholic faith.

2

## CANON LAW

4.      Canon law is the body of internal laws that govern the Catholic Church (the "Church").  The Greek word "canon" (κανών) means "rule, standard or measure."  The 1917 Code of Canon Law (the "1917 Code") was the first codification promulgated or issued as one legal text.  It was composed of five "books" or major sections.  Given the theological and practical developments that emerged from the Second Vatican Council in 1962-65, the Code was revised in 1983 in a seven-book (section) format (the "1983 Code").

5.      While the Code of Canon Law (the "Code") serves as the universal law of the Church, the Church also has provisions for particular law, or law governing a specific territorial area, such as a diocese.[1]  Universal law generally applies to Catholics throughout the world; particular law governs the territory for which it is promulgated.  (cc 12, 13)

6.      The Pope is the supreme legislator in the Church, and all universal laws are issued or authorized by him.  Those who supervise particular churches, such as dioceses, may issue particular laws.  Once laws are issued, they remain in effect until abrogated (changed in whole) or derogated (changed in part).  A universal law, however, may not be derogated by a particular law, unless the universal law expressly provides otherwise.  (c. 20)

7.      Christian burial and cemeteries are governed by both universal and particular law.  The canonical history of Catholic cemeteries in the Archdiocese of Milwaukee (the "Archdiocese") encompasses canonical provisions in effect prior to the 1917 Code, such as the norms of the Councils of Baltimore; the 1917 Code; and the 1983 Code.

---

[1] In citing to the Code, "canon" or "c." are proper citations or "cc" if citing to multiple provisions.

## CATHOLIC CEMETERIES

8.      Catholic cemeteries are protected and governed by the Church's law, which guarantees reverence and respect for the remains of the dead.  (Code, Book IV, Part III, Title I, Chapter 5)

9.      The Church affirms the sacredness of Catholic cemeteries, land that is blessed and consecrated by the Church for the specific use of Christian burial.  (*Id.*)  This sacred nature is directly related to the Church's belief in the resurrection of the body and the final consummation of the world.  (*See* ¶¶ 2-3 above)

10.     The Archdiocese was established on November 28, 1843 and created an archbishopric on February 12, 1875.  Its mission is to serve Catholic parishes, schools and institutions so that they may effectively carry out their mission, to serve the people of God in Southeastern Wisconsin and the broader community.

11.     Since 1857, and in furtherance of its religious mission, the Archdiocese has operated and maintained various Catholic cemeteries and mausoleums (collectively, the "Milwaukee Catholic Cemeteries").

12.     The Milwaukee Catholic Cemeteries consist of Catholic burial facilities within the geographic boundaries of the Archdiocese, including individual burial plots, crypts, niches, and property dedicated for future use as Catholic burial facilities.  They currently encompass approximately 1,000 acres of land, in which more than 500,000 individuals are interred.  An estimated 3,000 new burials take place each year.

13.     When the Archdiocese established its first Catholic cemetery in 1857, the importance of burying Catholics in Catholic cemeteries was enforced by the provisions of the First Plenary Council of Baltimore, which issued norms for the Church in the United States.  So clear was the connection between Catholic identity and Catholic burial that if a Catholic

4

cemetery was available, priests were forbidden to provide funeral services for a Catholic being buried in a cemetery owned by a non-Catholic church or a secular corporation. (First Plenary Council of Baltimore ("Conc. Balt. I"), n.3)

14.     This mandate was modified in the Second and Third Plenary Councils, allowing Catholic funeral services for Catholics being buried in a non-Catholic cemetery provided that the individual grave sites were blessed. Nonetheless, the importance of the Church's own cemeteries remained, as did the declaration regarding the sanctity of burial sites for Catholics. (Second Plenary Council of Baltimore ("Conc. Balt. II"), nn.391-392; Third Plenary Council of Baltimore ("Conc. Balt. III"), nn.317-319)

15.     Indeed, the Second and Third Plenary Councils of Baltimore further decreed that cemeteries must be maintained in a manner befitting their sacred purpose and that money must be set aside to provide ongoing upkeep of the property. (Conc. Balt. II, n.393; Conc. Balt. III, n.319)

16.     The 1917 Code continued the canonical expectation that the Church would own and maintain its own cemeteries, under specific rules, either at each parish or at a common site or sites in the diocese. (17CIC c. 1239) The inherent nature of Catholic cemeteries as sacred is reflected in the placement of the canons on cemeteries in the 1917 Code section entitled "Sacred Places." Cemeteries are not mere "property" in the Catholic faith.

17.     In 1975, the National Catholic Cemetery Conference issued "Christian Burial Guidelines," which became the basis for particular law in many dioceses throughout the United States. The Archdiocese issued a modified version of the guidelines in 1979. As expressed in those guidelines:

> Not only is the Catholic cemetery a sacred place, a place of prayer, and a place reflecting our beliefs and traditions, it is also for the

5

> community a sign of the link among all the faithful, living and
> dead. It is recognition of that Faith which is shared by the dead
> buried there and the living who commit their deceased to this holy
> ground.

*Guidelines for Christian Burial*, Archdiocese of Milwaukee, 1979.

18.    The Archdiocese's guidelines further set the expectation that Catholics, because

of their identity with the Church, will be buried in Catholic cemeteries.  According to the

Archdiocese's guidelines, Catholic cemeteries are "symbolic of that community which shared the

same faith, hope, and love with the deceased in life" and "reflect the doctrine of our belief in the

Resurrection of Jesus from the dead and our commitment to the Corporal Work of Mercy of

burying the dead."  Pursuant to the guidelines, Catholic cemeteries are "protected by the

Church's law providing the assurance of *permanence*, *reverence*, and *respect* for the remains of

the deceased." (Emphasis added.)

19.    The Archdiocese's guidelines also establish the expectation that service and

maintenance fees will be charged, subject to the age-old practice of reduced fees or a free burial

for those in need.

20.    The 1983 Code continues to express the Church's belief in the sacred nature of its

cemeteries.  The 1983 Code's canons on Cemeteries are found in Book IV (*The Sanctifying

Functions of the Church*), Chapter Five, Part III, entitled "Sacred Places and Times."  The final

canon in this chapter defines the role of the local church in ensuring the sacred character of

cemeteries:

> Particular law is to establish appropriate norms about the discipline
> to be observed in cemeteries, especially with regard to protecting
> and fostering their sacred character.

(c. 1243)  The Archdiocese's regulations on Catholic cemeteries constitute the relevant particular

law and provide norms governing these issues.

6

21.     The expectation that Catholic cemeteries will be properly maintained in perpetuity is grounded in the sacred character of the cemetery.  The designation and use of funds for the perpetual care of Catholic cemeteries is necessary to and inseparable from the Church's (including the Trustee's, Trust's and the Archdiocese's) exercise of its belief in the sacredness of Catholic cemeteries and reverence for the dead.

## THE TRUST

22.     Then Archbishop, now Cardinal Timothy M. Dolan, formed the Trust under the civil laws of the State of Wisconsin in 2007.  In addition to its civil law status, the Trust is a public juridic person under the Code.

23.     I, as Archbishop and Trustee, and the Trust act in conjunction and in conformance with the vision of the Roman Catholic Church.  The Trust nevertheless functions as an autonomous body with independent decision-making authority.  Under canon law, the property of public juridic persons is ecclesiastical property subject to the canons governing church property.  (cc 1254-1258)

24.     The Trust constitutes a separate and distinct legal entity from the Archdiocese, rather than a division or asset of the Archdiocese.  This separate status is reflected in all accounting related to the Trust, its independent creation and management, and its unique tax identification.

25.     The property of one juridic person in the Church, including the Perpetual Care Funds which comprise the Trust, cannot be transferred to another juridic person without observing the canonical norms on alienation of property.  For the administrator of a juridic person, such as the trustee of the Trust, to transfer funds to another is a matter of great import. Depending on the value involved, consultation or consent from certain Church bodies is required.  Such consultation or consent may also require obtaining approval from the Vatican.

7

The failure of an administrator to observe these norms could result in a canonical penalty: "A person who alienates ecclesiastical goods without the prescribed permission is to be punished with a just penalty." (c. 1377)

26.     The fact that one person may serve as the administrator of more than one juridic person, such as I do, does not mean that ownership of the property of the juridic persons is the same. Rather, under canon law, "ownership of goods belongs to that juridic person which has legitimately acquired them." (c. 1256)

27.     The administrator of a juridic person, such as the trustee of the Trust, may change with time, but the set purposes of the juridic body do not change. Juridic persons are presumed in canon law to be perpetual. (c. 120, §1) They can, under certain circumstances, go out of existence but only by prescribed processes.

28.     If a juridic person such as the Trust is suppressed (c. 120, §1), it may cease to exist, but the obligations do not cease; those obligations must be assumed by another physical or juridic person because the obligations are perpetual. If one juridic person merges with another, forming a third juridic person, all of the assets, but also all of the obligations, transfer to the new entity. (c. 121)

29.     The funds that comprise the Trust have taken nearly a century to accumulate, and the Archdiocese currently receives quarterly distributions from the Trust for costs incurred in providing for the perpetual care of the Milwaukee Catholic Cemeteries.

30.     If the Committee is successful in converting the Trust corpus into property of the Debtor's estate, there will be no funds or, at best, insufficient funds, for the perpetual care of the Milwaukee Catholic Cemeteries.

## CATHOLIC CEMETERY NORMS

31.     Pursuant to the *Catechism of the Catholic Church*, "the sacred character of Catholic cemeteries is noted not only in the Church's legal texts but also in its teaching documents. The bodies of the dead must be treated with respect and charity, in faith and hope of the Resurrection. The burial of the dead is a corporal work of mercy." CCC 2300.

32.     The Church affirms the sacredness of the Catholic cemetery as land that has been blessed and consecrated by the Church for the specific use of Christian burial. (c. 1240, §1)

33.     Decrees from Church authority mandate that cemeteries be maintained in a manner befitting their sacred purpose and that money be set aside to provide ongoing upkeep of the property.

34.     By accepting funds designated for the ongoing care of cemetery property, the Archdiocese, and subsequently the Trust and its Trustee, assume canonical and moral responsibility for that perpetual care. Regardless of the accounting mechanism used or the civil law construct established for fulfilling this responsibility, the Code is clear that funds entrusted for a designated purpose may only be used for that purpose:

> Offerings given by the faithful for a certain purpose can be applied only for that same purpose. (c. 1267, §3)

35.     The canon similarly requires that the property of an autonomous pious foundation be used for its designated purposes, governed by all the canonical norms on ecclesiastical property. (c. 1257, §1)

36.     In addition, funds that have a restricted purpose must be maintained as an "autonomous pious foundation." That term is defined as "aggregates of things destined for the purposes described in canon 114 §2, and established as juridic persons by the competent

9

ecclesiastical authority." Those purposes are limited to: "works of piety, of the apostolate or of charity, whether spiritual or temporal." (c. 114, §2)

37.    Canon law requires that those who administer property "exercise vigilance so that the goods entrusted to their care are in no way lost or damaged." (c. 1284, §2, 1°) They similarly are required to "take care that the ownership of ecclesiastical goods is protected by civilly valid methods." (c. 1284, §2, 2°). These means may, but do not necessarily, include reporting on designated funds in accord with generally accepted accounting principles or formalizing the restricted nature of funds through canonical or civil law.

38.    Under canon law, all persons who lawfully take part in the administration of ecclesiastical goods are bound to fulfill their duties in the name of the Church.

> §1 All administrators are to perform their duties with the diligence of a good householder.
>
> §2 Therefore they must: . . .
>
> > 2° ensure that the ownership of ecclesiastical goods is safeguarded in ways which are valid in civil law;
> >
> > 3° observe the provisions of canon and civil law, and the stipulations of the founder or donor or lawful authority; they are to take special care that damage will not be suffered by the Church through the non-observance of the civil law;
> >
> > 4° seek accurately and at the proper time the income and produce of the goods, guard them securely and expend them in accordance with the wishes of the founder or lawful norms;

(c. 1284)

39.    Under canon law, "[w]henever ecclesiastical goods have been alienated without the required canonical formalities but the alienation is valid civilly, it is for the competent authority, after having considered everything thoroughly, to decide whether and what type of

action, namely, personal or real, is to be instituted by whom and against whom in order to vindicate the rights of the Church." (c. 1296)

40.     Among other burdens, if the funds which comprise the Trust are deemed property of the Debtor's estate, the Archdiocese, the Trust and I, as Archbishop and Trustee, will be unable exercise our respective obligations to provide for the care required for the sacred grave sites under canon law, as well as the Catholic Church's historical and religious traditions and mandates, among other sources.

41.     I, the Trust and the Archdiocese have and have had a sincere intent to perform our obligations to provide perpetual care for the bodies of the dead.  According to canon law and the Catholic tradition, graves must be cared for in a certain fashion to maintain their character as sacred places as defined by canon law and the Catholic tradition.

42.     Observing canon law, I and my predecessor utilized means allowed under civil law to safeguard the Trust's funds, including approximately $55 million previously held in trust for the perpetual care of the Milwaukee Catholic Cemeteries and transferred to the Trust in or around March 2008 (collectively with any later earned or otherwise received Trust funds, the "Perpetual Care Funds"), and to advance the sacred and religious purpose of the cemeteries.  I and my predecessor, furthermore, established civil and canonical constructs to ensure faithful fulfillment of the responsibility to observe the will of contributors to the fund.  Likewise, the Perpetual Care Funds have been used to serve the religious purpose of maintaining the sacred character of Catholic cemeteries for which it was established.

43.     The legally compelled taking of the Perpetual Care Funds from the Trust would substantially burden, if not render entirely impossible, the adherence to core Catholic beliefs,

pursuant to which "we believe in the true resurrection of this flesh that we now possess." Church Council of Lyons II (1274); CCC § 1017.

44.     In my lay and ecclesiastical capacities, responsible for the religious, moral, and fiscal health of the Archdiocese—as well as the Trust—I have never been placed in a position of having to choose between a doctrinal directive or mandate from church authorities and a lawful order from a civil judicial authority.  No religious leader in American society should be compelled to make that choice, which is no choice at all in light of the overriding deference owed one's highest religious authority.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct and that this Declaration is executed on July _7_, 2012, in ___Tinley Park___, ___Illinois___.

+ Jerome E. Listecki
Archbishop Jerome E. Listecki

8095823_8

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

_____

In re:

       Archdiocese of Milwaukee,               Chapter 11

                Debtor.              Bankruptcy Case No. 11-20059-SVK

_____

       Archbishop Jerome E. Listecki, as Trustee
       of the Archdiocese of Milwaukee Catholic
       Cemetery Perpetual Care Trust,

                Plaintiff,

       v.                               Adv. Proc. No. 11-2459-SVK

       Official Committee of Unsecured Creditors,

                Defendant.

_____

**CERTIFICATE OF SERVICE**

_____

I hereby certify that on July 9, 2012, I caused the following documents:

- **TRUSTEE'S STATEMENT OF PROPOSED MATERIAL FACTS;**

- **DECLARATION OF ARCHBISHOP JEROME E. LISTECKI;** and

- **TRUSTEE'S RESPONSE TO CREDITORS' COMMITTEE'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT III OF AMENDED COMPLAINT**

to be electronically filed with the Clerk of Court using the ECF system, which will make these

documents available for viewing and downloading from the ECF system.

Linda S. Schmidt
GODFREY & KAHN, S.C.
780 North Water Street
Milwaukee, WI 53202-3590
Phone: 414-273-3500
Fax: 414-273-5198
Email: lschmidt@gklaw.com

The ECF system will send notification of such filing to the following counsel of record:

**Bruce G. Arnold**
barnold@whdlaw.com

**Gillian N. Brown**
gbrown@pszjlaw.com

**Daryl L. Diesing**
ddiesing@whdlaw.com

**Kenneth H. Brown**
kbrown@pszjlaw.com

**Michael E Gosman**
mgosman@whdlaw.com

**James I. Stang**
jstang@pszjlaw.com

**Francis H. LoCoco**
flococo@whdlaw.com

**Jason R. Pilmaier**
jpilmaier@hswmke.com

**Albert Solochek**
alsolochek@hswmke.com

Dated:  July 9, 2012.                    GODFREY & KAHN, S.C.

By:    *s/ Linda S. Schmidt*
       Brady C. Williamson
       Linda S. Schmidt

       780 North Water Street
       Milwaukee, WI 53202-3590
       Phone: 414-273-3500
       Fax: 414-273-5198
       Email: lschmidt@gklaw.com

       Attorneys for Archbishop Jerome E. Listecki, as
       Trustee of the Archdiocese of Milwaukee Catholic
       Cemetery Perpetual Care Trust

8172833_1

2

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

```
---------------------------
IN THE MATTER OF:           :
                            :   DOCKET NO: 11-20059
ARCHDIOCESE OF MILWAUKEE.   :
                            :   Milwaukee, Wisconsin
     Debtor(s)              :
--------------------------- :   October 18, 2012
ARCHDIOCESE OF MILWAUKEE    :
CATHOLIC CEMETERY           :
PERPETUAL CARE TRUST, ON    :
BEHALF OF ITSELF AND ITS    :
BENEFICIARIES,              :
                            :
     Plaintiffs.            :
                            :
   vs.                      :   Adversary No. 11-02459
                            :
OFFICIAL COMMITTEE OF       :
UNSECURED CREDITORS,        :
                            :
     Defendants.            :
                            :
---------------------------
```

TRANSCRIPT OF HEARING HEARD BEFORE
THE HONORABLE SUSAN V. KELLEY
UNITED STATES BANKRUPTCY JUDGE


TRANSCRIPT ORDERED BY:

    JASON P. ILMAIER, ESQ.
    (Howard Solochek & Weber, S.C.)


A P P E A R A N C E S:

    FRANCIS LOCOCO, ESQ., For Archdiocese of Milwaukee

    DARYL DIESING, ESQ., For Archdiocese of Milwaukee


AudioEdge Transcription, LLC
425 Eagle Rock Avenue - Suite 201
Roseland, New Jersey 07068
(973) 618-2310
www.audioedgetranscription.com

A P P E A R A N C E S   C O N T I N U E D:

    JEFFREY ANDERSON, ESQ. For survivors

    MICHAEL FINNEGAN, ESQ.,  For survivors

    ALBERT SOLOCHEK, ESQ.,  For Official Unsecured
                            Creditors Committee

    DAVID ASBACH, ESQ.,  For U.S. Trustee's Office

    DEBRA SCHNEIDER, ESQ., For U.S. Trustee's Office

    KENNETH BROWN, ESQ., For Creditors Committee

    JAMES STANG, ESQ., For Creditors Committee

    PAUL RICHLER, ESQ., For Special Insurance Counsel

    RUSSELL ROTEN, ESQ., For Duane Morris

    JEFF KAHANE, ESQ., For Duane Morris

    TIMOTHY NIXON, ESQ., For Godfrey & Kahn

    WILLIAM DUFFIN, ESQ., For Godfrey & Kahn

I N D E X
10/18/12

COURT:                                                                    PAGE

1          THE COURT:    This is Judge Kelley.    The matter is

2     the Archdiocese of Milwaukee and the adversary proceeding of

3     Archdiocese of Milwaukee Catholic Cemetery Perpetual Trust,

4     blah, blah, blah.    The main Case Number 11-20059.    The

5     adversary number is 11-2459.    We're here on a status conference

6     scheduled by the court.

7          May I have the appearances, please?    We'll start on

8     the telephone.

9          MR. ANDERSON:    On the telephone is Jeff Anderson and

10    Mike Finnegan.

11         MR. BROWN:    Also on the phone, Your Honor is Ken

12    Brown of Pachowski, Stang for the creditors committee.    I

13    believe that Mr. Stang and Mr. Solochek are in the courtroom as

14    well.

15         MR. RICHLER:    Your Honor, this is Paul Richler for

16    the creditors committee as special insurance counsel.

17         MR. ROTEN:    Your Honor, it's Russell Roten and Jeff

18    Kahane of Duane Morris.

19         THE COURT:    I'm sorry.    Maybe you know who that is,

20    but I don't know who that is.    Could you repeat it, please, and

21    who do you represent?

22         MR. ROTEN:    Your Honor, it's Russell Roten and Jeff

23    Kahane of Duane Morris for certain underwriters at Lloyd

24    Lendens and certain --

25         THE COURT:    The Duane Morris guys.    Gotcha.    Anyone

Colloquy

1    else?  Okay.  In the courtroom?

2            MR. DIESING:   Daryl Diesing and Frank Lococo on

3    behalf of the Archdiocese of Milwaukee.

4            MR. STANG:   James Stang and Al Solochek for the

5    committee.

6            MR. NIXON:   Your Honor, good afternoon.  Timothy

7    Nixon and William Duffin of Godfrey & Kahn on behalf of the

8    Archdiocese of Milwaukee Perpetual Cemetery Trust, blah, blah,

9    blah.

10           MR. ASBACH:   Good afternoon, Your Honor, David

11    Asbach, on behalf of the U.S. Trustee.  Also appearing with me

12    is Deb Schneider and our Marquette intern Mark Eldrige.

13           THE COURT:   Very good.  Good to see you Attorney

14    Schneider.  I was afraid it was going to be all the guys and me

15    and I was going to make them get Attorney Gillen Brown on the

16    phone if that was the case.

17           All right.  We're here because the mediator has

18    reported that the mediation proceedings were not successful.  I

19    did talk to the mediator.  Of course the proceedings were all

20    confidential so he did not give me details.

21           I want to express my appreciation to all the parties

22    for trying and I know that it was a difficult task that you

23    faced, but I do appreciate it and I must admit I'm very

24    disappointed that it wasn't successful, but my hope is that

25    there were some positive things that came out of it and that

Colloquy

1    just by going through the process we're now going to be able to

2    get on track to a prompt closure of the case or if by getting

3    back on track it returns the parties and is able to assist the

4    parties in reaching an ultimate settlement that will be

5    wonderful as well, because I continue to believe that a

6    negotiated settlement is going to be the best result for

7    everybody here.  But, we tried, I appreciate that, and now

8    we're going to get back on a litigation track that is going to

9    be very prompt indeed.

10           I have gone through the docket and I've identified,

11   and I'm going to need your help in case I've missed anything.

12   But I've identified what I believe to be the open issues in

13   this court and we will today set a schedule to resolve all of

14   those.

15           The first one, and I'm not sure that they're really

16   in perfect order, but what I have as first concerns you

17   Attorneys Anderson and Finnegan.  It is the request of

18   Claimants A75 and A367 to withdraw their claims from the

19   bankruptcy case without prejudice.  The motion was made, it was

20   objected to, I've reviewed it and there is no case authority

21   for allowing the withdraw of claims without prejudice in a case

22   like this where a bar date has expired.  The fact that the

23   claims are being withdrawn means by their nature it's with

24   prejudice because the bar date's expired and they couldn't be

25   filed timely at this time.  So if they're withdrawn and then

1    something changes and they want to file them again, they will

2    be late.  That means that if they are going to be withdrawn,

3    they will be withdrawn with prejudice.

4         I will give Claimants A75 and A367 one week to decide

5    whether they wish to withdraw the claims with prejudice.  If

6    they wish to withdraw them they'll be withdrawn with prejudice.

7    If they don't wish to withdraw them given this ruling they may

8    keep them in the case and we'll go forward with determining

9    them.  The objection is pending, we'll proceed with that.

10    That's the ruling on A75 and A367, one week from today if they

11    don't withdraw their withdraw, and I guess that's kind of

12    awkward, but that's the best way I could put it, those claims

13    are going to be withdrawn with prejudice.

14         The next is the motion to allow the committee to

15    litigate and recover transfers regarding the Parish Deposit

16    Fund.  There was a motion filed, an objection and a reply.  It

17    seems to me we're ready for a hearing on that matter.  I'm

18    prepared to set that for October 31st at 1 o'clock.

19         Does anyone have a problem scheduling wise with that

20    date?

21         MR. STANG:   No, Your Honor, we're good.

22         MR. SOLOCHEK:   Fine, Your Honor.

23         THE COURT:   All right.  The motion of Claimant 282

24    to introduce statements from the mediation into evidence.

25    There was a motion, an objection filed right as we went into

1    mediation.  Does Claimant 282 want the opportunity to reply to

2    the objection, Attorney Anderson?

3              MR. ANDERSON:   Yes, Your Honor.

4              THE COURT:   Okay.  How about November 1st?

5              MR. ANDERSON:   Yes.

6              THE COURT:   Do we need a hearing on this?

7              MR. ANDERSON:   I don't believe so.

8              THE COURT:   Okay.  So after that reply is filed by

9    November 1st, I will issue a prompt decision.  We're going to

10   shoot for November 7th.

11             Okay.  We have the new claim objections.  I'm going

12   to not mention 75 and 367 right now, because those are the ones

13   with the pending motions to withdraw.  But we've got 89, 36,

14   156, 282, I've got a little asterisk by, because that's the one

15   that we've got the issue about the evidence.  Then 341.  We've

16   got the objections and a response.  I think we need a reply to

17   those responses.

18             MR. ANDERSON:   Yes, Your Honor.

19             THE COURT:   Okay.  November 9th?

20             MR. ANDERSON:   Perfect.

21             THE COURT:   Okay.  Hearing November 15th.

22             MR. STANG:   Mr. Stang.  I don't represent these

23   folks, but at some point I'm hoping that you'll ask each of the

24   parties here to give their view as to how to proceed, and we

25   have a position that we'd like to express to you on whether

Colloquy

1    certain matters should go forward and this is the first one

2    where I think my comments would be relevant.

3            I would ask you -- you're going to go through your

4    calendar, you're going to list the issues, but the committee

5    has a proposal that would stay amongst other things, claims

6    objections being heard and resolved.

7            THE COURT:   Is there an objection to that?

8            MR. ANDERSON:   There is, Your Honor.

9            THE COURT:   Okay.  Sorry.  We're moving.  November

10   15th.

11           MR. STANG:   What time, Your Honor?

12           THE COURT:   We can do 11 A.M.

13           MR. STANG:   That would be great.  Thank you.  THE

14           COURT:   Does that work for you Attorney

15   Anderson and Finnegan?

16           MR. ANDERSON:   I'm looking at the calendar now and

17   I'm trying to pull it up if you'll give me a moment.

18           THE COURT:   Sure.

19           MR. ANDERSON:   This is Attorney Anderson.  I am gone

20   that week, Your Honor, I'm on personal vacation in St. Martine

21   that week.

22           THE COURT:   That sounds nice.  How about Friday,

23   November 30th?

24           MR. STANG:   Your Honor, we're good with that.

25           THE COURT:   Attorney Anderson?

Colloquy

```
 1              MR. ANDERSON:   I have got a deposition scheduled out
 2    of state.  There's a possibility I could change those.
 3              THE COURT:   Let's see, we're only two people.  We
 4    can maybe find something else.  What about Wednesday, November
 5    28th in the afternoon it would have to be.
 6              MR. ANDERSON:   Yes.  This is Anderson and that is
 7    open.
 8              THE COURT:   Okay.
 9              MR. STANG:   And that's good with us, Your Honor.
10              THE COURT:   Okay.  Now, there's another attorney on
11    one of those claims.
12              MR. STANG:   Mr. Finnegan or Mr. Anderson, do you
13    remember who the other lawyer is?
14              MR. FINNEGAN:   I know the claimant's name.  I'm
15    blanking on the attorney's name, but he is -- Dan Stevens and
16    he is local there in Milwaukee.
17              THE COURT:   Okay.
18              MR. STANG:   And he should have gotten the notice.
19              THE COURT:   Right.
20              MR. STANG:   I think he's on the docket now.  I'm
21    happy to check with him, Your Honor.
22              THE COURT:   Okay.  I am trying to move the case.
23    I'm not trying to have it on a date that an attorney has a
24    previous commitment, or, you know, somebody who wants to be
25    here has a previous commitment.  So if Attorney Stevens is
```

Colloquy

 1   unable to make that date, we'll move it to another date.

 2           MR. STANG:   Okay, I'll let him know that.

 3           THE COURT:   We're going to put it on November 28th

 4   at 1 o'clock.

 5           MR. STANG:   Then can I just let Ms. Blair know?

 6           THE COURT:   Yes.

 7           MR. STANG:   Okay.

 8           THE COURT:   Okay.  We suspended the hearing on the

 9   objection to the fee application.  Is it your desire to put

10   that back onto the calendar?

11           MR. DIESING:   No objection, Your Honor.

12           THE COURT:   Well, it was --

13           MR. DIESING:   I think we need to put it back on the

14   calendar, Your Honor.  As you recall we did provide that there

15   be at least a 30 day window, and one of the things that we need

16   to do and one of the reasons the parties agreed to a 30 day

17   window is that we were contemplating filing a motion to

18   increase Leverson & Mets fee cap and because of that objection

19   and their continued work.

20           THE COURT:   Right.

21           MR. DIESING:   We didn't file that during the

22   mediation just for obvious reasons, it didn't make sense, but

23   we would like to file that motion to increase that fee cap and

24   then schedule that hearing.

25           THE COURT:   Okay.  So we could have it -- I don't

1  see Attorney Anderson being required for this, do you?

2        MR. DIESING:   No.  It isn't a particular rush.

3        THE COURT:   So we could have it that November 30th

4  date.  Pardon?

5        MR. DIESING:   That part isn't a particular rush to

6  keep the case moving.

7        THE COURT:   Right.  So we could have it Friday,

8  November 30th?

9        MR. DIESING:   Your Honor, November 28th?

10        THE COURT:   30th.  Because we wouldn't need Attorney

11  Anderson.  He can't be there that day, he's in depositions, but

12  this would be between the committee, Attorney Mets.

13        MR. DIESING:   Is this a hearing on the motion --

14        MR. FINNEGAN:   A hearing on the fee objection, Your

15  Honor, or just the motion to increase the fee cap?

16        THE COURT:   I thought this was a hearing on the

17  objection.

18

19        MR. DIESING:   We do have to file a motion to

20  increase the fee cap.

21        THE COURT:   When are you going to get that filed?

22        MR. DIESING:   We can have it filed in the next day

23  or two.

24        THE COURT:   Okay, so have that filed by Monday.

25        MR. DIESING:   Certainly.

Colloquy

```
 1              THE COURT:   Okay.  And we'll have the hearing on the

 2   motion to increase the fee cap and the objection on Friday,

 3   November 30th.

 4              MR. DIESING:   I think, Your Honor, I don't want to

 5   speak for Mr. Mets, but I think he much rather hear the motion

 6   for the fee cap first because he's got to incur a lot of effort

 7   in preparing for the objection hearing and that's his concern.

 8              MR. BROWN:   Your Honor, may I make a suggestion,

 9   this is Ken Brown, perhaps it makes sense to -- I think -- my

10   understanding when Mr. Diesing and I talked about this some

11   time ago is that there would first be a determination on the

12   Mets fee cap issue and then we would schedule the hearing, so

13   perhaps we should just do one at a time.

14              THE COURT:   All right.  November 30th.  Again, is

15   Mets on the phone, no.  All right.  That is all the open issues

16   I see in this court in the main case.

17              MR. DIESING:   Your Honor, is that a 1 P.M. hearing

18   on the 30th?

19              THE COURT:   Yes.

20              MR. FINNEGAN: And that's just on the fee cap?

21              THE COURT:   Yes.  That's all the issues I see on the

22   main case.

23              In the cemetery trust adversary, there's a -- on July

24   2nd, the documents around then were delivered that I have to

25   look at and I intend to issue an order on whether those will be
```

1    compelled, the unredacted documents compelled.  I intend to

2    issue that order by November 2nd.

3            There's a motion for summary judgment.  The debtors

4    responded.  We need a date for a reply.

5            MR. STANG:  Mr. Brown would be best able to tell you

6    when -- how much time we'll need, Your Honor.

7            THE COURT:  How much time you need, I was thinking

8    November 2nd, Attorney Brown.

9            MR. BROWN:  Your Honor, this is the -- if you recall

10   this is the RFRA and the Constitutional, First Amendment

11   Constitutional issues.  The committee has represented primarily

12   with respect to those issues by what is --

13           MR. STANG:  Marcy Hamilton, Your Honor.

14           THE COURT:  A female attorney, yes, go ahead.

15           MR. BROWN:  And we've spoken to her generally about

16   this and she says that she would need at least 30 days.  I

17   would also add that we're happy to respond to the legal issues

18   in the short term, but the way this was left before the

19   mediation began and everything was stayed was, the committee

20   had moved for a summary judgment based purely on the issue of

21   RFRA doesn't apply in a situation where the Government is not a

22   party to a lawsuit and that the First Amendment does not bar

23   the application of the Bankruptcy Code to pursue avoidance

24   actions because it's a neutral generally applicable law.

25   Purely legal issues, there's no factual disputes whatsoever.

1          The Cemetery Trust opposed, filed an opposition to

2     our motion for summary judgment, a partially summary judgment

3     on those legal issues.  We were just moving for a dismissal of

4     the RFRA claim that the Cemetery Trust initiated.  The Cemetery

5     Trust opposed that and the move for a cross summary judgment on

6     the entire action based on the application of RFRA.  In order

7     for RFRA to apply among other things, the Cemetery Trust has to

8     establish that whatever will happen here in the Cemetery Trust

9     litigation will create a substantial burden on the exercise of

10    religion.  We believe that creates huge factual issues that are

11    going to require discovery, and moreover are simply premature

12    for the court to determine, because simply moving the Cemetery

13    Trust into the estate doesn't do anything to burden religion,

14    it just means that the estates gets to keep using the money

15    however it wants.  It can still use it to provide perpetual

16    care for cemeteries.

17          It's only when the court determines what the amount

18    of the claims are, what the other assets are for distribution

19    that it can be determined what portion if any of the cemetery

20    trust might be diverted for purposes other than cemetery care

21    and therefore might create any burden on religion.

22          Moreover, there has to be literally expert testimony

23    and discovery on the issue of well, what is a substantial

24    burden.  If we took $1,000 from the cemetery trust, does that

25    create a substantial burden, $10,000, a million, 10 million,

Colloquy

```
 1    that's going to involved testimony by cemeterians, because the

 2    committee's position is that even if RFRA did apply and that if

 3    you took all the money out of the Cemetery Trust and used it

 4    possibly for other purposes that there's some number that you

 5    could still give adequate care to the cemeteries and not

 6    "substantially burden religion."

 7            All of those issues have to be dealt with on

 8    discovery, they're factually intensive, and so our opposition

 9    to the Cemetery Trust cross motion for summary judgment is

10    simply, you know, it's completely premature and we would need a

11    lot of discovery.  We can respond to the legal issues on

12    whether or not RFRA applies as a legal matter and are happy to

13    do that, you know, in a reasonably short period of time based

14    on Marcy Hamilton's schedule, but the cross motion on the

15    disposition of the whole case based on whether there's a

16    substantial burden on religion as you can imagine, that's a lot

17    more factual discovery down the line.

18            THE COURT:  Well, Attorney Nixon, do you want to --

19    or Attorney Duffin do you want to reply to that?  I mean I'm

20    just going off of when I went back and looked at the scheduling

21    order that I think was consented to, it said the motion was

22    filed as a response by X date and the reply by Y date, and Y

23    came after the mediation started.

24            MR. BROWN:  Your Honor.

25            THE COURT:  Yes.
```

Colloquy

1          MR. BROWN:   Importantly, that never -- the

2    scheduling order we agreed to contemplated a ruling on the

3    partial summary judgment by the committee and it was -- the

4    scheduling order was agreed to before the Cemetery Trust moved

5    for cross motion for summary judgment.  And I think the Federal

6    Rules are quite clear, that when a cross motion for summary

7    judgment is filed, you know, the scheduling has to change on

8    any kind of response or hearing to deal with the new issues.

9          There have been huge new issues raised in this cross

10    motion for summary judgment well and way beyond what the

11    committee raised in its very, very narrow motion for summary

12    judgment, partial summary judgment simply on the issue of

13    whether you apply RFRA when the Government isn't a party.

14          THE COURT:   Well, can we decide that, or do we have

15    to go all the way -- go all in and decide all the other things.

16    Why can't we just decide that.

17          MR. BROWN:   We can, and that's what I'm trying to --

18    that's what I'm strongly urging here.

19          THE COURT:   Right.

20          MR. BROWN:   That we just decide that issue.  That

21    does not need any discovery.  The issue of whether RFRA applies

22    when Government is not a party and the issue of whether the

23    Bankruptcy Code is a neutral generally applicable law that is

24    not barred by RFRA.  Those two issues are what the committee

25    moved on.  They require no discovery, purely legal and we would

1   urge a ruling on that, but that's the only motion that I

2   believe is right for ruling on.

3              THE COURT:   Okay.  She wants 30 days?

4              MR. BROWN:   Yes, she wants at least 30 days, and I

5   think that's because among other things there's an academic

6   schedule to deal with, et cetera.

7              MR. NIXON:   Your Honor, do I get to talk?

8              THE COURT:   Attorney Nixon.

9              MR. NIXON:   Thank you, Your Honor.  Certainly there

10  is their motion for summary judgment pending there was our

11  response, they have a reply to that, we did file a cross motion

12  for summary judgment.  It seems to be, Your Honor, that what

13  Mr. Brown is basically saying is that he's asserting those

14  issues of material fact and summary judgment shouldn't be

15  granted.  It seems like at least traditionally summary judgment

16  he files a response that says there's material issues, and then

17  we reply and then the court says there are material issues or

18  there aren't.  At least that would be my suggestion and

19  whatever schedule the court believes is appropriate.

20             MR. BROWN:   Your Honor, we -- my position is that

21  it's premature, that we haven't been permitted an opportunity

22  to do discovery and that would be our position and any response

23  to the cross motion for summary judgment is there are factual

24  issues raised which discovery has not been permitted on yet.

25             THE COURT:   But not as to the pure legal issue of

1    whether RFRA applies if the Government is not a party.

2              MR. BROWN:    Correct.   Two issues that the committee

3    raised in its initial motion, does RFRA apply when the

4    Government is a party, you know, that's based -- our position

5    is based on a Judge Posner decision in the 7th Circuit, you

6    know, that's an easy motion we believe for the court to decide,

7    there's no facts to consider other than --

8              THE COURT:    My favorite kind by the way.

9              MR. BROWN:    Pardon me?

10             THE COURT:    My favorite kind of motion, my favorite

11   kind of decision, Attorney Brown easy.

12             MR. BROWN:    And a particular section 544, which is

13   how we're coming in, you know, on the avoidance action whether

14   that is barred -- the application of that is barred by RFRA, or

15   whether or not RFRA doesn't -- you know, doesn't apply -- I'm

16   sorry, whether that's barred by the First Amendment because it

17   somehow creates a burden on the free exercise of religion.   The

18   standard, and we've talked about it in the briefs, are that the

19   First Amendment only bars application of a law that

20   specifically targets religion.   It doesn't bar neutral

21   generally applicable law, which is what the Bankruptcy Code is.

22   Those are the issues that we moved on and no facts are at issue

23   or raised.

24             THE COURT:    Okay.   Well, those are the two issues

25   that I will ask for a reply on and I'll be looking for that by

1   November 23rd.

2          MR. BROWN:   Your Honor, I think that's going to be

3   fine.  I would just request since we are relying on Marcy

4   Hamilton that -- well, how about if we set that date and I

5   confirm it with Ms. Hamilton and get back to both you and

6   counsel for the Cemetery Trust.  I'm going to try to make sure

7   that it's doable, but because when we're relying on another

8   lawyer basically for the substance of the briefs, I would like

9   to have a little wiggle.

10          MR. NIXON:   Your Honor, may I?

11          MR. BROWN:   That dates that is a target.

12          THE COURT:   Again, I don't know what you all did in

13   the mediation because it was confidential, but if you weren't

14   discussing these issues and weren't thinking about these

15   issues, I don't know.  I mean I don't know why we need tons of

16   time to get this thing back on track.

17          MR. STANG:   Your Honor, we were discussing these

18   issues, but Ms. Hamilton did not attend and taking a discussion

19   of the issues to the brief given her academic schedule requires

20   time.

21          THE COURT:   Right.

22          MR. NIXON:   Your Honor, may I?

23          THE COURT:   Attorney Nixon.

24          MR. NIXON:   The 23rd is the day after Thanksgiving.

25          THE COURT:   Yes.

```
 1            MR. NIXON:   I would just point that out to the

 2   court.

 3            THE COURT:   Okay.

 4            MR. NIXON:   It's not my issue.

 5            THE COURT:   Right.  Okay.  So we're hoping that

 6   she'll be able to put this -- it's a reply brief on two issues.

 7            MR. BROWN:   You're right.  Your Honor, like I said,

 8   it's not that I'm not going to try to make --

 9            THE COURT:   I have confidence in her.  If I could do

10   it, Attorney Schneider, she can do it, okay, we're good.

11   Anything else in that -- so now you've got a cross motion with

12   other issues.  Does it make sense to wait for the decision on

13   this issue before we set briefing considerations on the cross

14   motion?

15            MR. BROWN:   Your Honor, I think it does.  I think

16   that revving up the rest of the Cemetery Trust litigation, we

17   were -- before the mediation began we were trying to achieve

18   some stipulated facts and the mediation -- I don't know if

19   we're going to get there or not, but I spent a lot of time and

20   work on it.  I believe the other side has too, and I think we

21   basically need to get back together, confer on what we can

22   stipulate to, what we're going to have discovery on and that we

23   should do that prior to setting other dates, because we need to

24   see what the disputed facts are.

25            THE COURT:   I think Attorney Nixon is going to agree
```

Colloquy

 1   with you.

 2          MR. NIXON:   I'm nodding my head, and if the court

 3   can't tell the direction of the rattle coming from it, it's up

 4   and down in the affirmative.

 5          THE COURT:   He's agreeing.  He agrees.  Do we need a

 6   hearing on the limited issue that's being briefed?

 7          MR. BROWN:   That's a tough one, Your Honor.  It is a

 8   purely legal issue.  Perhaps we should --

 9          MR. STANG:   Your Honor, I know Ms. Hamilton and --

10          MR. BROWN:   I think a hearing would be helpful to

11   you.

12          THE COURT:   Do you think so, Attorney Stang?

13          MR. STANG:   Your Honor, yes.  I think that knowing

14   Ms. Hamilton, having seen her make these arguments in some of

15   the other cases, I think she would like to have a chance to

16   speak to you directly.

17          THE COURT:   Okay.

18          MR. NIXON:   Your Honor, the court would probably

19   like to have Ms. Hamilton and Mr. Williamson argue the issues.

20   I would pay to come in and watch that.

21          MR. BROWN:   Yeah, I would watch it too.

22          MR. STANG:   Except I'm not sure of Mr. Williamson's

23   calendar and perhaps what I would suggest is we can talk.

24          THE COURT:   Right, okay.

25          MR. STANG:   And get back to the court with a date

Colloquy

1    that works for Ms. Hamilton and Mr. Williamson.

2              THE COURT:   I think we'll -- you can talk -- the two

3    sides that will be doing the argument with the calendars

4    available should get on the phone with Melissa Blair and chose

5    a date.  We need, I'd say a week to digest all the briefs and

6    review all the cases.  So any time after the 3rd of December, a

7    day I'll always remember, Poppa was a rolling stone, that's

8    where it came from.  Any time after December 3rd we can set

9    that oral argument and I would look forward to that.

10              Anything else in your adversary that you know is

11    pending and needs attention?  We are going to back burner the

12    issues on the cross motion for summary judgment with all the

13    factual issues and stipulated facts, et cetera.

14              MR. NIXON:   Your Honor, that is probably the best

15    use of all the parties time at this point.

16              THE COURT:   Okay, very good.  Anything else in the

17    main case that you thought of, Attorney Lococo?

18              MR. LOCOCO:   Yeah, I just have one question, Your

19    Honor, which you eluded to.  If Claimants A75 and 367 do not

20    withdraw their claims on November 25th, then I think Mr.

21    Anderson and Mr. Finnegan will want to do a response and then

22    we'll have to do a reply.  I don't know if you want to

23    preliminary set those deadlines, or try and sync them up with

24    what we already have, or do you want me to try and work that

25    out with them?

Colloquy                                                                                            24

```
 1                THE COURT:   Right.

 2                MR. LOCOCO:   Which I'm happy to do.

 3                THE COURT:   Yeah.  If you can't work something out

 4    if they don't withdraw the claims so that there needs to be an

 5    additional schedule, and you can't work it out, let me know and

 6    I'll help you work it out.

 7                MR. LOCOCO:   Okay.  Thank you.

 8                THE COURT:   Anything else?

 9                MR. DIESING:   Your Honor.

10                THE COURT:   Thank you very much.  Attorney Diesing?

11                MR. DIESING:   Your Honor, just one thing.  We plan

12    to file a motion for the appointment of plaintiff

13    representative, if we can -- future plaintiff representative on

14    board.  I think that will probably be an agreed motion between

15    the committee and the debtor.

16                THE COURT:   Attorney Stang?

17                MR. STANG:   We've been talking about this for a long

18    time, Your Honor.  If Mr. Diesing could give me a call about

19    what the debtor wants to do.

20                Your Honor, are you about ready to wrap up, because I

21    think there's the parish deposit fund motion for standing, I

22    think is --

23                THE COURT:   We did that.

24                MR. STANG:   I'm sorry, yes, we did.  I apologize.

25                THE COURT:   I consider that one as the -- to the
```

Colloquy

 1    front --

 2              MR. STANG:    I'm sorry, Your Honor, I missed that.

 3              THE COURT:    -- the closest to the front of the burner

 4    as my stove goes is where that dispute is sitting, Attorney

 5    Stang.

 6              MR. STANG:    Your Honor, there are some -- as a

 7    general status conference, I'd like to describe the committee's

 8    position on some upcoming issues.

 9              THE COURT:    That's fine.

10              MR. STANG:    Your Honor, the committee echos your

11    sentiment when you took the bench about hoping to reach a

12    consensual plan, and that consensual plan in the committee's

13    perspective would have three objectives.  One would be to

14    permit the Archdiocese to continue to perform its mission.

15    Second, additional, and I add additional protections for the

16    protection of children, recognizing that the Archdiocese has

17    done a lot to try to achieve that goal, and third, fair

18    compensations for the abuse survivors.

19              One of the themes of this case in terms of what the

20    assets are has been that there is no insurance coverage for

21    these claims and that opinion, which was expressed to the

22    committee by the debtor from the very beginning of the case to

23    such an extent that when the committee asked to speak with

24    special insurance counsel for the debtor Qualls & Brady, we

25    were told there was no reason for us to do that.

1          We believe that that conclusion by the debtor was

2     incorrect.  The debtor based that conclusion on its analysis of

3     what we refer to as the 1 beacon policy, and there was

4     litigation prior to the bankruptcy that went up through the

5     mid-level Appellate Court, determining that under the 1 beacon

6     policies, the placement of priests in parishes was not an

7     accident, therefore not a covered item.  That matter is pending

8     on Ritz for review before the Wisconsin Supreme Court and

9     because the accident was initiated by the insurance companies,

10    that matter has been stayed.

11         When Mr. Richler was retained to be special insurance

12    counsel to the committee, he reviewed that ruling, which we

13    refer to as the John Doe Ruling, and essentially what the court

14    said was the occurrence, the placement of the priests was not

15    an accident, occurrence is an accident, therefore no coverage.

16         We after we thought some difficult negotiations was

17    able to obtain other insurance policies from the debtor, and

18    Mr. Richler reviewed those policies and what he discovered was

19    that there are a number of insurance policies that cover up to

20    half -- in terms of time period at least, cover up to half the

21    claims in the case that have a different definition of the word

22    occurrence.  In the 1 beacon policy it says occurrence is an

23    accident, there's more verbiage, but that's the operative

24    language.

25              THE COURT:   Right.

1    MR. STANG:    In the policies issued by Lloyd's and a

2    company called Stonewall Insurance, it's -- yes, I know.

3        THE COURT:    That's rich.

4        MR. STANG:    My eyebrows went up too when I heard the

5    name.    It says that an occurrence is an accident, an event, or

6    a happening, different language.

7        THE COURT:    Right.

8        MR. STANG:    There is California Appellate Court

9    Authority from 1991 which says that those extra words mean

10   something.    We have taken, we believe, that an action, a

11   declaratory relief action for insurance coverage visa vi Lloyds

12   and Stonewall should be initiated by the debtor in conjunction

13   with the committee and that because those policies cover a lot

14   of claims, while they have occurrence limits, they have no

15   aggregate limits, and depending on the valuation of claims, it

16   could be in the tens of millions of dollars.

17       This insurance strategy is one that the committee

18   brought to the debtor.    We've discussed it at length with the

19   debtor, and I don't know what the debtor's intentions are, but

20   before you took the bench, it was my intention to suggest a 2

21   point proposal for having to deal with the case.    One of which

22   was that the debtor in conjunction with the committee should

23   properly initiate declaratory relief action as to those

24   policies and the impact of that additional language.

25       We would ask the debtor -- we've asked the debtor --

```
 1   well, I'm not sure if we formally asked the debtor to do it,

 2   but we've asked the debtor to do that in conjunction with us,

 3   and if the debtor is not going to do it, the committee will ask

 4   for the court to give its standing as a representative of the

 5   estate to do it, because this case demands a resolution that is

 6   not taking this Archdiocese down every possible litigation

 7   avenue and there are other causes of action of the estate that

 8   are not being prosecuted, and I want to tell you which ones we

 9   have identified, because it's going to be coming before you,

10   and focusing on the insurance is an avenue that we think best

11   achieves the three goals that the committee has on the

12   consensual plan.

13            It would be our suggestion -- well, let me leave it

14   at that for a moment.  We are coming up on the two year

15   anniversary of this case and with that two year anniversary

16   there's a statute of limitations regarding causes of action

17   that may exist under 544 and other avoidance action.  We've

18   identified the Cemetery Trust.  We have standing that

19   litigation is proceeding.  We have the PDF action, Parish

20   Deposit Fund, that will proceed, but there are some others.

21   Since the mediation stay terminated, the committee has written

22   three demand letters to the debtor regarding these other

23   avoidance type actions and I just want to tell you what they

24   are, because it will be forthcoming and I want to tell you what

25   the committee's idea is on how to proceed with it.
```

1          The first is, the committee has made a demand that
2    the debtor commence alter ego and substantive consolidation
3    actions against the parishes.

4          Second, the committee has made a demand that the
5    debtor undertake litigation to determine that title to the
6    Cousin Center is in fact in the Archdiocese and not in the
7    Cemenary Corporation.

8          And third, the committee has demanded that the debtor
9    undertake a fraudulent conveyance action against the faith in
10   our future trust on the basis that giving donation lists and to
11   the faith in the future fund was a fraudulent conveyance.  We
12   base that theory in part on the Fairbanks judge's decision in a
13   published decision saying that donor lists were a major asset
14   of the Fairbanks Diocese Estate, so using that concept, we
15   believe that there has been a fraudulent conveyance of the
16   donor list in the faith in the future.

17         Now, those demand letters have been sent.  There has
18   been some dialogue with counsel regarding deadlines that we set
19   in those demand letters for responses.  We would -- we had
20   asked prior to sending those demand letters for totaling
21   agreements, because we did not want to start what, at least in
22   the media has been described as scorched earth litigation.  We
23   think that's kind of a misnomer, because frankly if the estate
24   is insolvent, it's on the survivors and creditors backs and no
25   one else's back, but we asked for totaling agreements.  We

1    went, we've gone to the parish counsel and asking for totaling

2    agreements.  We talked to Mr. Diesing about the Archbishop

3    using either his governance powers as president or a member of

4    the board of these different corporations, or even his bully

5    pulpit to try to get totaling agreements.  We don't think we're

6    going to get those totaling agreements, and that's their

7    prerogative.

8                    THE COURT:    Right.

9                    MR. STANG:    Right.  But we have a deadline of I

10   believe January 4th, to get these agreements on file, or these

11   rights are lost.

12                   So, what the committee intends to do absent a consent

13   by the debtor to our standing, which we do not expect to get,

14   is to file those standing motions, have them adjudicated before

15   the deadline, if you determine that we've met the standard for

16   standing, they will be filed before the deadline.  If you

17   determine that they're not colorable, or whatever other

18   standards apply than they're not going to get filed.

19                   We had thought that a way to proceed was to get them

20   on file and then give the defendants basically an open

21   extension to answer --

22                   THE COURT:    Right.

23                   MR. STANG:    -- until the insurance matter was

24   resolved.

25                   THE COURT:    Right.  Why doesn't that work?

1          MR. STANG:   It may still work.

2          THE COURT:   Okay.

3          MR. STANG:   Because it is our goal to go from what

4     everyone thought the play was, which was just sue to recover

5     assets and to this declaratory relief action for the insurance.

6     I wanted you to know that we had done that after the mediation

7     stay had expired, what our intentions were regarding filing

8     motions and of course the deadline that exists, which is the

9     two year anniversary of the case.

10         THE COURT:   Right.

11         MR. STANG:   I'm not going to try to talk you out of

12    the docket items you set.  I think that would be a fruitless

13    exercise.

14         THE COURT:   It would.  I appreciate that you're

15    getting to know me, Attorney Stang.

16         MR. STANG:   And hopefully you're getting to know me

17    a little bit.

18         THE COURT:   I understand.  And I see where you're

19    now going and I appreciate that, but I think the best thing

20    from my standpoint and from what I could see, you know, and you

21    have -- as somebody put it the other day, you have cards that I

22    can't see.

23         Mr. STANG:   Understood.

24         THE COURT:   And from the cards that I could see, the

25    best way to proceed to potentially either resolve these things

1    and get them decided, or perhaps get people back into over the

2    hump of getting that settlement, that really again would be the

3    best way to finish the case in a consensual way was to set

4    these tight deadlines and get back on the rocket docket, but I

5    now see all the other items that I didn't see and I'm still not

6    going to change, because I still think we need to keep going

7    with the things that we're briefed.  It's not like something's

8    brand new started up in these.  We're ready to go when we hit

9    the mediation stay, so we are going to proceed and we'll see

10   what happens.

11            MR. STANG:   But it will be --

12            THE COURT:   It seems to me Attorney Lococo on this

13   insurance issue, why in the world would we not be filing that

14   motion instantly, that complaint for declaratory relief and

15   seeing if this coverage is indeed out there.

16            MR. LOCOCO:   Well, Your Honor, I guess the first say

17   to answer it is that this case needs, and I think the court

18   appreciates this, needs the claims to be decided, and a

19   coverage -- a piece of coverage litigation, and we have been in

20   conversation about this, but a piece of coverage litigation is

21   going to take months and months and months to get finally

22   adjudicated and even if the ultimate decider, you, someone

23   else, and then the 7th Circuit decides that there is in fact

24   coverage available, all that does is say there's coverage

25   available.  The claims are still there and will need to be

1    decided and the insurance carriers can wait us all out.  The

2    fact of the matter is, as the court knows, there are

3    significant statute of limitation defenses, legal defenses that

4    the insurance carriers see.  There are, as the court knows, I

5    mean there's almost 100 of these claims that involve people

6    with prior settlements.  There are hundreds involving

7    allegations against non-debtor entities and we are not going to

8    be in a position to talk settlement again in my judgment with

9    the carriers, even if there's a finding of coverage unless we

10   get the claims decided.  The cheapest way, the most efficient,

11   the least expensive way to get the claims decided -- to move

12   the case is to get the claims decided, because when we're

13   dealing with the claims the Archdiocese is not funding both

14   sides of the case.  You know, we're dealing with Mr. Anderson

15   and Mr. Finnegan or any of the other state court counsel.  A

16   lot of the issues have been researched and briefed

17   significantly, so getting onto all the other claims will not

18   cost that much more.

19        Candidly, some of these carriers have clauses in

20   their contract, in the insurance policies that talk about a

21   duty to defend.  If we can get to a point where we can prevail

22   on them to do that, that's going to further provide resources

23   to the estate that won't -- in other words, the estate won't be

24   spending down resources in dealing with the claims objections.

25   So, filing the coverage action is not the panacea.

1          The other thing I would say is that the policies that

2    Mr. --

3          THE COURT:   Why delay it, what good does delay do?

4          MR. LOCOCO:   Well, I'm not -- I'm --

5          THE COURT:   Well, get it going.  I've done coverage

6    disputes.  They didn't take --

7          MR. ANDERSON:   Yes, Your Honor.

8          THE COURT:   Yes, we remember.

9          MR. LOCOCO:   Well, they do take a while.  I'm not

10   saying that we're not --

11         THE COURT:   Not the way I try them.  I mean maybe

12   you're not -- you know, maybe there's some problem with my

13   authority to issue the order on it, we'll see.  It sounds like

14   it's probably the estate to me probably, so I just don't know

15   the reason for delaying.

16         MR. LOCOCO:   Just procedurally we have not -- we did

17   get many demands on Monday night this week.  Parishes to bring

18   an action to sue the 200 plus parishes, to bring an action to

19   sue the faith in our future trust.  We did not get a demand to

20   sue the carriers with respect to coverage.  I assume that's

21   forthcoming.  With respect to the demands that we did get, we

22   sent a letter back to Mr. Stang and Mr. Brown yesterday telling

23   them that the Archbishop is currently in the Dominican

24   Republic, he's on a mission trip, the soonest he can meet with

25   his board of directors is October 23rd, and we will get an

1   answer to the committee whether we'll proceed or not by the

2   next day.

3          Our initial analysis is both of those avoidance

4   actions have -- are not worth the time, effort, money,

5   attention, and there are significant factual problems with

6   what's been alleged and the legal claims don't add up, but

7   we're doing our analysis, our due diligence, we will get back

8   to the committee on that.  We'll do the same thing on the

9   coverage action if we get a demand.

10          MR. STANG:  Your Honor, a couple comments.  The

11   reason that we prioritized these avoidance action demands over

12   the insurance demands was because the insurance demand does not

13   have a January 4th deadline, it's property of the estate and we

14   don't lose that cause of action simply because the two years

15   goes by.  In the Jesuit Case, the Davenport Case, the Spokane

16   Case, the Fairbanks Case and the San Diego Case, each had

17   significant insurance contributions.  Not a single one of those

18   cases had a claim adjudicated to a dollar amount when the

19   insurance companies paid.

20          In Jesuit, I'm not going to go through each one,

21   Safeco paid in excess of 118 million dollars, and not a single

22   claim objection was adjudicated in the case.

23          THE COURT:  Didn't they have a statute of

24   limitations issue there though, Attorney Stang?

25          MR. STANG:  Absolutely.

1          THE COURT:   Because don't many of the states have

2    these windows where they reopened and we don't have such a

3    statute here?

4          MR. STANG:   Not in that case.

5          THE COURT:   Okay.

6          MR. STANG:   They have what I call the connect the

7    dots statute of limitations, where the deadline runs from the

8    realization that the abuse caused you injury, but it was not a

9    window like California which simply vacated it.

10          THE COURT:   Okay.  Right.

11          MR. STANG:   But they're absolutely --

12          MR. BROWN:   There are only three states that have

13    windows, Your Honor, it's Hawaii, California, and Delaware, no

14    other states do.

15          MR. STANG:   There absolutely were statute issues, so

16    that's one.  Number two is, if there's a determination that

17    there's coverage putting aside the defenses to the underlying

18    claims, the negotiations from the insurance companies will be

19    different.  And we can all rely on our individual experiences

20    on that, but I believe that.

21          And third, if there's going to be claims litigation,

22    that claims litigation is going to explore a whole lot of

23    different issues.  It could be issues frankly that may

24    ultimately prove prejudicial to the diocese.  It's going to go

25    beyond just the statute of limitations defense.  I would think

1    that we'd like to have a coverage decision and the opportunity

2    to explore settlement with the insurance companies before the

3    diocese goes off and finishes its rounds of claims objection

4    that may ultimately prove facts that may not be very helpful to

5    it, or come out with facts that may not be very helpful to it.

6    Now, there may be facts that aren't helpful to the survivors.

7

8          There is no doubt that there are certain claims that

9    the diocese feels are objectionable that don't even effect

10   statute of limitations, and, you know, it's possible that some

11   of them frankly just you read them and you wonder if the person

12   is well.  I've seen some of those in other cases.

13         What the diocese does with those is it will do, but

14   that's not the bulk of these cases.  The bulk of these cases

15   are 250 plus claims are potentially covered by Lloyd's and

16   Stonewall.  If the language in fact is different than the 1

17   beacon analysis would yield, and the debtor is going to get a

18   demand from us.  We would hope that a demand is not necessary.

19   This is the sort of thing frankly that -- well, we wish that

20   this had come to our attention in the first 6 months of the

21   case, and not 18 months into the case.

22         MR. LOCOCO:   Your Honor, if I could just say we

23   didn't -- we never prevented Mr. Stang or anyone else from

24   speaking with Mr. Rothstein over at Qualls & Brady.  There were

25   several phone conversations before we even got to the mediation

1  motion regarding the issue of insurance, so you know, I was

2  prepared actually to start off where I thought Mr. Stang was

3  going to start off and where the court started off that, you

4  know, I appreciate the time we spent in mediation.  I thought

5  it was productive.  I still think it was.  I think it will help

6  us -- I hope that it will help us in the future, and I thought

7  people dealt with the mediation in good faith and I still

8  believe that.

9        But it's not like we have prevented them from seeing

10 anything or refused to give them anything, unless I said for

11 example, we're not giving you those documents, if you want them

12 file a motion.  The document requests were handled in September

13 2011.  No further demands have been made on those requests.

14 So, I just don't want the record to be left with the impression

15 that we haven't attempted to cooperate with respect to these

16 issues.

17        THE COURT:  Right.

18        MR. STANG:  Your Honor, I'm not going to turn you

19 into a moderator of the presidential debate.

20        THE COURT:  Right, right.

21        MR. STANG:  I'm simply going to say I disagree with

22 Mr. Lococo.

23        THE COURT:  I look like Candy Crawly a little bit,

24 don't I?

25        MR. DIESING:  Your Honor, I would just like to point

1  out one other thing and that's with respect to the various

2  claims on entities such as Faith in our Future, or the

3  parishes.  We have consistently referred the committee to

4  counsel for those entities.  We are not counsel for those

5  entities.  They are represented and we think the focus on the

6  negotiations on totaling agreements and that sort of thing

7  should be with those entities first, because they're the ones

8  that have the authority if you will, or the power to grant

9  those agreements.

10            THE COURT:   Right.

11            MR. STANG:   Your Honor, we went to the president of

12  the corporation of the parishes who also sits on the board,

13  that would happen to be the Archbishop.  We went to the trustee

14  of Faith in our Future, that would happen to be the Archbishop.

15  We went to the Archbishop, because the Archdiocese gets the

16  rent payments on Cousin Center, it signed a lease on Cousin

17  Center, so we can be told go down this rabbit hole, go down

18  that rabbit hole, there's a third rabbit hole behind you that

19  you need to go to, but we tried to cut to the chase scene of

20  the movie.

21            MR. LOCOCO:   Your Honor, I --

22            MR. STANG:   We were told, you know, basically go

23  talk to the individual lawyers and that's what we've done.

24            THE COURT:   Okay.

25            MR. LOCOCO:   Your Honor, Chapter 187 of the

1   Wisconsin Statute says that with any of these corporations to

2   bind the company on a matter that is worth more than $300 there

3   has to be a unanimous vote of the board of directors.  So Mr.

4   Stang can say the Archbishop could do this, the Archbishop

5   could do that, it's not that simple.

6               MR. STANG:   I didn't say the Archbishop --

7               THE COURT:   Unlike Attorney Brown's motion, this is

8   not a simple situation, but I'm hearing this the first time.

9   These are my initial thoughts for what they're worth hearing it

10  the first time.

11              If you can get on board and agree that in order to

12  determine these very inviting sounding insurance coverage

13  issues, you can agree that these claims objections should stay

14  on the back burner.  I am more than happy to back burner down

15  and to ask Judge Randa if he would do the same, but if you're

16  not going to agree to that, I think they should continue.

17              Now, I will say this, what we're -- the process we're

18  at in my court with claim objections is motions for summary

19  judgment, grant it there are some of the similar issues that we

20  plowed before with the other motions for summary judgment.  On

21  those prior motions for summary judgment, which I denied on the

22  fraud causes of action, I denied summary judgment, that order

23  has not been stayed pending appeal.  We could set evidentiary

24  hearings and bring these folks in and have them testify about

25  what they knew when, et cetera, et cetera.  If that helps

1  anybody decide what to do here I'm willing to do that, but if

2  your feeling, Attorney Stang is no, let's keep -- I mean I

3  don't know how we're going to unring the bell of the legal

4  decisions that were made on the earlier set of claim

5  objections, given now this new potential insurance thing.  We

6  can't do that.

7          MR. STANG:   No, we can't.

8          THE COURT:   So deciding the next set of them on the

9  same issues I'm not sure is that relevant.  Taking the next

10  step, which is putting people on the stand and going beyond the

11  summary judgment I won't do unless you think that is helpful

12  for some reason.

13          MR. STANG:   Obviously we have some issues about

14  which court can do that, but I'll talk with Mr. Anderson, there

15  are his -- or other state court counsel whose clients are

16  affected, I think they're mostly his, in the objections and

17  we'll see.  Maybe that's what we want to do.

18          THE COURT:   Right.  Well, I mean the motion for

19  summary judgment was they, you know, they should have known

20  blah, blah, blah, and I said well, no, I think that's a factual

21  issue.

22          MR. STANG:   Right.

23          THE COURT:   And it wouldn't be I'm ruling on the

24  actual claim.  I would be ruling on did the statute of

25  limitations run and I think I can decide that.  I'm very

1   sensitive about what I can and can't decide.

2           MR. STANG:   I misunderstood you, Your Honor.  I'm

3   sorry.

4           THE COURT:   So I would be saying we can have an

5   evidentiary hearing on that right now, because that order isn't

6   stayed and it's been pending a long time.  But you're

7   suggesting it's better for this coverage determination that we

8   stop claim determination, I'll stop claim determination.  You

9   think about it, you let me know.

10          MR. STANG:   Okay.

11          THE COURT:   For now on the ones that are pending,

12  the new ones, we're going to go unless you all agree we

13  shouldn't go.  That's number one.  Number two, I think that

14  complaint to determine whether there is coverage should be

15  filed yesterday.  I don't agree that because it might take a

16  long time and the insurance companies have deep pockets and can

17  wait us all out is a good reason not to do it.  We should do

18  it.  We should get it done.  We'll see what the issues are.  It

19  doesn't sound that complicated to me.  It sounds like other

20  judges have already figured this stuff out.  I can read what

21  they did.  So, if you're not willing to file it, file a fast

22  motion saying we'll file it.  On these others, I wish there

23  would be a way, if you can't reach the right people and make

24  them understand why a totaling agreement would probably be the

25  smart move here, I guess file your motions, we'll get it

1    decided, at least to the point of stopping that statute of

2    limitations on the avoidance claims and maybe holding it as we

3    move forward and seeing if there's going to be coverage.

4              MR. STANG:   We have had fairly extensive contact now

5    with counsel for the debtors.

6              MR. BROWN:   And we'll try again, Your Honor,

7    because the last thing we want to do is burn through money on

8    this on this part of it, I'm preserving claims if we don't have

9    to.  We've tried our darndest to make that happen and to no

10   avail.  I will say that one thing we will be asking you for,

11   we're going to get those motions filed promptly.  We didn't

12   want to spin on this until the mediation had reached impasse,

13   as soon as it was clear that that was going to occur we knew we

14   had to start working on this because of the looming deadline.

15   But we will want to get a hearing date in ample time to have it

16   briefed and get it decided and enable us to at least get the

17   complaints filed and preserve the claims if standing is

18   granted.

19             THE COURT:   Right, right.

20             MR. BROWN:   We're probably looking at --

21             THE COURT:   And I don't -- given my schedule and

22   where we are in the calendar, I don't see that that's going to

23   be a problem, Attorney Brown.

24             MR. BROWN:   Okay.

25             THE COURT:   I see that not a problem at all.

1          MR. NIXON:    Your Honor --

2          THE COURT:    I do hope that we don't actually have to

3    litigate the whole thing, that in fact it gets filed to

4    preserve it from being lost by this bankruptcy statute of

5    limitations and then either we get insurance, or we get

6    settlement, or we get something else so we don't have to go

7    down that --

8          MR. BROWN:    I think that's what we're striving for,

9    Your Honor.

10         MR. STANG:    Your Honor, our current thinking is just

11   what I said to you is that, get them on file, and if the

12   insurance is progressing and say we survive a motion to

13   dismiss, a motion for summary judgment and insurance coverage,

14   we then revisit what we have to do in other aspects of the

15   case.

16         THE COURT:    Right.

17         MR. STANG:    Our current thinking is to do what I

18   said to you what you just echoed.

19         THE COURT:    Right.  Attorney Diesing.

20         MR. DIESING:    A couple of things.  I'm not sure we

21   agree with you on all these issues, but there is one issue that

22   I think Mr. Brown certainly has raised in the past and we'll

23   have to figure out, and that is even with respect to the

24   coverage issue, I think we have a Stern v. Marshal sort of

25   issue on that particular matter.

1          With respect to the rest of these actions, we do have

2     to go through the filter of whether or not we think the actions

3     are frivolous or not and whether there's a colorful claim and

4     that might be something that we'll have to decide.

5          MR. STANG:    That's the motions that the court was

6     referring to.

7          THE COURT:    Right, right.

8          MR. BROWN:    That's why the motions are being filed.

9          THE COURT:    Right.  That's the motions you would

10    file to see if you have -- I don't think we have to worry about

11    Stern v. Marshal until we decide whether the committee has

12    standing to bring the cases, and I think my initial gut

13    reaction on Stern v. Marshal is property of the estate, a

14    contract.  This isn't --

15         MR. BROWN:    Well, also, Your Honor, at the risk of

16    stating the obvious, Stern v. Marshal all that says is in a non

17    -- you know, a proceeding that's statutorily core of the

18    constitutionally non core you can't issue a final order.

19         THE COURT:    Right.

20         MR. BROWN:    That's true in a related to proceeding

21    too, you can't issue a final order.

22         THE COURT:    Right.  So I would do proposed findings

23    and -- for Judge Randa or somebody else to finalize -- I don't

24    see that as a --

25         MR. BROWN:    You could stay it, clearly it could be

1    stayed by you, that's not a final despositive order, so as long

2    as you have subject matter jurisdiction you can certainly

3    accomplish staying it.

4            THE COURT:   You're saying staying the?

5            MR. STANG:   He's talking about the avoidance

6    actions.

7            MR. BROWN:   I'm talking about these actions that

8    would be preserving -- you know, to preserve the estates

9    rights.

10           THE COURT:   Right.

11           MR. BROWN:   Well, your perspective of any Stern v.

12   Marshal issue you could certainly stay those matters after the

13   claims were preserved.

14           THE COURT:   Right.  Right.  I think we're all on the

15   same page there, Attorney Brown.

16           MR. STANG:   Yes.

17           THE COURT:   Anything else?  Thank you.

18           MR. STANG:   Thank you, Your Honor.

19           MR. DIESING:   Thank you, Your Honor.

20           MR. NIXON:   Thank you, Your Honor.

21           (Whereupon, the proceedings were concluded)

22                       * * * * *

23

24

25

<u>C E R T I F I C A T I O N</u>

I, Kelly Sellers, the assigned transcriber, do hereby certify that the foregoing transcript of proceedings in the U.S. Bankruptcy Court, Eastern District of Wisconsin, on October 18, 2012, is a true and accurate non-compressed transcript of the proceedings to the best of my knowledge and ability.


<u>   S/ Kelly Sellers          </u>         <u>October 29, 2012</u>

Kelly Sellers, AD/T #544          Date

AudioEdge Transcription, L.L.C.

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re                                                    Chapter 11
Archdiocese of Milwaukee,                                Case No.11-20059-svk
                    Debtor.

Archdiocese of Milwaukee Catholic Cemetery
Perpetual Care Trust, on behalf of itself
and its beneficiaries,
                    Plaintiff,
v.                                                       Adv. Case No. 11-2459

Official Committee of Unsecured Creditors,
                    Defendant.

Official Committee of Unsecured Creditors.
                    Counterclaimant,
v.

Archdiocese of Milwaukee Catholic Cemetery
Perpetual Care Trust; and Archbishop Jerome E.
Listecki, Archbishop of the Archdiocese of
Milwaukee, in his capacity as sole Trustee of the
Archdiocese of Milwaukee Catholic
Cemetery Perpetual Care Trust,
                    Counterdefendants.

Appearances and Summary of Disposition
Honorable Susan V. Kelley, Presiding

Date:  October 18, 2012

Start Time: 1:02:07 p.m.

End Time: 2:03:16 p.m.

Proceeding:  Status Conference

Courtroom Deputy:  Melissa S. Blair

Court Reporter:  Courtsmart

Appearances:
           Francis LoCoco and Daryl Diesing for the Debtor
           Albert Solochek, James Stang, and Kenneth Brown for the Official
           Committee of Unsecured Creditors
           Paul Richler, special insurance counsel for the Committee
           Timothy Nixon and William Duffin for the Archdiocese of Milwaukee
           Catholic Cemetery Perpetual Care Trust and Archbishop Jerome E.
           Listecki in his capacity as Trustee
           Jeffrey Anderson and Michael Finnegan for certain Claimants
           David Asbach and Debra Schneider for the U.S. Trustee
           Russell Roten and Jeff Kahane for Certain Underwriters at Lloyd's London

Upon receiving notification that the parties reached an impasse during the mediation process, the Court held a status conference and issued the following rulings and schedule.

Claimants A-75 and A-367 moved to withdraw their claims without prejudice.  (Docket No. 893).  The Court denied the Motion; no authority exists that permits these Claimants to withdraw claims without prejudice following expiration of the claims bar date.  On or before October 25, 2012, counsel for these Claimants will advise the Court whether they wish to withdraw their claims with prejudice.  If they do not withdraw their claims, counsel for the Debtor and counsel for these Claimants will either stipulate to additional scheduling on the claim objections or contact the Court.

The Committee's Motion relating to the standing of the Committee to seek to avoid transfers from the Parish Deposit Fund (Docket No. 806) is fully briefed.  The Court will hold a hearing on this Motion on October 31, 2012 at 1:00 p.m.

Claimant A-282 filed a Motion Requesting Permission to Introduce Communications from Mediation in Response to the Archdiocese's Motion for Summary Judgment. (Docket No. 876).  The Debtor filed an Objection to this Motion.  (Docket No. 913).  On or before November 1, 2012, Claimant A-282 will file a Reply to this Motion.  The Court will issue its decision on this Motion without a hearing on or about November 7, 2012.

As to the Debtor's Objections to the Claims filed by Claimant A-89 (Docket No. 733), A-36 (Docket No. 734), A-156 (Docket No. 736), A-282 (Docket No. 737) and A-341 (Docket No. 738), the Debtor's Reply to the Responses to the Objections (Docket No. 901 and 871) is due on or before November 9, 2012.  A hearing will be held on these Claim Objections on November 28, 2012 at 1:00 p.m.  Attorney LoCoco will contact Attorney Stevens (representing Claimant A-89) to confirm his availability for this hearing.

The Debtor objected to the Fifth Quarterly and Thirteenth Monthly Fee Requests of Pachulski Stang Ziehl & Jones, LLP. (Docket No. 882). On or before October 22, 2012, the Debtor will file a Motion to increase the fee cap of Leverson & Metz. The hearing on the Motion to increase the fee cap of Leverson & Metz will be held November 30, 2012 at 1:00 p.m. (assuming the availability of Attorney Metz). The hearing on the Objection to the Pachulski fees will be scheduled at that time.

In the Cemetery Trust adversary proceeding, the Committee filed a Motion to Compel the Debtor to Produce Unredacted Documents. (Docket No. 62). The Court will review the documents provided to Chambers *in camera* and issue an Order on this Motion on or around November 2, 2012.

Also in the Cemetery Trust adversary proceeding, the Committee filed a Motion for Summary Judgment on Count III of the Amended Complaint (Docket No. 57), and the Plaintiff (Archbishop Listecki, as Trustee), filed a Response to the partial summary judgment motion and also cross-moved for summary judgment as to the entire proceeding. (Docket No. 69). The Committee's Reply to the Plaintiff's Response to the Motion for Summary Judgment is due on or before November 23, 2012. The Court confirmed that the Committee's Reply should be limited to the two issues that Attorney Brown described on the record. The parties will contact the Court to schedule a hearing on this Motion, to be held after December 3, 2012. A briefing schedule on the Plaintiff's cross-motion for summary judgment will be issued after a decision is issued on the Committee's summary judgment motion.

Attorney Stang advised the Court of various claims the Committee intends to pursue, including a declaratory judgment action to determine whether there is insurance coverage available under policies issued by Lloyd's of London and Stonewall Insurance. The Debtor's response was that the claims should be determined prior to the initiation of expensive, time-consuming insurance coverage litigation. The Court recognized the Debtor's concern, but indicated that insurance coverage for the claims in this case should be a priority, and the Court urged the Debtor and the Committee to promptly move for this determination.

Attorney Stang stated that since the two year statute of limitations on avoidance claims is approaching, the Committee has identified three potential avoidance claims (in addition to the Cemetery Trust and the Parish Deposit Fund claims) and has made demand on the Debtor to pursue these actions before the actions are time-barred. These are claims for alter-ego and substantive consolidation against the parishes in the Archdiocese; a claim to determine that the Archdiocese is in fact the owner of the Cousins Center; and a fraudulent transfer action against the Faith in Our Future Fund for recovery of the donor list. The Court indicated that a "tolling agreement" under which the parishes, Cousins Center, and Faith in Our Future Fund would agree to an extension of the two year statute of limitations would be preferable to litigation over whether the Committee has standing to pursue these claims, but if such agreements cannot be reached, then the Court will make time to determine the issue. Attorney Stang and Attorney LoCoco confirmed that tolling agreements should be sought.

Counsel and the Court discussed that assuming the Committee is found to have standing to pursue the claims, the Complaints could be filed within the statute of limitations, but stayed pending a determination of whether insurance coverage is available.

An audio recording of the hearing is available on the docket.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| In re: | Chapter 11 |
| Archdiocese of Milwaukee, | Bankruptcy Case No. 11-20059-SVK |
| Debtor. | |
| Archbishop Jerome E. Listecki, as Trustee of the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust, | Adv. Proc. No. 11-02459-SVK |
| Plaintiff, | |
| vs. | |
| Official Committee of Unsecured Creditors, | |
| Defendant. | |
| Official Committee of Unsecured Creditors, | |
| Counterclaimant, | |
| vs. | |
| Archbishop Jerome E. Listecki, as Trustee of the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust, | |
| Counterdefendant. | |

**REPLY OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO
TRUSTEE'S RESPONSE TO MOTION FOR PARTIAL SUMMARY JUDGMENT ON
COUNT III OF AMENDED COMPLAINT**

James I. Stang (CA Bar No. 94435)
Kenneth H. Brown (CA Bar No. 100396)
Gillian N. Brown (CA Bar No. 205132)
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail: jstang@pszjlaw.com
        kbrown@pszjlaw.com
        gbrown@pszjlaw.com
DOCS_LA:260580.7 05058/003

## TABLE OF CONTENTS

INTRODUCTION.........................................................................................................1

ARGUMENT ..............................................................................................................2

    I. RFRA Claims Are Only Available in Cases Against "a Government". ........................2

    II. First Amendment Free Exercise Claims Are Only Available Against
        Government or Private Parties Acting Jointly With, or as Government
        Actors. ....................................................................................................................8

    III. The Bankruptcy Code Is Neutral and Generally Applicable......................................10

    IV. The Application of the Bankruptcy Code Does Not Impose a Substantial
        Burden on the Trust's Free Exercise of Religion. .................................................12

    V. Bankruptcy Code Section 544(b)(1) Incorporates State Law and, Therefore,
        RFRA Cannot Apply. ............................................................................................13

    VI. The Motion Presents Questions of Law Which May Be Decided Without
        Reference to Any Material Facts...........................................................................14

CONCLUSION ..........................................................................................................14

# TABLE OF AUTHORITIES

## CASES

*Boerne v. Flores*
   521 U.S. 507 (1997) ............................................................................................. 4, 16

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*
   508 U.S. 520 (1993) ............................................................................................. 12

*Civil Liberties for Urban Believers v. City of Chicago*
   342 F.3d 752 (7th Cir. 2003) .............................................................................. 15

*DeSimone v. Bartow*
   355 F. App'x 44 (7th Cir. 2009) ......................................................................... 15

*Employment Div. v. Smith*
   494 U.S. 872 (1990) ............................................................................................. 14

*Flagg Bros., Inc. v. Brooks*
   436 U.S. 149 (1978) ............................................................................................. 10

*Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*
   170 F.3d 359 (3d Cir. 1999) ............................................................................... 12

*General Conference Corp. of Seventh-Day Adventists v. McGill*
   617 F.3d 402 (6th Cir. 2010) .............................................................................. 3

*Grossbaum v. Indianpolis-Marion County Bldg. Authority*
   100 F.3d 1287 (7th Cir. 1996) ............................................................................ 12

*Hall v American Nat'l Red Cross*
   86 F.3d 919 (9th Cir. 1996) ................................................................................ 3

*Hankins v. Lyght*
   441 F.3d 96 (2d Cir. 2006) ................................................................................. 3

*Harvey v. Harvey*
   949 F.2d 1127 (11th Cir. 1992) .......................................................................... 9

*In re Barman*
   252 B.R. 403 (Bankr. E.D. Mich. 2000) ........................................................... 5, 7

*In re Faulkner*
   165 B.R. 644 (Bankr. W.D. Mo. 1994) ............................................................. 13

*In re Kerlo*
   311 B.R. 256 (Bankr. C.D. Cal. 2004) .............................................................. 6

*In re McDonald*
   232 B.R. 818 (Bankr. S.D. Fla. 1999) .............................................................. 13

*In re Meyer*
   467 B.R. 451 (Bankr. E.D. Wis. 2012) ............................................................. 13

*In re Newman*
   203 B.R. 468 (Bankr. D. Kan. 1996) ................................................................ 13

*Jackson v. Metro. Edison Co.*
   419 U.S. 345 (1974) ............................................................................................. 10

*Koger v. Bryan*
   523 F.3d 789 (7th Cir. 2008) .............................................................................. 15

*Living Faith, Inc. v. C.I.R.*
   950 F.2d 365 (7th Cir. 1991) .............................................................................. 12

*Lugar v. Edmondson Oil Co., Inc.*
   457 U.S. 922 (1982) .................................................................................................. 11
*Lyng v. Northwest Indian Cemetery Protective Ass'n*
   485 U.S. 439 (1988) .................................................................................................. 14
*Matter of Morris*
   30 F.3d 1578 (7th Cir. 1994) ...................................................................................... 7
*M'Culloch v. State*
   17 U.S. 316 (1819) ...................................................................................................... 5
*O'Bryan v. Bureau of Federal Prisons*
   349 F.3d 399 (7th Cir. 2003) ...................................................................................... 2
*Rayburn v. Hogue*
   241 F.3d 1341 (11th Cir. 2001) .................................................................................. 9
*Rweyemamu v. Cote*
   520 F.3d 198 (2d Cir. 2008) ...................................................................................... 3
*St. John's United Church of Christ v. City of Chicago*
   502 F.3d 616 (7th Cir. 2007) .................................................................................... 12
*Sutton v. Providence St. Joseph Med. Ctr.*
   192 F.3d 826 (9th Cir. 1999) ...................................................................................... 3
*Tomic v. Catholic Diocese of Peoria*
   442 F.3d 1036 (7th Cir. 2006) .................................................................................... 2
*Tower v. Glover*
   467 U.S. 914 (1984) .................................................................................................... 9
*United States v. Indianapolis Baptist Temple*
   224 F.3d 627 (7th Cir. 2000) .................................................................................... 14
*Universal Church v. Geltzer*
   463 F.3d 218 (2d Cir. 2006) .................................................................................... 13
*Warner v. City of Boca Raton*
   887 So. 2d 1023 (Fla. 2004) ...................................................................................... 3
*Williams Island Synagogue, Inc. v. City of Aventura*
   222 F.R.D. 554 (S.D. Fla. 2004) ................................................................................ 3
*Worldwide Church of God v. Philadelphia Church of God, Inc.*
   227 F.3d 1110 (9th Cir. 2000) .................................................................................... 4

## STATUTES

11 U.S.C. § 541 ............................................................................................................ 13
11 U.S.C. § 544(b)(1) .................................................................................................. 13
11 U.S.C. § 544(b)(2) .................................................................................................. 11
11 U.S.C. § 548 ............................................................................................................ 11
11 U.S.C. § 704(a) ........................................................................................................ 5
11 U.S.C. § 707(b) ...................................................................................................... 11
11 U.S.C. § 1103(c) ...................................................................................................... 5
11 U.S.C. § 1104 .......................................................................................................... 7
11 U.S.C. § 1325(b) .................................................................................................... 11
42 U.S.C. § 2000bb ............................................................................................ 1, 2, 4, 12
Wis. Stats § 701.01(8) .................................................................................................. 6
Wis. Stats § 701.10 ...................................................................................................... 6

**OTHER AUTHORITIES**

Timothy Zick, *Statehood as the New Personhood: The Discovery of Fundamental "States' Rights"* 46 WM. & MARY L. REV. 213 (Oct. 2004)...................................................................................7

iv

The Official Committee of Unsecured Creditors (the "Committee") respectfully submits its reply to the Response of the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust (the "Trust") to the Committee's Motion for Partial Summary Judgment on Count III of Amended Complaint.[1]

## INTRODUCTION

The Free Exercise Clause of the First Amendment to the United States Constitution and the Religious Freedom Restoration Act of 1993 (42 U.S.C. §§ 2000bb *et seq.*) ("RFRA") each explicitly limit the power of *government* to burden the free exercise of religion.[2] As the Committee is not a government, is not acting jointly with a government and is not acting under color of law vis a vis the Trust, the First Amendment and RFRA simply do not apply.

The Trust has not cited one case that stands for the proposition that a creditors' committee in a chapter 11 case qualifies as a government actor under the First Amendment or RFRA. That is because it is not. A creditors' committee is a group of *private* creditors acting to collect *private* debts. Furthermore, in this specific adversary proceeding, pursuant to a written agreement with the Archdiocese of Milwaukee (the "Archdiocese"), the Committee is derivatively asserting the Archdiocese's rights to recover $55 million that the Committee contends was fraudulently transferred to Trust. As such, the Committee stands in the shoes of a private nongovernmental actor (the Archdiocese) pursuant to an agreement with a private nongovernmental actor (the Archdiocese) to pursue claims against the Trust for the benefit of private, nongovernmental actors (the Archdiocese's estate and its creditors). As the *government* is not burdening the Trust's free

---

[1] The Committee's *Motion for Summary Judgment on Count III of Amended Complaint* [Docket No. 57] shall be referred to as the "Motion". The supporting *Memorandum of Law* [Docket 57] shall be referred to as the "Committee's MOL". The *Trustee's Response to Creditors' Committee's Motion for Partial Summary Judgment on Count III of Amended Complaint* [Docket No. 69] shall be referred to as the "Response". By the Response, the Trust also brought a cross-motion for summary judgment. At the October 18, 2012 status conference, the Court instructed that the Committee was not required to respond to the Trust's cross-motion for summary judgment at this time and instructed that the Committee's reply to the Response should only address the legal issues raised in its MOL.
[2] *See* Committee's MOL, at 6-7 & 15, n.8.

1

exercise of religion in this case, the First Amendment and RFRA simply do not apply, and the Court should grant the Motion.

## ARGUMENT

### I. RFRA Claims Are Only Available in Cases Against "a Government".

Congress creates private rights of action, not the courts.[3] Congress created the RFRA cause of action explicitly for private parties to sue "a government." *See* 42 U.S.C. § 2000bb-1(c) ("A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief *against a government*.") (emphasis added). The language of the statute could not be plainer, and the Trust's contorted attempts to make "a government" mean "a private party" should be rejected.[4]

As the Trust concedes, the Seventh Circuit has stated that RFRA is applicable only to suits to which the government is a party. *See Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006) (holding that music director who sued diocese for wrongful termination under ADEA was subject to the ministerial exception to the ADEA and discussing in dictum that RFRA may not be applied in a case in which the government is not a party), *cert. denied*, 549 U.S. 881 (2006). Nor has the Seventh Circuit ever held to the contrary. *Cf. O'Bryan v. Bureau of Federal Prisons*, 349 F.3d 399, 401 (7th Cir. 2003). The Courts of Appeals for the Sixth, Ninth and Second Circuits have also held that RFRA is only applicable to suits to which the government is a party. *See General Conference Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 410 (6th Cir. 2010), *cert. denied*, 2011 WL 1457562 (2011); *Sutton v. Providence St. Joseph Med. Ctr.*, 192

---

[3] *See* Committee's MOL, at 8-9.

[4] RFRA's plain language further reinforces the requirement of a government defendant in its burden assignment when it first imposes a burden on the religious actor to prove that the law imposes a "substantial burden." 42 U.S.C. § 2000bb-1(a) (West). Then the burden shifts to the government, "*Government* may substantially burden a person's exercise of religion only if *it* demonstrates that the law satisfies" a "compelling interest" and "serves the least restrictive means." 42 U.S.C. § 2000bb-1(b) (West) (emphasis added). RFRA further defines "demonstrates" to mean, "meets the burdens of going forward with the evidence and of persuasion." 42 U.S.C. § 2000bb-2 (West).

F.3d 826, 839 (9th Cir. 1999); *Hall v American Nat'l Red Cross,* 86 F.3d 919, 923 (9th Cir. 1996),

*cert. denied,* 519 U.S. 1010 (1996); *Rweyemamu v. Cote*, 520 F.3d 198, 204, n.2 (2d Cir. 2008)

(dictum).[5]  *See also Williams Island Synagogue, Inc. v. City of Aventura*, 222 F.R.D. 554, 557

(S.D. Fla. 2004) (interpreting same language to mean free exercise case can only be brought

against government), *aff'd*, 138 Fed. Appx. 299 (11th Cir. 2005); *Warner v. City of Boca Raton*,

887 So. 2d 1023, 1032 (Fla. 2004) (same).[6]

The Trust attempts to trump RFRA's plain language with one sentence of legislative

history--"To be absolutely clear, the bill does not expand, contract or alter the ability of a claimant

to obtain relief in a manner consistent with free exercise jurisprudence, including Supreme Court

jurisprudence, under the compelling government test prior to Smith."[7] This statement was simply

meant to calm the fears of those who worried that RFRA would have too broad of an impact.[8] It

also makes no difference, because, as discussed below, constitutional free exercise cases cannot be

brought against private parties like the Committee, either. The Trust also relies on testimony by

Professor Douglas Laycock, whose theory of RFRA's constitutionality was rejected by the

Supreme Court and who unsuccessfully defended RFRA's constitutionality before the United

---

[5] In 2006, a divided Second Circuit panel held that RFRA could be applied in a case involving two private parties, but only because a government entity, the Equal Employment Opportunity Commission, could have been a party to the case. *See Hankins v. Lyght*, 441 F.3d 96, 103 (2d Cir. 2006). Then-Judge Sotomayor disagreed, explaining in her dissent, "All of the examples cited in the Senate and House Reports on RFRA involve actual or hypothetical lawsuits in which the government is a party. The lack of even a single example of a RFRA claim or defense in a suit between private parties in these Reports tends to confirm what is evident from the plain language of the statute: It was not intended to apply to suits between private parties." *Id.* at 115, n.9. The *Hankins* decision is not factually on point and was significantly weakened by the subsequent decision in *Rweyemamu*.

[6] The Trust also invokes the Ninth Circuit's decision in *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1120-21 (9th Cir. 2000), *cert. denied*, 532 U.S. 958 (2001), which also does not support its extreme interpretation of RFRA. In that case, the court refused to decide the question. *Id.* at 1121.

[7] *See* Trust's Response at 14, HR Rep No 103-88, 8.

[8] Specifically, the House Report is addressing concerns that "if Roe v. Wade were reversed, the bill might be used to overturn restrictions on abortion." HR Rep No 103-88, 8.

States Supreme Court in *Boerne v. Flores*, 521 U.S. 507, 510 (1997).[9] In any event, Professor Laycock did not testify at any point that RFRA is available against private individuals or entities.

**A. The Committee is not the government. Therefore, the Trust may not assert a RFRA claim against it.**

A creditors' committee in a chapter 11 bankruptcy proceeding is not included in the definition of "government" under RFRA. 42 U.S.C. § 2000bb-2(1) ("The term 'government' includes a branch, department, agency, instrumentality and official (or other person acting under color of law) of the United States, or of a covered entity."). A committee is not a governmental branch, department, agency, instrumentality, official, or covered entity. Without citing a single case that supports its position, however, the Trust contends the Committee is an "instrumentality" or "official."[10] The Committee is neither. An "instrumentality" is an entity that carries into execution Congress' specified powers. *See generally M'Culloch v. State*, 17 U.S. 316, 396 (1819). The Committee is not ordained specifically by Congress to carry out Congress' work, and thus cannot be summarily labeled an "instrument" for the purposes of RFRA.

Similarly, no authority exists for the Trust's argument that the Committee in a chapter 11 proceeding is an official. Instead, relying on a single bankruptcy case from the Sixth Circuit *(In re Barman*, 252 B.R. 403 (Bankr. E.D. Mich. 2000)), the Trust attempts to analogize the Committee to a chapter 7 trustee acting in concert with a U.S. Marshal. In *Barman*, a chapter 7 trustee contended that the debtor had fraudulently concealed assets and filed an ex parte motion for an order authorizing him, in conjunction with a U.S. Marshal, to enter the debtor's residence to inspect and inventory the debtor's personal property. *Id.* at 407. After the trustee obtained

---

[9] *See* Response, at 13.

[10] *See* Response, at 17 n.9. The Committee is obviously not a covered entity, which is defined by Congress as "the District of Columbia, the Commonwealth of Puerto Rico, and each territory and possession of the United States." 42 U.S.C. § 2000bb-2(2).

permission, and executed the search with the U.S. Marshal, the debtor moved to suppress evidence

obtained on Fourth Amendment grounds. In a case of first impression, the bankruptcy court held,

"these circumstances surrounding the status and function of a trustee in a chapter 7 case all suggest

a sufficient nexus to the government and its power that it is necessary and appropriate to apply to

the trustee the fourth amendment limits on government power." *Id.* at 412–13.

Whether the *Barman* court was correct is debatable.[11] What is clear, however, is that

*Barman* is not applicable to this case. The role of a chapter 7 trustee is fundamentally different

than the role of a committee. In addition to those fundamental differences detailed in the

Committee's MOL, unlike a chapter 7 trustee, a committee is not the representative of the debtor's

estate.[12] A committee is a collection of independent, individual, private creditors of the debtor

which represents the interests of a larger class of unsecured creditors. The trustee's duties under

Bankruptcy Code section 704(a) are voluminous and mandatory. By comparison, a committee's

duties under Bankruptcy Code section 1103(c), all of which are permissive, are relatively minor.

There is no trustee in this chapter 11 case, so the representative of the estate is the

Archdiocese itself, and the Committee is acting, in general, within the scope of its limited duties

set forth in section 1103(c), which are primarily participatory, not directive. With respect to this

adversary proceeding specifically, the Trust asserts that because the Bankruptcy Court granted the

Committee permission to bring counterclaims against the Trust derivatively, the Committee is

essentially acting on behalf of the court. This is not true. The Archdiocese entered into a written

---

[11] *See In re Kerlo*, 311 B.R. 256, 265 (Bankr. C.D. Cal. 2004) ("Trustees in bankruptcy are not law enforcement officials. As previously discussed, a trustee is required to assemble assets of the estate, liquidate those assets for the benefit of creditors, and distribute proceeds of the estate to creditors. Although trustees may seek the assistance of governmental officials in carrying out their statutory and fiduciary duties and orders of the court, they do not act to assist the government in its investigatory or administrative activities. Rather, the trustees act independently under their statutory mandate in the Bankruptcy Code. Accordingly, a trustee or agent to a trustee is only subject to the Fourth Amendment if (1) the government knew of and acquiesced in the conduct and (2) the trustee acted with the intent to assist the government in its investigatory or administrative purposes.").

[12] *See* Committee's MOL, at 9-11.

agreement with the Committee granting the Committee permission to bring the avoidance action claims against the Trust derivatively on behalf of the Archdiocese's estate.[13] The Committee, therefore, is acting on behalf of the Archdiocese's estate (a private actor) by virtue of rights granted by the Archdiocese (a private actor) and for the benefit of the Archdiocese, its estate and its creditors (all private actors), not the court. Furthermore, this adversary proceeding was initiated by the Trust against the Committee for a declaratory judgment that the assets of the Trust are not property of the estate under section 541. The Trust chose to sue the Committee rather than the Archdiocese for a determination of what assets constitute property of the estate, and then asserted RFRA as an affirmative claim for relief against the Committee. This is very different from *Barman* in which a chapter 7 trustee acted in concert with a U.S. Marshal.

The Trust further argues that the Committee is a government actor because it was created by operation of law and operates with certain statutory powers.[14] This argument proves much too much. State and federal laws create many private arrangements, and then grant them certain powers. Yet, those entities created by operation of law are private. For example, corporations are creations of law. *See Matter of Morris*, 30 F.3d 1578, 1582 (7th Cir. 1994). In addition, they have certain powers designated by law, such as the power to own and sell property, to pay taxes, and to limit liability. Yet, no court would hold that a corporation is a government actor simply because it was created by law and/or operates with certain powers legally delegated to it.

---

[13] *See Second Stipulation between the Official Committee of Unsecured Creditors and Archbishop Jerome Listecki, as Trustee of the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust and the Debtor Regarding the Committee's Standing to Defend the Adversary Proceeding, Bring Avoidance Claims Related to the Estate, and Litigate and Propose or Accept a Settlement of the Adversary Proceeding* [Docket No. 37] and *Order* thereon [Docket No 39].

[14] *See* Trust's Response, at 16.

6

The Trust itself was created by operation of Wisconsin state law, and it operates under the restrictions and powers granted to it by state law.[15] Under the Trust's legal theory, it should be a government actor itself because it was created by operation of law and its powers are defined by law. If, as its theory would entail, the Trust were a government actor, its free exercise claims would be barred. Governments do not have the power to assert constitutional rights, and there is no question that the language of RFRA does not create a private right of action on behalf of government. *See* Timothy Zick, Article, *Statehood as the New Personhood: The Discovery of Fundamental "States' Rights"*, 46 WM. & MARY L. REV. 213, 218-9 (Oct. 2004). Thus, were this Court to adopt the Trust's theory of what constitutes a government actor, the Trust itself would have to be categorized as a government actor and it could assert no free exercise rights.

The Trust also attempts to rely on the Bankruptcy Court's "oversight" features, such as the fact that the bankruptcy court can order the Office of the United States Trustee to change the Committee's membership, must approve committee members' expenses and must approve the employment and payment of a committee's professionals, to argue that the Committee is acting under color of law. The same can be said, however, of the bankruptcy court's power over all major parties in any chapter 11 case. For example, a bankruptcy court can oust the debtor in possession's management by appointing an examiner or a chapter 11 trustee for, among other things, fraud, dishonesty or mismanagement. 11 U.S.C. § 1104. Surely, the fact that the court can order that the debtor be managed by a court-appointed examiner does not make the debtor a government actor. As to the employment and compensation of professionals, the bankruptcy court has to approve the

---

[15] The Trust admits that "the Trust was formally established under the statutes of the State of Wisconsin in 2007 . . ." *See Counterdefendants' Answer to Counterclaims* [Docket No. 13], at 2, ¶1. *See also* Wis. Stats § 701.10 (Charitable Trusts); *Trust Agreement Creating the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust* dated April 2, 2007 (Exhibit A to Affidavit of Kenneth Brown in Support of the Motion [Docket No. 57-2]) (the "Trust Agreement"), at 3, ¶ 1.2 ("This instrument . . . shall be governed, enforced and interpreted in accordance with the laws of the State of Wisconsin . . ."); *Id.* at 3, ¶ 1.1.11 ("The Trustee is a "trustee" within the meaning of Wisconsin Statutes Section 701.01(8) . . .");

7

employment and compensation of the debtor's professionals as well as the committee's. That

supervision, however, does not transform the debtor, the committee, or the professionals brought

into a case into government actors.

## II. First Amendment Free Exercise Claims Are Only Available Against Government or Private Parties Acting Jointly With, or as Government Actors.

While RFRA is explicit that it may only be used against "a government," constitutional

rights occasionally, though rarely, may be asserted against private actors. As a matter of well-

established law, a private party can be viewed as a government actor "only in rare circumstances."

*Harvey v. Harvey*, 949 F.2d 1127, 1130 (11th Cir. 1992). A private party is not liable for

constitutional violations, unless it was operating "under color of law" (addressed above) or

"willfully participating in joint action with government officials."[16] To determine whether a

private actor can be treated as a government actor, courts consider whether any of the following

three conditions are met: (1) the government has coerced or at least significantly encouraged the

action alleged to violate the Constitution; (2) the private party performed a public function, or (3)

the government has so insinuated itself into a position of interdependence with the private party

that it was a joint participant in the enterprise. *See Rayburn v. Hogue,* 241 F.3d 1341, 1347 (11th

Cir. 2001). None of these conditions are met in this case.[17]

The Committee does not begin to meet the requirements to be considered a government

actor under the analysis applicable to constitutional claims. First, the federal government has not

---

[16] *See generally* Committee MOL, at 8-12. See also *Tower v. Glover,* 467 U.S. 914 (1984); *Harvey v. Harvey,* 949 F.2d 1127 (11th Cir. 1992).

[17] The Trust relies on *New York Times Co. v. Sullivan,* 376 U.S. 253, 265 (1964), without recognizing that it is a free speech case, not a free exercise case. *See* Response, at 12. The First Amendment contains individual clauses covering free speech and free exercise, and independent doctrines have been developed with respect to each. Free speech doctrine covers cases involving the freedom of religious speech, as well as other types of speech, while free exercise doctrine covers only religious belief and conduct. If the Trust intended to imply that its claims sound in speech principles, it has provided yet another argument against the application of RFRA, which applies to conduct, not speech.

coerced or significantly encouraged the Committee to violate the Trust's Free Exercise rights. Nor does the Committee perform a public function. For the "public function" analysis to apply, the function must be one that has traditionally been exclusively the domain of the government. An analogous case, *Jackson v. Metro. Edison Co.*, 419 U.S. 345 (1974), considered whether the operation of a private utility, which was licensed and regulated by the state, performed a public function. The Supreme Court determined that the public function analysis is only applicable where a private entity exercises "powers traditionally exclusively reserved the State." *Id.* at 352. The Committee is not exercising powers traditionally exclusively reserved to the state. Instead, the Committee is a private group of individuals who are exercising their rights to collect private debts from the Archdiocese. The state and federal bankruptcy laws are not obligating the state to step in. Bankruptcy laws exist so private parties can reorganize their capitial structure and obtain a fair and equitable distribution of the assets of the estate to satisfy primarily private obligations; they do not *require* parties to take action to collect on their debts. *See also Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 161 (1978) (settlement of disputes between debtors and creditors is not traditionally an exclusive public function).

Finally, there is no "joint participation" between the government and the Committee. Although the Trust invokes *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922 (1982), to argue that the Committee is engaged in a joint participation with the government, the facts can be readily distinguished. There, a creditor sued to collect a debt and obtained a pre-judgment attachment against the property of the debtor, which disabled the debtor from selling it. To obtain the attachment, the creditor was only required to file an ex parte petition stating that the debtor might dispose of the property. A clerk of the court issued a writ of attachment, which was then executed by the sheriff. The Supreme Court specifically found that because the clerk and sheriff acted

9

*together* with the creditor, the creditor's action in obtaining the attachment was state action. *Id.* at 941. Here, there are no such government actors who are working in conjunction with the Committee. Rather, the Committee is a private party, operating appropriately under a statute, attempting to get recourse for monies owed. Free exercise claims under neither RFRA nor the Free Exercise Clause can be brought against the Committee because it is a private party. Accordingly, this Court should grant summary judgment against the Trust on its free exercise claims.

### III. The Bankruptcy Code Is Neutral and Generally Applicable.

As was stated in the Motion, neutral, generally applicable laws do not run afoul of the Free Exercise Clause even if they have the incidental effect of burdening a religious practice.[18] A law is <u>not</u> generally applicable when it treats religious entities more harshly than it treats non-religious entities. *See St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 631 (7th Cir. 2007), *cert. denied,* 553 U.S. 1032 (2007); *Grossbaum v. Indianpolis-Marion County Bldg. Authority*, 100 F.3d 1287, 1296 (7th Cir. 1996); *Living Faith, Inc. v. C.I.R.*, 950 F.2d 365, 376 (7th Cir. 1991). The Supreme Court has only found a law not to be generally applicable in a case in which the law was a gerrymander that only burdened religious actors and not secular actors performing the identical task. As Justice Kennedy explained in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543 (1993), "The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens <u>only</u> on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause." (emphasis added). The *Lukumi* court concluded that the ordinances in that case pursued the government's interests "<u>only</u> against conduct motivated by religious belief" which is the "precise evil . . . the requirement of general applicability is designed to prevent." *Lukumi*, 508 U.S. at 545-

---

[18] *See* Motion, at 16-20.

10

46. Another example of a government regulation that is not neutral or generally applicable is found

in *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 365-66 (3d

Cir. 1999), *cert. denied*, 528 U.S. 817 (1999), in which the Court of Appeals for the Third Circuit

found that the police department's decision to provide non-religious, medical exemptions to its no-

beard requirement, while refusing religious exemptions from same requirement, was not generally

applicable.

Numerous courts have held that the Bankruptcy Code does not treat religious entities more

harshly than non-religious entities. *See Universal Church v. Geltzer*, 463 F.3d 218, 227-28 (2d Cir.

2006) (holding avoidance provisions of the Bankruptcy Code do not violate the Free Exercise

clause regardless of their burden on religion because they are generally applicable and religion-

neutral), *cert. denied*, 549 U.S. 1113 (2007); *In re Meyer*, 467 B.R. 451, 457 (Bankr. E.D. Wis.

2012) ("This Court holds debtors have no federal constitutional right to a waiver of the standards

set by section 707(b)—a neutral and valid law of general applicability—on the ground that the law

is contrary to their religious beliefs."); *In re McDonald*, 232 B.R. 818,820-21 (Bankr. S.D. Fla.

1999) (holding that Bankruptcy Code section 1325(b) is a facially neutral law of general

application and does not violate the First Amendment); *In re Newman*, 203 B.R. 468, 475 (Bankr.

D. Kan. 1996) (holding avoidance of the debtors' tithes made within one year of bankruptcy does

not violate the debtors' right to free exercise of religion because Section 548 is a neutral law of

general application); *In re Faulkner*, 165 B.R. 644, 648 (Bankr. W.D. Mo. 1994) (holding section

707(b) of Bankruptcy Code is a neutral law of general applicability thus the Free Exercise clause

does not require an exception for religious practice). The Bankruptcy Code is like the Tax Code in

this regard. *See United States v. Indianapolis Baptist Temple*, 224 F.3d 627 (7th Cir. 2000), *cert.*

*denied*, 531 U.S. 1112 (2001). If anything, the Bankruptcy Code gives religious individuals

preferential treatment. *See* 11 U.S.C. § 544(b)(2) (excluding from avoidance transfers made to qualified religious entities).

According to these cases, the Bankruptcy Code is a neutral and generally applicable body of law. It simply does not burden religious actors in any way that is distinctive from secular actors. Accordingly, these courts have determined that Bankruptcy Code provisions cannot violate the Free Exercise Clause because they are neutral and generally applicable law. *Employment Div. v. Smith*, 494 U.S. 872 (1990).

### IV. The Application of the Bankruptcy Code Does Not Impose a Substantial Burden on the Trust's Free Exercise of Religion.

The Trust asserts that the operation of Chapter 11's provisions imposes a substantial burden on its free exercise of religion, which it must prove whether the claim is under RFRA or the Free Exercise Clause. *See generally* 42 U.S.C. § 2000bb-1(a) (West); *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450-451 (1988) (explaining that the plaintiff was required to prove a substantial burden on religion before the Court would "require government to bring forward a compelling justification for its otherwise lawful actions"). A substantial burden exists "only where a government action 'bears direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable.'" *DeSimone v. Bartow*, 355 F. App'x 44, 46 (7th Cir. 2009), *citing Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003), *cert. denied,* 541 U.S. 1096 (2004); *Koger v. Bryan*, 523 F.3d 789, 799 (7th Cir. 2008)).[19]

The Trust cannot show a substantial burden here. If the Trust's assets are recovered for the benefit of the Archdiocese's estate, the Archdiocese will still be able to use the assets for perpetual

---

[19] The Trust invokes a 1996 standard, ignoring how the standard has been more recently invoked in the Seventh Circuit. *See* Response, at 24.

care of its cemeteries during the pendency of the chapter 11 case, to the extent this use is in the ordinary course of its business and permitted by the Bankruptcy Code. How much of the recovered assets will be used to pay the allowed claims of general unsecured creditors (including any claims the Trust may have) cannot be determined at this time. That analysis depends on a number of factors, including the total amount of allowed unsecured, priority and administrative claims against the Archdiocese's estate and the total amount of assets available to pay those claims, including insurance proceeds. Accordingly, the Trust cannot show that the mere recovery of the funds for the benefit of the estate will render its religious exercise effectively impracticable.

## V. Bankruptcy Code Section 544(b)(1) Incorporates State Law and, Therefore, RFRA Cannot Apply.

If this Court were to expand RFRA to apply to suits against private parties, RFRA still does not apply. As was set forth in the Committee's MOL, the Trust cannot use RFRA to modify, preempt, or trump state law. At issue in this adversary proceeding is (a) whether the funds held in the Trust are property of the estate under Bankruptcy Code section 541 by virtue of Wisconsin law because the Trust is void as a self settled trust and (b) whether, even if the Trust is valid, the Archdiocese's transfer of its assets to the Trust in 2008 can be avoided under the Wisconsin fraudulent conveyance statutes, made applicable by section 544(b)(1) of the Bankruptcy Code. Both questions are resolved with reference to state law.[20] The resulting state law/federal law mix cannot be altered by RFRA under the Supreme Court's ruling in *Boerne v. Flores*, 521 U.S. 507 (1997), which absolutely bars federal alteration of state law. Congress lacked the power to enact RFRA against the states. *Id.* at 532-36. The Trust's arguments to the contrary fundamentally misunderstand the *Boerne* decision.

---

[20] *See* Committee's MOL, at 12-14.

13

**VI. The Motion Presents Questions of Law Which May Be Decided Without Reference to Any Material Facts**

The Trust correctly points out that the Committee did not file a separate a statement of proposed material facts as to which it contends there is no genuine issue and that entitle the Committee to a judgment as a matter of law. This is because the Committee's request for partial summary judgment rests purely on questions of law. There are no material facts at issue. This Motion is based on the pleadings. There is simply no legitimate dispute that the Court can determine the Trusts' RFRA and First Amendment claims (and the Committee affirmative defenses) purely as a matter of law. Accordingly, the filing a proposed statement of undisputed material facts was unnecessary.[21]

**CONCLUSION**

In light of the weakness of its arguments, the Trust's claim of free exercise rights needs to be understood for what it is, which is an attempt to place the Archbishop and the Archdiocese above the law that governs everyone else. The Archdiocese may not file a petition for relief under the Bankruptcy Code in order to take advantage of the very substantial benefits and protections of the Bankruptcy Code, including the automatic stay, the bar date, the discharge provisions, and the relief from punitive damages, and at the same time avoid all of the ordinary burdens that are attendant upon a chapter 11 filing that may impact him as the sole trustee of the Trust (which was created by the Archdiocese as settlor). Free exercise law was not crafted to come to the aid of

---

[21] While acting as the President and Sole Member of the Archdiocese, the Archbishop has filed four motions for summary judgment without separate statements of undisputed facts [Docket Nos. 565, 563, 561 and 740]. The Archbishop, now acting as the sole trustee of the Trust, asks this Court to deny the Motion because the Committee has not submitted one. Nor has the Trust contested any of the facts on which the Motion relies. Furthermore, as the Trust acknowledges, the Committee could have sought the same relief through a motion to dismiss or a motion for partial judgment on the pleadings, neither of which would have required a separate statement of facts.

14

religious actors in these circumstances, and does not relieve those voluntarily invoking chapter 11

of its incidental burdens.

For the reasons set forth above, the Committee respectfully requests that the Court grant

the Motion and enter summary judgment against the Trust on Count III of the Trust's Amended

Complaint and in favor of the Committee as to its Seventeenth, Twentieth and Twenty-Second

affirmative defenses.

Dated: November 21, 2012

Respectfully submitted,

PACHULSKI STANG ZIEHL & JONES LLP

By   */s/ Kenneth H. Brown*
     James I. Stang (CA Bar No. 94435)
     Kenneth H. Brown (CA Bar No. 100396)
     Gillian N. Brown (CA Bar No. 205132)
     Pachulski Stang Ziehl & Jones LLP
     10100 Santa Monica Blvd., 13th Floor
     Los Angeles, CA 90067
     Telephone: (310) 277-6910
     Facsimile: (310) 201-0760
     E-mail: jstang@pszjlaw.com
           kbrown@pszjlaw.com
           gbrown@pszjlaw.com

     -and-

     Albert Solochek (State Bar No. 1011075)
     Jason R. Pilmaier (State Bar No. 1070638)
     Howard, Solochek & Weber, S.C.
     324 E. Wisconsin Ave., Suite 1100
     Milwaukee, WI 53202
     Telephone: (414) 272-0760
     Facsimile: (414) 272-7265
     E-mail: asolochek@hswmke.com
           jpilmaier@hswmke.com

     Attorneys for the Official Committee of
     Unsecured Creditors

15

Dated: November 21, 2012

By      /s/ Marci A. Hamilton, Esq.
        Marci A. Hamilton, Esq.
        36 Timber Knoll Drive
        Washington Crossing, PA  18977
        (215) 353-8984
        Hamilton.marci@gmail.com

        Special Counsel to the Official Committee
        of Unsecured Creditors

16

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| In re: | Chapter 11 |
| Archdiocese of Milwaukee, | Bankruptcy Case No. 11-20059-SVK |
| Debtor. | |

| | |
|---|---|
| Archbishop Jerome E. Listecki, as Trustee of the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust, | Adv. Proc. No. 11-02459-SVK |
| Plaintiff, | |
| vs. | |
| Official Committee of Unsecured Creditors, | |
| Defendant. | |

Official Committee of Unsecured Creditors,

        Counterclaimant,

vs.

Archbishop Jerome E. Listecki, as Trustee of the
Archdiocese of Milwaukee Catholic
Cemetery Perpetual Care Trust,

        Counterdefendant.

## CERTIFICATE OF SERVICE

    Jason Pilmaier, being first duly sworn on oath deposes and says that on November 21, 2012, I caused to file and serve via CM/ECF in the above captioned Adversary Proceeding a copy of the following:

- Reply of the Official Committee of Unsecured Creditors to Trustee's Response to Motion for Partial Summary Judgment on Count III of Amended Complaint.

and that CM/ECF will cause electronic notice of the filing to be sent to the following:

| | |
|---|---|
| Timothy Nixon: | tnixon@gklaw.com |
| Matthew M. Wuest | mwuest@gklaw.com |
| Bruce G. Arnold | barnold@whdlaw.com |
| Daryl L. Diesing | ddiesing@whdlaw.com |
| Francis H. LoCoco | flococo@whdlaw.com |
| Micahel E. Gosman | mgosman@whdlaw.com |

                    /s/_____
Albert Solochek
Jason Pilmaier
Howard Solochek & Weber, S.C.
324 E. Wisconsin Ave., Suite 1100
Milwaukee, WI 53202
(414) 272-0760
(414) 272-7265
asolochek@hswmke.com
jpilmaier@hswmke.com

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

In re                                                     Case No. 11-20059-svk
Archdiocese of Milwaukee,                                 Chapter 11

                    Debtor.

---

Archbishop Jerome E. Listecki, as Trustee of the
Archdiocese of Milwaukee Catholic Cemetery
Perpetual Care Trust,

                    Plaintiff,
v.                                                        Adv. Proc. No. 11-02459

Official Committee of Unsecured Creditors,

                    Defendant.

---

Official Committee of Unsecured Creditors,

                    Counterclaimant,
v.

Archbishop Jerome E. Listecki, as Trustee of the
Archdiocese of Milwaukee Catholic
Cemetery Perpetual Care Trust,

                    Counterdefendant.

---

**DECISION ON MOTION FOR SUMMARY JUDGMENT**

---

On April 2, 2007, the Archdiocese of Milwaukee (the "Debtor") created the Milwaukee

Catholic Cemetery Perpetual Care Trust (the "Trust" or the "Cemetery Trust") to provide for the

perpetual care of the Debtor's cemetery property and grounds.  In March 2008, the Debtor

funded the Trust by transferring over $55 million to a Trust bank account at U.S. Bank.  The

Debtor filed a chapter 11 petition on January 4, 2011, and shortly thereafter, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee").  On January 13, 2012, the plaintiff, Archbishop Jerome E. Listecki (the "Archbishop"), as Trustee of the Trust, filed a five-count Amended Complaint against the Committee, which had been granted standing to defend, negotiate and settle the claims made concerning the Trust.

In the Amended Complaint, the Archbishop seeks a declaration that (1) the Trust is not property of the Debtor's bankruptcy estate, and (2) the funds held in the Trust are not property of the Debtor's bankruptcy estate.  Count III of the Amended Complaint alleges that the Committee cannot use the Bankruptcy Code to make the Trust property of the estate because doing so would violate the Religious Freedom Restoration Act of 1993 (42 U.S.C. § 200bb et. seq.) ("RFRA") and the First Amendment to the United States Constitution.  The Committee filed a Motion for Summary Judgment, seeking summary adjudication of Count III and the Committee's related Seventeenth, Twentieth and Twenty-Second affirmative defenses.

Does including the Trust assets in the bankruptcy estate substantially burden the Debtor's free exercise of religion in violation of RFRA, the First Amendment or both?  To answer in the affirmative would compel the Court to reach the unprecedented finding that a Chapter 11 creditors' committee is the government.  That is a leap of faith the Court will not make.  The Court also easily concludes that the Bankruptcy Code is a neutral and generally applicable statute that does not target religion or religious conduct.  Therefore, the Court will grant the Committee's Motion.  This disposition does not necessarily mean that the Cemetery Trust assets will be available to pay the Debtor's creditors; the other Counts of the Complaint[1] and the Committee's Counterclaim remain to be decided.

---

[1] Count I is a claim that the Trust assets are not property of the bankruptcy estate based on various theories of trust law.  Count II is a claim that since the Trust *res* was never commingled, the *res* was not

2

<u>Procedural Background</u>

The parties filed briefs and supporting materials, and the Court held a hearing on January 11, 2013.  The Archbishop stridently protested the Committee's failure to file a statement of proposed undisputed material facts.[2]  But there can be no serious dispute about the facts necessary for the Court to decide this Motion.  Whether RFRA applies to including Cemetery Trust assets in the Debtor's bankruptcy estate, and whether Bankruptcy Code provisions are neutral and generally applicable, are legal questions, not factual ones.  Both parties confirmed at the hearing that the issues are purely ones of law.  Under these circumstances, the Committee's failure to file a statement of proposed undisputed facts is harmless.[3]

The Committee advances three arguments:  (1) RFRA is applicable only to suits to which the government is a party; (2) RFRA may not be applied to invalidate state law, such as Wisconsin fraudulent transfer law; and (3) application of neutral, generally applicable provisions of the Bankruptcy Code does not violate First Amendment free exercise claims.

1. <u>RFRA is Applicable Only to Suits Involving the Government</u>

RFRA forbids "government" from substantially burdening religious exercise unless the burden is narrowly tailored to serve a compelling governmental interest.  42 U.S.C. § 2000bb-1. RFRA defines the term "government" to include a "branch, department, agency, instrumentality,

---

[2] property of the estate; Count IV alleges that since the funds were not commingled at the time of the bankruptcy petition, the trust funds are not property of the estate; and Count V alleges that since the Archbishop can trace the funds in the Trust, the funds are not property of the estate.

[2] This Court's Local Rules regarding summary judgment do not require the statement of undisputed facts, except possibly by reference to the District Court's Local Rules.  Arguably, the District Court's summary judgment procedural rules are inconsistent with the Bankruptcy Court's rules, and do not apply.  No pretrial order obligated the Committee to file the statement in this adversary proceeding, and the Court does not customarily require such statements, except as expressly stated in a pretrial order.  As the Committee noted, the Debtor has filed several Motions for Summary Judgment in this case, and none has been accompanied by a statement of undisputed facts.

[3] The Committee supported its Motion for Summary Judgment with an affidavit.

3

and official (or other person acting under color of law) of the United States." 42 U.S.C. §

2000bb-2. The Committee hangs its hat on *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036

(7th Cir. 2006), in which the court rejected the Second Circuit's decision in *Hankins v. Lyght*,

441 F.3d 96 (2d. Cir. 2006), and declared: "RFRA is applicable only to suits to which the

government is a party." *Tomic*, 442 F.3d at 1042. The Archbishop counters that *Tomic's*

pronouncement was mere dictum, but other courts of appeals have held that RFRA applies only

to suits involving the government.

For example, in *General Conf. Corp. v. McGill*, 617 F.3d 402, 410 (6th Cir. 2010), the

court defined the issue as "whether RFRA applies only in suits against the government or also in

suits by private parties seeking to enforce federal law against other private parties." Adopting

the dissent in *Hankins* by then-Judge Sotomayor, the Sixth Circuit concluded that RFRA does

not apply to suits between private parties for three reasons:

> First, as discussed above, RFRA's text does not support the *Hankins* majority's
> interpretation. Second, the *Hankins* majority limited its holding to the application
> of RFRA vis-a-vis federal laws that can be enforced by private parties and the
> government. That case concerned an action under the ADEA by a clergyman who
> had been forced into retirement. The ADEA claim could have been brought by
> the EEOC, and the majority sought to avoid disparate application of the statute
> based on who brings discrimination charges. *Id.* There is no EEOC-like agency
> that can bring trademark-enforcement actions. Third, a different panel of the
> Second Circuit already has expressed "doubts about *Hankins's* determination that
> RFRA applies to actions between private parties." *Rweyemamu v. Cote*, 520 F.3d
> 198, 203 (2d Cir. 2008). That panel stated that "we think the text of RFRA is
> plain," credited Judge Sotomayor's dissent, and concluded that RFRA should not
> apply to purely private disputes "regardless of whether the government is capable
> of enforcing the statute at issue." *Id.* at 203 n.2.

*Id.* at 411.

The Ninth Circuit, too, has concluded that RFRA does not apply to suits between private

parties. *See Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1121 (9th

Cir. 2000) ("It seems unlikely that the government action Congress envisioned in adopting

4

RFRA included the protection of intellectual property rights against unauthorized appropriation."); *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 834, 837-43 (9th Cir. 1999) (observing that Congress did not specify that RFRA applies to nongovernmental actors, as it typically does when intending to regulate private parties, and holding that private parties could not be considered state actors under RFRA unless they acted jointly with government officials to violate free-exercise rights).

In *Sutton*, the defendant (a private hospital) would not hire the plaintiff who for religious reasons refused to provide a social security number as federal law required. The *Sutton* court thoroughly explored when a private party acts "under color of law" and therefore qualifies as a governmental actor for RFRA purposes. The court noted that Congress has used the phrase "under color of law" in other statutes, including 42 U.S.C. § 1983. *Id.* at 835-36; s*ee also Brownson v. Bogenschultz*, 966 F. Supp. 795, 797 (E.D. Wis. 1997) (stating that the required degree of government action under RFRA is analyzed under same standard as § 1983). The court concluded that in determining whether a person is liable under § 1983, the ultimate issue is whether the alleged infringement of federal rights is fairly attributable to the government. *Sutton*, 192 F.3d at 835 (citing *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982)).

According to *Sutton*, the analysis starts with a presumption that private conduct does not constitute government action. Calling the circumstances under which a private party can act under color of law "rare," and noting that "something more" than simply enforcing a federal statute is required, the court identified four tests for identifying when a party acts under color of law: "(1) public function, (2) joint action, (3) governmental compulsion or coercion, and (4) governmental nexus." *Id.* at 835-36. The plaintiff seized on governmental compulsion, arguing that the government compelled the result by mandating that the hospital require the social

security number.  After a thorough review of the case law, the *Sutton* court rejected the

argument, finding that mere application of a statute is insufficient:  the government must provide

a "nexus" for a private entity to be clothed with the garb of a governmental actor.  Examples

include government participation in the action via conspiracy, official cooperation with the

action, or government enforcement and ratification of the private entity's action.  *Id.* at 841.  The

Ninth Circuit's own decisions supplied similar illustrations:

> In summary, Ninth Circuit precedent does not suggest that governmental
> compulsion, without more, is sufficient to deem a truly private entity a
> governmental actor in the circumstances of this case.  Instead, the plaintiff must
> establish some other nexus sufficient to make it fair to attribute liability to the
> private entity as a governmental actor.  Typically, the nexus consists of some
> willful participation in a joint activity by the private entity and the government.
> Plaintiff here fails to allege any such nexus.

*Id*. at 843.  The Archbishop argues that the court in *Sutton* "made clear it was not holding that, in

all instances, a party could not bring a RFRA claim against a private entity."  (Archbishop's

Response Brief at 11).  True, *Sutton* recognized the exceptions under which a private party can

act "under color of law."  But the court found no exception applicable, because the plaintiff

failed to show that there was any "nexus to make it fair to attribute liability to the private entity

as a government actor."  *Id.*

No nexus was shown in *Sutton*, and no nexus has been shown here.  The Archbishop has

not alleged that the Committee is engaged with the government in a conspiracy, has not alleged

any joint action and has not alleged that the government is officially cooperating with the

Committee.  Comprised of five individual creditors, the Committee merely seeks to apply

provisions of the Bankruptcy Code and Wisconsin law so as to include property in the Debtor's

bankruptcy estate.  The Archbishop says that this property is needed to maintain Catholic

cemeteries.  The "government" is not involved here any more than it was involved in *Sutton*.

The Archbishop argues that the Committee is acting under color of law because the Committee was appointed by the U.S. Trustee, is subject to court approval, and has shades of judicial immunity. The Archbishop concedes that no court has ever held that a creditors' committee is the "government" based on these factors. He cites *Brownson v. Bogenschultz*, 966 F. Supp. 795, 798 (E.D. Wis. 1997), but in *Brownson*, Judge Reynolds said: "Under the joint action theory, private defendants act under color of state law when they collaborate with a state official to deny the plaintiffs' rights. To transform a private defendant into a state actor under the joint action theory, the public and private actors must share a common and unconstitutional goal." (internal citations omitted). The Archbishop fails to explain how the Committee's performance of its functions in this bankruptcy case, or its immunity in performing them, translates to the Committee acting jointly with the federal government to accomplish a common goal, let alone an unconstitutional one.

The Archbishop also relies on *Taunt v. Barman (In re Barman)*, 252 B.R. 403 (Bankr. E.D. Mich. 2000), but *Barman* is easily distinguishable. In *Barman*, the Chapter 7 trustee obtained an *ex parte* order and went with the U.S. Marshal to the debtor's residence to search for concealed assets. The debtor sought to suppress the resulting evidence because his Fourth Amendment rights had been violated. Noting that the Fourth Amendment only applies to abuses by the government, the court concluded that the trustee was acting under color of law. The court reached this conclusion not only because the U.S. Marshal had accompanied the trustee on the search, but also because of the trustee's status as a trustee, someone appointed and supervised by the U.S. Trustee, an official of the U.S. Department of Justice.

Initially, this Court rejects the *Barman* court's determination that the trustee's connection to the U.S. Trustee elevates the Chapter 7 trustee to government status. Other courts have

7

declined to deem the trustee a governmental actor in various contexts. *See Cromelin v. United States,* 177 F.2d 275, 277 (5th Cir. 1949) (trustee "is in no sense an agent or employee or officer of the United States."); *Wells v. United States*, 98 B.R. 806 (N.D. Ill. 1989) ("For one thing, a trustee in bankruptcy has long been held not to be an agent of the United States."); *Spacone v. Burke (In re Truck-A-Way)*, 300 B.R. 31 (E.D. Cal. 2003) (disagreeing with *Barman* and suggesting that no order should have been issued to the trustee precisely because the trustee is not a government attorney or law enforcement official).

Even if the *Barman* trustee did act under color of law in searching the debtor's residence with the U.S. Marshal, the facts in this case are different. The Committee, acting derivatively through the Debtor as debtor in possession, is defending a lawsuit concerning property of the bankruptcy estate. The U.S. Trustee does not supervise debtors in possession or creditors' committees in the same manner as Chapter 7 trustees. Section 586(a)(1) of Title 28 U.S.C. provides: "Each United States Trustee . . . shall (1) establish, maintain, and *supervise* a panel of private trustees that are eligible and available to serve as trustees in cases under chapter 7 of title 11." 28 U.S.C. § 586(a)(1) (emphasis supplied). Conversely, section 586(a)(3)(E) states that the U.S. Trustee's role is simply to "monitor" the creditors' committee. 28 U.S.C. § 586(a)(3)(E). "Supervising" implies some level of control over Chapter 7 trustees' actions, while "monitoring" suggests little more than observation of committee participation in Chapter 11 cases.

Finally, although the U.S. Trustee appointed the Committee, the Committee is not acting in concert with the U.S. Trustee or any government official in this adversary proceeding. The U.S. Trustee is not a party to this adversary proceeding, and no representative of the U.S. Trustee appeared at the hearing on the Motion for Summary Judgment. The Court also rejects the Archbishop's suggestion that this Court's enforcement of the Bankruptcy Code and supervision

8

of this bankruptcy case makes the Committee a governmental actor for purposes of RFRA. Such

a nexus would render virtually every participant in a bankruptcy case the government.

In summary, the Court concludes that the Committee is not the government and is not

acting under color of law as that phrase is used in RFRA. This conclusion is grounded on (1) the

Seventh Circuit's statement in *Tomic*, and the other circuit court decisions concluding that RFRA

does not apply in suits between private parties; (2) the "rare" circumstances under which a

private party acts under color of law; (3) the failure of the Committee to satisfy any of the tests in

*Sutton*, such as joint action or government compulsion; and (4) the lack of any precedent under

which a creditors' committee has been found to be acting "under color of law" in defending or

prosecuting an avoidance action suit in bankruptcy court. Therefore, RFRA does not apply to

bar the Committee's claims or defenses in this adversary proceeding.

2. RFRA May Not be Applied to Invalidate State Law

Assuming it is necessary to reach the argument, the Court also agrees with the Committee

that RFRA does not bar the claims here because the ultimate law to be applied is state law. The

Supreme Court stated in *Cutter v. Wilkinson*, 544 U.S. 709, 715 (2005): "In *City of Boerne*, this

Court invalidated RFRA as applied to States and their subdivisions, holding that the Act

exceeded Congress' remedial powers under the Fourteenth Amendment."[4] After *Boerne*, even

assuming that RFRA applies to actions involving the federal government, RFRA clearly cannot

be used to invalidate a state law.

Although a federal statute, 11 U.S.C. § 541, defines what is property of the bankruptcy

estate, the ultimate determination whether the Trust assets are included in the Debtor's estate is a

---

[4] In a footnote, the Court added: "RFRA, Courts of Appeals have held, remains operative as to the
Federal Government and federal territories and possessions. *See O'Bryan v. Bureau of Prisons*, 349 F.3d
399, 400-401 (7th Cir. 2003); *Guam v. Guerrero*, 290 F.3d 1210, 1220-1222 (9th Cir. 2002); *Kikumura v.
Hurley*, 242 F.3d 950, 958-960 (10th Cir. 2001); *In re Young*, 141 F.3d 854, 858-863 (8th Cir. 1998). This
Court, however, has not had occasion to rule on the matter." *Id.*

question of state law.  In *Butner v. United States*, 440 U.S. 48, 55 (1979), the Supreme Court

stated:  "Property interests are created and defined by state law.  Unless some federal interest

requires a different result, there is no reason why such interests should be analyzed differently

simply because an interested party is involved in a bankruptcy proceeding."  Citing *Butner*, the

court in *Tort Claimants Comm. v. Roman Catholic Archbishop (In re Roman Catholic

Archbishop)*, 335 B.R. 842, 860 (Bankr. D. Or. 2005), questioned whether RFRA applied at all

to an estate property determination in a diocesan bankruptcy.

      In this adversary proceeding, Wisconsin trust law governs the validity of the Trust, and

Wisconsin fraudulent transfer law governs whether transfers of the Debtor's property to the Trust

are avoidable and recoverable by the Committee.  The Court agrees with the Committee that

these state laws cannot be invalidated by RFRA.

3.   <u>Application of Neutral, Generally Applicable Provisions of the Bankruptcy Code do not
Violate First Amendment Free Exercise Claims</u>

      In *Employment Division v. Smith*, 494 U.S. 872, 879 (1990), the Supreme Court held that

the Free Exercise Clause of the First Amendment ordinarily does not relieve a religious adherent

from compliance with a neutral, generally applicable law.  As applied to this case, the Court

cannot relieve the Archbishop from the estate-defining provisions of the Bankruptcy Code if the

Code is a neutral, generally applicable law.  A law is neutral if its object is something other than

the infringement or restriction of religious practices.  *See Church of the Lukumi Babalu Aye, Inc.

v. City of Hileah*, 508 U.S. 520, 533 (1993).  A law is not generally applicable if it imposes

burdens only on conduct motivated by religious belief in a selective manner.  *St. John's United

Church of Christ v. City of Chicago*, 502 F.3d 616, 631 (7th Cir. 2007) (quoting *Lukumi*, 508

U.S. at 543).

The Archbishop argues that the Bankruptcy Code is not a neutral, generally applicable law because the Code contains various exceptions and exemptions.  But none of the examples the Archbishop cites is "targeted" at religion, nor is the object of the Bankruptcy Code directed at religion or religious practices.  Rather, the provision at issue here – the provision that creates and defines the bankruptcy estate -- advances one of the "overarching purposes" of the Bankruptcy Code:  the protection of creditors.  *Andrews v. Riggs Nat'l Bank (In re Andrews)*, 80 F.3d 906, 909-910 (4th Cir. 1996).  This objective is "effectuated through statutory provisions that marshal and consolidate the debtor's assets into a broadly defined estate from which, in an equitable and orderly process, the debtor's unsatisfied obligations to creditors are paid to the extent possible."  *Id*.  The Code provisions and their underlying purpose have no connection whatsoever to religion and do not target religious activity.

Although there are exceptions to the statutory list of property includable in the bankruptcy estate, the exceptions are not directed at religion or conduct motivated by religious belief.  For example, the estate does not include certain funds placed in education individual retirement accounts.  11 U.S.C. § 541(b)(5).  Various conditions are attached to the college savings account exception, but none of them deals with religion.  The statutory exception does not differentiate in any way between a savings account for a religious education or a secular education.  The Archbishop fails to explain how this exception targets religion.  The Court concludes that the purpose and effect of the Bankruptcy Code provisions at issue in this case are generally applicable and religion-neutral.  Therefore, application of these provisions to the Archbishop and his Trust is not unconstitutional.

11

<u>Conclusion</u>

The Committee's Motion for Summary Judgment with respect to Count III of the Amended Complaint and the related affirmative defenses is granted.  The Court will issue a separate order.

Dated:  January 17, 2013

By the Court:

Susan V. Kelley
U.S. Bankruptcy Judge

12

THE FOLLOWING ORDER
IS APPROVED AND ENTERED
AS THE ORDER OF THIS COURT:



DATED: January 17, 2013

Honorable Susan V. Kelley
United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

In re                                                    Case No. 11-20059-svk
Archdiocese of Milwaukee,                                Chapter 11

       Debtor.

---

Archbishop Jerome E. Listecki, as Trustee of the
Archdiocese of Milwaukee Catholic Cemetery
Perpetual Care Trust,

       Plaintiff,
v.                                                       Adv. Proc. No. 11-02459

Official Committee of Unsecured Creditors,

       Defendant.

---

Official Committee of Unsecured Creditors,

       Counterclaimant,
v.

Archbishop Jerome E. Listecki, as Trustee of the
Archdiocese of Milwaukee Catholic
Cemetery Perpetual Care Trust,

     Counterdefendant.

---

### ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

---

For the reasons stated in the Decision filed on January 17, 2013,

IT IS THEREFORE ORDERED:  the Motion of the Official Committee of Unsecured

Creditors for Summary Judgment on Count III of the Amended Complaint and the Committee's

related Seventeenth, Twentieth and Twenty-Second affirmative defenses is granted.

      ####

2

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ARCHDIOCESE OF MILWAUKEE, | ) | Case No. 11-20059-SVK |
| | ) | |
| Debtor. | ) | |
| | ) | |

### ***AMENDED* OFFICIAL COMMITTEE OF UNSECURED CREDITORS' EMERGENCY MOTION FOR AN ORDER PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 2004 DIRECTING DEBTOR'S PRODUCTION OF DOCUMENTS**

By and through its undersigned counsel, the Official Committee of Unsecured Creditors (the "Committee") in the above-captioned bankruptcy case (the "Bankruptcy Case") of the Archdiocese of Milwaukee ("Debtor" or "ADOM") respectfully moves on an emergency basis (the "Motion") for the entry of an order directing the Debtor to produce documents responsive to the requests for production (the "Document Requests") attached hereto as **Exhibit A** within five (5) days after entry of the Order on the Motion. In support of this Motion, the Committee states as follows and references the Affidavit of James I. Stang in support of the Motion, filed concurrently herewith.

James I. Stang (CA Bar No. 94435)
Kenneth H. Brown (CA Bar No. 100396)
Gillian N. Brown (CA Bar No. 205132)
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail: jstang@pszjlaw.com
        kbrown@pszjlaw.com
        gbrown@pszjlaw.com

1

## **INTRODUCTION**

1.      The Committee is the defendant and counterclaimant in the adversary proceeding entitled *Archbishop Jerome E. Listecki, as Trustee of the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust, v. Official Committee of Unsecured Creditors*, Bankruptcy Court Case No. Adv. No. 11-2459 SVK and District Court Case No. 13-C-179 (the "Cemetery Trust Litigation").

2.      On July 29, 2013, District Court Judge Rudolph T. Randa issued his "Decision and Order" reversing the Bankruptcy Court's summary judgment order and remanding the case to the Bankruptcy Court for further proceedings consistent therewith. Judge Randa concluded that the Religious Freedom Restoration Act was a valid affirmative defense in the Cemetery Trust Litigation and that avoidance of the transfer of any part of the Cemetery Trust's assets would impose a substantial burden on the exercise of religion by Archbishop Listecki and the Cemetery Trust and would impact any Catholic interred in an Archdiocese cemetery.

3.      On August 1, 2013, the Bankruptcy Court issued proposed findings of fact and conclusions of law for Judge Randa's consideration.  On August 1, 2013, Judge Rudolph T. Randa entered judgment: (a) granting summary judgment to the Cemetery Trust, (b) denying partial summary judgment to the Committee and (c) dismissing the Cemetery Trust Litigation.  Judge Randa stated in his "Decision and Order" that the maintenance of the cemeteries via the Cemetery Trust funding is a fundamental tenet of the Catholic faith, a position never challenged by the Committee.

2

4.    After the issuance of Judge Randa's "Decision and Order", counsel for the Committee conducted an inquiry into whether Judge Randa had any relatives interred in any of the Archdiocese cemeteries.  Committee counsel has reviewed the 1940 Federal Census, the Archdiocesan cemetery website and published obituaries.  These sources show that Judge Randa's parents (Rudolph Randa and Clara Randa), two sisters (Joanne Fertl and Claire Marie McKeown), a brother–in–law (Gordon Fertl), uncle and aunt (John L. Randa and Lucillle M. Randa) and parents in law (Albert A. Matera and Catherine M. Matera) are interred in Archdiocesan cemeteries.  In total, thirty individuals with the last name "Randa" are interred in Archdiocesan cemeteries.  While certain records lead the Committee to suspect that Judge Randa has other relatives interred in Archdiocesan cemeteries, the Committee has not been able to verify that suspicion to the degree that it can allege it on information and belief.

5.    At no time during the Cemetery Trust Litigation has any party or Judge Randa disclosed any of the foregoing information to the Committee.

6.    In light of the Committee's discovery of this information, the Committee asked Debtor's counsel to search the Archdiocesan cemetery business records to determine if Judge Randa or his wife, Melinda (nee Matera) Randa have any agreements for burial spaces at the Archdiocesan cemeteries.  Counsel for the Archdiocese declined to provide this information on an informal basis and stated that the proper procedure to obtain this information is the submission of an application to the Bankruptcy Court so the Archdiocese could promptly respond.

7.     Judge Randa has a duty (a) to disclose any facts on which his impartiality might reasonably be questioned or that relate to a financial interest that he or his wife has in the Cemetery Trust Litigation and (b) to recuse himself in such cases.  28 U.S.C. 455; Canon 3 of the Code of Conduct for United States Judges; *Porter v. Singletary,* 49 F.3d 1483, 1489 (11th Cir.1995) (Judges have an ethical duty to disclose on the record information which the judge believes the parties or their lawyers might consider relevant to the question of disqualification).

8.     The Committee is considering filing a motion to recuse Judge Randa in the Cemetery Trust Litigation and a motion to vacate his "Decision and Order" and his August 1, 2013 order.  The standard for recusal based on questions of impartiality is an objective one and that standard requires facts.  While the internment of parents, sisters, brother-in-law, uncles, aunts and parents-in-law might be sufficient facts for recusal on the basis of both lack of impartiality and financial interest, the Committee is entitled to know about Judge Randa's and his wife's other personal interest, if any, in the Archdiocesan cemeteries.[1]

9.     The Committee seeks any documents relating to: (a) any agreement between Judge Randa or his wife, Melinda and the Archdiocese or its cemeteries related to the purchase of graves, crypts, mausoleum space, income care, endowment care and perpetual care for themselves; and (b) any interest they may have as "legal representatives, heirs, successors, assigns and beneficiaries of decedents buried,

---

[1] The Debtor filed a proof of claim (Claim No. 179) for all "legal representatives, heirs, successors, assigns and beneficiaries of decedents buried, interred or otherwise preserved in Archdiocesan cemeteries."

4

interred or otherwise preserved in Archdiocesan cemeteries." in relation to other decedents buried, interred or otherwise preserved in Archdiocesan cemeteries.

       10.    The Committee is seeking consideration of the Motion on an emergency basis.  The Committee believes that any motion to recuse Judge Randa and/or to vacate his rulings must be done prior to the deadline for filing a notice of appeal from his rulings, i.e. prior to August 29, 2013.  If the Court adheres to the standard fourteen (14) day notice rule, the Committee may not have sufficient time to review and consider the produced documents to make a reasoned decision on how to proceed.

       11.    As noted in the Affidavit of James I. Stang, the Committee asked the Debtor to provide the requested documents on an informal basis but the Debtor stated that it would require a Rule 2004 order.  While the Debtor did volunteer to review an advance copy of the Motion so that the Committee could represent its position on the Motion, the Committee did not do so given the time exigencies.

### JURISDICTION AND VENUE

       12.    This Court has jurisdiction of this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The relief requested is predicated upon 11 U.S.C. §§ 105(a) and Federal Rule of Bankruptcy Procedure 2004.

## BACKGROUND

13.     On January 4, 2011 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. §101 et seq. (the "Bankruptcy Code").  The Debtor is continuing to operate its business as a debtor in possession.

14.     On or about January 24, 2011, the United States Trustee appointed the Committee to represent the Debtor's unsecured creditors pursuant to 11 U.S.C. § 1102(a)(1).

15.     On February 5, 2011, the Committee filed an application with this Court for authorization to employ Pachulski Stang Ziehl & Jones LLP, pursuant to 11 U.S.C. §§328, 504, 1102 and 1103 and Federal Rules of Bankruptcy Procedure 2014 and 2016.

16.     On February 24, 2011, this Court entered an order authorizing the Committee to employ PSZJ as counsel for the Committee effective as of January 25, 2011.

17.     By stipulation and order of the Bankruptcy Court, the Committee has standing to defend the allegations in the Cemetery Trust Litigation and assert avoidance claims against the Cemetery Trust for the benefit of the Debtor's estate.

## RELIEF REQUESTED

18.     The Committee respectfully requests that the Court enter an Order directing the Debtor to produce documents responsive to the Committee's requests for

6

production of documents set forth at **Exhibit A** hereto.  The Committee reserves its rights

to seek additional documents and, if necessary, oral examinations of the Debtor and any

other person based on any information that may be revealed as a result of the foregoing

Document Requests.

## BASIS FOR RELIEF

      19.     Pursuant to section 1103(c)(2) of the Bankruptcy Code, the

Committee is charged with the duty to:

> investigate the acts, conduct, assets, liabilities, and
> financial condition of the debtor, the operation of the
> debtor's business and the desirability of the continuance of
> such business, and any other matter relevant to the case or
> to the formulation of a plan.

11 U.S.C. § 1103(c)(2).

      20.     Accordingly, the Committee seeks production of documents

responsive to the Document Requests in order to investigate whether there is any

agreement between Judge Randa or his wife, Melinda and the Archdiocese or its

cemeteries related to the purchase of graves, crypts, mausoleum space, income care,

endowment care and perpetual care or if they have an interest in any such purchases on

behalf of decedents in the cemeteries.  This information is highly relevant to determining

Judge Randa's impartiality in adjudicating the Cemetery Trust Litigation, whether he has

a financial interest in the outcome of the litigation and the formulation of a plan in this

case.  Moreover, section 105(a) of the Bankruptcy Code permits the Court to "issue any

order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

       21.     The Committee, as the party with standing in the Cemetery Trust Litigation to seek recovery of avoidable transfers is the only appropriate party to conduct this inquiry.

       22.     The scope of a Rule 2004 inquiry is "unfettered and broad," as the wording of the rule indicates.  *See* 9 COLLIER ON BANKRUPTCY ¶ 2004.02[1] at 2004-6 (15th ed. rev. 1997) (quoting *In re Table Talk, Inc.*, 51 B.R. 143, 145 (Bankr. D. Mass. 1985)). *See also In re Mittco, Inc.*, 44 B.R. 35, 36 (Bankr. E.D. Wis. 1984) (providing that scope of inquiry under Rule 2004 is very broad and great latitude of inquiry is permitted).  Indeed, the scope of Rule 2004 is far broader than the scope of discovery under Federal Rule of Civil Procedure 26.  *See Moore v. Lang (In re Lang)*, 107 B.R. 130, 132 (Bankr. N.D. Ohio 1989).  The well-settled scope of discovery conducted under Rule 2004 is so fundamental to the bankruptcy process that courts have approvingly described it as a "fishing expedition," "exploratory and groping," and "inquisition."  See*, e.g., Keene Corp. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 42 B.R. 362, 364 (S.D.N.Y. 1984); *In re Drexel Burnham Lambert Group*, 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991).

       23.     The Committee is informed and believes that parties in interest might assert that this inquiry should have been made prior to Judge Randa's ruling in the Cemetery Trust Litigation.  The Committee did not commence its inquiry until after his

rulings as it was entitled to rely on his duty to disclose and his impartiality. *American Textile Mfrs. Inst., Inc. v. Limited, Inc.*, 190 F.3d 729 (6th Cir.1999), (litigants and their attorneys have no duty to investigate presiding judge because they should assume the judge's impartiality and ethical duties of disclosure).

      24.    The Committee requests that the Court consider the Motion on an emergency basis and that the Debtor be directed to comply with the order on this Motion within five (5) days of its issuance.  The Committee is addressing the very time sensitive issue of whether to seek recusal and vacatur of Judge Randa's rulings coupled with a deadline for filing an appeal from the Cemetery Trust rulings and the information requested should be easily accessible in the Debtor's business records.

<u>**CONCLUSION**</u>

WHEREFORE, the Committee respectfully requests that this Court grant the Motion and enter an Order directing the Debtor to produce, within five (5)  days of the entry of such Order, all documents responsive to the Document Requests attached hereto as **Exhibit A**; and that the Court grant such other and further relief as it may deem just and equitable.

*[signatures on following page]*

9

Dated:     August 2, 2013

Respectfully submitted,

**PACHULSKI STANG ZIEHL & JONES LLP**

By     _/s/ James I. Stang_
James I. Stang (CA Bar No. 94435)
Kenneth H. Brown (CA Bar No. 100396)
Gillian N. Brown (CA Bar No. 205132)
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., #1100
Los Angeles, CA  90067
Telephone:  (310) 277-6910
Facsimile:  (310) 201-0760
E-mail:    jstang@pszjlaw.com
                kbrown@pszjlaw.com
                gbrown@pszjlaw.com

Dated:     August 2, 2013

**HOWARD, SOLOCHEK & WEBER, S.C.**

By     _/s/ Albert Solochek_
Albert Solochek (State Bar No. 1011075)
Jason R. Pilmaier (State Bar No. 1070638)
324 E. Wisconsin Ave., Suite 1100
Milwaukee, WI  53202
Telephone:  (414) 272-0760
Facsimile:  (414) 272-7265
E-mail:   asolochek@hswmke.com
                jpilmaier@hswmke.com

Attorneys for the Committee of Unsecured
Creditors

Dated:     August 2, 2013

**MARCI A. HAMILTON**

By     _/s/ Marci A. Hamilton_
Marci A. Hamilton, Esq.
36 Timber Knoll Drive
Washington Crossing, PA 18977
Telephone: (215) 353-8984
Facsimile: (215) 493-1094
Email: hamilton02@aol.com

Special Counsel for the Official Committee of
Unsecured Creditors

10

## EXHIBIT A

## INSTRUCTIONS

A.    YOU are required to conduct a thorough investigation and produce all DOCUMENTS (as defined below) in your possession, custody, and control including all DOCUMENTS in the possession, custody and control of your attorneys, investigators, experts, officers, directors, employees, agents, representatives, and anyone acting on your behalf.

B.    The use of either the singular or plural shall not be deemed a limitation. The use of the singular should be considered to include the plural and vice versa.

C.    The words "and," "or," and "and/or" are interchangeable and shall be construed either disjunctively or conjunctively or both, as broadly as necessary to bring within the scope of the Request those responses that might otherwise be construed to be outside the scope.

D.    If YOU are unable to comply with a particular category(ies) of the requests below and DOCUMENTS responsive to the category are in existence, state the following information:

1.    The date of the DOCUMENT;

2.    The type of DOCUMENT (e.g., letter, memorandum, report, etc.);

3.    The name, address, telephone number and title of the author(s) of the DOCUMENT;

4.    The name, address, telephone number and title of each recipient of the DOCUMENT;

5.    The number of pages in the DOCUMENT;

11

6.      The document control number, if any;

7.      The present location(s) of the DOCUMENT and the name, address and telephone number of the person(s) who has (have) possession of the DOCUMENT;

8.      A specific description of the subject matter of the DOCUMENT;

9.      The reason why the DOCUMENT cannot be produced or why you are unable to comply with the particular category of request.

E.      YOU are under a continuing duty to seasonably amend your written response and to produce additional DOCUMENTS if you learn that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the Plaintiff during the discovery process or in writing.

F.      YOU are required to produce the full and complete originals, or copies if the originals are unavailable, of each DOCUMENT responsive to the categories below along with all non-identical copies and drafts in its or their entirety, without abbreviations, excerpts, or redactions.  Copies may be produced in lieu of originals if the entirety (front and back where appropriate) of the DOCUMENT is reproduced and the Responding Party or its authorized agent or representative states by declaration or affidavit under penalty of perjury that the copies provided are true, correct, complete, and an accurate duplication of the original(s).

G.      You are required to produce the DOCUMENTS as they are kept in the usual course of business, or to organize and label them to correspond with each category in these requests.

H.      You are required to produce ELECTRONICALLY STORED

INFORMATION in searchable form on DVDs or CD-ROMs.

I.      For DOCUMENTS that are currently in paper format:

      1.      Documents must be scanned and produced electronically in single page TIFF format with corresponding OPT file, DAT file, as well as OCR or extracted text and .lst file.

      2.      To the extent available, please provide Beginning Production Number, Ending Production Number, Folder information, custodian information and family information.

J.      For DOCUMENTS that contain ELECTRONICALLY STORED INFORMATION, the following guidelines are to apply:

      1.      Single page, Group IV TIFFs with links to native files (for excel files, at a minimum) with corresponding OPT file, DAT file, as well as OCR or extracted text and .lst file.

      2.      Maintain family integrity.

      3.      Perform custodian-level deduplication.

      4.      Concordance standard delimited DAT load file with the following metadata fields: Beginning Production Number, Ending Production Number, Beginning Attachment Number, End Attachment Number, Family ID, Page Count, Custodian, Original Location Path, Email Folder Path, Document Type, Doc Author, Doc Last Author, Comments, Categories, Revisions, File Name, File Size, MD5 Hash, Date Last Modified, Time Last Modified, Date Created, Time Created, Date Last Accessed, Time Last Accessed, Date Sent, Time Sent, Date Received, Time Received, To, From, CC, BCC, Email Subject, Path to Native,

13

Path to Full Text, Original Time Zone.

      5.      OCR or extracted text for all ESI:  (a) Separate .txt files corresponding to beginning production number of each document; (b) Separate .lst file for fulltext.

      6.      Process all data in GMT and provide a metadata field indicating original time zone.

      K.      If you withhold or redact a portion of any DOCUMENT under a claim of privilege or other protection, each such DOCUMENT must be identified on a privilege log, which shall be produced contemporaneously with the non-privileged DOCUMENTS responsive to this Request for Production, and which privilege log shall state the following information:

      1.      The date of the DOCUMENT;

      2.      The type of DOCUMENT (e.g., letter, memorandum, report, etc.);

      3.      The name, address, telephone number and title of the author(s) of the DOCUMENT;

      4.      The name, address, telephone number and title of each recipient of the DOCUMENT;

      5.      The number of pages in the DOCUMENT;

      6.      The document control number, if any;

      7.      The present location(s) of the DOCUMENT and the name, address and telephone number of the person(s) who has (have) possession of the DOCUMENT;

      8.      A general description of the subject matter of the DOCUMENT or the portion redacted without disclosing the asserted privileged or protected

14

communication;

9.     The specific privilege(s) or protection(s) that you contend applies.

## **DEFINITIONS**

Unless otherwise stated, the following definitions shall apply to these Requests

for Production:

1.     "ADOM" or "ARCHDIOCESE" means and refers to the

Archdiocese of Milwaukee, the debtor in the above-referenced bankruptcy case; and

EACH of its predecessors and successors in interest; EACH of its present and former

officers, directors, attorneys, agents, servants, employees, representatives, priests,

DIOCESAN COUNCILS, committees within the Archdiocese of Milwaukee, its

Cemetery operations, and any other PERSON acting on its behalf or otherwise subject to

its control.  Upon information and belief, the ARCHDIOCESE is corporation organized

under the laws of the State of Wisconsin.  The ARCHDIOCESE is the debtor in the

above-captioned chapter 11 bankruptcy case and the legal entity through which the

Archbishop of Milwaukee conducts the temporal affairs of the Roman Catholic

Archdiocese of Milwaukee.  Upon information and belief, the ARCHDIOCESE uses the

"Roman Catholic Archdiocese of Milwaukee" to refer to the juridic person of the

Archdiocese under Canon law.  The term ARCHDIOCESE refers to both the secular

legal entity and the juridic person.

2.     ""CEMETERIES" means and refers to the cemeteries listed on

ADOM's Schedule A filed at docket no. 111 in the above-captioned bankruptcy case, and

15

identified as "Archdiocese of Milwaukee Catholic Cemeteries" at www.cemeteries.org, which is linked to ADOM's website.

      3.     "CONCERNING" means constituting, defining, evidencing, mentioning, containing, describing, discussing, embodying, reflecting, edifying, analyzing, stating, referring to, dealing with, or in any way pertaining to.

      4.     "DOCUMENT" means and includes all written, recorded, transcribed or graphic matter of every nature, type and kind, however and by whoever produced, reproduced, disseminated or made. This includes, but is not limited to, any and all originals, copies or drafts of any and all of the following: ELECTRONICALLY STORED INFORMATION; papers; books; letters; correspondence; telegrams; cables; telexes; messages; memoranda; notes; notations; transcripts; minutes; reports; recordings of telephone conversations; any other recordings; interviews; affidavits; declarations; statements; summaries; studies; analyses; evaluations; appraisals; estimates; projections; charts, graphs and tables; schedules; proposals; offers; acceptances; purchase orders; invoices; contracts; agreements; checks and canceled checks; bills of lading; insurance binders, policies or certificates; receipts; statements; pamphlets; diagrams; statistical records; any other records; calendars; appointment books; diaries; lists; tabulations; any information contained in any computer tape, card, disk, drive, program or other device; computer print-outs; CDs; videotapes; DVDs; facsimiles; e-mails; microfilm; microfiche; any other tangible or intangible thing or item that contains any information; and, all "writings and recordings" and "photographs" (and all negatives thereof) as defined in and by the Federal Rules of Evidence 1001. Any DOCUMENT that contains any comment,

notation, addition, insertion or marking of any type or kind which is not part of another DOCUMENT, is to be considered a separate DOCUMENT.

5.      "ELECTRONICALLY STORED INFORMATION" or "ESI" shall have the meaning ascribed to it in Federal Rules of Civil Procedure 16, 26, and 34.

6.      "PERSON" means and includes individuals, for profit and not for profit corporations, corporations sole, partnerships, unincorporated associations, limited liability companies, trusts, firms, cooperatives, fictitious business names, and any and all legal entities, their agents, representatives, and/or employees.

## **REQUESTS FOR PRODUCTION**

1.      Any DOCUMENTS CONCERNING the purchase of graves, crypts, mausoleum space, income care, endowment care and perpetual care by Rudolph T. Randa.

2.      Any DOCUMENTS CONCERNING the purchase of graves, crypts, mausoleum space, income care, endowment care and perpetual care by Melinda (nee Matera) Randa.

3.      Any DOCUMENTS CONCERNING Rudolph T. Randa as the legal representative, heir, successor, assign and beneficiary of any Person buried, interred or otherwise preserved in Archdiocesan cemeteries.

4.      Any DOCUMENTS CONCERNING Melinda (nee Matera). Randa as the legal representative, heir, successor, assign and beneficiary of any Person buried, interred or otherwise preserved in Archdiocesan cemeteries.

17

Dated: August 2, 2013

Respectfully submitted,

**PACHULSKI STANG ZIEHL & JONES LLP**

By    */s/ James I. Stang*
      James I. Stang (CA Bar No. 94435)
      Kenneth H. Brown (CA Bar No. 100396)
      Gillian N. Brown (CA Bar No. 205132)
      Pachulski Stang Ziehl & Jones LLP
      10100 Santa Monica Blvd., #1100
      Los Angeles, CA  90067
      Telephone:  (310) 277-6910
      Facsimile:  (310) 201-0760
      E-mail:  jstang@pszjlaw.com
              kbrown@pszjlaw.com
              gbrown@pszjlaw.com

      -and-

      Albert Solochek (State Bar No. 1011075)
      Jason R. Pilmaier (State Bar No. 1070638)
      Howard, Solochek & Weber, S.C.
      324 E. Wisconsin Ave., Suite 1100
      Milwaukee, WI  53202
      Telephone:  (414) 272-0760
      Facsimile:  (414) 272-7265
      E-mail:  asolochek@hswmke.com
             jpilmaier@hswmke.com

      Attorneys for the Committee of Unsecured
      Creditors

      Marci A. Hamilton, Esq.
      36 Timber Knoll Drive
      Washington Crossing, PA 18977
      Telephone: (215) 353-8984
      Facsimile: (215) 493-1094
      Email:  hamilton02@aol.com

      Special Counsel for the Official Committee
      of Unsecured Creditors

18

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ARCHDIOCESE OF MILWAUKEE, | ) | Case No. 11-20059-SVK |
| | ) | |
| Debtor. | ) | |
| | ) | |

### AMENDED AFFIDAVIT OF JAMES I. STANG IN SUPPORT OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS'EMERGENCY MOTION FOR AN ORDER PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 2004 DIRECTING DEBTOR'S PRODUCTION OF DOCUMENTS

I, James I. Stang, hereby declare:

1.       I am a partner in the law firm of Pachulski Stang Ziehl & Jones LLP,

counsel for the Official Committee of Unsecured Creditors in the above-captioned case

and in the adversary proceeding entitled *Archbishop Jerome E. Listecki, as Trustee of the*

*Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust, v. Official*

*Committee of Unsecured Creditors*, Bankruptcy Court Case No. Adv. No. 11-2459 SVK

and District Court Case No. 13-C-179 (the "Cemetery Trust Litigation").

2.       I am submitting this amended affidavit in support of the Committee's

motion for the entry of an order directing the Debtor to produce documents responsive to

James I. Stang (CA Bar No. 94435)
Kenneth H. Brown (CA Bar No. 100396)
Gillian N. Brown (CA Bar No. 205132)
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, CA  90067
Telephone:  (310) 277-6910
Facsimile:  (310) 201-0760
E-mail:  jstang@pszjlaw.com
         kbrown@pszjlaw.com
         gbrown@pszjlaw.com

1

DOCS_LA:269993.3 05058/003

the requests for production (the "Document Requests") attached to the motion and to

correct non-substantive typographical errors contained in my affidavit filed on August 2,

2013.

3.    Except as set forth herein, I have personal knowledge of the facts

contained in this affidavit.

4.    Judge Rudolph T. Randa is the United States District Court Judge

presiding in the Cemetery Trust Litigation as either the trial judge or the appellate judge

("Judge Randa").

5.    Melinda (nee Matera) Randa is Judge Randa's wife. I base this statement

on the obituary of Catherine M. Matera attached hereto as Exhibit A and incorporated

herein by reference which I obtained from the internet. In Mrs. Matera's obituary,

"Melinda (Honorable Rudolph) Randa of Milwaukee, WI" is identified as a surviving

daughter.

6.    Mrs. Matera and her husband Albert A. Matera (identified in Mrs.

Matera's obituary as her predeceased husband) are interred in an Archdiocesan cemetery.

True and correct copies of the results of a genealogical search on the Archdiocesan

cemetery website are attached hereto as Exhibits B and C and are incorporated herein by

reference.

7.    Rudolph Randa and Clara Randa are Judge Randa's deceased father and

mother and are interred in Archdiocesan cemetery. I examined the 1940 United States

Federal Census and found their names listed therein with a listing of two daughters:

Joanne and Claire Marie. In the next paragraph I explain how I determined that Judge

Randa is the son of Rudolph and Clara Randa. A true and correct copy of a portion of the

2

census is attached hereto as Exhibit D and incorporated herein by reference. True and correct copies of the results of a genealogical search on the Archdiocesan cemetery website are attached hereto as Exhibits E and F and are incorporated herein by reference. I noted that the decedents' last address in the genealogical records of the cemetery is the same address listed for them in the 1940 census.

8.     Claire (nee Randa) McKeown (Judge Randa's late sister) passed away on January 14, 2001 and is interred in an Archdiocesan cemetery. Her obituary identifies Rudolph Randa and Clara Randa as predeceased parents, Judge Randa as a surviving brother, Melinda Randa as a surviving sister in law and Joanne (nee Randa) Fertl as a predeceased sibling. Based on this obituary, I concluded that Rudolph Randa and Clara Randa are Judge Randa's parents and that Claire (nee Randa) McKeown and Joanne (nee Randa) Fertl are his deceased siblings. A true and correct copy of Mrs. McKeown's obituary is attached hereto as exhibit G and incorporated herein by reference. A true and correct copy of the results of a genealogical search on the Archdiocesan cemetery website is attached hereto as Exhibit H and is incorporated herein by reference establishes that Mrs. McKeown is interred in an Archdiocesan cemetery. I note that the genealogical search and the obituary reflect the same date of death.

9.     Joanne (nee Randa) Fertl (Judge Randa's late sister) and her husband Gordon Fertl (Judge Randa's late brother in law) are interred in an Archdiocesan cemetery. I assume that Gordon Fertl was Joanne (nee Randa) Fertl's husband because they are buried side by side. A true and correct copy of the results of a genealogical search on the Archdiocesan cemetery website (which identifies the burial plots) is attached hereto as Exhibit I and J and is incorporated herein by reference.

3

10.     John L. Randa and Lucille M. Randa are related to Judge Randa as uncle and aunt and are interred in an Archdiocesan cemetery. The 1940 census reflects that they lived at the same address as Judge Randa's parents. Based on the identity of the address and that John L. Randa was two years younger than Judge Randa's father, I assume that John L. Randa was Judge Randa's paternal uncle and that Lucille Mr. Randa, his wife, was Judge Randa's aunt by marriage. True and correct copies of the results of a genealogical search on the Archdiocesan cemetery website are attached hereto as Exhibits K and L and are incorporated herein by reference.

11.     Thirty decedents with the last name "Randa" are buried at Archdiocesan cemeteries. A true and correct copy of the results of a genealogical name search on the Archdiocesan cemetery website is attached hereto as Exhibit M and is incorporated herein by reference.

12.     In light of the Committee's discovery of this information, the Committee asked Debtor's counsel to search the Archdiocesan cemetery business records to determine if Judge Randa or his wife, Melinda (nee Matera) Randa have any agreements for burial spaces at the Archdiocesan cemeteries. Counsel for the Archdiocese declined to provide this information on an informal basis and stated that the proper procedure to obtain this information is the submission of an application to the Bankruptcy Court so the Archdiocese could promptly respond.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___ day of August 2013 in Los Angeles, California.

_____
James I. Stang

4

# CALIFORNIA JURAT WITH AFFIANT STATEMENT

☑ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–5 to be completed only by document signer[s], *not* Notary)

_____       _____
Signature of Document Signer No. 1          Signature of Document Signer No. 2 (if any)

State of California

County of *Los Angeles*

Subscribed and sworn to (or affirmed) before me on this

*5th* day of *August*, 20*13*, by
Date               Month                        Year

(1) *James Stang*,
Name of Signer

proved to me on the basis of satisfactory evidence
to be the person who appeared before me (.) (,)

(and

(2) _____,
Name of Signer

proved to me on the basis of satisfactory evidence
to be the person who appeared before me.)

Signature _____
Signature of Notary Public

**GINI L. DOWNING**
**Commission # 1941234**
**Notary Public - California**
**Los Angeles County**
**My Comm. Expires Jun 17, 2015**

Place Notary Seal Above

―――――――――― **OPTIONAL** ――――――――――

*Though the information below is not required by law, it may prove*
*valuable to persons relying on the document and could prevent*
*fraudulent removal and reattachment of this form to another document.*

**Further Description of Any Attached Document**

Title or Type of Document: *Amended Affidavit*

Document Date: *08-05-13*        Number of Pages: *4*

Signer(s) Other Than Named Above: *N/A*

| RIGHT THUMBPRINT OF SIGNER #1 |
| Top of thumb here |

| RIGHT THUMBPRINT OF SIGNER #2 |
| Top of thumb here |

© 2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org    Item #5910    Reorder: Call Toll-Free 1-800-876-6827

# EXHIBIT A

# ObitsforLife.com

## A commercial free obituary and advanced funeral details listing website.

- Home
- Obituary Listings
- Funeral Homes
- About Us
- Newspapers
- Register Today
- Contact

# Catherine M. Matera Obituary

### Date of Birth:

Tuesday, April 23rd, 1918

### Date of Death:

Thursday, April 29th, 2010

### Funeral Home:

Proko Funeral Home
www.prokofuneralhome.com
5111-60th Street
Kenosha, Wisconsin, UNITED STATES
53144

## Obituary:

Catherine M. Matera, 92, of Kenosha, passed away peacefully on Thursday, April 29, 2010, at Brookside Care Center.

Born on April 23, 1918, in Kenosha, she was the daughter of the late Serafino and Anna (Ricchio) Molinaro. A lifelong resident of Kenosha, she was educated in local schools.

On September 7, 1940, she married Albert A. Matera at Our Lady of the Holy Rosary Catholic Church. He passed away on June 5, 1984.

From 1957 until 1969 she was employed by Kresges in downtown Kenosha. Later she worked and volunteered at St. Catherines Hospital.

She was a member of Our Lady of the Holy Rosary Catholic Church, Holy Rosary Ladies Society and the Catholic Womens Club.

Catherine loved cooking for extended family on Sunday mornings, spending time with her grandchildren and great-grandchildren. She also enjoyed traveling to Italy, taking bus trips around the United States and walking.

Surviving are a son, Emil (Lynn) Matera of Kenosha; two daughters, Melinda (Honorable Rudolph) Randa of Milwaukee, WI, and Marilyn (Thomas) Westland of Kenosha; a sister, Janet (Ralph) Thayer of Clermont, FL; her grandchildren, Marcia (Bryan) Johnson of Cedarburg, WI, Martin (Jennifer) Matera of Kenosha, Dr. Christopher (Toni) Westland of Ft. Myers, FL, David (Elisabeth) Matera of Rockville, MD, Rudolph Randa of Chicago, IL, and Daniel Randa of Milwaukee, WI; and great-grandchildren, Andrew, Nicholas, Sophia, Emily, Addison and Audrina.

She was preceded in death by an infant son, Ronald Matera; two sisters, Anna and Mary; and a brother, Jake Molinaro.

Funeral services will be held on Monday, May 3rd, from Proko Funeral Home at 10:00 a.m. Mass will be celebrated at Our Lady of the Holy Rosary Catholic Church at 10:30 a.m. Entombment will follow at All Saints Mausoleum. Visitation will be held on Sunday at Proko Funeral Home from 4:00 p.m. until 7:00 p.m.

Proko Funeral Home & Crematory

5111-60th Street

Kenosha, WI 53144

Phone: (262) 654-3533

Visit Catherines Online Memorial Book at:

www.prokofuneralhome.com

Brought to you by: Proko Funeral Home

- Obituary/Death Notice
- Map & Directions
- Tributes & Condolences
- Place a Memorial Candle
- Online Memorial Donations

In the event that there is an error in the information presented, please contact the funeral home by clicking here.

- Login
- Sign Up

Click Here to Order Flowers

- Home
- Obituary Listings
- Funeral Homes
- About Us
- Newspapers
- Register Today
- Contact

Protected by ObitSafe.com

Use the links below to share with your family and friends.

© Obits For Life 2011 all rights reserved. Legal Privacy Policy
Powered by FrontRunner Professional
Software and Web Site Solutions for Funeral Professionals

# EXHIBIT B



# Archdiocese of Milwaukee Catholic Cemeteries

*A Tradition of Comforting Concern*

| About Us | Burial Options | Grief/Bereavement | Spiritual Guidance | Service Counseling |
|---|---|---|---|---|
| Burial Records | Advance Planning | Memorialization | Genealogy | News & Events |

Home > Genealogy > Genealogy Search Details

Genealogy Search

Famous Burials ▶

Genealogy Resources Elsewhere

Contact Us
FAQ-*Updated*
Glossary
Site Map

# Genealogy — Burial Records
## Detailed Search Results

Print This Name





Name: Catherine Matera
Date of Birth: 4/23/1918
Date of Death: 4/29/2010
Date of Burial: 4/29/2010
Age at Death: 92
Marital Status: Widowed
Last Address: 3506 Washington Rd, Kenosha
Funeral Home: Proko
Cemetery: All Saints Cemetery
Location: Crypt/niche: 105
Tier: B
Outside: P-d

Search for nearby graves or crypts

Back to List of Search Results       New Genealogy Search

■ Printable maps of any Catholic Cemetery, grounds and mausoleums.

■ Tell us more about Catherine Matera. Provide a birthdate or other factual information.

■ Share memories, thoughts, and prayers about this loved one.

■ Submit a short biography, send a digital picture to create a personal tribute for your loved one.

■ Memorialize your loved one with personalized products of remembrance such as markers and monuments, flower vases, eternal lights, photo ceramics or bronze emblems.

If you are using this genealogy search engine as a hobbyist to obtain "family tree" information, please remember that the information provided represents so much more than text on a page. The people provided by your search represent a faithful community of Christ's disciples. They are family members and friends that are responsible for our existence as we know it and are surely preparing a place in heaven for all of us. With that understanding, we encourage you to use the above links to express your faith, grief, reconciliation and love.

**Most importantly**, we encourage you to visit your Catholic Cemetery where you can be with your loved one in spirit. God bless you and your respect and reverence for the deceased.

Return to top

# EXHIBIT C



# Archdiocese of Milwaukee Catholic Cemeteries

*A Tradition of Comforting Concern*

| About Us | Burial Options | Grief/Bereavement | Spiritual Guidance | Service Counseling |
|---|---|---|---|---|
| Burial Records | Advance Planning | Memorialization | Genealogy | News & Events |

Home > Genealogy > Genealogy Search Details

Genealogy Search

Famous Burials

Genealogy Resources Elsewhere

Contact Us
FAQ-*Updated*
Glossary
Site Map

# Genealogy — Burial Records
### Detailed Search Results

Print This Name





Name: Albert A Matera
Date of Death: 6/5/1984
Date of Burial: 6/7/1984
Age at Death: 70
Marital Status: Married
Last Address: 4525 17Th Ave
Funeral Home: Proko
Cemetery: All Saints Cemetery
Location: Crypt/niche: 105
Tier: B
Ls/rs:
Inside:
Outside: P-d

Search for nearby graves or crypts

Back to List of Search Results          New Genealogy Search

▪ Printable maps of any Catholic Cemetery, grounds and mausoleums.

▪ Tell us more about Albert A Matera. Provide a birthdate or other factual information.

▪ Share memories, thoughts, and prayers about this loved one.

▪ Submit a short biography, send a digital picture to create a personal tribute for your loved one.

▪ Memorialize your loved one with personalized products of remembrance such as markers and monuments, flower vases, eternal lights, photo ceramics or bronze emblems.

If you are using this genealogy search engine as a hobbyist to obtain "family tree" information, please remember that the information provided represents so much more than text on a page. The people provided by your search represent a faithful community of Christ's disciples. They are family members and friends that are responsible for our existence as we know it and are surely preparing a place in heaven for all of us. With that understanding, we encourage you to use the above links to express your faith, grief, reconciliation and love.

**Most importantly**, we encourage you to visit your Catholic Cemetery where you can be with your loved one in spirit. God bless you and your respect and reverence for the deceased.

Return to top

# EXHIBIT D

1940 United States Federal Census for Rudolph Randa

Wisconsin > Milwaukee > Milwaukee > 72-476

| Line No. | Street | House No. | Visited | Home Owned | Home Value | Farm | Name | | Name | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 61 | 1377 | 107 | R | 108 | No | | Jorman, Robert W.B. | Head | O | M | W | 29 |
| 62 | | | | | | | Marguerite | Wife | | F | W | 22 |
| 63 | 1377 | 108 | R | 35 | No | | Allwardt, Carl | Head | O | M | W | 37 |
| 64 | | | | | | | Adelaide | Wife | | F | W | 42 |
| 65 | 1369 | 109 | R | 25 | No | | Randa, Rudolph | Head | O | M | W | 36 |
| 66 | | | | | | | Clara | Wife | | F | W | 32 |
| 67 | | | | | | | Joanne | Daughter | | F | W | 10 |
| 68 | | | | | | | Claire Marie | Daughter | | F | W | 4 |
| 69 | 1369 | 110 | R | 25 | No | | Randa, John L | Head | O | M | W | 34 |
| 70 | | | | | | | Lucille M. | Wife | | F | W | 33 |
| 71 | | | | | | | John R. | Son | | M | W | 7 |
| 72 | | | | | | | Patricia L. | Daughter | | F | W | 3 |
| 73 | | | | | | | Peter M. | Son | | M | W | 1 |
| 74 | | | | | | | Fons, Louise | Sister-in-law | | F | W | |

National Archives and Records Administration

Sapp 398

# EXHIBIT E



# Archdiocese of Milwaukee Catholic Cemeteries
## *A Tradition of Comforting Concern*

| About Us | Burial Options | Grief/Bereavement | Spiritual Guidance | Service Counseling |
|---|---|---|---|---|
| Burial Records | Advance Planning | Memorialization | Genealogy | News & Events |

Home > Genealogy > Genealogy Search Details

Genealogy Search

Famous Burials ▶

Genealogy Resources Elsewhere

Contact Us
FAQ-*Updated*
Glossary
Site Map

# Genealogy — Burial Records
**Detailed Search Results**



Print This Name



Name: Rudolph F. Randa
Date of Death: 7/31/1975
Date of Burial: 8/4/1975
Age at Death: 71
Marital Status: Married
Last Address: 3369 North Pierce St.
Funeral Home: Schramka
Cemetery: Holy Cross Cemetery
Location: Crypt/niche: 105
Tier: B
Side: R
Inside: D
Outside:

Search for nearby graves or crypts

Back to List of Search Results        New Genealogy Search

■ Printable maps of any Catholic Cemetery, grounds and mausoleums.

■ Tell us more about Rudolph F. Randa. Provide a birthdate or other factual information.

■ Share memories, thoughts, and prayers about this loved one.

■ Submit a short biography, send a digital picture to create a personal tribute for your loved one.

■ Memorialize your loved one with personalized products of remembrance such as markers and monuments, flower vases, eternal lights, photo ceramics or bronze emblems.

If you are using this genealogy search engine as a hobbyist to obtain "family tree" information, please remember that the information provided represents so much more than text on a page. The people provided by your search represent a faithful community of Christ's disciples. They are family members and friends that are responsible for our existence as we know it and are surely preparing a place in heaven for all of us. With that understanding, we encourage you to use the above links to express your faith, grief, reconciliation and love.

**Most importantly**, we encourage you to visit your Catholic Cemetery where you can be with your loved one in spirit. God bless you and your respect and reverence for the deceased.

Return to top

# EXHIBIT F



# Archdiocese of Milwaukee Catholic Cemeteries
### A Tradition of Comforting Concern

| About Us | Burial Options | Grief/Bereavement | Spiritual Guidance | Service Counseling |
|---|---|---|---|---|
| Burial Records | Advance Planning | Memorialization | Genealogy | News & Events |

Home > Genealogy > Genealogy Search Details

Genealogy Search
Famous Burials ▸
Genealogy Resources Elsewhere

Contact Us
FAQ-*Updated*
Glossary
Site Map

# Genealogy — Burial Records
**Detailed Search Results**





Print This Name

Name: Clara Randa
Date of Death: 2/10/1976
Date of Burial: 2/14/1976
Age at Death: 68
Marital Status: Widowed
Last Address: 3369 North Pierce St.
Funeral Home: Schramka
Cemetery: Holy Cross Cemetery
Location: Crypt/niche: 105
 Tier: B
 Side: R
 Inside: D
 Outside:

Search for nearby graves or crypts

Back to List of Search Results          New Genealogy Search

■ Printable maps of any Catholic Cemetery, grounds and mausoleums.

■ Tell us more about Clara Randa. Provide a birthdate or other factual information.

■ Share memories, thoughts, and prayers about this loved one.

■ Submit a short biography, send a digital picture to create a personal tribute for your loved one.

■ Memorialize your loved one with personalized products of remembrance such as markers and monuments, flower vases, eternal lights, photo ceramics or bronze emblems.

If you are using this genealogy search engine as a hobbyist to obtain "family tree" information, please remember that the information provided represents so much more than text on a page. The people provided by your search represent a faithful community of Christ's disciples. They are family members and friends that are responsible for our existence as we know it and are surely preparing a place in heaven for all of us. With that understanding, we encourage you to use the above links to express your faith, grief, reconciliation and love.

**Most importantly**, we encourage you to visit your Catholic Cemetery where you can be with your loved one in spirit. God bless you and your respect and reverence for the deceased.

Return to top

# EXHIBIT G